## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | |
|---|---|
| IN RE: | : |
| | : |
| THRUSH AIRCRAFT, INC., | : Chapter 11 Case No. 19-10976 |
| | : |
| Debtor, | : |
| | : |
| Vs. | : |
| | : Contested Matter |
| WELLS FARGO BANK, NATIONAL | : |
| ASSOCIATION, (INC.) and PAYNE HUGHES | : |
| | : |
| Respondents. | : |

---

**MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN FINANCING FROM HHM AVIATION FINANCING, LLC PURSUANT TO 11 U.S.C. § 364(c) AND AUTHORIZATION TO ENTER INTO THE MANAGEMENT SERVICES AGREEMENT**

Thrush Aircraft, Inc., Debtor and Debtor-in-Possession (the "**Debtor**"), hereby moves this Court, pursuant to 11 U.S.C. § 364(c) and Federal Rules of Bankruptcy Procedure 4001(c) and 9014, for interim and final orders authorizing Debtor to obtain post-petition financing from HHM Aviation Financing, LLC (the "**DIP Lender**" or "**HHM**") and authority to enter into the Management Services Agreement.  In support hereof, the Debtor respectfully shows this Court as follows:

**I.      Jurisdiction, Venue, and Background**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This Motion is a contested matter and a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (D).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      On September 4, 2019 (the "**Petition Date**"), Debtor filed a voluntary petition in this Court for reorganization under title 11 of chapter 11 of the United States Code (the "**Bankruptcy Code**").   Debtor continues to manage its property as a Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee has been appointed.

3.      No committee has been appointed or organized.

4.      Thrush is a manufacturer of single engine turbine powered aircraft (the
"**Business**").  Headquartered in Albany, Georgia, Thrush manufactures and sells a full range of
aerial application aircraft utilized in agriculture, forestry and firefighting roles worldwide.
Thrush currently offers and actively sells to customers throughout the world five different models
of aircraft, utilizing engines manufactured by both Pratt & Whitney and General Electric.  Thrush
produces the following models for use in agricultural aviation:  Thrush 510p, Thrush 510G,
Thrush 510GR, Thrush 550P, and Thrush 710P.  Thrush's aircraft have been utilized by such
familiar names as Dole Fresh Fruit, Del Monte Fresh Fruit, Aerovic, FumiPalma, as well as many
worldwide governments.   Moreover, Thrush's agricultural models have evolved into new uses in
other industries, such as border patrol and reconnaissance for world governments.

5.      Respondent Wells Fargo Bank, National Association (Inc.) ("Wells Fargo"), is a
foreign profit corporation having its principal office at 464 California Street, San Francisco, CA,
94104, and may be served by U.S. first class mail at such address or upon its Registered Agent
for Service of Process in Georgia, Corporation Service Company, 40 Technology Parkway South,
Suite 300, Norcross, Georgia, 30092, or upon its counsel of record in this Case, Parker, Hudson,
Rainer & Dobbs, attn.:  C. Edward Dobbs and Rufus T. Dorsey, 303 Peachtree Street, N.E., Suite
3600, Atlanta, Georgia 30308.

6.      Respondent Payne Hughes ("**Hughes**") is an individual residing in the State of
Georgia holding a senior lien on certain aircraft type certificates earmarked to collateralize the
credit facility described herein.  Hughes has consented to the relief sought herein.

7.      Thrush is actively negotiating an Asset Purchase Agreement with HHM as the
stalking horse buyer of the Business and substantially all of the assets of Thrush.  Thrush expects
to file appropriate motions on or before the week September 16, 2019.

8.      As a condition to the financing, HHM requires Thrush to enter into that certain
Management Services Agreement allowing HHM full access to the Debtor's premises in Albany,
Georgia, the Debtor's books, and the Debtor's records, all for the purpose of managing the

Debtor's business affairs while the DIP Agreement remains outstanding (the "**Management Services Agreement**"). A copy of the Management Services Agreement is attached hereto and incorporated herein by reference as **Exhibit A**.

## II.    Relief Requested and Basis Therefor

9.    To facilitate its reorganization and sale efforts, Debtor believes it should obtain loans at rates of advance adequate to stabilize its finances, continue to manufacture six aircraft currently in process through year end, and meet the costs of reorganization, including, without limitation, administrative expenses.

10.    Debtor believes HHM is the best source of such financing and have requested HHM to provide financing to Debtor on a revolving credit basis, up to $1,200,000. HHM has indicated its willingness to provide a revolving credit facility on the terms and conditions set forth in that certain Post-Petition Credit Agreement, attached hereto and incorporated herein by this reference, shown as **Exhibit B** (hereinafter referred to as the "**DIP Agreement**"), and a certain proposed Interim Order Authorizing Debtor to Obtain Financing and Granting Priority Status pursuant to 11 U.S.C. § 364(c), a copy of which is attached hereto and incorporated herein by this reference, shown as **Exhibit C** (the "**DIP Order**").

11.    In accordance with Bankruptcy Rule 4001(c)(1)(B), the Debtor identifies the following information:

**Interest Rate.** 12% per annum, which shall be compounded monthly. [DIP Agreement § 1.2(a)].

**Maturity.** The DIP Agreement matures on or before the later of (a) December 1, 2019, (b) 90 days from the initial advance, (c) the effective date of the Debtor's Plan of Reorganization, unless DIP Lender has agreed to extend the financing beyond the effective date and continue to fund the company in support of the plan, (d) consummation of a 363 sale under the Bankruptcy Code, or (e) upon the occurrence of an Event of Default, in which the case the DIP Agreement will terminate, the obligations will be immediately due and payable, and DIP Lender will exercise all rights and remedies available to it under the loan agreement and any Interim or Final

Order of the Court.  [DIP Agreement § 1.7 and Definitions - "Commitment Termination Date"].

**Fees.**  HHM shall be entitled to a one-time non-refundable fee of 1% of the Maximum Facility Amount, due on first draw, but payable on the earlier of: (a) the 90th day after the Petition Date or (b) termination of the facility for any reason.  [DIP Agreement § 1.3].  Additionally, the Debtor shall reimburse HHM for all reasonable attorney's fees, statutory and filing fees, and reasonable due diligence costs and expenses as incurred by HHM upon providing suitable documentation of such costs, and such amount shall not exceed $60,000.00.  [DIP Agreement § 1.3].

**Events of Default.**  The DIP Agreement provides for the following events of default: (a) a default in any payment due under the terms of the DIP Agreement which is not cured within the time provided therein; (b) without the DIP Lender's prior written consent, the Debtor's exceeding any line item in the Debtor's approved budget by more than 15% of the amount reflected for that line item; (c) the loss or suspension by the Federal Aviation Administration of any Production Certificate issues to Borrower and pursuant to which Borrower is permitted to construct aircraft at its facility in Albany, Georgia; (d) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, to which the DIP Lender does not consent or otherwise agrees; (e) the entry of an order in the Chapter 11 Case confirming a plan of reorganization that does not contain a provision for termination of the DIP Agreement and repayment in full in cash of all of the Obligations under the DIP Agreement on or before the effective date of such plan or plans, unless agreed otherwise by the DIP Lender; (f) the entry of an order amending, supplementing, staying, vacating, or otherwise modifying the terms of the DIP Agreement or the Interim Order or any Final Order without the written consent of the Lender; (g) a Final Order is not entered immediately following the expiration of the Interim Order; (h) the payment of, or application for authority to pay, any pre-petition claim without the DIP Lender's prior written consent unless otherwise permitted under the DIP Agreement; (i) the appointment of an interim or permanent trustee in the Chapter 11 Case; or the sale without the DIP Lender's consent, of all or

- 4 -

substantially all of any Debtor's assets either through a sale under Section 363 of the Bankruptcy

Code or otherwise that does not provide for payment in full in cash of the DIP Credit Facility and

termination of DIP Lender's commitment to make the Revolving Loan; (j) the dismissal of the

Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one

under Chapter 7 of the Bankruptcy Code; (k) the entry of an order in the Chapter 11 Case

avoiding or requiring repayment of any portion of the payments made on account of the DIP

Credit Facility; (l) the failure of the Debtor to perform any of its obligations under the Interim

Order or the Final Order; (m) the entry of an order in the Chapter 11 Case granting any other

super-priority administrative claim or lien equal or superior to that granted to DIP Lender; (n)

and the termination or expiration of the Management Services Agreement between Debtor and

DIP Lender; and (o) the expiration of the time period covered by the Approved Budget.  [DIP

Agreement § 6.1].

**Borrowing Conditions.**  The DIP Agreement provides for the following borrowing

conditions:

(a)     The Borrower shall have commenced the Chapter 11 Cases on or before September 6, 2019;

(b)     The Bankruptcy Court, upon due and proper notice to all creditors and parties in interest, of a final and non-appealable order pursuant to 11 U.S.C. § 364(c) in a form acceptable to DIP Lender authorizing the borrower to obtain the DIP Credit Facility (the "Order"). The Order must provide that all Obligations under the DIP Credit Facility, including funds advanced, interest, fees, and expenses, shall (i) have priority status pursuant to Bankruptcy Code §364(c)(1) over any and all administrative expenses and claims of any kind, including those specified in 11 U.S.C. §§ 105, 326, 328, 503(b), 506(c), 607(a), 726 and 1114, but subject and subordinate to priority for payment of professional fees and expenses of the Borrower under 11 U.S.C. §§ 330 and 331 or any order of the Bankruptcy Court allowing payment of professional fees and expenses of the Borrower on a final or interim basis to the extent provided in the budget and (ii) be secured by an automatically perfected lien in thirty-three (33) Type Certificates issued by the FAA and identified on <u>Annex B</u> to this Agreement and all related drawing packages and specialized tooling, which automatically perfected lien shall have priority over all other liens and security interests, and a second priority lien and security interest in substantially all the assets of the borrower, including now and hereafter acquired, tangible and intangible assets. The Order shall further contain an explicit determination that DIP Lender has extended credit to Borrower in good faith based on evidence presented at the hearing conducted in connection with the Borrower's motion; that the first priority lien to be granted DIP Lender may not be primed or supplanted by a senior or equal lien on that property under 11 U.S.C. § 364(d) or in any

plan of reorganization; and that the property in which DIP Lender is to be granted a first priority lien shall not be subject to surcharge pursuant to 11 U.S.C. § 506(c);

(c)     A written budget, in form and substance satisfactory to DIP Lender in its sole and absolute discretion, shall have been approved by the DIP Lender and by the Bankruptcy Court in the Interim Order;

(d)     no adequate protection payments in excess of those provided in the approved budget shall have been ordered or approved by the Bankruptcy Court;

(e)     The Bankruptcy Court, upon due and proper notice to all creditors and parties in interest, shall have entered a final and non-appealable order approving a Management Services Agreement between the Borrower and DIP Lender, in form satisfactory to DIP Lender, under which the DIP Lender shall be afforded full access to the Borrower's premises in Albany, Georgia, the Borrower's books, and the Borrower's records, all for the purpose of managing the Borrower's business affairs while the DIP Credit Facility remains outstanding and under which the Borrower will provide appropriate office space at the Borrower's premises for the DIP Lender's representative;

(f)     The lender of KPH Properties II, Inc. shall have consented to a non-recourse pledge of collateral in favor of the DIP Lender consisting of the second mortgage on the property it owns currently in Albany, Georgia leased by Borrower;

(g)     KPH Properties II, Inc. shall have executed a second-priority deed to secure debt conveying the Albany, Georgia real property (leased by Borrower as of the Petition Date) to the DIP Lender to secure the Obligations evidencing the DIP Credit Facility, second in priority only to the prior lien or deed to secure debt of SB&T, a division of Synovus Bank, on the Albany, Georgia real property, which secures the debt of Borrower in the approximate amount of $1,400,000.00; provided further that KPH Properties II, Inc.;

(h)     DIP Lender shall have received (i) satisfactory evidence that the Borrower has obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, in connection with the filing of the Chapter 11 Case and to the execution, delivery and performance of this Agreement and the DIP Credit Facility or (ii) an officer's certificate in form and substance reasonably satisfactory to DIP Lender affirming that no such consents or approvals are required;

(i)     Entry by the Bankruptcy Court of the Interim Order, by no later than 7 business days after the Petition Date in form and substance satisfactory to DIP Lender, among other things, (x) approving the transactions contemplated hereby, (y) granting a first priority perfected security interest in the Collateral subject only to the senior Wells Fargo lien on all assets of the Borrower other than the thirty-three (33) Type Certificates and related drawings and tooling, the Carve-Out Expenses up to the Carve-Out Amount, and (z) modifying the automatic stay to permit the creation and perfection of DIP Lender' Liens; provided, however, that the Interim Order shall further contain an explicit determination that DIP Lender has extended credit to Borrower in good faith based on evidence presented at the hearing conducted in connection with the Borrower's motion;

(j)    DIP Lender shall be satisfied with the corporate structure, capital structure, debt instruments, material contracts, and governing documents of Borrower, and the tax effects resulting from the commencement of the Chapter 11 Case and the credit facility evidenced by this Agreement;

[DIP Agreement § 7.1].

**Additional Borrowing Conditions.** The DIP Agreement provides for the following additional borrowing conditions, prior to the DIP Lender advancing:

(a)    any representation or warranty by Borrower contained herein or in any document associated with the DIP Credit Facility is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date and DIP Lender has determined not to make such Loan as a result of the fact that such warranty or representation is untrue or incorrect;

(b)    the Bankruptcy Court shall not have entered the Final Order on or before the date that is 60 days after the Petition Date, (ii) the Bankruptcy Court shall not have entered the Final Order following the expiration of the Interim Order, (iii) the Interim Order or the Final Order, as the case may be, shall have been vacated, stayed, reversed, modified or amended without DIP Lender' consent or shall otherwise not be in full force and effect, (iv) a motion for reconsideration of any such order shall have been timely filed or (v) an appeal of any such order shall have been timely filed and such order in any respect is the subject of a stay pending appeal;
(c)    all orders entered by the Bankruptcy Court on or prior to Funding Date shall be satisfactory in form and substance to DIP Lender and its counsel; or

(d)    any Default or Event of Default has occurred and is continuing or would result after giving effect to such Loan and DIP Lender has determined not to make such Loan as a result of that Default or Event of Default.

[DIP Agreement § 7.2].

**Liens.** The DIP Agreement, along with all accrued interest, fees, and obligations shall have priority over any or all administrative expenses of the kind specified in 11 U.S.C. §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 726, and 1114. The Liens granted to DIP Lender on the Collateral (as defined below) owned by Borrower, and the priorities accorded to the obligations shall have priority status afforded by 11 U.S.C. § 364(c), and §364 (d) (with respect to the security interest of Hughes in the aforesaid type certificates), subject to the Carve-Out Expenses. [DIP Agreement § 1.12(b)].

**Collateral.** The DIP Agreement is secured by a lien on 33 Type Certificates (identified on Exhibit A attached thereto) issued by the Federal Aviation Administration and the related

- 7 -

drawing packages as authorized by 11 U.S.C.§ 364(d), and specialized tooling and on all property of the estate that is not otherwise subject to a lien; and secured by a junior lien on all property of the estate that is subject to a lien, all as authorized under 11 U.S.C. § 346(c) (collectively, the "**Collateral**"). [DIP Agreement § 1.12(c)]. As additional collateral, KPH Properties II, Inc., with consent of its lender, will make a non-recourse pledge of collateral consisting of a second mortgage on the property it owns currently leased by Debtor in Albany, Georgia. [DIP Agreement § 1.12(d)].

**Borrowing Limits.** The Maximum Facility Amount is $1,200,000. [DIP Agreement Definitions - "Maximum Facility Amount"].

12.    The financing sought by Debtor will minimize the disruption of Debtor's business, help preserve the assets of Debtor's estate by increasing the possibility of a successful reorganization of Debtor through a 363 sale, and is in the best interests of Debtor, its creditors, its employees and its estate. The terms of the proposed financing are fair and reasonable under the circumstances.

13.    Debtor believes HHM has negotiated this financing in good faith, and request HHM receive the protections afforded by Section 364(e) of the Bankruptcy Code.

14.    The Debtor's sound business judgment supports entry into the Management Services Agreement, as the terms of the Management Services Agreement are fair and reasonable and the services provided are in the best interests of the Debtor, its estate, creditors, and other parties in interest.

15.    In connection with this DIP Agreement, the Debtor seeks authority from this Court to enter into the Management Services Agreement. The DIP Lender would not enter into the DIP Agreement without the Management Services Agreement allowing HHM full access to the Debtor's premises in Albany, Georgia, the Debtor's books, and the Debtor's records, all for the purpose of managing the Debtor's business affairs while the DIP Agreement remains outstanding.

16.    Accordingly, the Debtor requests the Court approve the DIP Agreement and authorize entry into the Management Services Agreement.

**III.    Notice**

17.    In accordance with Federal Rule of Bankruptcy Procedure 4001(c)(1)(C), a copy of this Motion with all exhibits, has been provided to the: (a) United States Trustee, (b) the creditors listed on the list filed by the Debtor with the Court pursuant to Federal Rule of Bankruptcy Procedure 1007(d), (c) HHM, and (d) each creditor claiming a security interest in or lien upon any property of the Debtor.  Additionally, Debtor proposes to serve notice of the final hearing on this Motion in accordance with Federal Rule of Bankruptcy Procedure 4001(c)(2) and (3), and no earlier than fourteen (14) days after service of the Motion.

**WHEREFORE** Debtor respectfully prays that this Motion be inquired into and that the same be **GRANTED**; that Debtor be authorized to execute, deliver and perform under the DIP Agreement and to obtain loans pursuant to the terms thereof; that Debtor's assumption of the Management Services Agreement be authorized; and that the Court grant such other and further relief as is just and equitable.

Respectfully submitted, this 10th day of September, 2019.

**STONE & BAXTER, LLP**
By:

*/s/ Ward Stone, Jr.*
Ward Stone, Jr.
Georgia Bar No. 684630
Matthew S. Cathey
Georgia Bar No. 759547
G. Daniel Taylor
Georgia Bar No. 528521
wstone@stoneansbaxter.com
mcathey@stoneandbaxter.com
dtaylor@stoneandbaxter.com

Fickling & Co. Building, Suite 800
577 Mulberry Street
Macon, Georgia 31201
478.750.9898

**LOGUE LAW, P.C.**

By:

_/s/ A. Keith Logue_
A. Keith Logue
Georgia Bar No. 456250
keith@logue-law.com

3423 Weymouth Court
Marietta, Georgia 30062
770.321.5750

Proposed Counsel for Debtors

g:\clients\thrush aircraft\first day motions\s & b drafts\motion to approve dip financing.9.9.2019.doc

# EXHIBIT A

## MANAGEMENT SERVICES AGREEMENT

THIS MANAGEMENT SERVICES AGREEMENT (this "**Agreement**") is made as of September___, 2019 (the "**Effective Date**"), by and between HHM Aviation Financing, LLC, a Georgia limited liability company ("**HHM**"), on the one hand, and Thrush Aircraft, Inc., a Georgia corporation ("**Debtor**"), on the other hand.  HHM and the Debtor are referred to herein collectively as the "Parties" and individually as a "Party".

### Recitals

A.      Debtor is primarily engaged in the design, manufacture and sale of various models of single engine turbine powered aircraft (the "**Business**") from its facility in Albany, Georgia (the "**Facility**").

B.      On September 4, 2019, Debtor filed and commenced a chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the Middle District of Georgia, Albany Division, Case No. 19-10976 (the "**Bankruptcy Court**").

C.      HHM and Debtor have entered into a Debtor-in-Possession Credit Facility contemporaneously with this Agreement pursuant to which HHM is extending credit to the Debtor under 11 U.S.C. § 364 (the "**DIP Loan**").

D.      HHM and Debtor are currently negotiating terms for an Asset Purchase Agreement pursuant to which Lender proposes to acquire the Business including all assets thereof through a sale under 11 U.S.C. § 363 (the "**APA**").

E.      Debtor desires to engage HHM under the terms of this Agreement to provide its experience and certain personnel to provide management and consulting services for the Business pending and anticipated sale of the Business, possibly to HHM.

F.      HHM is desirous of performing the management and consulting services for the Business in accordance with the terms hereof.

G.      This Agreement is subject to the approval of the Bankruptcy Court pursuant to Sections 105, 364, and 365 of the United States Bankruptcy Code (the "**Bankruptcy Code**").

**NOW, THEREFORE**, in consideration of the premises and the mutual promises and covenants of the parties hereunder, HHM and Debtor, intending to be legally bound, hereby agree as follows:

1.      <u>**Services and Duties.**</u>

1.1      <u>Independent Contractor Relationship</u>.   Debtor hereby retains HHM and HHM hereby agrees to provide management and consulting services, subject to all the provisions hereof.  The parties hereto acknowledge that all times during the Term (as such term is defined

below) hereof, HHM shall be an independent contractor and Debtor shall not assume any liability for the withholding or payment of any federal, state or local taxes to HHM for HHM's services provided hereunder. HHM shall be responsible for the payment of all wages, payroll taxes, fringe benefits and any other expenses that may become owing to or on behalf of all Persons employed by HHM in providing services under this Agreement. "**Person**" means any individual, partnership, corporation, association, trust, joint venture, limited liability partnership, limited liability company or other entity.

    1.2   Authority and Responsibility of HHM. Debtor acknowledges that HHM has been engaged hereunder solely to perform the tasks described on **Exhibit A** attached hereto and may perform additional services as agreed between Parties from time to time pursuant to the terms of this Agreement (collectively, the "**Services**"). It shall be the responsibility of Debtor to elect whether to accept or reject the recommendations of HHM.

    1.3   Authority and Control Retained By Seller. Seller shall at all times retain ultimate authority and control over the assets and operation of the Business. By entering into this Agreement, Debtor does not delegate to HHM any of the power, duties and responsibilities required as a debtor-in-possession in its case before the Bankruptcy Court.

    1.4   HHM's Working Space. During the Term of this Agreement, Debtor shall provide HHM and HHM's employees or subcontractors reasonable working space at the Facility as is required to perform HHM's duties as described within this Agreement.

    1.5   Personnel Recommendations. HHM may recommend personnel changes or reductions in force to the Debtor's senior management. The Debtor's senior management shall reasonably consider each such recommendation in good faith (it being understood that the Debtor's senior management may take into account the state of the transactions contemplated by the DIP Loan and APA in such consideration).

    **2.**   **Meetings of Parties.** A representative of HHM shall meet with Debtor daily to exchange information, or as determined otherwise by the Parties.

    **3.**   **Fees and Costs.** During the Term of this Agreement, HHM shall earn and accrue a fee in the amount of $500.00 per business day, which amount, together with all expenses reasonably incurred by HHM in discharging its duties hereunder (including any premium paid for an insurance policy purchased by it in connection with its services rendered hereunder) shall be due and payable monthly in arrears.

    **4.**   **Term of Agreement.** The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue in full force and effect for a period of three (3) months, subject to extension or earlier termination by mutual consent of the Parties. However, it will terminate automatically at the earliest of: (a) the occurrence of the Closing (as defined in the APA) under the APA, (b) the date of termination by HHM of the APA, (c) the termination or expiration of the DIP Loan, or (d) at the conclusion of the Auction (as defined in the APA), if the Bankruptcy Court determines the Prevailing Bid (as defined in the APA) was not submitted by HHM.

**5.**     **Non-Disclosure of Proprietary or Confidential Information.**

5.1     <u>Non-Disclosure and Non-Use</u>.  By operation of and performance under this Agreement, the Parties may have access to information that is confidential or proprietary to the other Party.  The Parties shall not disclose Proprietary or Confidential Information received by the other Party except to legal, financial or other advisors assisting HHM with its duties hereunder or in any efforts to purchase substantially all of the assets of Seller pursuant to the APA to be negotiated between them, provided that each such advisor agrees in writing to be bound by the terms of this Article 5.  "Proprietary or Confidential Information" consists of (a) any documents exchanged that are not in the public domain; (b) any trade secrets or confidential information of the Business, including information disclosed by Debtor to HHM or learned by HHM as a result of its access to the systems, data, files, documents, offices, property or personnel of the Business; and (c) any other information or data of a Party disclosed to or learned by another Party that a reasonable Person in like circumstances would understand to be confidential or proprietary information of the disclosing party.  A disclosing party's Proprietary or Confidential Information shall not include information that:

(i)     Is or became a part of the public domain through no act or omission of the receiving party; or

(ii)    Was in the receiving party's lawful possession prior to the time such information was disclosed to or learned by the receiving party from or by access to the disclosing party, and at the time of such prior possession the receiving party was not under a duty of confidentiality to the disclosing party with respect thereto.

5.2     <u>When Required by Law</u>.  Nothing in this Agreement shall prohibit any disclosure of Proprietary or Confidential Information by the receiving party as required by law, regulation, or court order, but only to the extent so required.  The receiving party shall inform the disclosing party of the requirement and shall cooperate in good faith with the disclosing party in obtaining a protective order and other reasonable protections for the Proprietary or Confidential Information subject to disclosure.

5.3     <u>Equitable Relief</u>.  Each Party acknowledges that any use or disclosure of any other party's Proprietary or Confidential Information other than as specifically provided for in this Agreement will result in irreparable injury and damage to the party whose Proprietary or Confidential Information is being used or disclosed that is not adequately compensable in monetary damages alone.  Accordingly, each Party hereby agrees that, in the vent of use or disclosure by a Party of the Proprietary or Confidential Information of another Party (other than as specifically provided for in this Agreement or in another written agreement between the parties), the Party whose Proprietary or Confidential Information is being used or disclosed shall be entitled to a preliminary and permanent injunctive relief and other equitable relief as granted by the Bankruptcy Court or such other court having competent jurisdiction.

6.     **Miscellaneous.**

      6.1     Change in Law.  If any law or governmental regulation is adopted or any court decision is published after the date of this Agreement, and such, law regulation or court decision makes this Agreement or a provision hereof illegal, the Parties agree to use their commercially reasonable efforts to restructure this Agreement in such a manner that will avoid such illegality and, to the extent practicable, will preserve the existing financial and business relationships among them.

      6.2     Reasonable Care.  HHM shall have an obligation to exercise reasonable care in carrying out its obligations under this Agreement, including the handling, supervision and distribution of funds.

      6.3     Access to Facility.  HHM shall, at all times during the Term hereof, have complete access to the Business, its records, offices and the Facility, in order to carry out its obligations hereunder.

      6.4     Restriction on Assignment.  No Party shall assign its interest under this Agreement without the written consent of the other Party.

      6.5     Entire Agreement.  This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior understandings between the Parties, whether written or oral, as to such subject matter.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the parties after review by the Parties' legal counsel.  No waiver shall be binding unless executed in writing by the Party making the waiver.

      6.6     Headings.  The headings to the various sections of this Agreement have been inserted for reference purposes only and shall not modify, define, limit or expand the expressed provisions of this Agreement.

      6.7     Counterparts.  This Agreement may be executed in multiple counterparts, each of which is considered an original and will be binding upon the Party who executed the same, but all such counterparts will constitute the same Agreement.  Signatures sent by facsimile or electronic transmission (including PDF) shall be deemed to be originals for all purposes of this Agreement.

      6.8     Notices.  All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given when hand delivered or three business days after deposit in the United States mail, if mailed by certified or registered mail, return receipt requested, postage prepaid and addressed as follows:

      If to HHM:        HHM Aviation Financing, LLC
                           Attn: Mark McDonald
                           325 N. River Road, N.E.
                           Rome, GA 30161

mark@hhmaviation.com

| | |
|---|---|
| With a copy to: | John McGoldrick, Esq.<br>Martin Snow, LLP<br>P.O. Box 1606<br>Macon, Georgia 31202-1606 |
| If to Seller: | Thrush Aircraft, Inc.<br>Attn: K. Payne Hughes, Sr., CEO<br>300 Old Pretoria Road<br>Albany, Georgia 31721 |
| With a copy to: | Ward Stone, Jr., Esq.<br>Matthew S. Cathey, Esq.<br>Stone & Baxter, LLP<br>Fickling & Co. Building, Suite 800<br>577 Mulberry Street<br>Macon, Georgia 31201 |

A Party may change it address by giving notice in the manner provided above.

      6.8   <u>Authorization for Agreement</u>. Each Party represents and warrants to the other party that (i) execution and performance of this Agreement by such Party have been duly authorized by all necessary laws, resolutions or corporate action, and (ii) this Agreement constitutes the valid and enforceable obligations of such Party in accordance with its terms.

      6.9   <u>Governing Law</u>. The Agreement shall be deemed to have been made and shall be construed and interpreted in accordance with the laws of the State of Georgia, without giving effect to any principles of conflicts of law (whether of the State of Georgia or any other jurisdiction).

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first set forth above.

**HHM:**

HHM Aviation Financing, LLC

**DEBTOR:**

Thrush Aircraft, Inc.

By: _____
Name: Mark McDonald
Title:   Manager

By: _____
Name: K. Payne Hughes, Sr.
Title: Chief Executive Officer

g:\clients\thrush aircraft\stalking horse\management services agreement 9.10.2019.docx

## EXHIBIT A

## DESCRIPTION OF MANAGEMENT SERVICES

During the Term of this Agreement, HHM will evaluate the operations and various tasks and services of the Business consistent with the terms and conditions of this Agreement and make recommendations to management, including the following:

Cost

Inventory

Customers

Orders

Accounting

Vendor Contracting

Facilities and Plant Management

Business Office

Risk Management

Corporate Performance Improvement and Quality Control

Cash Management

Preparation of Monthly Operating Reports as required by the United States Trustee in the Bankruptcy Case, with assistance of Debtor's Employees

Information Technology Services

Preparation of Schedules and Statement of Financial Affairs to be filed in the Bankruptcy Case

Personnel

Production Operations

**EXHIBIT B**

POST-PETITION CREDIT AGREEMENT

DATED AS OF SEPTEMBER 4, 2019

by and among

THRUSH AIRCRAFT, INC., DEBTOR-IN-POSSESSION

as Borrower,

and

HHM AVIATION FINANCING, LLC

as DIP Lender.

## **INDEX OF APPENDICES**

<u>Annexes</u>

| | | |
|---|---|---|
| Annex A | - | Definitions |
| Annex B | - | Thirty-Three (33) Type Certificates Issued by the FAA |

<u>Exhibits</u>

| | | |
|---|---|---|
| Exhibit 1.1(a)(i) | - | Notice of Revolving Credit Advance |
| Exhibit 1.1(a)(ii) | - | Revolving Note |
| Exhibit 4.3(l) | - | Compliance and Excess Cash Flow Certificate |

<u>Schedules</u>

| | | |
|---|---|---|
| Schedule 3.2 | - | Liens |
| Schedule 3.3 | - | Investments |
| Schedule 3.4 | - | Contingent Obligations |
| Schedule 5.4(a) | - | Jurisdictions of Organization and Qualifications |
| Schedule 5.4(b) | - | Capitalization |
| Schedule 5.6 | - | Intellectual Property |
| Schedule 5.7 | - | Investigations and Audits |
| Schedule 5.8 | - | Employee Matters |
| Schedule 5.10 | - | Litigation |
| Schedule 5.14 | - | ERISA |
| Schedule 5.16 | - | Deposit and Disbursement Accounts |
| Schedule 5.17 | - | Agreements and Other Documents |

## POST-PETITION CREDIT AGREEMENT

This POST-PETITION CREDIT AGREEMENT (this "Agreement"), dated as of September 4 2019 by and among Thrush Aircraft, Inc. as a debtor-in-possession ("Borrower"), and HHM Aviation Financing, LLC, as lender ("DIP Lender").

R E C I T A L S:

WHEREAS, on September 4, 2019 ("Petition Date"), the Borrower commenced Chapter 11 Case No. 19-10976 ("Chapter 11 Case") by filing a voluntary petition for reorganization under Chapter 11, 11 U.S.C. § 101 et seq. ("Bankruptcy Code"), in the United States Bankruptcy Court for the Middle District of Georgia, Albany Division ("Bankruptcy Court"). The Borrower continues to operate its businesses and manage its properties as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, Wells Fargo ("Wells Fargo") provided financing to Borrower pursuant to various Credit Agreements between Borrower and Wells Fargo (the "Wells Fargo Loan Documents") secured by liens against property of Borrower, including, *inter alia* inventory, accounts receivable, other cash equivalents and their proceeds, under which Borrower was in default as of the Petition Date, as a result of which default Wells Fargo has revoked Borrower's ability to use its cash and proceeds of accounts receivable to operate its business, as permitted under the Wells Fargo Loan Documents;

WHEREAS, HHM Aviation Financing, LLC ("DIP Lender") and Borrower have been in discussions for the purpose of entering into an Asset Purchase Agreement under which DIP Lender would acquire certain assets of Borrower, including collateral of Wells Fargo (the "Assets");

WHEREAS, without additional lending from DIP Lender, Borrower will be unable to sustain its operations or preserve the integrity of the Assets pending a sale to DIP Lender or another qualified purchaser;

WHEREAS, Borrower has requested that DIP Lender provide a senior secured, revolving credit facility to Borrower of up to **$1,200,000.00** in the aggregate (the "Maximum Facility Amount") to fund the working capital requirements of the Borrower for a negotiated period of time following the filing of the Chapter 11 Case and to enter into a Management Services Agreement with Borrower pending such sale;

WHEREAS, DIP Lender is willing to make certain Post-petition loans and other extensions of credit to Borrower of up to **$1,200,000.00** and to provide management services upon the terms and conditions set forth herein ("DIP Credit Facility");

WHEREAS, Borrower has agreed to secure all of its borrowings under the DIP Credit Facility (the "Obligations") by granting to DIP Lender, a security interest in and lien upon all of its existing and after-acquired personal and real property subordinate to the liens of Wells Fargo (the "Collateral");

1

WHEREAS, Payne Hughes, owner of 100% of the stock of the Borrower and a creditor of Borrower, is willing to grant to, and subordinate in favor of, DIP Lender, a security interest in and lien upon thirty-three (33) aircraft type certificates issued by the Federal Aviation Administration and owned by Borrower, including as part of the type certificates all related drawing packages and specialized tooling (collectively, "Type Certificates"), to secure the Obligations and to subordinate his interest in the Type Certificates to the liens created in favor of DIP Lender hereunder;

WHEREAS, Borrower believes that the DIP Credit Facility and Management Services Agreement will enhance the aggregate borrowing powers of the Borrower and facilitate the administration of the Chapter 11 Case to the advantage of the Borrower;

WHEREAS, Borrower acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement;

WHEREAS, Borrower is unable to obtain sufficient unsecured credit allowable under section 11 U.S.C. § 503(b)(1) as an administrative expense to operate its business;

WHEREAS, the DIP Lender's willingness to extend financial accommodations to the Borrower, and to administer Borrower's collateral security therefor as more fully set forth in this Agreement, is done solely as an accommodation to the Borrower and at the Borrower's request and in furtherance of the Borrower's enterprise; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them in Annex A and, for purposes of this Agreement and the DIP Credit Facility, the rules of construction set forth in Annex A shall govern. All Annexes, Disclosure Schedules, Exhibits and other attachments (collectively, "Appendices") hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement. These Recitals shall be construed as part of the Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrower and DIP Lender agree as follows:

**SECTION 1.**
**AMOUNTS AND TERMS OF REVOLVING LOANS**

1.1    Credit Facility.

(a)    Revolving Loan.

(i)    Subject to the terms and conditions hereof, DIP Lender agrees to make available to Borrower from time to time until the Commitment Termination Date advances (each, a "Revolving Credit Advance"). The Revolving Loan of DIP Lender shall not at any time exceed the Revolving Loan Commitment. The aggregate amount of Revolving Credit Advances outstanding shall not exceed at any time the sum of (a) the aggregate Revolving Loan Commitments minus (b) the Carve-Out Reserve and any other Reserves established by DIP Lender at such time in its reasonable judgment

2

("Borrowing Availability"). Until the Commitment Termination Date, Borrower may borrow, repay and re-borrow under this Section 1.1(a)(i). Each Revolving Credit Advance shall be made on notice by Borrower Representative on behalf of Borrower to one of the representatives of DIP Lender identified in Schedule 1.1 at the address specified therein. Any such notice must be given no later than 11:00 a.m. (Eastern Time) on the date which is three (3) Business Days prior to the proposed Revolving Credit Advance. Each such notice (a "Notice of Revolving Credit Advance") must be given in writing (by e-mail, telecopy, or overnight courier) substantially in the form of Exhibit 1.1(a)(i), and shall include the information required in such Exhibit and such other information as may be required by DIP Lender.

(ii)     Except as provided in Section 1.8, Borrower shall execute and deliver to DIP Lender a note to evidence the Revolving Loan Commitment of DIP Lender. The note shall be in the principal amount of the Revolving Loan Commitment, dated as of the Closing Date and substantially in the form of Exhibit 1.1(a)(ii) (the "Revolving Note"). The Revolving Note shall represent the obligation of the Borrower to pay the amount of the DIP Lender's Revolving Loan Commitment or, if less, the aggregate unpaid principal amount of all Revolving Credit Advances to Borrower together with interest thereon as prescribed in Section 1.2. The entire unpaid balance of the aggregate Revolving Loan and all other non-contingent Obligations shall be immediately due and payable in full in immediately available funds on the Commitment Termination Date.

(b)     Reliance on Notices; Appointment of Borrower Representative. DIP Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Revolving Credit Advance or similar notice believed by DIP Lender to be genuine. DIP Lender may assume that each Person executing and delivering any notice in accordance herewith was duly authorized, unless the responsible individual acting thereon for DIP Lender has actual knowledge to the contrary. The Borrower Representative is hereby appointed to serve as representative on Borrower's behalf for the purposes of issuing Notices of Revolving Credit Advances, giving instructions with respect to the disbursement of the proceeds of the DIP Credit Facility, giving and receiving all other notices and consents under this Agreement, and taking all other actions (including in respect of compliance with covenants) on behalf of Borrower. Borrower's Representative hereby accepts such appointment.

(c)     Availability of Revolving Credit Advances. The DIP Credit Facility shall be available for the items, in the amounts, and at those times as set forth in a budget to be approved by both the DIP Lender and the Bankruptcy Court, in form and substance satisfactory to DIP Lender in its sole and absolute discretion, and as may be modified from time to time by agreement between Borrower and DIP Lender. The DIP Lender in its capacity as interim manager of the Borrower's business affairs under the Management Services Agreement shall retain the sole discretion while the DIP Credit Facility remains outstanding to alter budgeted expenditures in the best interest of the Borrower. The DIP Lender's willingness to extend the DIP Credit Facility to the Borrower is conditioned on there being no adequate protection payments in excess of those provided for in the DIP budget. Notwithstanding compliance with an approved budget, the DIP Credit Facility will be available provided only if Borrower is in compliance with all other terms and conditions of this Agreement. The DIP Lender may withhold further advances in the event the Federal Aviation Administration suspends any Production Certificate issued to Borrower or in the event that the Bankruptcy Court either (a) orders any adequate protection payments in excess of

3

those provided in the DIP budget or (b) grants any creditor or party in interest relief from the automatic stay of bankruptcy.

    1.2    <u>Interest.</u>

    (a)    From the date the Revolving Loan is made and the date the other Obligations become due, the Revolving Loan and the other Obligations shall bear interest at 12% percent per annum, compounded monthly.

    (b)    All computations of Fees calculated on a per annum basis and interest shall be made by DIP Lender on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such Fees and interest are payable; and all interest and Fees shall be paid on the first Business Day of each month in arrears. Each determination by DIP Lender of an interest rate and Fees hereunder shall be final, binding and conclusive on Borrower, absent manifest error.

    (c)    So long as an Event of Default has occurred and is continuing and upon notice to Borrower, the interest rate applicable to the Revolving Loan shall be increased by five percentage points (5%) per annum above the rate of interest otherwise applicable hereunder ("<u>Default Rate</u>"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

    (d)    Notwithstanding anything to the contrary set forth in this <u>Section 1.2</u>, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "<u>Maximum Lawful Rate</u>"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; <u>provided</u>, <u>however</u>, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by DIP Lender is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in <u>Sections 1.2(a) through (c)</u>, unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again apply. In no event shall the total interest received by DIP Lender pursuant to the terms hereof exceed the amount that DIP Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. If the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. If, notwithstanding the provisions of this <u>Section 1.2(d)</u>, a court of competent jurisdiction shall determine by a final, non-appealable order that a DIP Lender has received interest hereunder in excess of the Maximum Lawful Rate, DIP Lender shall, to the extent permitted by applicable law, promptly apply such excess as specified in <u>Section 1.5(e)</u> and thereafter shall refund any excess to Borrower or as such court of competent jurisdiction may otherwise order.

1.3    Fees.

(a)    Fees, Expenses, and Attorneys Fees. Borrower agrees to pay to the DIP Lender a preliminary fee equal to 1% of the Maximum Facility Amount, due upon Borrower's first draw, but payable on the earlier of (a) the 90th day after the Petition Date or (b) the termination of the DIP Credit Facility for any reason. Borrower agrees to reimburse DIP Lender for all reasonable attorney's fees, statutory and filing fees, and reasonable due diligence costs and expenses as incurred in connection with the performance of this Agreement, whether incurred by DIP Lender or by professional advisors engaged by DIP Lender, upon providing suitable documentation of such costs, and which shall not exceed $60,000.00. Borrowers will be liable for such fees regardless of whether or a final DIP Credit Facility is consummated, and reimbursement of such fees all or in part shall in no way obligate DIP Lender to close a transaction, which shall only occur upon execution by both parties of a suitable final lending agreement acceptable to DIP Lender. Apart from the category of fees and expenses that are capped at $60,000 in accordance with this paragraph, Borrower further additionally agrees to promptly pay all fees, charges, costs and expenses (including reasonable attorneys' fees and expenses and the allocated cost of internal legal staff) incurred by DIP Lender in connection with any matters contemplated by or arising out of this Agreement, in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the transactions contemplated herein and in connection with the continued administration of the DIP Credit Facility including any amendments, modifications, consents and waivers. Borrower agree to promptly pay reasonable documentation charges assessed by DIP Lender for amendments, waivers, consents and any of the documentation prepared by DIP Lender's internal legal staff. Borrower agrees to promptly pay all fees, charges, costs and expenses (including fees, charges, costs and expenses of attorneys, auditors (whether internal or external), appraisers, consultants and advisors and the allocated cost of internal legal staff) incurred by DIP Lender in connection with any Event of Default, work-out or action to enforce this DIP Credit Facility or to collect any payments due from any Borrower. In addition, in connection with any Chapter 11 Case, work-out or action to enforce the DIP Credit Facility or to collect any payments due from Borrower, Borrower agrees to promptly pay all fees, charges, costs and expenses incurred by DIP Lender. All fees, charges, costs and expenses for which Borrower is responsible under this Section 1.3(d) shall be deemed part of the Obligations when incurred, payable upon demand or in accordance with the final sentence of Section 1.4 and secured by the Collateral.

1.4    Payments. All payments by Borrower of the Obligations shall be without deduction (other than Excluded Taxes but subject to the provisions of Section 1.9(a) hereof), defense, setoff or counterclaim and shall be made in same day funds and delivered to DIP Lender by wire transfer to the following account or such other place as DIP Lender may from time to time designate in writing.

Regions Bank
615 S. College Street Charlotte, NC 28202
ABA: 062005690
Acct: 0272201614
Acct: Name: HHM Aviation Financing
Acct Address: 325 N. River Rd NE
Rome, GA 30161

Borrower shall receive credit on the day of receipt for funds received by DIP Lender by 5:00 p.m. (Eastern Time). In the absence of timely receipt, such funds shall be deemed to have been paid on the next Business Day. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest and Fees due hereunder.

     1.5    Prepayments.

     (a)    Voluntary Prepayments of Revolving Loan. At any time upon at least five (5) days' prior written notice from Borrower Representative to DIP Lender, Borrower may voluntarily prepay the Revolving Loan and permanently reduce (but not terminate) the Revolving Loan Commitment, in whole or in part; provided, that any such prepayment of a Revolving Loan shall be in a minimum amount of $100,000 and integral multiples of $100,000 in excess of such amount. In addition, Borrower may at any time on at least five (5) days' prior written notice by Borrower Representative to DIP Lender terminate the Revolving Loan Commitment; provided, upon such termination, the Revolving Loan and other non-contingent Obligations shall be immediately due and payable in full. Prepayments shall be applied in accordance with Section 1.5(g) or as otherwise may be agreed by DIP Lender.

     (b)    Revolving Loan in Excess of Borrowing Availability. If at any time the outstanding balance of the aggregate Revolving Loan exceeds the sum of the Revolving Loan Commitment minus the Carve-Out Reserve and all other Reserves, Borrower shall immediately repay the aggregate outstanding Revolving Credit Advances to the extent required to eliminate such excess.

     (c)    Prepayments from Asset Dispositions. Immediately upon receipt of any Net Proceeds (after payment to Wells Fargo, but only to the extent that Wells Fargo's obligations are secured by the Collateral) from any Asset Dispositions, Borrower shall repay Total Obligations by an amount equal to the amount of such excess Net Proceeds; provided, that as long as no Event of Default has occurred and is continuing, Borrower may reinvest Net Proceeds from sales of Equipment permitted hereunder or from casualty or condemnation proceeds, in each case within one hundred twenty (120) days in productive replacement fixed assets, or with DIP Lender's prior written consent, in the repair of existing assets, in each case, of a kind then used or usable in the business of Borrower. Borrower shall provide DIP Lender with prompt written notice of any Net Proceeds received. If an Event of Default has occurred and is continuing or if Borrower does not intend to so reinvest such Net Proceeds or if the period set forth in the immediately preceding sentence expires without Borrower having reinvested such Net Proceeds, Borrower shall prepay the Total Obligations in an amount equal to such Net Proceeds of such Asset Disposition. The payments required hereunder shall be applied in accordance with Section 1.5(g).

     (d)    Prepayments from Issuance of Securities. Immediately upon the receipt by Borrower of the proceeds of the issuance of Stock, Borrower shall prepay the Total Obligations in an amount equal to such proceeds, net of underwriting discounts and commissions and other reasonable costs associated therewith. The payments shall be applied in accordance with Section 1.5(g).

(e)      Prepayments from Change of Control. Upon the occurrence and during the continuation of an Event of Default arising solely under Section 6.1(n) hereof, the Borrower shall prepay the entire Total Obligations unless the Obligations are assumed by the new controlling entity.

(f)      Application of Proceeds. Prior to the occurrence of an Event of Default, prepayments made pursuant to Sections 1.5(c), (d), (e) and (f) hereof shall be applied first, to any fees and expenses payable hereunder, second, to any accrued and unpaid interest hereunder and, third, to the Revolving Loan outstanding hereunder which shall result in a permanent reduction to the Revolving Loan Commitment. On and after the occurrence of an Event of Default, prepayments made pursuant to Sections 1.5(c), (d), (e) and (f) hereof shall be applied to the Total Obligations in whatever manner the DIP Lender deems advisable in the DIP Lender's sole discretion.

1.6      Application and Allocation of Payments. Except as set forth in Section 1.5(g) hereof, Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by DIP Lender from or on behalf of Borrower and Borrower expressly agrees that DIP Lender may apply all such amounts received by DIP Lender after the Petition Date to payment of the Obligations arising on or after the Petition Date. Except as set forth in Section 1.5(g) hereof, Borrower hereby irrevocably agrees that DIP Lender shall have the continuing exclusive right to apply and to reverse and reapply any and all payments received at any time or times hereafter against the Obligations in such manner as DIP Lender may deem advisable notwithstanding any entry by DIP Lender upon any of its books and records.

1.7      Maturity. All Obligations evidencing the DIP Credit Facility shall become due and payable upon the Commitment Termination Date; provided, however, that the DIP Lender reserves the right, exercisable in its sole discretion, to extend the term of the DIP Credit Facility for additional periods. Until all Obligations have been fully paid and satisfied and the Revolving Loan Commitment has been terminated, DIP Lender shall be entitled to retain the security interests in the Collateral granted under the Collateral Documents and the ability to exercise all rights and remedies available under the DIP Credit Facility and applicable laws.

1.8      Loan Accounts. DIP Lender shall maintain a loan account (the "Loan Account") on its books to record: the Revolving Loan, all payments made by Borrower, and all other debits and credits as provided in this Agreement with respect to the Revolving Loan or any other Obligations. All entries in the Loan Account shall be made in accordance with DIP Lender's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded on DIP Lender's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to DIP Lender by Borrower; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay the Obligations. DIP Lender shall render to Borrower a monthly accounting of transactions with respect to the Revolving Loan setting forth the balance of the Loan Account for the immediately preceding month. Unless Borrower Representative notifies DIP Lender in writing of any objection to any such accounting (specifically describing the basis for such objection), within thirty (30) days after the date thereof, each and every such accounting shall, absent manifest error, be deemed final, binding and conclusive on Borrower in all respects as to all matters reflected therein. Only those items expressly objected to in such notice shall be deemed to be disputed by Borrower. Notwithstanding any provision herein contained to the contrary, DIP Lender may

elect (which election may be revoked) to dispense with the issuance of Revolving Notes to that DIP Lender and may rely on the Loan Account as evidence of the amount of Obligations from time to time owing to it.

1.9     Reserved.

1.10    Taxes.

(a)     No Deductions. Any and all payments or reimbursements made hereunder or under the Revolving Notes shall be made free and clear of and without deduction for any and all Charges, taxes, levies, imposts, deductions or withholdings, and all liabilities with respect thereto of any nature whatsoever imposed by any taxing authority, other than Excluded Taxes (such non-excluded items hereinafter referred to as "Covered Taxes"). If Borrower shall be required by law to deduct any Covered Taxes from or in respect of any sum payable hereunder to DIP Lender, then the sum payable hereunder shall be increased as may be necessary so that, after making all required deductions for Covered Taxes, DIP Lender receives an amount equal to the sum it would have received had no such deductions been made.

(b)     Changes in Tax Laws. In the event that, subsequent to the Closing Date, (1) any changes in any existing law, regulation, treaty or directive or in the interpretation or application thereof, (2) any new law, regulation, treaty or directive enacted or any interpretation or application thereof, or (3) compliance by DIP Lender with any request or directive (whether or not having the force of law) from any Governmental Authority:

(i)     does or shall subject DIP Lender to any tax of any kind whatsoever with respect to this Agreement, the DIP Credit Facility, or the Revolving Loan made hereunder, or change the basis of taxation of payments to DIP Lender or such DIP Lender of principal, fees, interest or any other amount payable hereunder (except for, or with respect to, Excluded Taxes); or

(ii)    does or shall impose on DIP Lender any other condition or increased cost in connection with the transactions contemplated hereby or participations herein; and the result of any of the foregoing is to increase the cost to DIP Lender of making or continuing the Revolving Loan hereunder, as the case may be, or to reduce any amount receivable hereunder, then, in any such case, Borrower shall promptly pay to DIP Lender, upon its demand, any additional amounts necessary to compensate DIP Lender, on an after-tax basis, for such additional cost or reduced amount receivable, as determined by DIP Lender with respect to this Agreement. If DIP Lender becomes entitled to claim any additional amounts pursuant to this Section 1.10(b), it shall promptly notify Borrower Representative of the event by reason of which DIP Lender has become so entitled. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by DIP Lender to Borrower (with a copy to DIP Lender) shall, absent manifest error, be final, conclusive and binding for all purposes.

1.11    Single Loan. The Revolving Loan to Borrower arising under this Agreement and the DIP Credit Facility shall constitute one general obligation of Borrower secured, until the Termination Date, by all of the Collateral.

8

1.12    Super Priority Nature of Obligations and DIP Lender's and DIP Lender' Liens.

(a)    The priority of DIP Lender's and DIP Lender' Liens on the Collateral owned by the Borrower shall be set forth in the Interim Order and the Final Order.

(b)    All Obligations shall constitute administrative expenses of Borrower in the Chapter 11 Case, with administrative priority and senior secured status under Sections 364(c) of the Bankruptcy Code. Such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 726, 1114 (whether incurred in the Chapter 11 Case or any conversion thereof to a case under chapter 7 of the Bankruptcy Code or any other proceeding related to the Chapter 11 Case), and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code. The Liens granted to DIP Lender on the Collateral owned by the Borrower, and the priorities accorded to the Obligations shall have the priority status afforded by Sections 364(c) of the Bankruptcy Code (all as more fully set forth in the Interim Order and Final Order) and the priority status further explained in Section 1.12(c) below.

(c)    As security for the Obligations, DIP Lender shall be granted pursuant to sections 364(c)(2), and 364(c)(3) of the Bankruptcy Code, a lien (the "DIP Liens") on all Collateral, including in particular a lien on thirty-three (33) Type Certificates (identified on Annex B attached to this Agreement) issued by the Federal Aviation Administration to Borrower together with the related drawing packages and specialized tooling. The liens granted to the DIP Lender in the Collateral shall be *senior to* the rights of the Borrower in the Collateral and *senior to* any lien of Wells Fargo in the thirty-three (33) Type Certificates identified on Annex B to this Agreement, together with the related drawing packages and specialized tooling (the "First-Priority Collateral"), but otherwise shall be *subordinate to* the liens of Wells Fargo in the Collateral, *subordinate to* the Senior Permitted Encumbrances, and *subordinate to* the following (collectively, "Carve-Out Expenses"): (a) fees and disbursements incurred and allowed on and after the Petition Date by professionals retained by the Borrower and whose retention is approved by the Bankruptcy Court pursuant to Section 327, 328 and 1103 of the Bankruptcy Code ("Borrower's Professionals") and the professionals retained by the Committee and whose retention is approved by the Bankruptcy Court pursuant to Section 327, 328 and 1103 of the Bankruptcy Code (the "Committee Professionals" and together with the Borrower's Professionals, the "Retained Professionals") that were budgeted in, and up to the amount budgeted in the budget approved by the Bankruptcy Court; and (b) the unpaid fees pursuant to Section 1930 of Title 28 of the United States Code and to the Clerk of the Bankruptcy Court (the dollar amount for the Carve-Out Expenses being referred to herein as the "Carve-Out Amount") (determined without regard to fees and expenses which may be awarded and paid on an interim basis or any pre-petition retainer paid to any Borrower's or Committee's counsel in connection with the Chapter 11 Case).

The Carve-Out Expenses shall not include any other claims that are or may be senior to or *pari passu* with any of the Carve-Out Expenses or any professional fees and expenses of a Chapter 7 trustee, and the Carve-Out Expenses also shall not include any fees or disbursements arising after the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code. Except as set forth herein or in the Final Order, no other claim having a priority superior or *pari passu* to that granted to DIP Lender by

9

the Final Order shall be granted or approved while any Obligations under this Agreement remain outstanding.

In addition, and notwithstanding anything to the contrary in this Agreement, the DIP Lender shall have a perfected security interest in the First-Priority Collateral.

(d)   As additional security for the Obligations, KPH Properties II, Inc., with consent of its lender, will make a non-recourse pledge of collateral in favor of the DIP Lender consisting of a second mortgage on the property it owns currently leased by Borrower in Albany, Georgia.

1.13   Payment of Obligations. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement, DIP Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

1.14   No Discharge; Survival of Claims. Borrower agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case and (ii) the administrative claim granted to DIP Lender pursuant to the Interim Order and Final Order and described in Section 1.11 and the Liens granted to DIP Lender pursuant to the Interim Order and Final Order and described in Section 1.11 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

1.15   Release. Borrower hereby acknowledges effective upon entry of the Interim Order, that Borrower has no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's liability to repay DIP Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from DIP Lender. Borrower, on behalf of its bankruptcy estate, and on behalf of its successors, assigns (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge DIP Lender and all of DIP Lender's past and present officers, directors, servants, DIP Lender, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or un-asserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order.

1.16   Waiver of any Priming Rights. Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, Borrower hereby irrevocably waive any

right, pursuant to Section 364(c) of the Bankruptcy Code to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

## SECTION 2.
## AFFIRMATIVE COVENANTS

Borrower executing this Agreement jointly and severally agrees that from and after the date hereof and until the Termination Date:

2.1    <u>Compliance With Laws and Contractual Obligations.</u> Except as occasioned by the Chapter 11 Cases, Borrower will (a) comply with (i) the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including, without limitation, laws, rules, regulations and orders relating to taxes, employer and employee contributions, securities, employee retirement and welfare benefits, environmental protection matters and employee health and safety) as now in effect and which may be imposed in the future in all jurisdictions in which Borrower is now doing business or may hereafter be doing business and (ii) the obligations, covenants and conditions contained in all Contractual Obligations of such Borrower other than those laws, rules, regulations, orders and provisions of such Contractual Obligations the noncompliance with which could not be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (b) maintain or obtain all licenses, qualifications and permits now held or hereafter required to be held by such Borrower, for which the loss, suspension, revocation or failure to obtain or renew, could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. This Section 2.1 shall not preclude Borrower from contesting any taxes or other payments, if they are being diligently contested in good faith in a manner which stays enforcement thereof and if appropriate expense provisions have been recorded in conformity with GAAP, subject to Section 3.2. Borrower represents and warrants that it (i) is in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority and the obligations, conditions and covenants contained in all Contractual Obligations other than those laws, rules, regulations, orders and provisions of such Contractual Obligations the noncompliance with which could not be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (ii) maintains all licenses, qualifications and permits required to be held by such Borrower, for which the loss, suspension, revocation or failure to obtain or renew, could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. Borrower shall pay and discharge promptly when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; provided, no Borrower shall be required to pay any Charges, Taxes or Claims the nonpayment of which is permitted by the Bankruptcy Code.

2.2    <u>Maintenance of Properties; Insurance.</u>

(a)    <u>Maintenance of Properties.</u> Borrower will maintain or cause to be maintained in good repair, working order and condition (reasonable wear and tear excepted) all material properties used in the business of Borrower and will make or cause to be made all appropriate repairs, renewals and replacements thereof.

(b)    <u>Insurance Coverage</u>. Without limiting any of the other obligations or liabilities of Borrower under this Agreement, Borrower shall, during the term of this Agreement, carry and maintain, at its own expense, at least the minimum insurance coverage set forth in this <u>Section 2.2(b)</u>. Borrower shall also carry and maintain any other insurance that DIP Lender may reasonably require from time to time. All insurance carried pursuant to this <u>Section 2.2(b)</u> shall be placed with such insurers having a minimum A.M. Best rating of A or as otherwise may be reasonably acceptable to the DIP Lender, and be in such form, with terms, conditions, limits and deductibles as shall be acceptable to the DIP Lender.

(i)    <u>All Risk Property Insurance</u>. Borrower shall maintain all risk property insurance covering against physical loss or damage to its property, including but not limited to fire and extended coverage, collapse, and flood. Coverage shall be written on a replacement cost basis in an amount reasonably acceptable to the DIP Lender. Such insurance policy shall contain an agreed amount endorsement waiving any coinsurance penalty and shall include expediting expense coverage in an amount not less than $25,000; and

(ii)    <u>Comprehensive General Liability Insurance</u>. Borrower shall maintain comprehensive general liability insurance written on an occurrence basis with a limit of not less than $1,000,000. Such coverage shall include, but not be limited to, premises/operations, explosion, collapse, underground hazards, sudden and accidental pollution, contractual liability, fireworks liability, independent contractors, products/completed operations, property damage and personal injury liability. Such insurance shall not contain an exclusion for punitive or exemplary damages where insurable by applicable law; and

(iii)    <u>Workers' Compensation/Employer's Liability</u>. Borrower shall maintain workers' compensation insurance in accordance with statutory provisions covering accidental injury, illness or death of an employee of Borrower while at work or in the scope of his employment with Borrower and employer's liability in an amount not less than $1,000,000. Such coverage shall not contain any occupational disease exclusions. Borrower may self-insure such worker's compensation coverage with the approval of the DIP Lender and submittal to DIP Lender of approved certification from the state authorities; and

(iv)    <u>Automobile Liability</u>. Borrower shall maintain automobile liability insurance covering owned, non-owned, leased, hired or borrowed vehicles against bodily injury or property damage. Such coverage shall have a limit of not less than $1,000,000; and

(v)    <u>Excess/Umbrella Liability</u>. Borrower shall maintain excess or umbrella liability insurance in an amount not less than $25,000,000 written on an occurrence basis providing coverage limits excess of the insurance limits required under sections (b)(iii), (b)(iv) employer's liability only, and (b)(v). Such insurance shall follow the form the primary insurances and drop down in case of exhaustion of underlying limits and/or aggregates. Such insurance shall not contain an exclusion for punitive or exemplary damages where insurable under applicable law; and

(c)    <u>Endorsements</u>. Borrower shall cause all insurance policies carried and maintained in accordance with this <u>Section 2.2(b)</u> to be endorsed as follows:

(i)       Borrower shall be the named insured and the DIP Lender shall be an additional insured and the DIP Lender shall be loss payee with respect to policies described in subsection (b)(i). Borrower shall be the named insured and the DIP Lender shall be an additional insured with respect to policies described in subsections (b)(iii), (b)(iv) to the extent allowed by applicable law, (b)(v), and (b)(vi). It shall be understood that any obligation imposed upon Borrower, including but not limited to the obligation to pay premiums, shall be the sole obligation of such Borrower and not that of the DIP Lender; and

(ii)       with respect to policies described in subsections (b)(i) and (b)(ii), the interests of the DIP Lender shall not be invalidated by any action or inaction of any Borrower, or any other person, and shall insure the DIP Lender regardless of any breach or violation by Borrower or any other person, of any warranties, declarations or conditions of such policies; and

(iii)       the insurers thereunder shall waive all rights of subrogation against the DIP Lender, any right of setoff or counterclaim and any other right to deduction, whether by attachment or otherwise; and

(iv)       such insurance shall be primary without right of contribution of any other insurance carried by or on behalf of the DIP Lender with respect to its interests herein; and,

(v)       if such insurance is canceled for any reason whatsoever, including non-payment of premium, or any changes are initiated by Borrower or carrier which affect the interests of the DIP Lender, such cancellation or change shall not be effective as to the DIP Lender until thirty (30) days, except for non-payment of premium which shall be ten (10) days, after receipt by the DIP Lender of written notice sent by registered mail from such insurer.

(d)       <u>Certifications</u>. On the Closing Date, and at each policy renewal, but not less than annually, Borrower shall provide to the DIP Lender approved certification from each insurer or by an authorized representative of each insurer. Such certification shall identify the underwriters, the type of insurance, the limits, deductibles, and term thereof and shall specifically list the special provisions delineated in (c) above for such insurance required in this <u>Section 2.2(b)</u>.

(e)       <u>Insurance Report</u>. Concurrently with the furnishing of all certificates referred to in (d) above, Borrower shall furnish the DIP Lender with an opinion from an independent insurance broker, acceptable to the DIP Lender, stating that all premiums then due have been paid and that, in the opinion of such broker, the insurance then maintained by such Borrower is in accordance with this <u>Section 2.2(b)</u>. Furthermore, upon its first knowledge, such broker shall advise the DIP Lender promptly in writing of any default in the payment of any premiums or any other act or omission, on the part of any person, which might invalidate or render unenforceable, in whole or in part, any insurance provided by Borrower hereunder.

(f)       <u>General</u>. The DIP Lender shall be entitled, upon reasonable advance notice, to review Borrower' books and records regarding all insurance policies carried and maintained with respect to Borrower' obligations under this <u>Section 2.2(b)</u>. Upon request, Borrower shall furnish the DIP Lender

with copies of all insurance policies, binders, and cover notes or other evidence of such insurance. Notwithstanding anything to the contrary herein, no provision of this Section 2.2(b) or any provision of this Agreement shall impose on the DIP Lender any duty or obligation to verify the existence or adequacy of the insurance coverage maintained by Borrower, nor shall the DIP Lender be responsible for any representations or warranties made by or on behalf of such Borrower to any insurance broker, company or underwriter. The DIP Lender, at its sole option, may obtain such insurance if not provided by Borrower and in such event, such Borrower shall reimburse the DIP Lender upon demand for the cost thereof together with interest.

2.3     Inspection; DIP Lender Meeting. Borrower shall permit any authorized representatives of DIP Lender to visit, audit and inspect any of the properties of Borrower, including its financial and accounting records, and to make copies and take extracts therefrom, and to discuss its affairs, finances and business with its officers and certified public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested upon at least three (3) Business Days prior notice. Without in any way limiting the foregoing, Borrower will participate and will cause key management personnel of Borrower to participate in a meeting with DIP Lender at least once during each year, which meeting shall be held at such time and such place as may be reasonably requested by DIP Lender.

2.4     Organizational Existence. Except as otherwise permitted by Section 3.6, Borrower will to at all times preserve and keep in full force and effect its organizational existence.

2.5     Environmental Matters. Borrower shall and shall cause each Person within its control to: (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected to have a Material Adverse Effect; (b) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws and Environmental Permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, in, under, above, to, from or about any of its Real Estate; (c) notify DIP Lender promptly after such Borrower or any Person within its control becomes aware of any violation of Environmental Laws or Environmental Permits or any Release on, at, in, under, above, to, from or about any Real Estate that is reasonably likely to result in Environmental Liabilities to a Borrower or its Subsidiaries in excess of $75,000; and (d) promptly forward to DIP Lender a copy of any order, notice, request for information or any communication or report received by such Borrower or any Person within its control in connection with any such violation or Release or any other matter relating to any Environmental Laws or Environmental Permits that could reasonably be expected to result in Environmental Liabilities in excess of $75,000, in each case whether or not the Environmental Protection Agency or any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter. If DIP Lender at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by Borrower any Person under its control or any Environmental Liability arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, that, in each case, could reasonably be expected to have a Material Adverse Effect, then Borrower shall, upon DIP Lender's written request (i) cause the performance of such environmental audits including subsurface sampling of soil and groundwater, and

14

preparation of such environmental reports, at Borrower' expense, as DIP Lender may from time to time reasonably request, which shall be conducted by reputable environmental consulting firms reasonably acceptable to DIP Lender and shall be in form and substance reasonably acceptable to DIP Lender, and (ii) permit DIP Lender or its representatives to have access to all Real Estate for the purpose of conducting such environmental audits and testing as DIP Lender deems appropriate, including subsurface sampling of soil and groundwater. Borrower shall reimburse DIP Lender for the costs of such audits and tests and the same will constitute a part of the Obligations secured hereunder.

2.6     Landlords' Agreements, Mortgagee Agreements, Bailee Letters and Real Estate Purchases. After the Closing Date, no additional real property shall be leased by Borrower unless and until a satisfactory landlord agreement or leasehold mortgage, as appropriate, shall first have been obtained with respect to such location. Borrower shall timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased location or public warehouse where any Collateral is or may be located.

2.7     Further Assurances.

(a)     Borrower shall, from time to time, execute such guaranties, financing statements, documents, security agreements and reports as DIP Lender at any time may reasonably request to evidence, perfect or otherwise implement the guaranties and security for repayment of the Obligations contemplated by this DIP Credit Facility.

(b)     In the event Borrower acquires an interest in real property after the Closing Date, such Borrower shall deliver to DIP Lender a fully executed mortgage, leasehold mortgage or deed of trust, as applicable, over such real property in form and substance reasonably satisfactory to DIP Lender, together with such title insurance policies, surveys, appraisals, evidence of insurance, legal opinions, environmental assessments and other documents and certificates as shall be required by DIP Lender.

2.8     Environmental and Safety Inspections. Borrower will permit DIP Lender and its authorized representatives to, at Borrower' expense, visit, audit, inspect and test the Borrower's manufacturing plant for purposes of environmental, health and safety compliance. If DIP Lender at any time has reasonable basis to believe that there may be a violation of any Environmental Laws or health and safety laws which result or could be reasonably expected to result in a Material Adverse Effect, then Borrower, upon DIP Lender's written request, shall at its expense implement appropriate remedial measures to cure such violations and/or minimize potential liabilities in a manner and within such time periods as shall be reasonably satisfactory to DIP Lender.

2.9     Cash Deposits. Borrower shall cause all cash received (including, without limitation, from aircraft sales, parts sales, and other sales as part of Borrower's operations) and other cash proceeds of Collateral received by the Borrower to be deposited on a daily basis into a depository account.

2.10.   Bankruptcy Filings. The Borrower shall file a plan of reorganization with the Bankruptcy Court or a 363 Motion for the sale of the assets within 90 days of the Petition Date.

## SECTION 3.
## NEGATIVE COVENANTS

Borrower agrees that from and after the date hereof until the Termination Date:

3.1    <u>Indebtedness.</u> Borrower shall not create, incur, assume, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness (other than pursuant to a Contingent Obligation permitted under Section 3.4) except:

(a)    the Obligations; and

(b)    trade debt incurred in the ordinary course of business.

Borrower shall make no payments on pre-petition unsecured debts or other pre-petition obligations while the DIP Credit Facility is outstanding other than those already made or agreed to under the current cash budget. Borrower shall make no change in the management or ownership of the Borrower without the express written consent of DIP Lender.

3.2    <u>Liens and Related Matters.</u>

(a)    <u>No Liens</u>. Borrower shall not directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to any property or asset of such Borrower, whether now owned or hereafter acquired, or any income or profits therefrom, except Permitted Encumbrances (including, without limitation, those Liens constituting Permitted Encumbrances existing on the date hereof and renewals and extensions thereof, as set forth on <u>Schedule 3.2</u>). Notwithstanding the foregoing, Liens permitted herein shall at all times be junior and subordinate to the Liens under the DIP Credit Facility and the Interim Order and Final Order, other than the Carve-Out Expenses up to the Carve-Out Amount. The prohibition provided for in this <u>Section 3.2</u> specifically includes, without limitation, any effort by any Borrower, any Committee, or any other party-in-interest in any Chapter 11 Case to prime or create *pari passu* to any claims, Liens or interests of DIP Lender any Lien (other than for the Carve-Out Expenses up to the Carve-Out Amount) irrespective of whether such claims, Liens or interests may be "adequately protected".

(b)    <u>No Negative Pledges</u>. The Borrower shall not directly or indirectly enter into or assume any agreement (other than the DIP Credit Facility) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired.

3.3    <u>Investments.</u> Borrower shall not directly or indirectly make or own any Investment in any Person except:

(a)    Borrower may make loans and advances to employees for moving, entertainment, travel and other similar expenses in the ordinary course of business not to exceed $2,000 in the aggregate at any time outstanding; and

(b)    Investments outstanding as of the Closing Date and described on <u>Schedule 3.3</u> hereto.

16

3.4     Contingent Obligations. Borrower shall not directly or indirectly create or become or be liable with respect to any Contingent Obligation except:

(a)     those resulting from endorsement of negotiable instruments for collection in the ordinary course of business;

(b)     those existing on the Closing Date and described in Schedule 3.4;

(c)     those arising under indemnity agreements to title insurers to cause such title insurers to issue to DIP Lender mortgagee title insurance policies; and

(d)     those incurred with respect to Indebtedness permitted by Section 3.1 provided that any such Contingent Obligation is subordinated to the Obligations to the same extent as the Indebtedness to which it relates is subordinated to the Obligations.

3.5     Restriction on Fundamental Changes. Except as authorized by the Bankruptcy Court, Borrower shall not directly or indirectly: (a) amend, modify or waive any term or provision of its organizational documents, including its articles of incorporation, certificates of designations pertaining to preferred stock, by-laws, partnership agreement or operating agreement unless required by law or unless DIP Lender provides its prior written consent not to be unreasonably withheld unless DIP Lender deems any such change to be adverse to Borrower or the interests of DIP Lender; (b) enter into any transaction of merger or consolidation; (c) liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution); or (d) acquire by purchase or otherwise all or any substantial part of the business or assets or Stock of any other Person.

3.6     Disposal of Assets. Except as authorized by the Bankruptcy Court, Borrower shall not directly or indirectly convey, sell, lease, sublease, transfer or otherwise dispose of, or grant any Person an option to acquire, in one transaction or a series of related transactions, any of its property, business or assets, whether now owned or hereafter acquired, except for sales dispositions of obsolete equipment not used or useful in the business.

3.7     Hazardous Materials. Borrower shall not cause or permit a Release of any Hazardous Material on, at, in, under, above, to, from or about any of the Real Estate where such Release would (a) violate in any respect, or form the basis for any Environmental Liabilities by the Borrower under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the value or marketability of any of the Real Estate or any of the Collateral, other than such violations or Environmental Liabilities that could not reasonably be expected to have a Material Adverse Effect.

3.8     Chapter 11 Claims. Borrower shall not incur, create, assume, suffer to exist or permit any other administrative claim which is *pari passu* with or senior to the claims of DIP Lender against the Borrower, except as set forth in Section 1.

17

## SECTION 4.
## FINANCIAL COVENANTS/REPORTING

Borrower covenants and agrees that from and after the date hereof until the Termination Date, such Borrower shall perform and comply with all covenants in this Section 4.

4.1    Net Cash Receipts.

The difference between the Borrower' actual aggregate cash receipts and actual aggregate cash expenditures (the "Net Cash Receipts") during any week covered by the Approved Budget shall not be less than 85% of the amount set forth in the Approved Budget in effect for such week; provided that to the extent the actual amount of Net Cash Receipts of the Borrower during any week covered by the Approved Budget exceed 100% of the amounts set forth in the Approved Budget for such week, the Borrower shall be permitted, to the extent this Section 4.1 would otherwise be violated during any following week or weeks of the Approved Budget following such week, to deem such excess Net Cash Receipts to have been received during any of such week or weeks without duplication.

4.2    Cash Expenditures.

Except as Borrower and DIP Lender otherwise agree in writing, (a) the proceeds of the Revolving Loan and cash collateral of the Borrower shall be used by the Borrower solely for the purposes set forth in the Approved Budget, (b) aggregate expenditures under any line item of any Approved Budget for any week shall not exceed the sum of one hundred fifteen percent (115%) of the budgeted amount for such line item for such week plus any excess of the cumulative amounts budgeted for such line item during the periods elapsed since the Petition Date over the cumulative amount of Borrower' actual expenditures under such line item for such prior time period and (c) any unused portion of any line item in the Approved Budget may be carried forward (but not carried backward) to the same line item for any subsequent week in the Approved Budget; provided, that the unused portion of any line item may not be carried over to any other line item.

4.3    Financial Statements and Other Reports. Borrower will maintain a system of accounting established and administered in accordance with sound business practices to permit preparation of Financial Statements in conformity with GAAP (it being understood that monthly Financial Statements are not required to have footnote disclosures). Borrower will deliver each of the Financial Statements and other reports described below to DIP Lender (and DIP Lender in the case of the Financial Statements and other reports described in Sections (4.3)(a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (o), (q) and (r)).

(a)    Monthly Financials. As soon as available and in any event within fifteen (15) days after the end of each month (including the last month of Borrower' Fiscal Year), Borrower will deliver (1) the unaudited consolidated and consolidating balance sheets of Borrower as at the end of such month, and the related consolidated and consolidating statements of income, stockholders' equity and cash flow for such month and for the period from the beginning of the then current Fiscal Year of Borrower to the end of such month, (2) a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent Projections for the current Fiscal Year delivered pursuant to Section 4.3(f), and (3) a schedule of the outstanding Indebtedness for borrowed money describing in reasonable detail each such debt issue or

loan outstanding and the principal amount and amount of accrued and unpaid interest with respect to each such debt issue or loan.

      (b)    Quarterly Financials. As soon as available and in any event within fifteen (15) days after the end of each Fiscal Quarter (including the last Fiscal Quarter of Borrower' Fiscal Year), Borrower Representative will deliver (1) the unaudited consolidated and consolidating balance sheets as at the end of such Fiscal Quarter, and the related consolidated and consolidating statements of income, stockholders' equity and cash flow for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year of Borrower to the end of such Fiscal Quarter, (2) a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent Projections for the current Fiscal Year delivered pursuant to Section 4.3(f) and (3) a schedule of the outstanding Indebtedness for borrowed money describing in reasonable detail each such debt issue or loan outstanding and the principal amount and amount of accrued and unpaid interest with respect to each such debt issue or loan.

      (c)    Year-End Financials. As soon as available and in any event within sixty (60) days after the end of each Fiscal Year of Borrower, Borrower Representative will deliver (1) the consolidated and consolidating balance sheets as at the end of such year, and the related consolidated and consolidating statements of income, stockholders' equity and cash flow for such Fiscal Year, (2) a schedule of the outstanding Indebtedness for borrowed money describing in reasonable detail each such debt issue or loan outstanding and the principal amount and amount of accrued and unpaid interest with respect to each such debt issue or loan and (3) a report with respect to the consolidated Financial Statements from a firm of Certified Public Accountants selected by Borrower Representative and reasonably acceptable to DIP Lender which report shall be prepared in accordance with Statement of Auditing Standards No. 58 (the "Statement") "Reports on Audited Financial Statements" and such report shall be "Unqualified" (as such term is defined in such Statement).

      (d)    Accountants' Reports. Promptly upon receipt thereof, Borrower Representative will deliver copies of all significant reports submitted by Borrower' firm of certified public accountants in connection with each annual, interim or special audit or review of any type of the Financial Statements or related internal control systems of Borrower its Subsidiaries made by such accountants, including any comment letter submitted by such accountants to management in connection with their services.

      (e)    Management Report. Together with each delivery of Financial Statements pursuant to Sections 4.3(b) and (c) and, within thirty (30) days after the end of each month until the Termination Date, Borrower Representative will deliver a management report (1) describing the operations and financial condition of Borrower and its Subsidiaries for the period then ended and the portion of the current Fiscal Year then elapsed (or for the Fiscal Year then ended in the case of year-end financials) and (2) discussing the reasons for any significant variations and (3) describing any and all Asset Dispositions occurring in such period. The information above shall be presented in reasonable detail and shall be certified by the chief financial officer of Borrower Representative to the effect that such information fairly presents the results of operations and financial condition of Borrower and its Subsidiaries as at the dates and for the periods indicated.

(f)     Projections. As soon as available and in any event no later than 30 days prior to the last day of each of Borrower's Fiscal Year, Borrower Representative will deliver Projections of Borrower for the forthcoming three (3) calendar months, and for the forthcoming quarter, month by month.

(g)     Events of Default, Etc. Promptly upon any officer of Borrower obtaining knowledge of any of the following events or conditions, Borrower Representative shall deliver copies of all notices given or received by Borrower with respect to any such event or condition and a certificate of Borrower Representative specifying the nature and period of existence of such event or condition and what action Borrower has taken, is taking and proposes to take with respect thereto: (1) any condition or event that constitutes, or which could reasonably be expected to result in the occurrence of, an Event of Default or Default; (2) any notice that any Person has given to Borrower or any other action taken with respect to a claimed default or event or condition of the type referred to in Section 6.1(b); (3) any event or condition that could reasonably be expected to result in any Material Adverse Effect; or (4) any default or event of default with respect to any Indebtedness of Borrower.

(h)     Litigation. Promptly upon any officer of Borrower obtaining knowledge of (1) the institution of any action, charge, claim, demand, suit, proceeding, petition, governmental investigation, tax audit or arbitration now pending or, to the best knowledge of such Borrower, threatened against or affecting Borrower any property of Borrower ("Litigation") not previously disclosed by Borrower to DIP Lender and to the extent any such Litigation involves amounts in excess of $10,000 individually or $25,000 in the aggregate for all such Litigation or (2) any material development in any action, suit, proceeding, governmental investigation or arbitration at any time pending against or affecting Borrower any property of Borrower which, in each case in clauses (1) and (2), could reasonably be expected to have a Material Adverse Effect, Borrower Representative will promptly give notice thereof to DIP Lender and provide such other information as may be reasonably available to them to enable DIP Lender and its counsel to evaluate such matter.

(i)     Notice of Corporate and other Changes. Borrower Representative shall provide prompt written notice of (1) all jurisdictions in which a Borrower becomes qualified after the Closing Date to transact business, (2) any change after the Closing Date in the authorized and issued Stock of Borrower or any amendment to its articles or certificate of incorporation, by-laws, or other organizational documents, and (3) any other event that occurs after the Closing Date which would cause any of the representations and warranties in Section 5 of this Agreement to be untrue or misleading in any material respect. The foregoing notice requirement shall not be construed to constitute consent by any of the DIP Lender to any transaction referred to above which is not expressly permitted by the terms of this Agreement.

(j)     Omitted.

(k)     Other Information. With reasonable promptness, Borrower Representative will deliver such other information and data with respect to Borrower as from time to time may be reasonably requested by DIP Lender.

(l)     Compliance and Excess Cash Flow Certificate. Together with each delivery of Financial Statements pursuant to Sections 4.3(a), (b) and (c), Borrower Representative will deliver a fully

and properly completed Compliance and Excess Cash Flow Certificate (in substantially the same form as Exhibit 4.3(l) (the "Compliance and Excess Cash Flow Certificate") signed by the Borrower Representative.

(m)   Taxes. Borrower Representative shall provide prompt written notice of (i) the execution or filing with the IRS or any other Governmental Authority of any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges by Borrower and (ii) any agreement by Borrower request directed to Borrower to make any adjustment under IRC Section 481(a), by reason of a change in accounting method or otherwise, which in the case of (i) or (ii), could reasonably be expected to have a Material Adverse Effect.

(n)   Approved Budgets. On or prior to the Closing Date, Borrower Representative shall deliver to DIP Lender a budget setting forth all projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period from September 1, 2019 through and including January 31, 2020, a copy of which shall be attached as an Exhibit to the Interim Order (the "Initial Approved Budget"). The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) prepared by Borrower, delivered by Borrower Representative to DIP Lender and approved by the DIP Lender and Required DIP Lender in writing (each such additional budget, a "Supplemental Approved Budget").

4.4   Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement. For purposes of this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to such terms in conformity with GAAP. Financial statements and other information furnished to DIP Lender pursuant to Section 4.3 or any other section (unless specifically indicated otherwise) shall be prepared in accordance with GAAP as in effect at the time of such preparation; provided that no Accounting Change shall affect financial covenants, standards or terms in this Agreement; provided further that Borrower shall prepare footnotes to the Financial Statements required to be delivered hereunder that show the differences between the Financial Statements delivered (which reflect such Accounting Changes) and the basis for calculating financial covenant compliance (without reflecting such Accounting Changes). All such adjustments described in clause (c) of the definition of the term Accounting Changes resulting from expenditures made subsequent to the Closing Date (including capitalization of costs and expenses or payment of pre-Closing Date liabilities) shall be treated as expenses in the period the expenditures are made.

## SECTION 5.
## REPRESENTATIONS AND WARRANTIES

To induce DIP Lender to enter into the DIP Credit Facility and to make the Revolving Loan, Borrower represents, warrants and covenants to DIP Lender that the following statements are true, correct and complete in all material respects (without duplication of any materiality qualifier contained therein) until the Termination Date.

5.1   Disclosure. No representation or warranty of Borrower contained in this Agreement, the Financial Statements referred to in Section 5.5, or any other document, certificate or written statement

furnished to DIP Lender by or on behalf of Borrower for use in connection with the DIP Credit Facility contains any untrue statement of a material fact or omitted, omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.

5.2    No Material Adverse Effect. Since September 4, 2019, there have been no events or changes in facts or circumstances affecting Borrower which individually or in the aggregate have had or could reasonably be expected to have a Material Adverse Effect and that have not been disclosed herein or in the attached Disclosure Schedules.

5.3    No Conflict. The execution and delivery of the DIP Credit Facility does not and will not violate or conflict with any laws, rules, regulations or orders of any Governmental Authority or violate, conflict with, result in a breach of, or constitute a default (with due notice or lapse of time or both) under any Contractual Obligation or organizational documents of Borrower except if such violations, conflicts, breaches or defaults could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

5.4    Organization, Powers, Capitalization and Good Standing.

(a)    Organization and Powers. Borrower is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and qualified to do business in all states where such qualification is required except where failure to be so qualified could not reasonably be expected to have a Material Adverse Effect. The jurisdiction of organization and all jurisdictions in which Borrower is qualified to do business are set forth on Schedule 5.4(a). Upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), the Borrower has all requisite organizational power and authority to own and operate its properties, to carry on its business as now conducted and proposed to be conducted, to enter into this DIP Credit Facility to incur the Obligations and grant liens and security interests in the Collateral.

(b)    Binding Obligation. This Agreement is, and the other Related Transactions Documents when executed and delivered will be, the legally valid and binding obligations of the Borrower thereto, each enforceable against each of such parties, as applicable, in accordance with their respective terms.

5.5    Financial Statements and Projections. All Financial Statements concerning Borrower which have been or will hereafter be furnished to DIP Lender pursuant to this Agreement have been or will be prepared in accordance with GAAP consistently applied (except as disclosed therein) and do or will present fairly in all material respects the financial condition of the Borrower as at the dates thereof and the results of its operations for the periods then ended, subject to, in the case of unaudited Financial Statements, the absence of footnotes and normal year-end adjustments. The Projections delivered on or prior to the Closing Date and the updated Projections delivered pursuant to Section 4.3(f) represent and will represent as of the date thereof the good faith estimate of Borrower and the Borrower Representative concerning the most probable course of its businesses.

5.6    Intellectual Property. Borrower owns, is licensed to use or otherwise has the right to use, all Intellectual Property used in or necessary for the conduct of its business as currently conducted that is

22

material to the condition (financial or other), business or operations of such Borrower and all such Intellectual Property is identified on Schedule 5.6 and, to the extent necessary or material to the operations of Borrower' businesses, fully protected and/or duly and properly registered, filed or issued in the appropriate office and jurisdictions for such registrations, filings or issuances. Except as disclosed in Schedule 5.6, the use of such Intellectual Property by the Borrower and the conduct of its business does not and has not been alleged by any Person to infringe on the rights of any Person.

　　　5.7　　Investigations, Audits, Etc. As of the Closing Date, except as set forth on Schedule 5.7, no Borrower is the subject of any review or audit by the IRS or any governmental investigation concerning the violation or possible violation of any law.

　　　5.8　　Employee Matters. Except as set forth on Schedule 5.8, (a) no Borrower nor any of its respective employees is subject to any collective bargaining agreement, (b) no petition for certification or union election is pending with respect to the employees of Borrower and no union or collective bargaining unit has sought such certification or recognition with respect to the employees of Borrower or any of its Subsidiaries, (c) there are no strikes, slowdowns, work stoppages or controversies pending or, to the best knowledge of Borrower, threatened between Borrower and its respective employees, other than employee grievances arising in the ordinary course of business which could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect and (d) hours worked by and payment made to employees of Borrower comply in all material respects with the Fair Labor Standards Act and each other federal, state, local or foreign law applicable to such matters. Except as set forth on Schedule 5.8, Borrower is not party to an employment contract.

　　　5.9　　Approved Budgets. The Initial Approved Budget and each Supplemental Approved Budget submitted to DIP Lender by Borrower Representative will include and contain the Borrower' best estimate of all operational receipts and operational disbursements, fees, costs and other expenses that will be payable, incurred and/or accrued by any of the Borrower during the period covered by such Approved Budget and such operational disbursements, fees, costs and other expenses will be timely paid in the ordinary course of business of the Borrower unless such operational disbursements, fees, costs and other expenses are not incurred or otherwise payable.

　　　5.10　　Litigation; Adverse Facts. Except as set forth on Schedule 5.10, there are no judgments outstanding against Borrower or affecting any property of Borrower, nor is there any Litigation pending, or to the best knowledge of Borrower threatened, against Borrower which could reasonably be expected to result in any Material Adverse Effect.

　　　5.11　　Use of Proceeds.

　　　　　(a)　　Subject to Borrowing Availability and Section 4.3 hereof, Borrower shall utilize the proceeds of the Revolving Loan (net of any amounts used on the Closing Date to pay Fees) (a) for working capital and general corporate purposes including certain fees and expenses of professionals retained by the Borrower and the Committee, subject to the Carve-Out Amount, but excluding in any event the making of any Restricted Payment not specifically permitted by Section 6.14) and (b) certain other pre-petition expenses that are approved by the Bankruptcy Court and consented to by the DIP Lender. Borrower shall not be permitted to use the proceeds of the Revolving Loan: (i) for the payment of

interest and principal with respect to Subordinated Debt, (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of DIP Lender or its rights and remedies under this Agreement, the Interim Order or the Final Order, (iii) to make any distribution under a plan of reorganization in any Chapter 11 Case and (v) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of DIP Lender.

5.12    ERISA.

(a)    Schedule 5.14 lists all Plans and separately identifies all Pension Plans, including Title IV Plans, Multiemployer Plans, ESOPs and Welfare Plans, including all Retiree Welfare Plans. Copies of all such listed Plans, together with a copy of the latest form IRS/DOL 5500-series for each such Plan have been delivered to DIP Lender. Except with respect to Multiemployer Plans, each Qualified Plan has been determined by the IRS to qualify under Section 401 of the IRC, the trusts created thereunder have been determined to be exempt from tax under the provisions of Section 501 of the IRC, and nothing has occurred that would cause the loss of such qualification or tax-exempt status. Each Plan is in compliance with the applicable provisions of ERISA and the IRC, including the timely filing of all reports required under the IRC or ERISA, including the statement required by 29 CFR Section 2520.104-23. Borrower has not failed to make any contribution or pay any amount due as required by either Section 412 of the IRC or Section 302 of ERISA or the terms of any such Plan. Borrower has not engaged in a "prohibited transaction," as defined in Section 406 of ERISA and Section 4975 of the IRC, in connection with any Plan, that would subject Borrower to a material tax on prohibited transactions imposed by Section 502(i) of ERISA or Section 4975 of the IRC.

(b)    Except as set forth in Schedule 5.14: (i) no Title IV Plan has any Unfunded Pension Liability; (ii) no ERISA Event or event described in Section 4062(e) of ERISA with respect to any Title IV Plan has occurred or is reasonably expected to occur; (iii) there are no pending, or to the knowledge of any Borrower, threatened claims (other than claims for benefits in the normal course), sanctions, actions or lawsuits, asserted or instituted against any Plan or any Person as fiduciary or sponsor of any Plan; (iv) Borrower has not incurred, and does not reasonably expect to incur, any liability as a result of a complete or partial withdrawal from a Multiemployer Plan; (v) within the last five years no Title IV Plan of Borrower has been terminated, whether or not in a "standard termination" as that term is used in Section 404(b)(1) of ERISA, nor has any Title IV Plan of Borrower (determined at any time within the past five years) with Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of Borrower; (vi) except in the case of any ESOP, Stock of Borrower makes up, in the aggregate, no more than 10% of fair market value of the assets of any Plan measured on the basis of fair market value as of the latest valuation date of any Plan; and (vii) no liability under any Title IV Plan has been satisfied with the purchase of a contract from an insurance company that is not rated AAA by S&P or an equivalent rating by another nationally recognized rating agency.

5.13    Brokers. No broker or finder acting on behalf of Borrower brought about the obtaining, making or closing of the Revolving Loan, and no Borrower thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

5.14   Deposit and Disbursement Accounts. Schedule 5.16 lists all banks and other financial institutions at which Borrower maintains deposit or other accounts as of the Closing Date, including any Disbursement Accounts, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

5.15   Agreements and Other Documents. As of the Closing Date, Borrower has provided to DIP Lender or its counsel, on behalf of DIP Lender, accurate and complete copies (or summaries) of all of the following agreements or documents to which it is subject and each of which is listed in Schedule 5.17: supply agreements and purchase agreements not terminable by such Borrower within sixty (60) days following written notice issued by such Borrower and involving transactions in excess of $500,000 per annum; leases of Equipment having a remaining term of one year or longer and requiring aggregate rental and other payments in excess of $500,000 per annum; licenses and permits held by the Borrower, the absence of which could reasonably be expected to have a Material Adverse Effect; instruments and documents evidencing any Indebtedness or Guaranteed Indebtedness of such Borrower and any Lien granted by such Borrower with respect thereto; and instruments and agreements evidencing the issuance of any equity securities, warrants, rights or options to purchase equity securities of such Borrower.

5.16   Reorganization Matters.

(a)   The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motion seeking approval of the DIP Credit Facility and the Interim Order and Final Order, (y) the hearing for the approval of the interim order, and (z) the hearing for the approval of the Final Order. Borrower shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)   After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only to the Carve-Out Expenses up to the Carve-Out Amount.

(c)   After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on the thirty-three (33) Type Certificates identified on Annex B attached to this Agreement, including the related drawing packages and specialized tooling, and a subordinate Lien all the remainder of the Collateral.

(d)   The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

25

## SECTION 6.
## DEFAULT, RIGHTS AND REMEDIES

6.1    <u>Event of Default.</u> Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application, or motion to, hearing before, or order of the Bankruptcy Court or any notice to any Borrower, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default":

(a)    a default in any payment due under the terms of the DIP Credit Facility which is not cured within the time provided therein;

(b)    without the DIP Lender's prior written consent, the Borrower's exceeding any line item in the Borrower's approved budget by more than 15% of the amount reflected for that line item;

(c)    the loss or suspension by the Federal Aviation Administration of any Production Certificate issued to Borrower or Borrower's affiliate and pursuant to which Borrower is permitted to construct aircraft at its facility located in Albany, Georgia;

(d)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, to which the DIP Lender does not consent or otherwise agrees;

(e)    the entry of an order in the Chapter 11 Case confirming a plan of reorganization that does not contain a provision for termination of the DIP Credit Facility and repayment in full in cash of all of the Obligations under the DIP Credit Facility on or before the effective date of such plan, unless agreed otherwise by the DIP Lender;

(f)    the entry of an order amending, supplementing, staying, vacating, or otherwise modifying the terms of the DIP Credit Facility or the Interim Order or any Final Order without the written consent of the DIP Lender;

(g)    a Final Order is not entered immediately following the expiration of the Interim Order;

(h)    the payment of, or application for authority to pay, any pre-petition claim without the DIP Lender's prior written consent unless otherwise permitted under the DIP Credit Facility;

(i)    the appointment of an interim or permanent trustee in the Chapter 11 Case; or the sale without the DIP Lender's consent, of all or substantially all of any Borrower's assets either through a sale under Section 363 of the Bankruptcy Code or otherwise that does not provide for payment in full in cash of the DIP Credit Facility and termination of DIP Lender's commitment to make the Revolving Loan;

(j)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

26

(k)    the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Credit Facility;

(l)    the failure of the Borrower to perform any of its obligations under the Interim Order or the Final Order;

(m)    the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or lien equal or superior to that granted to DIP Lender;

(n)    the termination or expiration of the Management Services Agreement between Borrower and DIP Lender; and

(o)    the expiration of the time period covered by the Approved Budget.

6.2    Remedies.

(a)    If any Event of Default has occurred and is continuing, DIP Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the Revolving Loan facility with respect to additional advances, whereupon any additional Advances shall be made or incurred in DIP Lender's sole discretion (or in the sole discretion of the DIP Lender, if such suspension occurred at its direction) so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, DIP Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Revolving Loan to the Default Rate.

(b)    Subject to the terms of the Interim Order and Final Order, if any Event of Default has occurred and is continuing, DIP Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court: (i) terminate the Revolving Loan facility with respect to further Advances; (ii) reduce the Revolving Loan Commitment from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of any Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower and each other Borrower; (iv) direct the Borrower to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the DIP Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct Borrower to assume and assign any lease or executory contract included in the Collateral in accordance with and subject to Section 365 of the Bankruptcy Code), (v) enter onto the premises of Borrower in connection with an orderly liquidation of the Collateral, or (vi) exercise any rights and remedies provided to DIP Lender under the DIP Credit Facility or at law or equity, including all remedies provided under the Code; and pursuant to the Interim Order and the Final Order; provided, however, notwithstanding anything to the contrary contained in this Agreement, the DIP Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon 3 days' prior written notice to Borrower and counsel approved by the Bankruptcy Court for the Committee. Upon the occurrence of an Event of Default and the exercise by DIP Lender of its rights and remedies under

this Agreement, Borrower shall assist DIP Lender in effecting a sale or other disposition of the Collateral upon such terms as are acceptable to the DIP Lender. The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the DIP Credit Facility, and any Interim or Final Orders of the Bankruptcy Court.

6.3    Performance by DIP Lender. If Borrower shall fail to perform any covenant, duty or agreement contained in any of the DIP Credit Facility, DIP Lender may perform or attempt to perform such covenant, duty or agreement on behalf of such Borrower after the expiration of any cure or grace periods set forth herein. In such event, such Borrower shall, at the request of DIP Lender, promptly pay any amount reasonably expended by DIP Lender in such performance or attempted performance to DIP Lender, together with interest thereon at the highest rate of interest in effect upon the occurrence of an Event of Default as specified in Section 1.2(d) from the date of such expenditure until paid. Notwithstanding the foregoing, it is expressly agreed that DIP Lender shall not have any liability or responsibility for the performance of any obligation of Borrower under this Agreement.

6.4    Application of Proceeds. Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, (a) Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by DIP Lender from or on behalf of Borrower, and DIP Lender shall have the continuing and exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as DIP Lender may deem advisable notwithstanding any previous application by DIP Lender and (b) in the absence of a specific determination by DIP Lender with respect thereto, the proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied: first, to all Fees, costs and expenses incurred by or owing to DIP Lender a with respect to this Agreement, or the Collateral; second, to accrued and unpaid interest on the Obligations (including any interest which but for the provisions of the Bankruptcy Code, would have accrued on such amounts); third, to the principal amount of the Obligations outstanding; and fourth to any other obligations of Borrower owing to DIP Lender under the DIP Credit Facility . Any balance remaining shall be delivered to Borrower or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct.

## SECTION 7.
## CONDITIONS TO LOAN

The obligations of DIP Lender to make the Revolving Loan are subject to satisfaction of all of the applicable conditions set forth below.

7.1    Conditions to Revolving Loan. The obligations of DIP Lender to make the Initial Revolving Credit Advance on the Closing Date are, in addition to the conditions precedent specified in Section 7.2, subject to the following conditions precedent, all of which shall be waived or satisfied in form and substance, or in a manner, satisfactory to DIP Lender:

(a)    The Borrower shall have commenced the Chapter 11 Cases on or before September 6, 2019;

(b)    The Bankruptcy Court, upon due and proper notice to all creditors and parties in interest, of a final and non-appealable order pursuant to 11 U.S.C. § 364(c) in a form acceptable to DIP Lender authorizing the borrower to obtain the DIP Credit Facility (the "Order"). The Order must provide that all Obligations under the DIP Credit Facility, including funds advanced, interest, fees, and expenses, shall (i) have priority status pursuant to Bankruptcy Code §364(c)(1) over any and all administrative expenses and claims of any kind, including those specified in 11 U.S.C. §§ 105, 326, 328, 503(b), 506(c), 607(a), 726 and 1114, but subject and subordinate to priority for payment of professional fees and expenses of the Borrower under 11 U.S.C. §§ 330 and 331 or any order of the Bankruptcy Court allowing payment of professional fees and expenses of the Borrower on a final or interim basis to the extent provided in the budget and (ii) be secured by an automatically perfected lien in thirty-three (33) Type Certificates issued by the FAA and identified on Annex B to this Agreement and all related drawing packages and specialized tooling, which automatically perfected lien shall have priority over all other liens and security interests, and a second priority lien and security interest in substantially all the assets of the borrower, including now and hereafter acquired, tangible and intangible assets. The Order shall further contain an explicit determination that DIP Lender has extended credit to Borrower in good faith based on evidence presented at the hearing conducted in connection with the Borrower's motion; that the first priority lien to be granted DIP Lender may not be primed or supplanted by a senior or equal lien on that property under 11 U.S.C. § 364(d) or in any plan of reorganization; and that the property in which DIP Lender is to be granted a first priority lien shall not be subject to surcharge pursuant to 11 U.S.C. § 506(c);

(c)    A written budget, in form and substance satisfactory to DIP Lender in its sole and absolute discretion, shall have been approved by the DIP Lender and by the Bankruptcy Court in the Interim Order;

(d)    no adequate protection payments in excess of those provided in the approved budget shall have been ordered or approved by the Bankruptcy Court;

(e)    The Bankruptcy Court, upon due and proper notice to all creditors and parties in interest, shall have entered a final and non-appealable order approving a Management Services Agreement between the Borrower and DIP Lender, in form satisfactory to DIP Lender, under which the DIP Lender shall be afforded full access to the Borrower's premises in Albany, Georgia, the Borrower's books, and the Borrower's records, all for the purpose of managing the Borrower's business affairs while the DIP Credit Facility remains outstanding and under which the Borrower will provide appropriate office space at the Borrower's premises for the DIP Lender's representative.

(f)    The lender of KPH Properties II, Inc. shall have consented to a non-recourse pledge of collateral in favor of the DIP Lender consisting of the second mortgage on the property it owns currently in Albany, Georgia leased by Borrower.

(g)    KPH Properties II, Inc. shall have executed a second-priority deed to secure debt conveying the Albany, Georgia real property (leased by Borrower as of the Petition Date) to the DIP Lender to secure the Obligations evidencing the DIP Credit Facility, second in priority only to the prior lien or deed to secure debt of SB&T, a division of Synovus Bank, on the Albany, Georgia real property,

which secures the debt of Borrower in the approximate amount of $1,400,000.00; provided, however, that DIP Lender shall be able to obtain a lender's title insurance policy for the benefit of DIP Lender.

(h)      DIP Lender shall have received (i) satisfactory evidence that the Borrower has obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, in connection with the filing of the Chapter 11 Case and to the execution, delivery and performance of this Agreement and the DIP Credit Facility or (ii) an officer's certificate in form and substance reasonably satisfactory to DIP Lender affirming that no such consents or approvals are required;

(i)      Entry by the Bankruptcy Court of the Interim Order, by no later than 7 business days after the Petition Date in form and substance satisfactory to DIP Lender, among other things, (x) approving the transactions contemplated hereby, (y) granting a first priority perfected security interest in the Collateral subject only to the senior Wells Fargo lien on all assets of the Borrower other than the thirty-three (33) Type Certificates and related drawings and tooling, the Carve-Out Expenses up to the Carve-Out Amount, and (z) modifying the automatic stay to permit the creation and perfection of DIP Lender' Liens; provided, however, that the Interim Order shall further contain an explicit determination that DIP Lender has extended credit to Borrower in good faith based on evidence presented at the hearing conducted in connection with the Borrower's motion;

(j)      DIP Lender shall be satisfied with the corporate structure, capital structure, debt instruments, material contracts, and governing documents of Borrower, and the tax effects resulting from the commencement of the Chapter 11 Case and the credit facility evidenced by this Agreement; and

7.2      Additional Conditions to Revolving Loan. Except as otherwise expressly provided herein, the DIP Lender shall not be obligated to fund any Loan, if, as of the date of such Loan (the "Funding Date"):

(a)      any representation or warranty by Borrower contained herein or in any document associated with the DIP Credit Facility is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date and DIP Lender has determined not to make such Loan as a result of the fact that such warranty or representation is untrue or incorrect;

(b)      the Bankruptcy Court shall not have entered the Final Order on or before the date that is 60 days after the Petition Date, (ii) the Bankruptcy Court shall not have entered the Final Order following the expiration of the Interim Order, (iii) the Interim Order or the Final Order, as the case may be, shall have been vacated, stayed, reversed, modified or amended without DIP Lender' consent or shall otherwise not be in full force and effect, (iv) a motion for reconsideration of any such order shall have been timely filed or (v) an appeal of any such order shall have been timely filed and such order in any respect is the subject of a stay pending appeal;

(c)      all orders entered by the Bankruptcy Court on or prior to Funding Date shall be satisfactory in form and substance to DIP Lender and its counsel; or

(d)    any Default or Event of Default has occurred and is continuing or would result after giving effect to such Loan and DIP Lender has determined not to make such Loan as a result of that Default or Event of Default.

The request and acceptance by Borrower of the proceeds of any Loan shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by such Borrower that the conditions in this Section 7.2 have been satisfied and (ii) a reaffirmation by such Borrower of the granting and continuance of DIP Lender's Liens, on behalf of itself and DIP Lender, pursuant to the Collateral Documents.

## SECTION 8.
## MISCELLANEOUS

8.1    Indemnities. Borrower agrees to indemnify, pay, and hold DIP Lender and its respective officers, directors, employees, DIP Lender, and attorneys ("Indemnitees") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs and expenses (including all reasonable fees and expenses of counsel to such Indemnitees) of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Indemnitee as a result of such Indemnitees being a party to this Agreement or the transactions consummated pursuant to this Agreement or otherwise relating to any of the Related Transactions; provided, that Borrower shall have any obligation to an Indemnitee hereunder with respect to liabilities to the extent resulting from the gross negligence or willful misconduct of that Indemnitee as determined by a court of competent jurisdiction. If and to the extent that the foregoing undertaking may be unenforceable for any reason, Borrower agrees to make the maximum contribution to the payment and satisfaction thereof which is permissible under applicable law.

8.2    Amendments and Waivers.

(a)    Except for actions expressly permitted to be taken by DIP Lender, no amendment, modification, termination or waiver of any provision of this Agreement or any consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Borrower or DIP Lender, as applicable.

8.3    Notices. Any notice or other communication required shall be in writing addressed to the respective party as set forth below and may be personally served, e-mailed, telecopied, sent by overnight courier service or U.S. mail and shall be deemed to have been given: (a) if delivered in person, when delivered; (b) if delivered by email or fax, on the date of transmission if transmitted on a Business Day before 5:00 p.m. Georgia Time; (c) if delivered by overnight courier, one (1) Business Day after delivery to the courier properly addressed; or (d) if delivered by U.S. mail, four (4) Business Days after deposit with postage prepaid and properly addressed.

Notices shall be addressed as follows:

If to Borrower:
Thrush Aircraft, Inc.

300 Old Pretoria Road
Albany, Georgia 31712


If to DIP Lender:

HHM Aviation Financing, LLC
325 N River Rd NE
Rome, Georgia. 30161

8.4     Failure or Indulgence Not Waiver; Remedies Cumulative. No failure or delay on the part of DIP Lender or any DIP Lender to exercise, nor any partial exercise of, any power, right or privilege hereunder or under the DIP Credit Facility shall impair such power, right, or privilege or be construed to be a waiver of any Default or Event of Default. All rights and remedies existing hereunder or under the DIP Credit Facility are cumulative to and not exclusive of any rights or remedies otherwise available.

8.5     Marshaling; Payments Set Aside. DIP Lender shall be under no obligation to marshal any assets in payment of any or all of the Obligations. To the extent that Borrower make payment(s) or DIP Lender enforces its Liens or DIP Lender exercises its right of set-off, and such payment(s) or the proceeds of such enforcement or set-off is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred

8.6     Severability. The invalidity, illegality, or unenforceability in any jurisdiction of any provision under the DIP Credit Facility shall not affect or impair the remaining provisions in the DIP Credit Facility.

8.7     Headings. Section and subsection headings are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purposes or be given substantive effect.

8.8     Applicable Law. THIS AGREEMENT AND EACH OF THE OTHER DIP CREDIT FACILITY WHICH DOES NOT EXPRESSLY SET FORTH APPLICABLE LAW SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF GEORGIA, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

8.9     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns except that Borrower may not assign their rights or obligations hereunder without the written consent of DIP Lender except in connection with any consent provided by DIP Lender under Section 1.5(h).

8.10    No Fiduciary Relationship; Limited Liability. No provision in the DIP Credit Facility and no course of dealing between the parties shall be deemed to create any fiduciary duty owing to Borrower by DIP Lender. Borrower agrees that DIP Lender shall have no liability to Borrower (whether sounding in tort, contract or otherwise) for losses suffered by Borrower in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the DIP Credit Facility, or any act, omission or event occurring in connection therewith, unless and to the extent that it is determined that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought as determined by a final non-appealable order by a court of competent jurisdiction. DIP Lender shall have no liability with respect to, and Borrower hereby waives, releases and agrees not to sue for, any special, indirect or consequential damages suffered by Borrower in connection with, arising out of, or in any way related to the DIP Credit Facility or the transactions contemplated thereby.

8.11    Construction. DIP Lender, Borrower each acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review the DIP Credit Facility with its legal counsel and that the DIP Credit Facility shall be construed as if jointly drafted by DIP Lender and Borrower.

8.12    Confidentiality. DIP Lender agrees to exercise its best efforts to keep confidential any non-public information delivered pursuant to the DIP Credit Facility and identified as such by Borrower and not to disclose such information to Persons other than Persons employed by or engaged by DIP Lender including attorneys, auditors, professional consultants, rating agencies, insurance industry associations and portfolio management services. The confidentiality provisions contained in this Section 9.13 shall not apply to disclosures (i) required to be made by DIP Lender to any regulatory or governmental agency or pursuant to legal process or (ii) consisting of general portfolio information that does not identify Borrower. The obligations of DIP Lender under this Section 9.13 shall supersede and replace the obligations of DIP Lender under any confidentiality agreement in respect of this financing executed and delivered by DIP Lender prior to the date hereof.

8.13    Survival of Warranties and Certain Agreements. All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement, the making of the Revolving Loan, and the execution and delivery of the Notes. Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements of Borrower set forth in Sections 1.3(b), 1.10 and 9.1 shall survive the repayment of the Obligations and the termination of this Agreement.

8.14    Entire Agreement. This Agreement, the Notes, and the DIP Credit Facility embody the entire agreement among the parties hereto and supersede all prior commitments, agreements, representations, and understandings, whether oral or written, relating to the subject matter hereof, and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. All Exhibits, Schedules and Annexes referred to herein are incorporated in this Agreement by reference and constitute a part of this Agreement.

8.15    Counterparts; Effectiveness. This Agreement and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which

counterparts together shall constitute but one in the same instrument. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto.

8.16    Delivery of Termination Statements and Mortgage Releases. Upon payment in full in cash and performance of all of the Obligations (other than indemnification Obligations), termination of the Revolving Loan Commitments and a release of all claims against DIP Lender, and so long as no suits, actions proceedings, or claims are pending or threatened against any Indemnitee asserting any damages, losses or liabilities that are indemnified liabilities hereunder, DIP Lender shall deliver to Borrower Representative termination statements, mortgage releases and other documents necessary or appropriate to evidence the termination of the Liens securing payment of the Obligations.

[Signature Pages Follow]

Witness the due execution hereof by the respective duly authorized officers of the undersigned as of the date first written above.

**THRUSH AIRCRAFT, INC.**

By: _____
Name: _____
Title: _____


**HHM AVIATION FINANCING, LLC**


By: _____
Name: J. Mark McDonald
Title: Manager


g:\clients\thrush aircraft\dip financing\dip credit agreement.final.9.10.2019.docx

.

**ANNEX A**
**to**
**CREDIT AGREEMENT**

**DEFINITIONS**

Capitalized terms used in the DIP Credit Facility shall have (unless otherwise provided elsewhere in the DIP Credit Facility) the following respective meanings and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Agreement:

"Account Debtor" means any Person who may become obligated to Borrower under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a payment intangible).

"Accounting Changes" means: (a) changes in accounting principles required by GAAP and implemented by Borrower; (b) changes in accounting principles recommended by Borrower' certified public accountants and implemented by Borrower; and (c) changes in carrying value of Borrower' or any of its Subsidiaries' assets, liabilities or equity accounts resulting from (i) the application of purchase accounting principles (A.P.B. 16 and/or 17 and EITF 88-16 and FASB 109) to the Related Transactions or (ii) as the result of any other adjustments that, in each case, were applicable to, but not included in, the Pro Forma.

"Accounts" means all "accounts," as such term is defined in the Code, now owned or hereafter acquired by Borrower, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments), (including any such obligations that may be characterized as an account or contract right under the Code), (b) all of Borrower's rights in, to and under all purchase orders or receipts for goods or services, (c) all of Borrower's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to Borrower for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Borrower or in connection with any other transaction (whether or not yet earned by performance on the part of such Borrower), (e) all healthcare insurance receivables, and (f) all collateral security of any kind, now or hereafter in existence, given by any Account Debtor or other Person with respect to any of the foregoing.

"Agreement" means this Credit Agreement (including all schedules, sub-schedules, annexes and exhibits hereto), as the same may be amended, supplemented, restated or otherwise modified from time to time.

"Approved Budget" means the aggregate, without duplication, of all items approved by DIP Lender in the Initial Approved Budget and all Supplemental Approved Budgets.

"Asset Disposition" means the disposition whether by sale, lease, transfer, loss, damage, destruction, casualty, condemnation or otherwise of any of the following: (a) any of the Stock or other equity or ownership interest of any of Borrower' Subsidiaries or (b) any or all of the assets of Borrower or any of its Subsidiaries.

"Bankruptcy Code" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. or any other applicable bankruptcy, insolvency or similar laws.

"Bankruptcy Court" shall have the meaning assigned to it in the recitals to the Agreement.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"Borrower" means Thrush Aircraft, Inc.

"Borrower Representative" means K. Payne Hughes in his capacity as Borrower Representative pursuant to the provisions of Section 1.1(b), until such time as the Management Services Agreement takes effect, upon which time Stan Logue shall become the Borrower Representative.

"Borrower" and "Borrower" have the respective meanings ascribed thereto in the preamble to the Agreement.

"Borrower's Professionals" has the meaning ascribed to it in Section 1.12(c).

"Borrowing Availability" has the meaning ascribed to it in Section 1.1(a)(i).

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of Georgia.

"Capital Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, would be required to be classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligation" means, with respect to any Capital Lease of any Person, the amount of the obligation of the lessee thereunder that, in accordance with GAAP, would appear on a balance sheet of such lessee in respect of such Capital Lease.

"Carve-Out Amount" has the meaning ascribed to it in Section 1.12(c).

"Carve-Out Expenses" has the meaning ascribed to it in Section 1.12(c).

-2-

"Carve-Out Reserve" means a Reserve against Borrowing Availability in an amount at any time equal to the sum of (a) $100,000, plus (b) the cumulative amount of fees and expenses of Retained Professionals that were budgeted in the Approved Budget for the period from the Petition Date through and including such time; minus (c) Carve-Out Expenses actually paid during such period; provided, however, that if aggregate actual Carve-Out Expenses for any period exceed the amounts budgeted for such period, DIP Lender, in its reasonable credit judgment, may retain additional amounts in the Carve-Out Reserve to account for such excess.

"Change of Control" means any event, transaction or occurrence as a result of which (a) Payne Hughes ceases to own and control all of the economic and voting rights associated with ownership of at least fifty-three percent (53%) of all classes of the outstanding Stock of Borrower on a fully diluted basis (calculated in accordance with the treasury stock method), (ii) directly or indirectly have the power to elect a majority of the board of directors of Borrower or (iii) be the chief executive officer of Borrower (or otherwise ceases having primary responsibility for performing the functions of senior management of Borrower) , provided that Borrower's entering into the Management Services Agreement, or the same going into effect shall not constitute a Change in Control for the purposes of this Agreement.

"Chapter 11 Case" has the meanings ascribed thereto in the Recitals to the Agreement

"Charges" means all federal, state, county, city, municipal, local, foreign or other governmental taxes, levies, assessments, charges, liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Borrower, (d) any Borrower's ownership or use of any properties or other assets, or (e) any other aspect of any Borrower's business.

"Chattel Paper" means any "chattel paper," as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by any Borrower, wherever located.

"Closing Date" means the first date upon which the conditions precedent in Section 7.1 of this Agreement have been satisfied or waived by the DIP Lender in its sole discretion.

"Code" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of Georgia; provided, that to the extent that the Code is used to define any term herein or in any DIP Credit Facility and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, DIP Lender's or any DIP Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Georgia, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

-3-

"Collateral" means all Assets of the Borrower and any other property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of DIP Lender, on behalf of itself and DIP Lender, to secure the Obligations or any portion thereof, including but not limited to all assets of Borrower, whether real, personal or mixed (including, without limitation, accounts, inventory, chattel paper, instruments, documents, general intangibles, fixtures, and fee and leasehold interests in real estate), but subject to the lien of Wells Fargo, except as to Thirty-three (33) FAA issued Type Certificates shown on Annex B, against which DIP Lender shall have a first lien.

"Commitment Termination Date" means, unless earlier terminated as described in this Agreement, the later of (1) December 1, 2019; (2) 90 days from the initial advance; (3) the effective date of the Borrower's Plan of Reorganization, unless DIP Lender has agreed to extend the financing beyond the effective date and continue to fund the company in support of the plan; (4) consummation of a 363 sale under the Bankruptcy Code; or (5) upon the occurrence of an Event of Default, in which the case the DIP Credit Facility will terminate, the obligations will be immediately due and payable, and DIP Lender will exercise all rights and remedies available to it under this Agreement and under any Interim or Final Order of the Court.

"Committees" shall mean collectively, the official committee of unsecured creditors and any other committee formed, appointed, or approved in any Chapter 11 Case and each of such Committees shall be referred to herein as a Committee.

"Committee Professionals" has the meaning ascribed to it in Section 1.12(c).

"Compliance, and Excess Cash Flow Certificate" has the meaning ascribed to it in Section 4.3.

"Contingent Obligation" means, as applied to any Person, means any direct or indirect liability of that Person: (i) with respect to Guaranteed Indebtedness and with respect to any Indebtedness, lease, dividend or other obligation of another Person if the purpose or intent of the Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (ii) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (iii) under any foreign exchange contract, currency swap agreement, interest rate swap agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, (iv) any agreement, contract or transaction involving commodity options or future contracts, (v) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement, or (vi) pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed.

-4-

"<u>Contractual Obligations</u>" means, as applied to any Person, any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject including the Related Transactions Documents.

"<u>Copyright License</u>" means any and all rights nor owned or hereafter acquired by Borrower under any written agreement granting any right to use any Copyright or Copyright registration.

"<u>Copyrights</u>" means all of the following now owned or hereafter adopted or acquired by any Borrower: (a) all copyrights and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; and (b) all reissues, extensions or renewals thereof.

"<u>Current Assets</u>" means, all current assets of Borrower as of any date of determination calculated in accordance with GAAP.

"<u>Current Liabilities</u>" means, with respect to Borrower, all liabilities that should, in accordance with GAAP, be classified as current liabilities, and in any event shall include all Indebtedness payable on demand or within one year from any date of determination without any option on the part of the obligor to extend or renew beyond such year, all accruals for federal or other taxes based on or measured by income and payable within such year, but excluding the current portion of long-term debt required to be paid within one year.

"<u>Default</u>" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"<u>Default Rate</u>" has the meaning ascribed to it in <u>Section 1.2(d)</u>.

"<u>DIP Credit Facility</u>" means the Agreement, the Notes, the Collateral Documents, and all other agreements, instruments, documents executed and delivered to, or in favor of, DIP Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrower, or any employee of Borrower, and delivered to DIP Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement to a DIP Credit Facility shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such DIP Credit Facility as the same may be in effect at any and all times such reference becomes operative.

"<u>DIP Lender</u>" means HHM Aviation Financing, LLC.

"<u>DIP Liens</u>" has the meaning ascribed to it in <u>Section 1.12(c)</u>.

"Disclosure Schedules" means the Schedules prepared by Borrower and denominated as Schedules 3.2 through 5.18 in the index to the Agreement.

"Documents" means any "document," as such term is defined in the Code, including electronic documents, now owned or hereafter acquired by any Borrower, wherever located.

"Dollars" or "$" means lawful currency of the United States of America.

"Environmental Laws" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) et seq.), and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equipment" means all "equipment," as such term is defined in the Code, now owned or hereafter acquired by any Borrower, wherever located and, in any event, including all such Borrower's machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment, including embedded software and

peripheral equipment and all engineering, processing and manufacturing equipment, office machinery, furniture, materials handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties and rights with respect thereto, and all products and proceeds thereof and condemnation awards and insurance proceeds with respect thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulations promulgated thereunder.

"ERISA Event" means, with respect to Borrower, (a) any event described in Section 4043(c) of ERISA with respect to a Title IV Plan; (b) the withdrawal of Borrower from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of Borrower from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (f) the failure by Borrower to make when due required contributions to a Multiemployer Plan or Title IV Plan unless such failure is cured within 30 days; (g) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of liability under Section 4069 or 4212(c) of ERISA; (h) the termination of a Multiemployer Plan under Section 4041A of ERISA or the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; or (i) the loss of a Qualified Plan's qualification or tax exempt status; or (j) the termination of a Plan described in Section 4064 of ERISA.

"Event of Default" has the meaning ascribed to it in Section 6.1.

"Fees" means any and all fees payable to DIP Lender or any DIP Lender pursuant to the Agreement or the DIP Credit Facility.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the DIP Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the DIP Lender waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to DIP Lender, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the DIP Credit Facility, as the case may be, and provides for the super priority of the DIP Lender's and the DIP Lender' claims.

"<u>Financial Statements</u>" means the consolidated and consolidating income statements, statements of cash flows and balance sheets of Holdings, Borrower and its Subsidiaries delivered in accordance with <u>Section 4.3</u>.

"<u>First-Priority Collateral</u>" means all assets of Borrower and of its bankruptcy estate, whether real, personal or mixed (including, without limitation, accounts, inventory, chattel paper, instruments, documents, general intangibles, fixtures, and fee and leasehold interests in real estate) acquired by the estate or by the Borrower after the commencement of the case that are not subject to any lien resulting from any security agreement entered into by the Borrower before the commencement of the case and which do not constitute proceeds, products, offspring, or profits of property that that was the subject of any security agreement entered into by the Borrower before the commencement of the case, as provided under 11 U.S.C. § 552(a) and (b), including thirty-three (33) Type Certificates issued by the Federal Aviation Administration and the related drawing packages and specialized tooling.

"<u>Fiscal Quarter</u>" means any of the quarterly accounting periods of Borrower, ending on March 31, June 30, September 30 and December 31 of each year.

"<u>Fiscal Year</u>" means any of the annual accounting periods of Borrower ending on December 31 of each year.

"<u>Fixtures</u>" means all "fixtures" as such term is defined in the Code, now owned or hereafter acquired by any Borrower.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, consistently applied.

"<u>General Intangibles</u>" means "general intangibles," as such term is defined in the Code, now owned or hereafter acquired by any Borrower, including all right, title and interest that such Borrower may now or hereafter have in or under any Contractual Obligation, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all insurance, and all unearned premiums), uncertificated securities, choses in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, rights of indemnification, all books and records, correspondence, credit files, invoices and other papers, including all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Borrower or any computer bureau or service company from time to time acting for such Borrower.

"Goods" means any "goods," as such term is defined in the Code, now owned or hereafter acquired by any Borrower, wherever located, including embedded software to the extent included in "goods" as defined in the Code, manufactured homes, standing timber that is cut and removed for sale and unborn young of animals.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guaranties" means, collectively, each guaranty executed by any Guarantor in favor of DIP Lender in respect of the Obligations.

"Guarantors" means any other person who executes a guaranty or other similar agreement in favor of DIP Lender, for itself and the ratable benefit of DIP Lender, in connection with the transactions contemplated by the Agreement and the DIP Credit Facility.

"Hazardous Material" means any substance, material or waste that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a "solid waste," "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "contaminant," "hazardous constituent," "special waste," "toxic substance" or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"Indebtedness" means, with respect to any Person, without duplication (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property payment for which is deferred six (6) months or more, but excluding obligations to trade creditors incurred in the ordinary course of business that are unsecured and not overdue by more than six (6) months unless being contested in good faith, (b) all reimbursement and other obligations with respect to letters of credit, bankers' acceptances and surety bonds, whether or not matured, (c) all obligations evidenced by notes, bonds, debentures or similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations and the present value (discounted at the Index Rate as in effect on the Closing Date) of future rental payments under all synthetic leases, (f) all obligations of such Person under commodity purchase or option agreements or other commodity price hedging arrangements, in each case whether contingent or matured, (g) all obligations of such Person under any foreign exchange contract, currency swap agreement, interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether contingent or matured, (h) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, (i) "earnouts" and similar payment obligations, and (j) the Obligations.

"Indemnitees" has the meaning ascribed to it in Section 9.1.

"Index Rate" means, for any day, a floating rate equal to the higher of (i) the rate publicly quoted from time to time by The Wall Street Journal as the "prime rate" (or, if The Wall Street Journal ceases quoting a prime rate, the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the Bank prime loan rate or its equivalent), and (ii) the Federal Funds Rate plus 50 basis points per annum. Each change in any interest rate provided for in the Agreement based upon the Index Rate shall take effect at the time of such change in the Index Rate.

"Instruments" means all "instruments," as such term is defined in the Code, now owned or hereafter acquired by any Borrower, wherever located, and, in any event, including all certificated securities, all certificates of deposit, and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks.

"Interest Payment Date" means the last Business Day of each March, June, September and December of each year to occur while the Revolving Loan is outstanding; provided, that, in addition to the foregoing, the date upon which the Revolving Loan has been paid in full shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued under the Agreement.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance satisfactory to DIP Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower to execute and perform under the terms of this Agreement and the DIP Credit Facility, substantially in the form of Exhibit A-1.

"Inventory" means any "inventory," as such term is defined in the Code, now owned or hereafter acquired by any Borrower, wherever located, including inventory, merchandise, goods and other personal property that are held by or on behalf of Borrower for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, supplies or materials of any kind, nature or description used or consumed or to be used or consumed in such Borrower's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"IRC" means the Internal Revenue Code of 1986, as amended, and all regulations promulgated thereunder.

"IRS" means the Internal Revenue Service.

"License" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by any Borrower.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"Litigation" has the meaning ascribed to it in Section 4.3(h).

"Loan Account" has the meaning ascribed to it in Section 1.7.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or financial or other condition of the Borrower considered as a whole, (b) any Borrower's ability to pay the Revolving Loan or any of the other Obligations in accordance with the terms of the Agreement, (c) the Collateral or DIP Lender's Liens, on behalf of itself and DIP Lender, on the Collateral or the priority of such Liens, or (d) DIP Lender's or any DIP Lender's rights and remedies under the Agreement and the DIP Credit Facility. Without limiting the generality of the foregoing, any event or occurrence adverse to Borrower which results or could reasonably be expected to result in costs and/or liabilities in excess of $3,000,000 shall constitute a Material Adverse Effect.

"Maximum Facility Amount" means $1,200,000.00.

"Maximum Lawful Rate" has the meaning ascribed to it in Section 1.2(f).

"Net Proceeds" means cash proceeds received by Borrower from any Asset Disposition (including insurance proceeds, awards of condemnation, and payments under notes or other debt securities received in connection with any Asset Disposition), net of (a) the costs of such Asset Disposition (including taxes attributable to such sale, lease or transfer) and (b) amounts applied to repayment of Indebtedness (other than the Obligations) secured by a Lien on the asset or property disposed.

"Notes" means, collectively the Revolving Notes.

"Notice of Revolving Credit Advances" has the meaning ascribed to it in Section 1.1(a)(i).

"Obligations" means all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable), owing by Borrower to DIP Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Agreement or any of the DIP Credit Facility. This term includes all principal, interest (including all interest that accrues after the

-11-

commencement of any case or proceeding by or against Borrower in bankruptcy, whether or not allowed in such case or proceeding), Fees, Charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the DIP Credit Facility.

"Patent License" means rights under any written agreement now owned or hereafter acquired by Borrower granting any right with respect to any invention on which a Patent is in existence.

"Patents" means all of the following in which Borrower now holds or hereafter acquires any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or of any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or any other country, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"Pension Plan" means a Plan described in Section 3(2) of ERISA.

"Permitted Encumbrances" means the following encumbrances: (a) Liens for taxes or assessments or other governmental Charges not yet due and payable; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which Borrower is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business, so long as such Liens attach only to Equipment, Fixtures and/or Real Estate; (e) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business and securing liabilities in an outstanding aggregate amount not in excess of $10,000 at any time, so long as such Liens attach only to Inventory; (f) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which Borrower is a party; (g) any attachment or judgment lien not constituting an Event of Default under Section 6.1; (h) zoning restrictions, easements, licenses, or other restrictions on the use of any Real Estate or other minor irregularities in title (including leasehold title) thereto, so long as the same do not materially impair the use, value, or marketability of such Real Estate; (i) presently existing or hereafter created Liens in favor of DIP Lender, on behalf of DIP Lender; (j) Liens existing on the date hereof and renewal, and extensions thereof which Liens are set forth on Schedule 3.2; and (k) Liens securing Indebtedness permitted by Section 3.1(c) provided that the Liens attach only to the assets financed by such Indebtedness; (l) liens in favor of Wells Fargo, (n) Liens arising pursuant to purchase money security interests securing Indebtedness representing the purchase price (or financing of the purchase price within 90 days after the respective purchase) of assets acquired after the Closing Date, provided that (1) any such Liens attach only to the assets so purchased, upgrades thereon and, if the asset so purchased is an upgrade, the original asset itself (and such other assets financed by the same financing source), (2) the Indebtedness (other than Indebtedness incurred from the same financing source to purchase other assets and excluding Indebtedness representing obligations to pay installation and delivery charges for the property so purchased) secured by any such Lien does not exceed 100% of the lesser of the fair market value or the purchase price of the property being purchased at the

-12-

time of the incurrence of such Indebtedness and (3) the Indebtedness secured thereby is permitted to be incurred pursuant to <u>Section 3.1(e)</u> of the Agreement.

"<u>Person</u>" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"<u>Petition Date</u>" has the meaning ascribed to it in the Recitals of the Agreement.

"<u>Post-petition</u>" means the time period beginning immediately after the filing of the Chapter 11 Cases.

"<u>Prepetition</u>" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"<u>Pro Forma</u>" means the unaudited consolidated and consolidating balance sheets of Borrower prepared in accordance with GAAP as of the Closing Date. "<u>Projections</u>" means Borrower' forecasted consolidated and consolidating: (a) balance sheets; (b) profit and loss statements; (c) cash flow statements; and (d) capitalization statements consistent with the historical Financial Statements of Borrower, together with appropriate supporting details and a statement of underlying assumptions.

"<u>Production Certificate</u>" shall have the meaning ascribed to it by federal law, including but not limited to the definition set forth in 14 C.F.R. § 21.131 *et seq.*

"<u>Proposed Change</u>" has the meaning ascribed to it in <u>Section 9.19(c)</u>.

"<u>Qualified Plan</u>" means a Pension Plan that is intended to be tax-qualified under Section 401(a) of the IRC.

"<u>Real Estate</u>" has the meaning ascribed to it in <u>Section 5.12</u>.

"<u>Release</u>" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"<u>Released Parties</u>" shall have the meaning ascribed to it in <u>Section 1.15</u>.

"<u>Releasing Parties</u>" shall have the meaning ascribed to it in <u>Section 1.15</u>.

"<u>Reserves</u>" means, (a) reserves established by DIP Lender from time to time in accordance with the terms of this Agreement, (b) the Carve-Out Reserve, and (c) such other reserves which DIP Lender may, in the exercise of its reasonable credit judgment, establish from time to time. Without limiting generality of the foregoing, Reserves established to ensure the

-13-

payment of past due charges, accrued interest expense, Fees or Indebtedness shall be deemed to be a reasonable exercise of DIP Lender's credit judgment.

"Retained Professionals" has the meaning ascribed to it in Section 1.12(c).

"Retiree Welfare Plan" means, at any time, a Welfare Plan that provides for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to Section 4980B of the IRC and at the sole expense of the participant or the beneficiary of the participant.

"Revolving Credit Advance" has the meaning ascribed to it in Section 1.1(a)(i).

"Revolving Loan" means, at any time, the aggregate amount of Revolving Credit Advances outstanding to Borrower.

"Revolving Loan Commitment" means (a) as to any DIP Lender, the aggregate commitment of such DIP Lender to make Revolving Credit Advances and (b) as to all DIP Lender, the aggregate commitment of all DIP Lender to make Revolving Credit Advances or incur Letter of Credit Obligations, which aggregate commitment shall be Three Million Dollars ($3,000,000) on the Closing Date, as such amount may be adjusted, if at all, from time to time in accordance with the Agreement.

"Revolving Note" has the meaning ascribed to it in Section 1.1(a)(ii).

"Reserves"

"Senior Permitted Encumbrances" means the Permitted Encumbrances, including any non-avoidable, valid and enforceable liens and security interests in existence on the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, but only to the extent such Permitted Encumbrances (i) exist as of the Petition Date, and (ii) are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

"Settlement Date" has the meaning ascribed to it in Section 8.5(a)(ii).

"Software" means all "software" as such term is defined in the Code, now owned or hereafter acquired by any Borrower, other than software embedded in any category of Goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Termination Date" means the date on which (a) the Revolving Loan Commitments have terminated, (b) the Revolving Loan has been indefeasibly repaid in full and (c) all other Obligations under the Agreement and the DIP Credit Facility have been completely discharged.

"Type Certificate" shall have the meaning ascribed to it by federal law, including but not limited to the definition set forth in 14 C.F.R. § 21.11 *et seq.*

-14-

"<u>Unfunded Pension Liability</u>" means, at any time, the aggregate amount, if any, of the sum of (a) the amount by which the present value of all accrued benefits under each Title IV Plan exceeds the fair market value of all assets of such Title IV Plan allocable to such benefits in accordance with Title IV of ERISA, all determined as of the most recent valuation date for each such Title IV Plan using the actuarial assumptions for funding purposes in effect under such Title IV Plan, and (b) for a period of 5 years following a transaction which might reasonably be expected to be covered by Section 4069 of ERISA, the liabilities (whether or not accrued) that could be avoided by Borrower as a result of such transaction.

"<u>Welfare Plan</u>" means a Plan described in Section 3(1) of ERISA.

Rules of construction with respect to accounting terms used in the Agreement or the DIP Credit Facility shall be as set forth or referred to in this <u>Annex A</u>. All other undefined terms contained in any of the DIP Credit Facility shall, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Code, the definition contained in Article or Division 9 shall control. Unless otherwise specified, references in the Agreement or any of the Appendices to a Section, subsection or clause refer to such Section, subsection or clause as contained in the Agreement. The words "herein," "hereof" and "hereunder" and other words of similar import refer to the Agreement as a whole, including all Annexes, Exhibits and Schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Annex, Exhibit or Schedule.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the DIP Credit Facility) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations. Whenever any provision in any DIP Credit Facility refers to the knowledge (or an analogous phrase) of any Borrower, such words are intended to signify that such Borrower has actual knowledge or awareness of a particular fact or circumstance or that such Borrower, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

-15-

ANNEX B
to
**CREDIT AGREEMENT**

**Thirty-Three (33) FAA-Issued Type Certificates**

TCDS: TCDS No. A3SW, Rev. No. 19, Thrush Aircraft, Inc.
TCDS: TCDS No. 2A7, Rev. No. 17, Thrush Aircraft, Inc.
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-R1820
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-T45
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-G5
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2RHG-T34
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-G6
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-H80
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-T660
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-R1340
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2RHG-T65
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-T65
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-T34
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-G10
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-G1
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-T11
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., 600 S-2D
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-T15
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc., S2R-R3S
Model: TCDS No. A4SW, Rev. No. 34, Thrush Aircraft, Inc.
Model: TCDS No. A3SW, Rev. No. 19, Thrush Aircraft, Inc., 600 S-2D
Model: TCDS No. A3SW, Rev. No. 19, Thrush Aircraft, Inc., S2R-R3S
Model: TCDS No. A3SW, Rev. No. 19, Thrush Aircraft, Inc., S2R-R1340
Model: TCDS No. A3SW, Rev. No. 19, Thrush Aircraft, Inc., S2R-T11
Model: TCDS No. A3SW, Rev. No. 19, Thrush Aircraft, Inc., S2R-T15
Model: TCDS No. A3SW, Rev. No. 19, Thrush Aircraft, Inc., S2R
Model: TCDS No. A3SW, Rev. No. 19, Thrush Aircraft, Inc., S2R-T34
Model: TCDS No. 2A7, Rev. No. 17, Thrush Aircraft, Inc., S2B
Model: TCDS No. 2A7, Rev. No. 17, Thrush Aircraft, Inc., 600 S-2C
Model: TCDS No. 2A7, Rev. No. 17, Thrush Aircraft, Inc., S-2C
TCDS: TCDS No. 2A9, Rev. No. 13, Thrush Aircraft, Inc.
Model: TCDS No. 2A9, Rev. No. 13, Thrush Aircraft, Inc., S2A

EXHIBIT 4.3(l)

## COMPLIANCE CERTIFICATE

Date: _____, _____

This Certificate is given by Thrush Aircraft, Inc. ("Borrower") pursuant to Section 4.3(l) of that certain Post-petition Credit Agreement dated as of September 4, 2019 among Borrower and the DIP Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

The undersigned is duly authorized to execute and deliver this Certificate on behalf of Borrower. By executing this Certificate such officer hereby certifies to DIP Lender that:

(a)    the financial statements delivered with this Certificate in accordance with Sections 4.3(a), 4.3(b) and/or 4.3(c) of the Credit Agreement fairly present in all material respects the results of operations and financial condition of Borrower and its Subsidiaries as of the dates of such financial statements;

(b)    I have reviewed the terms of the Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of the Borrower during the accounting period covered by such financial statements;

(c)    such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any condition or event that constitutes a Default or an Event of Default, except as set forth on Schedule 1 hereto, which includes a description of the nature and period of existence of such Default or an Event of Default and what action Borrower have taken, are taking and proposes to take with respect thereto;

(d)    except as set forth on Schedule 1 hereto, Borrower are in compliance with the covenants contained in Sections 3.1, 3.3, 3.4, 3.5, 3.7 and 3.8 and Section 4 of the Credit Agreement;

(e)    except as set forth on Schedule 3 hereto, subsequent to the date of the most recent Certificate submitted by Borrower pursuant to Section 4.3(l) of the Credit Agreement, no Borrower has (i) changed its name as it appears in official filings in the jurisdiction of its organization, (ii) changed its chief executive office, principal place of business, corporate offices, warehouses or locations at which Collateral is held or stored, or the location of its records concerning Collateral, (iii) changed the type of entity that it is, (iv) changed (or has had changed) its organization identification number, if any, issued by its jurisdiction of organization, (v) changed its jurisdiction of organization, (vi) changed the end of its Fiscal Year, or (vii) formed any new Subsidiary or entered into any partnership or joint venture with any other Person; and

(f)      except as set forth on <u>Schedule 4</u> hereto, subsequent to the date of the most recent Certificate submitted by Borrower pursuant to Section 4.3(l) of the Credit Agreement, there has been no event which would alter any of the disclosures set forth on Schedule 5.4(b) of the Credit Agreement.

IN WITNESS WHEREOF, Borrower have caused this Certificate to be executed by its _____ this _____ day of _____, _____.

THRUSH AIRCRAFT, INC.


By
Its

**ALL AMOUNTS IN EXHIBIT 4.3(l) ARE WITHOUT DUPLICATION AND, UNLESS
OTHERWISE INDICATED IN THE CREDIT AGREEMENT, ARE CALCULATED
FOR BORROWER AND its SUBSIDIARIES ON A CONSOLIDATED BASIS
INDEBTEDNESS
(Section 3.1)**

Indebtedness secured by purchase money Liens:

| | |
|---|---|
| Actual in the aggregate | $_____ |
| Permitted in the aggregate | $_____ |
| In Compliance | Yes/No |

Unsecured Indebtedness:

| | |
|---|---|
| Actual in the aggregate | $_____ |
| Permitted in the aggregate | $_____ |
| In Compliance | Yes/No |

## INVESTMENTS
### (Section 3.3)

Loans and advances to employees for moving, traveling and other similar expenses in the ordinary course of business:

|  |  |
|---|---|
| Actual in the aggregate | $_____ |
| Permitted in the aggregate | $_____ |
| In Compliance | Yes/No |

**RESTRICTED JUNIOR PAYMENTS**
**(Section 3.5)**

Ordinary course operating expenses (other
than taxes and licensing expenses):

      Actual in the aggregate (year to date)      $_____

      Permitted in the aggregate for Fiscal Year    $_____

In Compliance                      Yes/No

## DISPOSAL OF ASSETS
### (Section 3.7)

Describe any Asset Dispositions made during the period (list each transaction by market value of assets sold):

| | |
|---|---|
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |

Permitted Asset Dispositions in a single transaction or series of related transactions (asset market value)                          $_____

In Compliance                                                                                      Yes/No

Aggregate market value of Asset Dispositions in Fiscal Year              $_____

Permitted aggregate market value of Asset Dispositions in Fiscal Year

$_____

In Compliance                                                                                      Yes/No

## CONDITIONS OR EVENTS WHICH CONSTITUTE A DEFAULT OR
## EVENT OF DEFAULT

If any condition or event exists that constitutes a Default or Event of Default, specify nature and period of existence and what action Borrower have taken, is taking or proposes to take with respect thereto; if no condition or event exists, state "None."

SCHEDULE 3
Exhibit 4.3(l)

## ORGANIZATION/LOCATION CHANGES

If Borrower has (i) changed its name as it appears in official filings in the state of its organization, (ii) changed its chief executive office, principal place of business, corporate offices, warehouses or locations at which Collateral is held or stored, or the location of its records concerning Collateral, (iii) changed the type of entity that it is, (iv) changed (or has had changed) its organization identification number, if any, issued by its jurisdiction or organization, (v) changed its jurisdiction of organization, (vi) changed the end of its Fiscal Year, or (vii) formed any new Subsidiary or entered into any partnership or joint venture with any Person, such change shall be specified below; if no such change has been made, state "None."

SCHEDULE 4
Exhibit 4.3(l)

## CAPITALIZATION CHANGES

If with respect to Borrower there has been a change in authorized Stock, issued and outstanding Stock or the identity of the holders of any Stock, or if with respect to Borrower there has been a change pertaining to preemptive rights or any other outstanding rights, options, warrants, conversion rights or similar agreements or understandings for the purchase or acquisition of any Stock, such change shall be set forth below; if no such change has occurred, state "None."

EXHIBIT 1.1(a)
TO
POST-PETITION CREDIT AGREEMENT

FORM OF REVOLVING LOAN NOTE

DIP Lender: **HHM Aviation Financing, LLC, Floyd County, Georgia**
Principal Amount: $_____ _____, 20\_\_

      FOR VALUE RECEIVED, the undersigned, Thrush Aircraft, Inc. (the "Borrower"), hereby promises to pay to the order of the DIP Lender set forth above (the "DIP Lender") the Principal Amount set forth above, or, if less, the aggregate unpaid principal amount of the Revolving Loan (as defined in the Post-petition Credit Agreement referred to below) of the DIP Lender to the Borrower, payable at such times and in such amounts as are specified in the Post-petition Credit Agreement.

      The Borrower jointly and severally promise to pay interest on the unpaid principal amount of the Revolving Loan from the date made until such principal amount is paid in full, payable at such times and at such interest rates as are specified in the Post-petition Credit Agreement. Demand, diligence, presentment, protest and notice of non-payment and protest are hereby waived by the Borrower.

      Both principal and interest are payable in Dollars to DIP Lender, at the address set forth in the Credit Agreement, in immediately available funds.

      This Note is one of the Notes referred to in, and is entitled to the benefits of, the Post-petition Credit Agreement, dated as of September \_\_, 2019 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Post-petition Credit Agreement"), among the Borrower, the DIP Lender and General Electric Capital Corporation, as administrative DIP Lender for the DIP Lender. Capitalized terms used herein without definition are used as defined in the Post-petition Credit Agreement.

      The Post-petition Credit Agreement, among other things, (a) provides for the making of Revolving Loan by the DIP Lender to the Borrower in an aggregate amount not to exceed at any time outstanding the Principal Amount set forth above, the indebtedness of the Borrower resulting from such Revolving Loan being evidenced by this Note and (b) contains provisions for acceleration of the maturity of the unpaid principal amount of this Note upon the happening of certain stated events and also for prepayments on account of the principal hereof prior to the maturity hereof upon the terms and conditions specified therein.

      This Note is a DIP Credit Facility, is entitled to the benefits of the DIP Credit Facility and is subject to certain provisions of the Post-petition Credit Agreement.

      This Note is a registered obligation, transferable only upon notation in the Register, and no assignment hereof shall be effective until recorded therein.

This Note shall be governed by, and construed and interpreted in accordance with, the law of the State of Georgia.

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place set forth above.

**THRUSH AIRCRAFT, INC.**


By: _____
Name: _____
Title: _____

2

**Schedule 3.2**
**Liens**


**To Be Added**

**Schedule 3.3**
**Investments**

**To Be Added**

**Schedule 3.4**
**Contingent Obligations**

**To Be Added**

**Schedule 5.4(a)**
**Jurisdictions of Organization and Qualifications**

**To Be Added**

**Schedule 5.4(b)**
**Capitalization**

**To Be Added**

**Schedule 5.6**
**Intellectual Property**

**To Be Added**

**Schedule 5.7**
**Investigations and Audits**

**To Be Added**

**Schedule 5.8**
**Employee Matters**

**To Be Added**

**Schedule 5.10**
**Litigation**

**To Be Added**

**Schedule 5.14**
**ERISA**

**To Be Added**

**Schedule 5.16**
**Deposit and Disbursement Account**

**To Be Added**

**Schedule 5.17**
**Agreements and Other Documents**


**To Be Added**

**EXHIBIT C**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| **THRUSH AIRCRAFT, INC.,** | : | **Chapter 11 Case No. 19-10976** |
| | : | |
| Debtor, | : | |
| | : | |
| Vs. | : | |
| | : | **Contested Matter** |
| **WELLS FARGO BANK, NATIONAL** | : | |
| **ASSOCIATION (Inc.),  and PAYNE** | : | |
| **HUGHES** | : | |
| | : | |
| Respondents. | : | |

---

### INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN FINANCING AND GRANTING ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. § 364(c)

The Motion of Thrush Aircraft, Inc. ("**Thrush**"), Debtor and Debtor-in-Possession in the

above-styled case (the "**Debtor**"), for entry of an Interim Order Authorizing Debtor to Obtain

Financing from HHM Aviation Financing, LLC (the "**Lender**") Pursuant to 11 U.S.C. § 364(c)

and for Authorization to Enter into the Management Services Agreement (the "**Motion**") seeking

authorization to obtain DIP financing having been served in accordance with Federal Rule of

Bankruptcy Procedure 4001(c), the Motion having come on for an interim hearing before this

Court on the 12th day of September, 2019, and after considering the Motion, the evidence

presented at the hearing and the comments of counsel, the Court is of the opinion that the Motion

and Notice served with the Motion comply with F.R.B. P. 4001 and that the motion should be

granted on  a preliminary basis under the conditions contained herein, and it appearing that

Respondent Hughes has consented to the relief sought herein, and that the interests of Wells

Fargo are not implicated or are adequately protected until a final hearing may be held upon the

Debtor-in-possession's Motion; the relief requested will aid in the efficient administration of this

Estate, stabilization of the Debtor's cash flow, and be consistent with the interests of the Debtor,

creditors and the Estate, accordingly

The Court makes the following findings of fact and conclusions of law:

A.    Jurisdiction; Venue. This Court has jurisdiction over the Chapter 11

Case and the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Motion

constitutes a contested matter and a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and

F.R.B.P. 4001.  The statutory predicates for the relief sought herein are 11 U.S.C. § 364 and

Federal Rule of Bankruptcy Procedure 4001.  Venue of the Chapter 11 Case and the Motion in

this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Service of the Motion upon the

Respondents is adequate under the circumstances.

B.    Lender's Willingness to Extend Interim DIP Financing.  The Court has

been advised that Lender is willing to advance post-petition funds (the "**DIP Financing**") in the

form of a revolving credit facility in the maximum amount of $1,200,000.00 (the "**DIP Loan**")

to the Debtor, from the date of this Order through the later of (i) December 1, 2019, (ii) 90 days

from the initial advance, (iii) the effective date of any plan confirmed in this case, (iv)

consummation of a 363 sale under the Bankruptcy Code, or (v) upon the occurrence of an Event

of Default, all as more fully set forth in the Post-petition Credit Agreement (the "**Post-petition**

**Credit Agreement**"), attached hereto as **Exhibit 1**.  Unless otherwise specified, all capitalized

terms used herein without definition shall have the respective meanings given such terms in the

Post-petition Credit Agreement.  It is a condition to Lender's willingness to make DIP Loan that

this Preliminary Order shall have been entered and that the Debtor and Lender shall have

executed and delivered the Post-petition Credit Agreement and the Management Services

Agreement, attached to the Motion, and that a Permanent Order be entered at the final hearing on

the Motion.  In the event of any express contradiction between the terms and provisions of this

Order and the Post-petition Credit Agreement, the terms and provisions of this Order shall

control to the extent of such express contradiction.

        C.     <u>Need For Funding</u>.  As a result of its financial condition, the Debtor has

been unable to obtain a source of cash or credit in the form of unsecured credit allowable as an

administrative expense under 11 U.S.C. §§ 364(b) and 503(b)(1).  If the Debtor is unable to

obtain the financing proposed under the Post-petition Credit Agreement, it risks the inability to

continue its limited operations, pay administrative expenses of the case, the disruption of its

business, and the inability to successfully reorganize through sale or otherwise.

        D.     <u>11 U.S.C. § 364(e); Good Faith</u>.  The Lender has acted in good faith in

agreeing to extend credit and other financial accommodations to the Debtor in accordance with

the Post-petition Credit Agreement and this Order.  The terms of the DIP Financing authorized

by this Order, as set forth below, are for reasonably equivalent value and fair consideration.  The

agreements and arrangements authorized in this Order are enforceable in accordance with their

terms and have been entered into in good faith.  Any credit extended and loans made by the

Lender to the Debtor pursuant to this Order and/or the Post-petition Credit Agreement shall be

deemed to have been extended in good faith, as that term is used in 11 U.S.C. § 364(e).

E.    Good Cause Shown.  Good cause has been shown for the entry of this

Order.  Among other things, entry of this Order will increase the possibility of preserving the fair

market value of the Debtor's assets and maximizing the value of the Debtor's assets through a

reorganization or sale, and will avoid immediate and irreparable harm to, and is in the best

interests of, the Debtor, its creditors and its Estate.

F.    The Debtor-in-possession is unable to obtain sufficient unsecured credit

allowable under section 503(b)(1) of this title as an administrative expense to operate its

business.

G.    The preliminary liens granted to the Lender hereunder will not impair any

lien of Wells Fargo in property of the Debtor but is secured by a junior lien on property of the

estate that is subject to a lien , and the holder of such lien, Payne Hughes, has consented to the

entry hereof.

H.    The Motion; Notice.  Pursuant to Federal Rules of Bankruptcy Procedure

4001 and 9014, the Debtor has provided notice of the Motion to the following parties and/or to

their counsel as indicated:  (a) office of the United States Trustee for the Middle District of

Georgia (the "**U.S. Trustee**"), (b) the holders of the twenty (20) largest unsecured claims against

the Debtor, (c) the Lender, and (d) all creditors claiming a security interest in the property of the

Debtor.  Adequate notice and opportunity for a hearing has been given in accordance with the

provisions of 11 U.S.C. § 364 and Federal Rules of Bankruptcy Procedure 4001 and 9014, and

4

any other applicable law, and no further notice relating to this proceeding is necessary or

required.

Therefore, it is hereby ORDERED that:

1.    <u>Motion Granted</u>.  The Motion is granted on a preliminary basis as

provide under 11 U.S.C. § 364 (b)(2).  Subject to the terms hereof, this Order is valid

immediately and is fully effective upon its entry.

2.    **The Motion shall come on for final hearing on September __, 2019 at**

**__ _.m. in Courtroom __ at the U.S. Courthouse located at _____.**

Debtor shall provide notice of such hearing within three (3) business days to all parties entitled

to receive notice under Bankruptcy Rule 4001 and shall file a certificate of service with the

Court indicating such service.

3.    Notwithstanding any other provision of this Order, unless extended by

further order of this Court, this Order shall expire at midnight of the day on which the Final

Hearing concludes.

4.    <u>Authorization to Borrow under DIP Loan.</u>  The Debtor is authorized to

enter into, and be bound by this Order and to borrow money and perform its obligations under

this Order and the Post-petition Credit Agreement, in substantially the form of **Exhibit 1**

attached hereto.  The Post-petition Credit Agreement shall be incorporated as part of this Order

and shall be deemed binding on and enforceable in accordance with its terms against the

Debtor, the estate created by the filing of the Petition, and its successors and assigns.  The

Debtor is further authorized to execute and deliver any non-material amendments or

modifications to the Post-petition Credit Agreement and/or any waivers as may be agreed upon

in writing by the Debtor and the Lender, without the need of further notice, hearing or order of

this Court.  All indebtedness and obligations incurred on or after the date of this Order by the

Debtor to the Lender pursuant to the Post-petition Credit Agreement (including principal,

accrued and unpaid interest and costs and expenses, including reasonable attorneys' fees and

expenses) are referred to herein as the "**DIP Indebtedness**".  No obligation, payment, transfer

or grant of security under the Post-petition Credit Agreement shall be stayed, restrained,

voidable, or recoverable under the Bankruptcy Code, or under any applicable law, or be subject

to any defense, reduction, offset or counterclaim.

       3.    <u>Maximum Amount of Borrowing</u>.  The maximum aggregate outstanding

principal amount of the DIP Loan the Debtor may borrow from Lender pursuant to this Order

and the Post-petition Credit Agreement shall be $1,200,000.00 subject to the limitation provided

in the Post-petition Credit Agreement and DIP Budget attached hereto as **Exhibit 2**.  During the

term of this Interim Order (and following any final approval), the Debtor shall strictly comply

with the terms of the DIP Budget.

       4.    <u>Interest</u>.  The rate of interest to be charged on extensions of credit to the

Debtor under the Post-petition Credit Agreement shall be the rates set forth in the Post-petition

Credit Agreement.

       5.    <u>Termination of DIP Revolving Loan; Term of Post-petition Credit

Agreement</u>.  Unless the DIP Indebtedness is already due and payable, and notwithstanding

anything to the contrary contained in this Order, all DIP Indebtedness shall be immediately due

and payable in cash (except as Lender may otherwise agree in writing) upon the later of: (i)

December 1, 2019, (ii) 90 days from the initial advance, (iii) the effective date of any plan

confirmed in this case, (iv) consummation of a 363 sale under the Bankruptcy Code, or (v) upon

the occurrence of an Event of Default, all as more fully set forth in the Post-petition Credit Agreement

6.  <u>Priority Status</u>.  Pursuant to Section 364(c)(l) of the Bankruptcy Code, all of the Debtor's obligations, indebtedness and liabilities arising under or in respect of the DIP Financing, the Post-petition Credit Agreement, and this Interim Order (collectively, the "**DIP Obligations**") shall constitute obligations of the Debtor with priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 552, 726, 1114, or other similar section of the Bankruptcy Code subject to the Carve-Out Amount.

7.  <u>Collateral</u>.  The DIP Loan and the DIP Indebtedness shall be secured by a first priority lien on 33 Type Certificates (identified on Exhibit A attached to the Post-petition Credit Agreement) issued by the FAA and the related drawing packages and specialized tooling and a lien on all other property of the estate that is not otherwise subject to a lien, all as authorized under 11 U.S.C. § 364(c) or (d) (the "**Collateral**").  As additional collateral, KPH Properties II, Inc., with consent of its lender, will make a non-recourse pledge of collateral consisting of a second mortgage on the property it owns currently leased by the Debtor in Albany, Georgia.

8.  <u>Preservation of Liens and Rights Granted Under the Interim Order</u>.

(a)  No claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the Lender shall be granted while any portion of the DIP Obligations remains outstanding.

(b)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice by the Lender and/or the Lender of the effective date of such reversal, stay, modification or vacation or (ii) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the Post-petition Credit Agreement or this Interim Order with respect to any DIP. Notwithstanding any such reversal, stay, modification or vacation, any use of funds from the DIP Loan prior to the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the Lender shall be entitled to all the rights, remedies, privileges and benefits granted in this Interim Order and/or pursuant to the Post-petition Credit Agreement.

(c)    Debtor shall not file any pleading in this Court, or any other court of competent jurisdiction, challenging the validity of or seeking to modify, alter, amend, or vacate any provision of this Interim Order, the Final Order, or the Post-petition Credit Agreement.

9.    <u>Section 364(e); Effect of Modification of Order</u>.  Having been found to be making the loan to the Debtor in good faith, Lender shall be entitled to the full protection of 11 U.S.C. § 364(e) with respect to the DIP Indebtedness and the priorities created or authorized by this Order in the event that this Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal.  Each of the terms and conditions set forth in this Order constitutes a part of the authorization under 11 U.S.C. § 364, and is therefore, subject to the protections contained in 11 U.S.C. § 364(e).  Any stay, modification, reversal or vacatur of this Order shall not affect the validity of any DIP Indebtedness outstanding immediately prior to the effective time of such stay, modification or vacatur, or the validity or enforceability of any lien,

8

priority, right, privilege or benefit authorized hereby with respect to any such Indebtedness.

Notwithstanding any such stay, modification or vacatur, any Indebtedness outstanding

immediately prior to the effective time of such modification, stay or vacatur shall be governed in

all respects by the original provisions of this Order, and Lender shall be entitled to all of the

rights, privileges and benefits, including, without limitation, the security interests and priorities

granted herein, with respect to all such Indebtedness.

      10.    <u>Authorization to Enter Into Management Services Agreement</u>.  The Debtor

is hereby authorized to enter into that certain Management Services Agreement with the DIP

Lender attached to the Motion as Exhibit A.

***END OF DOCUMENT***

This Order prepared by:

*/s/ Matthew S. Cathey*
Matthew S. Cathey
Georgia Bar No. 759547
Stone & Baxter, LLP
Suite 800, Fickling & Co. Building
577 Mulberry Street
Macon, Georgia  31201
(478) 750-9898; (478) 750-9899 (fax)

Proposed Counsel for Debtor

G:\CLIENTS\Thrush Aircraft\First Day Motions\S & B Drafts\Interim Order on Motion to Approve DIP Financing.docx

**Exhibit 1**

**Post-Petition Credit Agreement**

**[INCLUDED IN MOTION AS EXHIBIT B**

**TO BE ADDED TO ORDER]**

**Exhibit 2**

**Budget**

**Thrush Aircraft Inc**
*Chapter 11*
  *September 10, 2019*


<u>Debt Repayment Assumptions:</u>


<u>Production and Sales Assumptions:</u>

2019   6   Aircraft (Between 09/16/2019 and 12/15/2019 - DIP Period)
       6   500 series
       0   700 series
       USD 1.25 M Parts


T34-498 is not counted in the above assumptions because,
although it is in the cash flow, it has no correlating revenues,
as it has been fully paid for by the customer.

6 Aircraft will be completed in the DIP period. However, the
cash inflows for two of the planes are outside of the DIP
period (1 ExIm transaction and 1 cash transaction).

# Executive Summary

| Days | 1-28 | 29-63 | 64-91 | Total |
|---|---|---|---|---|
| **Beginning Balance** | - | 12,826 | 253,856 | - |
| **Total Inflows** | 1,690,983 | 3,629,507 | 1,639,685 | 6,960,175 |
| Aircraft and Parts Sales | 384,615 | 3,100,749 | 1,639,685 | 5,125,050 |
| Financial/Other Inflows | 121,368 | 513,758 | - | 635,125 |
| DIP Line of Credit Inflow | 1,185,000 | 15,000 | - | 1,200,000 |
| **Total Outflows** | 1,678,157 | 3,388,476 | 1,880,021 | 6,946,654 |
| **Operational Outflows** | 1,383,875 | 2,522,275 | 1,541,530 | 5,447,680 |
| Payroll related | 369,979 | 472,518 | 325,979 | 1,168,476 |
| Material Costs | 794,396 | 1,440,356 | 869,051 | 3,103,803 |
| Cost of Sales | 5,000 | 260,775 | 85,500 | 351,275 |
| Building related | 94,000 | 95,500 | 105,500 | 295,000 |
| Other Expenses (Including Ferry Flights) | 120,500 | 253,125 | 155,500 | 529,125 |
| **Leases and Notes Outflows** | 88,127 | 104,782 | 159,414 | 352,323 |
| Notes Payable (Insurance) | 84,132 | 68,787 | 68,787 | 221,705 |
| Notes Payable (Adequate Protection) | 3,995 | 20,187 | 20,187 | 44,369 |
| Capital Leases | - | 15,808 | 70,440 | 86,249 |
| **Financial and Restructuring Costs** | 206,155 | 761,419 | 179,077 | 1,146,651 |
| DIP Line of Credit Interest | 8,155 | 13,812 | 11,077 | 33,044 |
| WF Adequate Protection Payments | 55,000 | 580,000 | 25,000 | 660,000 |
| Restructuring Payments | 143,000 | 167,607 | 143,000 | 453,607 |
| *Net Cash Flow Period* | 12,826 | 241,031 | (240,336) | 13,521 |
| **Ending Balance** | 12,826 | 253,856 | 13,521 | 13,521 |

USD 500 k asset experimental aircraft sale still needs to be negotiated with GE. Eventual proceeds will be used as adequate protection payment to Wells Fargo.

**THRUSH** AIRCRAFT

| | | 1-28 | 29-63 | 64-91 | Total |
|---|---|---|---|---|---|
| **Available Cash** | | | | | |
| | Beginning Balance | 0 | 12,826 | 253,856 | 0 |
| | Ending Balance | 12,826 | 253,856 | 13,521 | 13,521 |
| | | | | | |
| **DIP Line of Credit** | | | | | |
| Draw | | 1,185,000 | 15,000 | 0 | 1,200,000 |
| Repayment | | 0 | 0 | 0 | 0 |
| Funds Advanced | - | 1,185,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| Remaining Availability | 1,200,000.00 | 15,000 | 0 | 0 | 0 |
| **Inflows** | | | | | |
| **Deposits/Sales Inflows** | | | | | |
| Total Aircraft Deposits | | 0 | 0 | 275,070 | 275,070 |
| | | | | | |
| Total Aircraft Sales | | 0 | 2,619,980 | 980,000 | 3,599,980 |
| | | | | | |
| Total Parts Sales | | 384,615 | 480,769 | 384,615 | 1,250,000 |
| | | | | | |
| Total and Estimated Deposits/Sales Inflows | | 384,615 | 3,100,749 | 1,639,685 | 5,125,050 |
| | | | | | |
| **Financial Inflows** | | | | | |
| | | | | | |
| Cash from Asset Aircraft | | 0 | 500,000 | 0 | 500,000 |
| | | | | | |
| Cash from Notes Held for Investment | | 121,368 | 13,758 | 0 | 135,125 |
| | | | | | |
| Other Cash Inflows | | 0 | 0 | 0 | 0 |
| | | | | | |
| Total and Estimated Financial Inflows | | 121,368 | 513,758 | - | 635,125 |
| | | | | | |
| CASH INFLOW THIS PERIOD | | 505,983 | 3,614,507 | 1,639,685 | 5,760,175 |
| **Outflows** | | | | | |
| **Payment Outflows** | | | | | |
| | | | | | |
| **Payroll related** | | 384,979 | 517,518 | 355,979 | 1,258,476 |
| Salaries | | 172,376 | 258,563 | 172,376 | 603,315 |
| Payroll Taxes | | 75,146 | 112,719 | 75,146 | 263,012 |
| 401(k) Deductions | | 12,543 | 18,815 | 12,543 | 43,902 |
| Payroll Fees | | 6,500 | 8,300 | 6,500 | 21,300 |
| Health Claims | | 89,000 | 75,000 | 60,000 | 224,000 |
| Insurance | | 29,414 | 44,121 | 29,414 | 102,948 |
| | | | | | |
| **Payroll Reduction Challenge** | | (15,000) | (45,000) | (30,000) | (90,000) |
| Reduction | | (15,000) | (45,000) | (30,000) | (90,000) |
| | | | | | |
| **Discounts/Commissions** | | 5,000 | 260,775 | 85,500 | 351,275 |
| Discounts/Commissions  Cash | | 5,000 | 260,775 | 85,500 | 351,275 |
| Discounts/Commissions  Exim | | 0 | 0 | 0 | 0 |
| | | | | | |
| **Material Costs - Agriculture** | | 455,704 | 854,741 | 561,358 | 1,871,803 |
| Engines | | 0 | 730,040 | 366,278 | 1,096,318 |
| Props + Starters | | 0 | 0 | 0 | 0 |
| Other Materials | | 0 | 0 | 195,080 | 195,080 |
| Current Production - Material Needed Schedule | | 455,704 | 124,701 | 0 | 580,405 |
| | | | | | |
| **Material Costs - Patrol** | | 0 | 0 | 0 | 0 |
| Engines | | 0 | 0 | 0 | 0 |
| Props + Starters | | 0 | 0 | 0 | 0 |
| Other Materials | | 0 | 0 | 0 | 0 |
| Patrol Spool-Up | | 0 | 0 | 0 | 0 |
| CAPEX/Development Costs | | 0 | 0 | 0 | 0 |
| | | | | | |
| **Material Costs - Parts** | | 338,692 | 585,615 | 307,692 | 1,232,000 |
| Raw Materials | | 338,692 | 585,615 | 307,692 | 1,232,000 |

**THRUSH** AIRCRAFT

| | 1-28 | 29-63 | 64-91 | Total |
|---|---|---|---|---|
| **Available Cash** | | | | |
| Beginning Balance | 0 | 12,826 | 253,856 | 0 |
| Ending Balance | 12,826 | 253,856 | 13,521 | 13,521 |
| | | | | |
| **Building related** | 94,000 | 95,500 | 105,500 | 295,000 |
| Office/Building Rent | 25,000 | 25,000 | 25,000 | 75,000 |
| Water & sewage | 10,500 | 10,500 | 10,500 | 31,500 |
| Electricity | 40,000 | 40,000 | 40,000 | 120,000 |
| Telephone + Internet | 4,000 | 4,000 | 4,000 | 12,000 |
| Maintenance | 8,500 | 8,500 | 20,000 | 37,000 |
| Property Tax | 0 | 0 | 0 | 0 |
| Other | 6,000 | 7,500 | 6,000 | 19,500 |
| | | | | |
| **Other Expenses** | 120,500 | 253,125 | 155,500 | 529,125 |
| Shipping Spare Parts | 10,500 | 13,125 | 10,500 | 34,125 |
| Ferry Flight | 50,000 | 120,000 | 30,000 | 200,000 |
| IT Related | 15,000 | 15,000 | 15,000 | 45,000 |
| Fuel (Planes) | 10,000 | 10,000 | 10,000 | 30,000 |
| Travel | 15,000 | 15,000 | 15,000 | 45,000 |
| Other payments from accounts payable | 0 | 0 | 0 | 0 |
| Credit card balance payment (Inc. Travel) | 0 | 0 | 0 | 0 |
| Exim Premiums | 0 | 55,000 | 55,000 | 110,000 |
| Items not anticipated | 20,000 | 25,000 | 20,000 | 65,000 |
| | | | | |
| **Notes Payable** | 88,127 | 88,974 | 88,974 | 266,075 |
| Liability Insurance (Executory) | 59,750 | 56,904 | 56,904 | 173,559 |
| Workers Comp Insurance (Statutory) | 24,382 | 11,882 | 11,882 | 48,147 |
| SB&T-FARO ADV (Adequate Protection) | 3,995 | 1,998 | 1,998 | 7,990 |
| AB&T-Okuma (Adequate Protection) | 0 | 18,190 | 18,190 | 36,380 |
| | | | | |
| **Capital Leases** | 0 | 15,808 | 70,440 | 86,249 |
| Leaf FARO | 0 | 0 | 3,831 | 3,831 |
| Leaf Makino | 0 | 3,586 | 3,586 | 7,172 |
| Trumpf Trulaser | 0 | 10,562 | 10,562 | 21,124 |
| Trumpf LiftMaster | 0 | 0 | 7,568 | 7,568 |
| Toyota Forklift | 0 | 1,660 | 1,660 | 3,320 |
| Wells Fargo-HAAS VF2SS | 0 | 0 | 0 | 0 |
| Wells Fargo-Red Bird | 0 | 0 | 0 | 0 |
| Winthrop Resources | 0 | 0 | 43,234 | 43,234 |
| | | | | |
| **Other Financing Payments** | 63,155 | 593,812 | 36,077 | 693,044 |
| DIP Line of Credit Interest | 8,155 | 13,812 | 11,077 | 33,044 |
| WF Interest | 0 | 0 | 0 | 0 |
| WF International LOC | 0 | 0 | 0 | 0 |
| WF Domestic LOC | 0 | 0 | 0 | 0 |
| WF Adequate Protection Payments | 55,000 | 580,000 | 25,000 | 660,000 |
| Fees | 0 | 0 | 0 | 0 |
| Engine Vendors Interest | 0 | 0 | 0 | 0 |
| Engine Vendors Paydown | 0 | 0 | 0 | 0 |
| Other Parts Vendors Paydown | 0 | 0 | 0 | 0 |
| Other Supply Vendors Paydown | 0 | 0 | 0 | 0 |
| | | | | |
| **Restructuring Payments** | 143,000 | 167,607 | 143,000 | 453,607 |
| Stone & Baxter | 30,000 | 30,000 | 30,000 | 90,000 |
| Logue Law | 12,500 | 12,500 | 12,500 | 37,500 |
| UCC | 15,000 | 15,000 | 15,000 | 45,000 |
| US Trustee | 0 | 10,107 | 0 | 10,107 |
| GGG Partners | 15,000 | 15,000 | 15,000 | 45,000 |
| DIP Lender Costs | 40,000 | 50,000 | 40,000 | 130,000 |
| Manager Services | 10,000 | 12,500 | 10,000 | 32,500 |
| Manager Expenses (Reimbursements) | 8,000 | 10,000 | 8,000 | 26,000 |
| Other | 12,500 | 12,500 | 12,500 | 37,500 |
| | | | | |
| **Fed and State Taxes** | 0 | 0 | 0 | 0 |
| Income Taxes | 0 | 0 | 0 | 0 |
| | | | | |
| **CASH OUTFLOW THIS PERIOD** | 1,678,157 | 3,388,476 | 1,880,021 | 6,946,654 |
| | | | | |
| **NET CASH FLOW** | (1,172,174) | 226,031 | (240,336) | (1,186,479) |

**THRUSH**

| | | September | | | October | | | | November | | | | December | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Start of Period | 09-16-19 | 09-23-19 | 09-30-19 | 10-07-19 | 10-14-19 | 10-21-19 | 10-28-19 | 11-04-19 | 11-11-19 | 11-18-19 | 11-25-19 | 12-02-19 | 12-09-19 |
| | End of Period | 09-22-19 | 09-29-19 | 10-06-19 | 10-13-19 | 10-20-19 | 10-27-19 | 11-03-19 | 11-10-19 | 11-17-19 | 11-24-19 | 12-01-19 | 12-08-19 | 12-15-19 |
| **Available Cash** | 381.57 | | | | | | | | | | | | | |
| Beginning Balance | | 0 | 382 | 930 | 12,784 | 12,826 | 206,609 | 13,253 | 142,404 | 48,482 | 253,856 | 120,611 | 225,035 | 177,208 |
| Ending Balance | | 382 | 930 | 12,784 | 12,826 | 206,609 | 13,253 | 142,404 | 48,482 | 253,856 | 120,611 | 225,035 | 177,208 | 13,521 |
| **DIP Line of Credit** | | | | | | | | | | | | | | |
| Draw | | 563,000 | 135,000 | 390,000 | 97,000 | | 15,000 | | | | | | | |
| Repayment | | | | | | | | | | | | | | |
| **Funds Advanced** | | 637,000 | 562,000 | 112,000 | 15,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Remaining Availability | 1,200,000.00 | 698,000 | 1,088,000 | 1,185,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Deposits/Sales Inflows** — *Inflows* | | | | | | | | | | | | | | |
| **Aircraft Deposits** | | | | | | | | | | | | | | |
| Serial Numbers   a (Cash Planes) | | T34-495 | | T34-496 | | T34-5000C | | H8D-233 | | T34-5000C | T34-502 | | | 510 Jan 1 |
| Serial Numbers   b (Cash Planes) | | | HBD-232DC | | | | HBD-232DC | | | | | | | 510 Jan 2 |
| Serial Numbers   c (Exim Planes) | | | | | | | | | | | | | | |
| **Total Deposits** | | | | | | | | | | | | | | |
| a (Cash Planes) Aircraft Deposits | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 137,535 |
| b (Cash Planes) Aircraft Deposits | | | | | | | | | | | | | | 137,535 |
| c (Exim Planes) Aircraft Deposits | | | | | | | | | | | | | | |
| **Aircraft Sales** | | | | | | | | | | | | | | |
| Regular Delivery   a (Cash Planes) | | T34-498 | | T34-495 | | T34-496 | | T34-496 | | T34-5000C | | H8D-233 | | T34-502 |
| Serial Numbers   b (Cash Planes) | | | | | | | | | | | | | | |
| Serial Numbers   c (Exim Planes) | | | | | | | | | | | | | | |
| Serial Numbers   d (Patrol Planes) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delivery/Funding   a (Cash Planes) | | T34-498 | | T34-495 | | T34-496 | | T34-5000C | | T34-5000C | | H8D-233 | | |
| Serial Numbers   b (Cash Planes) | | | | | | | | | | | | | | |
| Serial Numbers   c (Exim Planes) | | | | | | | | | | | | | | |
| **Total Aircraft Sales** | | | | | | | | | | | | | | |
| Cash Aircraft Sales   a (Cash Planes) | | 0 | 0 | 0 | 629,980 | 629,980 | 0 | 995,000 | 995,000 | 995,000 | 980,000 | 980,000 | 0 | 0 |
| Cash Aircraft Sales   b (Cash Planes) | | | | | | | | | | | | | | |
| Cash Aircraft Sales   c (Exim Planes) | | | | | | | | | | | | | | |
| Cash Aircraft Sales   d (Patrol Planes) | | | | | | | | | | | | | | |
| **Total Parts Sales** | | 96,154 | 96,154 | 96,154 | 96,154 | 96,154 | 96,154 | 96,154 | 96,154 | 96,154 | 96,154 | 96,154 | 96,154 | 96,154 |
| **Total and Estimated Deposits/Sales Inflows** | | 96,154 | 96,154 | 96,154 | 726,134 | 726,134 | 96,154 | 1,091,154 | 1,091,154 | 1,091,154 | 1,091,154 | 1,076,154 | 233,689 | 233,689 |
| **Financial Inflows** | | | | | | | | | | | | | | |
| Cash from Asset Sales | | 0 | 0 | 0 | 0 | 0 | 0 | 500,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| GE Developmental Aircraft - H8D-192 | | | | | | | | 500,000 | | | | | | |
| Cash from Notes Held for Investment | | 121,368 | 0 | 0 | 0 | 0 | 13,758 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| T34-4440C Aerotera | | 121,368 | | | | | | | | | | | | |
| H8D-176 Dornheimer | | | | | | | 13,758 | | | | | | | |
| Other Cash Inflows | | | | | | | | | | | | | | |
| **Total and Estimated Financial Inflows** | | 121,368 | | | | | 13,758 | 500,000 | | | | | | |
| **CASH INFLOW THIS PERIOD** | | 217,521 | 96,154 | 96,154 | 726,134 | 726,134 | 109,911 | 1,591,154 | 96,154 | 1,091,154 | 1,091,154 | 1,076,154 | 233,689 | 233,689 |

**THRUSH**

## Available Cash

| | 09-16-19 / 09-22-19 | 09-23-19 / 09-29-19 | 09-30-19 / 10-06-19 | 10-07-19 / 10-13-19 | 10-14-19 / 10-20-19 | 10-21-19 / 10-27-19 | 10-28-19 / 11-03-19 | 11-04-19 / 11-10-19 | 11-11-19 / 11-17-19 | 11-18-19 / 11-24-19 | 11-25-19 / 12-01-19 | 12-02-19 / 12-08-19 | 12-09-19 / 12-15-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | 0 | 382 | 930 | 12,784 | 12,826 | 206,609 | 13,253 | 142,404 | 48,482 | 253,856 | 120,611 | 225,035 | 177,208 |
| Ending Balance | 382 | 930 | 12,784 | 12,826 | 206,609 | 13,253 | 142,404 | 48,482 | 253,856 | 120,611 | 225,035 | 177,208 | 13,521 |

## Payment Outflows

**Payroll related**

| | 09-16 | 09-23 | 09-30 | 10-07 | 10-14 | 10-21 | 10-28 | 11-04 | 11-11 | 11-18 | 11-25 | 12-02 | 12-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salaries | 86,188 | | 86,188 | | 86,188 | | 86,188 | | 86,188 | | 86,188 | | 86,188 |
| Payroll Taxes | 37,573 | | 37,573 | | 37,573 | | 37,573 | | 37,573 | | 37,573 | | 37,573 |
| 401(k) Deductions | 6,272 | | 6,272 | | 6,272 | | 6,272 | | 6,272 | | 6,272 | | 6,272 |
| Payroll Fees | 1,800 | | 1,800 | | 1,800 | | 1,800 | | 1,800 | | 1,800 | | 1,800 |
| Health Claims | 44,000 | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Insurance | 14,707 | | 14,707 | | 14,707 | | 14,707 | | 14,707 | | 14,707 | | 14,707 |
| **Payroll total** | 190,539 | | 161,539 | | 161,539 | | 161,539 | | 161,539 | | 161,539 | | 161,539 |

**Payroll Reduction Challenge**

| Reduction | | | (15,000) | | (15,000) | | (15,000) | | (15,000) | | (15,000) | | (15,000) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Discounts/Commissions**

| | Cash | 5,000 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Discounts/Commissions a (Cash Planes) | Exim | 5,000 | | | | | 86,925 | 86,925 | | 86,925 | | 85,500 | | |

**Material Costs – Agriculture**

| | 09-16 | 09-23 | 09-30 | 10-07 | 10-14 | 10-21 | 10-28 | 11-04 | 11-11 | 11-18 | 11-25 | 12-02 | 12-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Engine a (Cash Planes) | | | | | | | | | | | | | |
| Engine b (Cash Planes) | | | | | | | | | | | | | |
| Engine c (Exim Planes) | | | | | | | | | | | | | |
| Total Engines | | | | | | | | | | | | | |
| Props + Starters a (Cash Planes) | | | | | 365,020 | 365,020 | 365,020 | 365,020 | 365,020 | | 366,278 | | 130,054 |
| Props + Starters b (Cash Planes) | | | | | | | | | | | | | |
| Props + Starters c (Exim Planes) | | | | | | | | 424,118 | | | | | |
| Total Props + Starters | | | | | | | | | | | | | |
| Other Materials a (Cash Planes) | | | | | | | | | | | | | |
| Other Materials b (Cash Planes) | | | | | | | | | | 65,027 | | 65,027 | 130,054 |
| Other Materials c (Exim Planes) | | | | | | | | | | | | | |
| Total Other Materials | | | | | | | | | | | | | |
| Current Production – Material Needed Schedule | 331,003 | | 124,701 | | 65,603 | | | | 59,098 | | 366,278 | 65,027 | 130,054 |

**Material Costs – Patrol**

| Engines | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Props | | | | | | | | | | | | | |
| Other Materials | | | | | | | | | | | | | |
| Patrol Spool-Up/Add'l OH | | | | | | | | | | | | | |
| CAPEX/Development Costs | | | | | | | | | | | | | |

**Material Costs – Parts**

| Raw Materials | 87,923 | 76,923 | 76,923 | 96,923 | 76,923 | 196,923 | 76,923 | 76,923 | 157,923 | 76,923 | 61,500 | 76,923 | 76,923 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Building related**

| | 09-16 | 09-23 | 09-30 | 10-07 | 10-14 | 10-21 | 10-28 | 11-04 | 11-11 | 11-18 | 11-25 | 12-02 | 12-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Office/Building Rent | 50,000 | | | 41,000 | | | 41,000 | | | 41,000 | | | 41,000 |
| Water & Sewage | | | | 25,000 | | | 25,000 | | | 25,000 | | | 25,000 |
| Electricity | 40,000 | | | 10,500 | | | 10,500 | | | 10,500 | | | 10,500 |
| Telephone + Internet | | | 4,000 | | | | 4,000 | | | | 4,000 | | |
| Maintenance | 8,500 | | | | 8,500 | | | | | | 20,000 | | |
| Property Tax | | | | | | | | 15,000 | | | | | |
| Other | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |

**Other Expenses**

| | 09-16 | 09-23 | 09-30 | 10-07 | 10-14 | 10-21 | 10-28 | 11-04 | 11-11 | 11-18 | 11-25 | 12-02 | 12-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shipping Spare Parts | 27,625 | 32,625 | 7,625 | 32,625 | 92,625 | 37,625 | 62,625 | 22,625 | 37,625 | 62,625 | 32,625 | 52,625 | 7,625 |
| | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 |
| Ferry Flight | 20,000 | | 30,000 | | 30,000 | 30,000 | 30,000 | | 30,000 | | | 30,000 | |
| IT Related | | | 15,000 | | | | | 15,000 | | | | 15,000 | |
| Fuel (Planes) | | 10,000 | | | 10,000 | | 10,000 | | | 10,000 | | | |
| Travel | | 15,000 | | | 15,000 | | 15,000 | | | 15,000 | | 15,000 | |

# THRUSH

| | September | | October | | | | | November | | | | December | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start of Period | 09-16-19 | 09-23-19 | 09-30-19 | 10-07-19 | 10-14-19 | 10-21-19 | 10-28-19 | 11-04-19 | 11-11-19 | 11-18-19 | 11-25-19 | 12-02-19 | 12-09-19 | |
| End of Period | 09-22-19 | 09-29-19 | 10-06-19 | 10-13-19 | 10-20-19 | 10-27-19 | 11-03-19 | 11-10-19 | 11-17-19 | 11-24-19 | 12-01-19 | 12-08-19 | 12-15-19 | |
| **Available Cash** | | | | | | | | | | | | | | |
| Beginning Balance | 0 | 382 | 930 | 12,784 | 12,826 | 206,609 | 13,253 | 142,404 | 48,482 | 253,856 | 120,611 | 225,035 | 177,208 | |
| Ending Balance | 382 | 930 | 12,784 | 12,826 | 206,609 | 13,253 | 142,404 | 48,482 | 253,856 | 120,611 | 225,035 | 177,208 | 13,521 | |
| Other payments from accounts payable | | | | | | | | | | | | | | |
| Credit card balance payment (inc. Travel) | | | | | | | | | | | | | | |
| Exim Premiums | | | | | | | | 55,000 | | 55,000 | | | | |
| Items not anticipated | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | |
| **Notes Payable** | 72,250 | 1,997 | | 13,880 | | | 75,094 | 13,880 | | | 75,094 | | 13,880 | |
| Liability Insurance (Executory) | 59,750 | | | | | | | | | | | | | |
| Workers Comp Insurance (Statutory) | 12,500 | | | | | | | | | | | | | |
| SB&T-FARO ADV (Adequate Protection) | | | | 11,882 | | | 56,904 | 11,882 | | | 56,904 | | 11,882 | |
| AB&T Okuma (Adequate Protection) | | 1,997 | | 1,998 | | | 18,190 | 1,998 | | | 18,190 | | 1,998 | |
| **Capital Leases** *(Deferred: Yes)* | | | | | | | | 15,808 | | 54,632 | | 12,222 | 3,586 | |
| Leaf FARO | | | | | | | | 3,586 | | | | | 3,586 | |
| Leaf Makino | | | | | | | | 10,562 | | | | 10,562 | | |
| Trumpf Trulaser | | | | | | | | | | 3,831 | | | | |
| Trumpf LiftMaster | | | | | | | | | | 7,568 | | | | |
| Toyota Forklift | | | | | | | | 1,660 | | | | 1,660 | | |
| Wells Fargo-HAAS VF25S | | | | | | | | | | | | | | |
| Wells Fargo-Red Bird | | | | | | | | | | | | | | |
| Winthrop Resources | | | | | | | | | | 43,234 | | | | |
| **Other Financing Payments** | 1,299 | 1,611 | 57,511 | 2,735 | 47,735 | 2,769 | 537,769 | 2,769 | 2,769 | 27,769 | 2,769 | 2,769 | 2,769 | |
| DIP Line of Credit Interest | 1,299 | 1,611 | 2,511 | 2,735 | 2,735 | 2,769 | 2,769 | 2,769 | 2,769 | 2,769 | 2,769 | 2,769 | 2,769 | |
| WF Interest | | | | | | | | | | | | | | |
| WF International LOC | | | | | | | | | | | | | | |
| WF Domestic LOC | | | | | | | | | | | | | | |
| WF Adequate Protection Payments | | | 55,000 | | 45,000 | | 535,000 | | | 25,000 | | | | |
| Fees | | | | | | | | | | | | | | |
| Engine Vendors Interest | | | | | | | | | | | | | | |
| Engine Vendors Paydown | | | | | | | | | | | | | | |
| Other Parts Vendors Paydown | | | | | | | | | | | | | | |
| Other Supply Vendors Paydown | | | | | | | | | | | | | | |
| **Restructuring Payments** | 14,500 | 99,500 | 14,500 | 14,500 | 14,500 | 14,500 | 109,607 | 14,500 | 99,500 | 14,500 | 99,500 | 14,500 | 14,500 | |
| Stone & Baxter | | 30,000 | | | | | 30,000 | | 30,000 | | 30,000 | | | |
| Logue Law | | 12,500 | | | | | 12,500 | | 12,500 | | 12,500 | | | |
| UCC | | 15,000 | | | | | 15,000 | | 15,000 | | 15,000 | | | |
| US Trustee | | | | | | | 10,107 | | | | | | | |
| GGG Partners | | 15,000 | | | | | 15,000 | | 15,000 | | 15,000 | | | |
| DIP Lender Costs | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| Manager Services | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | |
| Manager Expenses (Reimbursements) | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | |
| Other | | 12,500 | | | | | 12,500 | | 12,500 | | 12,500 | | | |
| **Fed and State Taxes** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Income Taxes | | | | | | | | | | | | | | |
| **CASH OUTFLOW THIS PERIOD** | 780,140 | 230,606 | 474,299 | 193,112 | 532,350 | 318,267 | 1,462,004 | 190,075 | 885,780 | 229,400 | 971,729 | 281,516 | 397,376 | |
| **NET CASH FLOW** | (562,618) | (134,452) | (378,145) | (96,959) | (208,356) | 129,150 | 129,922 | (93,922) | 205,374 | (133,246) | 104,425 | (47,827) | | (163,687) |

USD 500 k asset experimental aircraft sale still needs to be negotiated with GE. Eventual proceeds will be used as adequate protection payment to Wells Fargo.

Capital Leases Deferment cure payment is outside of the DIP period.

**THRUSH**

| Line Item Descriptions | |
| --- | --- |
| Start of Period | Period Start Date (Monday) |
| End of Period | Period End Date (Sunday) |

**Available Cash**

| | |
| --- | --- |
| **Beginning Balance** | Projected beginning cash balance at the start of the period. |
| **Ending Balance** | Projected ending cash balance at the end of the period. |

**DIP Line of Credit**

DIP Line of Credit Section

| Draw | | Amount Drawn from the DIP Line of Credit for the period. |
| --- | --- | --- |
| Repayment | | Amount Repaid on the DIP Line of Credit for the period. |
| **Funds Advanced** | | Total cumulative drawn amount on the DIP Line of Credit at the end of the period (Previous Period Funds Advances + Draw - Repayment) |
| | Remaining Availability | Remaining available balance on the DIP Line of Credit (Line Limit - Funds Advanced) |

**Deposits/Sales Inflows**

Inflows

**Aircraft Deposits** — Projected deposit receipts on plane sales section.

| Serial Numbers | a (Cash Planes) | Serial number of the aircraft that the deposit shown on line "Aircraft Deposits - a (Cash Planes)" refers to. |
| --- | --- | --- |
| Serial Numbers | b (Cash Planes) | Serial number of the aircraft that the deposit shown on line "Aircraft Deposits - b (Cash Planes)" refers to. |
| Serial Numbers | c (Edm Planes) | Serial number of the aircraft that the deposit shown on line "Aircraft Deposits - b (Edm Planes)" refers to. |

This line ads up the three lines below it and summarizes projected deposit receipts.

| **Total Deposits** | | |
| --- | --- | --- |
| Aircraft Deposits | a (Cash Planes) | Projected deposit receipt for the aircraft serial number shown on line "Serial Numbers - a (Cash Planes)". |
| Aircraft Deposits | b (Cash Planes) | Projected deposit receipt for the aircraft serial number shown on line "Serial Numbers - b (Cash Planes)". |
| Aircraft Deposits | c (Edm Planes) | Projected deposit receipt for the aircraft serial number shown on line "Serial Numbers - c (Edm Planes)". |

**Aircraft Sales** — Projected delivery date and funding date of each aircraft Section (they may vary depending on the sales type (Cash or Exim sales).

| Serial Numbers | a (Cash Planes) | Aircraft serial numbers that have projected delivery dates on each period. This line drives the manufacturing costs projection for that serial number. |
| --- | --- | --- |
| Regular Serial Numbers | b (Cash Planes) | Aircraft serial numbers that have projected delivery dates on each period. This line drives the manufacturing costs projection for that serial number. |
| Delivery Serial Numbers | c (Edm Planes) | Aircraft serial numbers that have projected delivery dates on each period. This lines drives the manufacturing costs projection for that serial number. |
| Serial Numbers | d (Patrol Planes) | Patrol aircraft serial numbers that have projected delivery dates on each period. This lines drives the manufacturing costs AND receipt projections for that serial number. |

| Delivery Serial Numbers | a (Cash Planes) | Aircraft serial numbers that have projected funding dates on each period. This line drives the receipts projection for that serial number. |
| --- | --- | --- |
| Funding Serial Numbers | b (Cash Planes) | Aircraft serial numbers that have projected funding dates on each period. This line drives the receipts projection for that serial number. |
| Serial Numbers | c (Edm Planes) | Aircraft serial numbers that have projected funding dates on each period. This line drives the receipts projection for that serial number. |

This line ads up the three lines below it and summarizes projected sales receipts (Net of eventual deposits for each serial number).

| **Total Aircraft Sales** | | |
| --- | --- | --- |
| Cash Aircraft Sales | a (Cash Planes) | Projected dollar amount receipts for the aircraft on line "Delivery / Funding - Serial Numbers - a (Cash Planes)". |
| Cash Aircraft Sales | b (Cash Planes) | Projected dollar amount receipts for the aircraft on line "Delivery / Funding - Serial Numbers - b (Cash Planes)". |
| Cash Aircraft Sales | c (Edm Planes) | Projected dollar amount receipts for the aircraft on line "Delivery / Funding - Serial Numbers - c (Edm Planes)". |
| Cash Aircraft Sales | d (Patrol Planes) | Projected dollar amount receipts for the aircraft on line "Regular Delivery - Serial Numbers - d (Patrol Planes)". |

| **Total Parts Sales** | | Projected sales amounts for spare parts and provisioning. |
| --- | --- | --- |

| **Total Estimated Deposits/Sales Inflows** | | Summary of the total sales projected receipts for each period. (Total Deposits + Total Aircraft Sales + Total Parts Sales). |
| --- | --- | --- |

**Financial Inflows**

| **Cash from Asset Aircraft** | | If any asset aircraft is sold, its sales receipts are shown here. |
| --- | --- | --- |

| **Cash from Notes Held for Investment** | | Thrush holds some Promissory Notes relating to specific aircraft sales. This section shows the projected receivables for those notes. This line shows the total projected for each period. |
| T34-444DC Aeroterra | | Projected receivables for the Promissory Note relating to Aircraft T34-444DC sale. |
| H80-176 DirHeimer | | Projected receivables for the Promissory Note relating to Aircraft H80-376 sale. |

| **Other Cash Inflows** | | Other Cash inflows that do not fit any of the previous line items (Equity Cash infusion, loans, non-operating income, etc). |
| --- | --- | --- |

| **Total Estimated and Financial Inflows** | | Summary of the total projected financial inflows for each period. (Cash from asset Aircraft + Cash From Notes Held for Investment + Other Cash Inflows) |
| --- | --- | --- |

| **CASH INFLOW THIS PERIOD** | | Summary of the total projected inflows for the period. (Total and Estimated Deposits/Sales Inflows + Total and Estimated Financial Inflows). |
| --- | --- | --- |



**Line Item Descriptions**

| | Line Item | Description |
|---|---|---|
| | Start of Period | Period Start Date (Monday) |
| | End of Period | Period End Date (Sunday) |
| **Available Cash** | Beginning Balance | Projected beginning cash balance at the start of the Period. |
| | Ending Balance | Projected ending cash balance at the end of the period. |
| **Payment Outflows** | | |

**Payroll related**

| Line Item | Description |
|---|---|
| Salaries | Payroll projected payables (Salary and Hourly) - Net of Withholdings and Deductables. |
| Payroll Taxes | Projected payroll taxes - Corporate taxes and withheld taxes. |
| 401(k) Deductions | 401 K contributions deducted from employees. |
| Payroll Fees | Fees charged by financial institution to process payroll payments. |
| Health Claims | Health service claims for the self insured portion of the health insurance of the employees. |
| Insurance | Payroll related insurances. |

**Payroll Reduction Challenge**

| Line Item | Description |
|---|---|
| Reduction | Further Payroll Reduction Challenge that the company needs to achieve (Total) |
| Reduction | Further Payroll Reduction Challenge that the company needs to achieve. |

**Cost of Sales**

| Line Item | Description |
|---|---|
| Cost of Sales | Total Cost of sales for each period. |
| Cost of Sales — Cash | Dealer comissions and other cost of sales (discounts, returns, etc) relating to cash deals. |
| Cost of Sales — Exim | Dealer comissions and other cost of sales (discounts, returns, etc) relating to Exim deals. |

**Material Costs - Agriculture**

Total projected material costs to be paid on each period for agricultural aircraft manufacturing.

| Line Item | Description |
|---|---|
| Engine a (Cash Planes) | Projected Engine Payment for aircraft funded on each period (Driven by line "Delivery / Funding - Serial Numbers - a (Cash Planes)"). |
| Engine b (Cash Planes) | Projected Engine Payment for aircraft funded on each period (Driven by line "Delivery / Funding - Serial Numbers - b (Cash Planes)"). |
| Engine c (Exim Planes) | Projected Engine Payment for aircraft funded on each period (Driven by line "Delivery / Funding - Serial Numbers - c (Exim Planes)"). |
| Total Engines | Sum of lines: Engine a + Engine b + Engine c |
| Props + Starters a (Cash Planes) | Projected Prop + Starter Payment on each period for aircraft delivered (Driven by line "Regular Delivery - Serial Numbers - a (Cash Planes)" - Payment 1 week in advance). |
| Props + Starters b (Cash Planes) | Projected Prop + Starter Payment on each period for aircraft delivered (Driven by line "Regular Delivery - Serial Numbers - b (Cash Planes)" - Payment 1 week in advance). |
| Props + Starters c (Exim Planes) | Projected Prop + Starter Payment on each period for aircraft delivered (Driven by line "Regular Delivery - Serial Numbers - c (Exim Planes)" - Payment 1 week in advance). |
| Total Props + Starters | Sum of lines: "Prop + Starter a" + "Prop + Starter b" + "Prop + Starter c" |
| Other Materials a (Cash Planes) | Projected Other Material Payments on each period for aircraft delivered (Driven by line "Regular Delivery - Serial Numbers - a (Cash Planes)" - Payment: 50% 3 weeks and 50% 4 weeks in advance). |
| Other Materials b (Cash Planes) | Projected Other Material Payments on each period for aircraft delivered (Driven by line "Regular Delivery - Serial Numbers - b (Cash Planes)" - Payment: 50% 3 weeks and 50% 4 weeks in advance). |
| Other Materials c (Exim Planes) | Projected Other Material Payments on each period for aircraft delivered (Driven by line "Regular Delivery - Serial Numbers - c (Exim Planes)" - Payment: 50% 3 weeks and 50% 4 weeks in advance). |
| Total Other Materials | Sum of lines: "Other Materials a" + "Other Materials b" + "Other Materials c" |
| Current Production - WIP Schedule | Projected payments for aircraft shown in Tab "WIP". |

**Material Costs - Patrol**

Total projected material costs to be paid on each period for Patrol aircraft manufacturing.

| Line Item | Description |
|---|---|
| Engines | Projected Engine Payment on each period for aircraft delivered (Driven by line "Regular Delivery - Serial Numbers - d (patrol Planes)"). |
| Props | Projected Prop Payment on each period for aircraft delivered (Driven by line "Regular Delivery - Serial Numbers - d (patrol Planes)- Payment 1 week in advance"). |
| Other Materials | Projected Other Materials Payment on each period for aircraft delivered (Driven by line "Regular Delivery - Serial Numbers - d (patrol Planes)" - Payment 25% per week between 5 and 8 weeks in advance). |
| Patrol Spool-Up/Addt'l OH | Projected patrol and overhead Spool-up - begins 16 weeks before first projected delivery. |
| CAPEX/Development Costs | Patrol projected CAPEX/Development costs to re-start production line. |

**Material Costs - Parts**

| Line Item | Description |
|---|---|
| Raw Materials | Total projected material costs to be paid on each period for Parts and provisioning manufacturing. |
| | Projected material costs to be paid on each period for Parts and provisioning manufacturing. |

**Building related**

Total projected Building related to be paid on each period.

| Line Item | Description |
|---|---|
| Office/Building Rent | Rent to be paid on the land in which the factory is located. |
| Water & Sewage | Projected Water and Sewage cost to be paid for at each period. |
| Electricity | Projected Electricity cost to be paid for at each period. |
| Telephone + Internet | Projected Telephone + Internet cost to be paid for a at each period. |
| Maintenance | Projectes building maintenance costs to be paid at each period. |
| Property Tax | Projected Property Tax to be paid (12/20) |
| Other | Other projected building related costs. |

**Other Expenses**

Total projected Other Expenses to be paid on each period.

| Line Item | Description |
|---|---|
| Shipping Spare Parts | Projected costs for shipping spare parts and provisioning sold. |
| Ferry Flight | Projected ferry flight for aircraft that are sold CIF (This amount is to be discounted from sales price to sales is Ex Works) |
| IT Related | Projected IT related costs (server maintenance, software licensing, etc.) |
| Fuel (Planes) | Projected fuel costs for test flights and filling up planes for delivery. |
| Travel | Projected travel costs (sales support and administrative). |
| Other payments from accounts payable | Projected payments from Accounts Payable. |
| Credit card balance payment (inc. Travel) | Projected WF credit card payment (Currently not used). |
| Exim Premiums | Projected Exim premiums to be paid (only for Exim transactions. Reimbursed after around 60 days - when note sales process is completed). |

**THRUSH**

**Available Cash**

| Line item | Line item Descriptions |
|---|---|
| | Start of Period / Period Start Date (Monday) |
| | End of Period / Period End Date (Sunday) |
| **Beginning Balance** | Projected beginning cash balance at the start of the Period. |
| **Ending Balance** | Projected ending cash balance at the end of the period. |
| Items not anticipated | Projected contingency for items not previously anticipated. |

**Notes Payable** — Total Projected Notes Payable

| Line item | Description |
|---|---|
| Liability Insurance (Executory) | Projected payments for financed liability insurance premium |
| Workers Comp Insurance (Statutory) | Projected payments for financed workers comp insurance premium |
| SB&T FARO ADV (Adequate Protection) | Projected payments for equipment loan - adequate protection |
| AB&T Okuma (Adequate Protection) | Projected payments for equipment loan - adequate protection |

**Capital Leases** — Total Projected Capital Leases Payable - First 60 days deferred to outside DIP period (Yellow Cells on 52 Week Cash Flow Tab).

| Line item | Description |
|---|---|
| Leaf FARO | Projected payments for equipment lease. First 60 days deferred to outside DIP period |
| Leaf Makino | Projected payments for equipment lease. First 60 days deferred to outside DIP period |
| Triumpf TruLaser | Projected payments for equipment lease. First 60 days deferred to outside DIP period |
| Triumpf LiftMaster | Projected payments for equipment lease. First 60 days deferred to outside DIP period |
| Toyota Forklift | Projected payments for equipment lease. First 60 days deferred to outside DIP period |
| Wells Fargo-HAAS VF25S | Projected payments for equipment lease. First 60 days deferred to outside DIP period |
| Wells Fargo-Red Bird | Projected payments for equipment lease. First 60 days deferred to outside DIP period |
| Winthrop Resources | Projected payments for operating lease. First 60 days deferred to outside DIP period |

**Other Financing Payments** — Total Projected Other Financing payments

| Line item | Description |
|---|---|
| DIP Line of Credit Interest | Projected DIP line of credit interest - 10% a year, paid weekly |
| WF Interest | Projected Wells Fargo interest to be paid - zeroed out |
| WF International LOC | Projected Wells Fargo international Line of Credit principal payments - zeros out |
| WF Domestic LOC | Projected Wells Fargo domestic Line of Credit principal payments - zeros out |
| WF Adequate Protection Payments | Projected Wells Fargo Adequate Protection Payments - paid at each aircraft funding |
| Fees | Projected Bank fees to be paid (account maintenance, checking fees, etc) |
| Engine Vendors Interest | Projected Engine vendors interest payments - zeroed out |
| Engine Vendors Paydown | Projected Engine vendors principal payments - zeroed out |
| Other Parts Vendors Paydown | Projected Other Parts vendors principal payments - zeroed out |
| Other Supply Vendors Paydown | Projected Other Supply vendors principal payments - zeroed out |

**Restructuring Payments** — Total Projected Restructuring Costs Payments

| Line item | Description |
|---|---|
| Stone & Baxter | Projected payments for Bankruptcy Lawyers Stone & Baxter |
| Logan Law | Projected payments for Bankruptcy Lawyers Logan Law |
| UCC | Projected Unsecured Creditors Comittee costs payable. |
| US Trustee | Projected US Trustee payments (1% of total outflows - paid quarterly) |
| GGG Partners | Projected GGG partners payments (financial advisors) |
| DIP Lender Costs | Projected DIP Lender Costs - facility set up and monthly maintenance costs - other than interest. |
| Manager Services | Projected manager services compensation |
| Manager Expenses | Projected manager services expenses reimbursements/costs |
| Other | Other non-anticipated restructuring costs |

**Fed and State Taxes** — Total Projected Income Tax Payments

| Line item | Description |
|---|---|
| Income Taxes | Projected Income Tax payments (Federal and Georgia Income Tax) |

**CASH OUTFLOW THIS PERIOD** — Total Cash Outflow for each period.

**NET CASH FLOW** — Total Net Cash Flor for each period (CASH INFLOW THIS PERIOD - CASH OUTFLOW THIS PERIOD)

**Thrush Aircraft, Inc**
Materials Needed to Complete

| | T34-495 | T34-496 | T34-5000C | HBD-2320C | T34-502 | HBD-233 | Total |
|---|---|---|---|---|---|---|---|
| Engine | $ - | $ 365,020.00 | $ 365,020.00 | $ 366,278.00 | $ 365,020.00 | $ 366,278.00 | $ 1,827,616.00 |
| Prop | $ 19,098.00 | $ 19,098.00 | $ 19,098.00 | $ 25,603.00 | $ 19,098.00 | $ 25,603.00 | $ 127,598.00 |
| Engine & Prop Sub Total | $ 19,098.00 | $ 384,118.00 | $ 384,118.00 | $ 391,881.00 | $ 384,118.00 | $ 391,881.00 | $ 1,955,214.00 |
| A/C | $ 9,311.00 | $ 9,311.00 | $ 9,908.00 | $ 9,908.00 | $ 9,311.00 | $ 9,311.00 | $ 47,749.00 |
| Other | $ 163.00 | $ 3,021.00 | $ 19,463.00 | $ 17,612.00 | $ 26,655.00 | $ 28,144.00 | $ 95,058.00 |
| Sub Total | $ 19,251.00 | $ 396,450.00 | $ 413,489.00 | $ 419,401.00 | $ 420,084.00 | $ 429,336.00 | $ 2,098,021.00 |
| Consumables, RM, & HW | $ 10,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 70,000.00 |
| Options | $ 40,000.00 | $ 40,000.00 | $ 40,000.00 | $ 40,000.00 | $ 40,000.00 | $ 40,000.00 | $ 240,000.00 |
| Total | $ 69,261.00 | $ 448,450.00 | $ 465,489.00 | $ 471,401.00 | $ 472,084.00 | $ 481,336.00 | $ 2,408,021.00 |

| | T34-495 | T34-496 | T34-5000C | HBD-2320C | T34-502 | HBD-233 | Total |
|---|---|---|---|---|---|---|---|
| Pre Airworthiness Cash | $ 69,261.00 | $ 83,430.00 | $ 100,469.00 | $ 105,123.00 | $ 107,064.00 | $ 115,058.00 | $ 580,405.00 |
| Funded From Sale | $ - | $ 365,020.00 | $ 365,020.00 | $ 366,278.00 | $ 365,020.00 | $ 366,278.00 | $ 1,827,616.00 |
| Add'l Cash for Release/Delivery | | | | | | | |



**Summary of Primary Payments**
Sums all to date

| Date | 02-09-19 08-09-19 | 09-09-19 15-09-19 | 16-09-19 22-09-19 | 23-09-19 29-09-19 | 30-09-19 06-10-19 | 07-10-19 13-10-19 | 14-10-19 20-10-19 | 21-10-19 27-10-19 | 28-10-19 03-11-19 | 04-11-19 10-11-19 | 11-11-19 17-11-19 | 18-11-19 24-11-19 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T34-495 | | | 69,261 | | | | | | | | | | 69,261 |
| T34-496 | | | 83,430 | | | | | | | | | | 83,430 |
| T34-5000C | | | 41,371 | | 59,098.00 | | | | | | | | 100,469 |
| HBD-2320C | | | 39,520 | | 65,603 | | | | | | | | 105,123 |
| T34-502 | | | 47,966 | | | | 65,603 | | | | | | 107,064 |
| HBD-233 | | | 49,455 | | | | | | | | 59,098.00 | | 115,058 |
| | $ - | $ - | $ 331,003 | $ - | $ 124,701 | $ - | $ 65,603 | $ - | $ - | $ - | $ 59,098 | $ - | $ 580,405 |

**Primary Material Purchases**

Link to Cash Projection