**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| THRUSH AIRCRAFT, INC., | : | Chapter 11 Case No. 19-10976 |
| | : | |
| Debtor. | : | |

**DECLARATION OF K. PAYNE HUGHES IN SUPPORT OF FIRST DAY MOTIONS**

I, K. Payne Hughes, hereby state and declare as follows:

1.      I am the Chief Executive Officer, sole member of the Board of Directors, and sole shareholder of Thrush Aircraft, Inc. ("**Thrush**"), a corporation duly organized and existing under the laws of the State of Georgia, debtor in the above-captioned Chapter 11 case, as debtor and debtor-in-possession (the "**Debtor**").  I am generally familiar with the day-to-day operations, business and financial affairs and books and records of the Debtor.

2.      I am authorized to submit this Declaration in support of Debtor's First Day Motions (as hereinafter defined).  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial affairs, including business records of the Debtor.  If I were called upon to testify, I would testify competently to the facts set forth herein.

**Background**

3.      On September 4, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Middle District of Georgia, Albany Division (the "**Court**").  The Debtor is authorized to operate its business as debtor-in-possession pursuant to

1

Sections 1107 and 1108 of the Bankruptcy Code.

4.      Founded in 2003, Thrush is located in Albany, Georgia and it primarily engaged in the design, manufacture and sale of various models of single engine turbine powered aircraft (the "**Business**").  Headquartered in Albany, Georgia, Thrush manufactures and sells a full range of aerial application aircraft utilized in agriculture, forestry, and firefighting roles worldwide. Thrush currently offers and actively sells to customers throughout the world five different models of aircraft, utilizing engines manufactured by both Pratt & Whitney and General Electric. Thrush produces the following models for use in agricultural aviation:  Thrush 510P, Thrush 510G, Thrush 510GR, Thrush 550P, and Thrush 710P.  Thrush's aircraft have been utilized by such familiar names as Dole Fresh Fruit, Del Monte Fresh Fruit, Aerovic, FumiPalma, as well as many worldwide governments.   Moreover, Thrush's agricultural models have evolved into new uses in other industries, such as border patrol and reconnaissance for world governments.

5.      Thrush operates a state of the art manufacturing facility in Albany, Georgia capable of producing seventy (70) aircraft per year in a single shift (the "**Facility**").  The 227,000 square foot facility includes all aspects of design, tooling production, planning, product manufacturing, and product support with superior efficiency and low operating costs.  As an additional service to customers, Thrush offers pilot training through the use of a RedBird Flight Simulator located at the facility.  The Facility provides "through the gate" access to Southwest Georgia Regional Airport allowing for quick delivery and customer access.

6.      An additional source of income to Thrush is the manufacture of parts and subassemblies for the aerospace industry for worldwide sales.

7.      Thrush leases its facility from KPH Properties II, Inc.[1] ("**KPH**") on a long term lease a rate of $25,000.00 per month. KPH owns the building and associated fixtures, while the

---

[1] Solely owned by K. Payne Hughes.

Debtor owns all equipment, inventory, work-in-process, and finished aircraft located at the Facility.

8.      The predecessor to the Business of the Debtor was Ayers Aircraft Corporation ("**Ayers**"). The Debtor acquired the Business through the purchase of substantially all of the Ayers assets from GATX Capital.

9.      Upon the acquisition of the Business, the Debtor commenced operations and continued to expand. As part of its expansion, the Debtor added to the single 510P production program, restarted the  710P production program, obtained certification of the 510G and 510G Switchback, developed a border patrol plane based on the 710P model, and initiated the certification process for the 710P Firefighting model. However, due to various economic factors and the lack of adequate operating capital, the Debtor has continued to suffer losses forcing the filing of the instant Chapter 11 case.

10.     A primary reason for the lack of adequate operating capital is threefold:

i.      First, substantially all of Thrush's production and sales have historically been agricultural model aircraft contracted to be sold in the northern hemisphere. As part of its growth initiative, Thrush aggressively pursued growth opportunities in the international market using the Export Import Bank of the United States' ("**EXIM**") guarantee program. Under such program, Thrush would initiate sales to international customers, take a promissory note for payment of the purchase, and then place EXIM insurance on each individual note. Thrush would then sell those notes on the secondary market for a price equal to the face value of the note, thereby generating cash for operations. Historically, Wells Fargo Bank, N.A. ("**Wells Fargo**") purchased these notes.

However, over time the Wells Fargo processing period to close a note sale increased to as much as 12 months to complete the purchase of a note. This delay created a strain on Thrush's cash flows.  In 2017, Thrush was in default under its credit facility with Wells Fargo, which resulted in Wells Fargo's discontinuing of its purchase of notes.  Thrush has now entered into a new arrangement with PNC Bank for the purchase of the notes, which allows Thrush to flip the notes in a period of 60-90 days from the date of execution. Despite the PNC Bank note buying arrangement, Thrush's trade payables have continued to increase at an excess rate.

ii.   Secondly, in December 2015 the worldwide agricultural equipment market experienced a market downturn, which resulted in a high volume of cancelled customer orders. By way of example, at one point in late 2015, Thrush had 15 airplanes sitting on its tarmac without buyers, due to cancelations. As a result, in the spring of 2016, in search of new markets outside the agricultural industry, Thrush, together with its customer IOMAX USA, Inc. ("**IOMAX**") embarked on an aggressive redesign and manufacture of Thrush's 710P plane model, which resulted in the patrol aircraft known as the Archangel. Thrush produced 25 of these planes during the next two years. .

iii.  As the agricultural aircraft market was rebounding,  Thrush invested heavily into expanding its growing  border patrol aircraft development and sales using existing cash flow.  A large follow on order was placed for 14 aircraft scheduled for delivery over a period of two years amounting to revenue in the approximate range of $30 to $34 million dollars, coupled with the resurgence

of the agricultural product line required Thrush to increase production capacity.  In an effort to increase its overall production capacities and efficiencies, Thrush hired up to a total of 300 employees, invested in several high valued pieces of equipment to aid in the acceleration of production, and improved customer service through capital investments in its sales department. Additionally, Thrush made substantial investments in IT and production software through its purchase and implementation of the SAP accounting systems, including the ERP software system. The SAP implementation process was a failure for the first three years and a multi-million dollar investment that is just beginning to show a return. Today the system is running smoothly with steady improvements being made by our in house team. In summary, between 2015 and 2017 Thrush made substantial investments in highly skilled personnel, investments in advanced technology machinery, expanded plant facilities, expanded pilot training facilities, computer and IT functionalities, and significant investments in research and development.  In 2017, the key order for 11 aircraft was cancelled resulting in estimated lost revenue between $30 and $34 million dollars.  This put Thrush in a difficult cash flow position, resulting in a net loss during 2017 in the amount of $8.8 million and $5.6 million for the period ending on July 31, 2018.

11.    An additional reason for the downturn in Thrush's business was my declining health. Beginning in May 2017, I experience a number of health problems. Between May 2017 and June 2019 I underwent 18 surgeries, and which required me to be out of work

extended periods of time. My absence and inability to actively participate in the day-to-day management of Thrush also contributed to its decline.

11.    In response to the lack of adequate operating capital, Thrush's management has effectively implemented many cost reductions and improved efficiencies. Even with the same, Thrush's operating capital, long term debt, and trade debt remain at a critical stage necessitating the instant bankruptcy filing.

12.    On August 28, 2019, in an effort to further reduce costs of continuing to operate and at the insistence of Wells Fargo, Thrush laid off 108 employees and has continued to operate on a limited basis in order to build out remaining aircraft to fulfill orders.

13.    The primary objective of this Chapter 11 case is to reorganize the Business through a sale of substantially all of the Debtor's assets as a going concern. Debtor's specific challenges during this time lie with their balance sheet and debt structure, not with the day-to-day operations. As such, Chapter 11 bankruptcy does not mean that the Debtor is going out of business. To the contrary, the filing is a critical step in enabling the Business to continue through the sale of the assets to a buyer allowing for a smooth transition with the goal of maximizing value to the creditors while continuing to employ its uniquely experienced and highly qualified workforce. The Debtor believes that any purchaser of the Business will immediately begin hiring back the laid off employees. The Debtor will continue to conduct its limited operations as a debtor-in-possession and expects to emerge from the bankruptcy process in a timely manner.

14.    Debtor's primary assets relate to the Business, including manufacturing equipment, raw materials, inventory, intellectual property, flight simulation and training equipment, type and production certificates issued by the FAA, and customer receivables.

Additionally, the Debtor owns one prototype aircraft used in the certification process of the new

GE H80 EEC engine.  This airplane is considered experimental until the certification program is

completed.. The Debtor also owns a home in Albany, Georgia which is used as executive

housing.  The Debtor's approximate book value[2] of the general category of assets, as of August

31, 2019, are as follows:

| | |
|---|---|
| Real Estate | $373,295 |
| Cash [Restricted & Non-Restricted] | $394,016 |
| Deposits | $43,710 |
| Accounts Receivable | $578,541 |
| Notes Held for Invest/Sale | $454,374 |
| Prepaids | $859,412 |
| Vehicles/Aircraft | $500,000 (experimental plane) |
| Machinery, Equipment, Supplies | $7,926,663 |
| Inventory | $11,888,665 |
| | $35,185,000 |

15.    The Debtor carries the following liabilities on its balance sheet, as of August 31,

2019, described in the following general categories:

| | |
|---|---|
| Secured Debt / Operating Leases | $30,152,063 |
| Trade Debt / Unsecured | $12,677,071 |
| | $42,829,134 |

**The First Day Motions**

16.    Contemporaneously with the filing of its bankruptcy petition and certain other

motions, the Debtor filed the motions and applications listed on **Exhibit A** (collectively, the

---

[2] The Debtor notes that the fair market and liquidation value of such assets are substantially less.

"**First Day Motions**").  I submit this declaration in support of the First Day Motions.  I have

reviewed each of the First Day Motions (including the exhibits and schedules attached thereto)

and, to the best of my knowledge, I believe that the facts set forth therein are true and correct.

Such representation is based upon information and belief, through my review of various

materials and other information, and my experience and knowledge of the Debtor's operations

and financial condition.  If called upon to testify, I could and would, based on the foregoing,

testify competently to the facts set forth in each of the First Day Motions.

17.    As a result of my first-hand experience, and through my review of various

materials and other information, discussions with the Debtor's executives, and discussions with

the Debtor's professionals, I have formed opinions as to (a) the necessity of obtaining the relief

sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions

for the Debtor to continue to operate effectively; and (c) the negative impact upon the Debtor if it

does not obtain the relief sought in the First Day Motions.

18.    As described more fully below, the relief sought in the First Day Motions will

minimize the adverse effects of the chapter 11 case on the Debtor and ensure that the Business

will proceed as efficiently as possible, resulting in maximum recovery for stakeholders.  I believe

the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate as

an effective debtor-in-possession.

**A.  Application to Employ Stone & Baxter, LLP as Counsel for Debtor ("S&B Employment Application")**

19.    During the course of this case, the Debtor will require counsel with extensive

experience in insolvency and bankruptcy cases.  The Debtor has chosen Stone & Baxter, LLP

("**Stone & Baxter**") as its bankruptcy counsel and desires to retain Stone & Baxter as its

attorneys.  Stone & Baxter is a law firm with extensive insolvency and bankruptcy expertise that

has competently handled many bankruptcy cases.

20.    Since July 2019, Stone & Baxter has been advising the Debtor with respect to insolvency issues.  As a result, Stone & Baxter has obtained valuable institutional and specific knowledge of the facts and law pertinent to the resolution of this case.  It would impose a serious financial hardship on the Debtor to pay another firm to acquire the knowledge of the law and facts of the case that Stone & Baxter already has.  Stone & Baxter is well qualified and able to represent the Debtor in this case and, accordingly, this Court should approve the S&B Employment Application.

21.    Prior to the Petition Date, the Debtor paid Stone & Baxter all fees and expenses owed to Stone & Baxter in the ordinary course of business.

**B.  Application to Employ Logue Law, P.C. as Counsel for Debtor ("Logue Employment Application")**

22.    As with Stone & Baxter, during the course of this case, the Debtor will require counsel with extensive experience in insolvency and bankruptcy cases.  The Debtor has chosen A. Keith Logue ("**Mr. Logue**") as additional bankruptcy counsel and desires to retain Mr. Logue as its attorney.  Mr. Logue has extensive insolvency and bankruptcy expertise and has competently handled many bankruptcy cases.

23.    Since February 2019, Mr. Logue has been advising the Debtor with respect to insolvency issues.  As a result, Mr. Logue has obtained valuable institutional and specific knowledge of the facts and law pertinent to the resolution of this case.  It would impose a serious financial hardship on the Debtor to pay another firm to acquire the knowledge of the law and facts of the case that Mr. Logue already has.  Mr. Logue is well qualified and able to represent the Debtor in this case and, accordingly, this Court should approve the Logue Employment Application.

24.     Prior to the Petition Date, the Debtor paid Mr. Logue all fees and expenses owed in the ordinary course of business.

### C. Motion to Establish Compensation Procedures for Professionals

25.     The Debtor seeks the establishment of procedures for compensating and reimbursing professionals approved by this Court on a monthly basis, which procedures are comparable to the procedures established in other Chapter 11 cases. Those procedures would streamline the professional compensation process and enable the Court, creditors, the United States Trustee, and other parties-in-interest to more effectively monitor the professional fees incurred in these cases.  Additionally, disbursement by the Debtor every 120 days of accumulated professional fees could unreasonably impact the Debtor's cash flow.  Further, the proposed procedures will avoid forcing the professionals approved by this Court to finance the Debtor's bankruptcy case while awaiting final approval of fees and expenses.  The Debtor also requests that the Court limit the notice of hearings to consider interim and final compensation and reimbursement of expense applications to the Notice Parties (as defined in the Motion) and any parties requesting notice pursuant to Bankruptcy Rule 2002.  Such notice procedures will preserve the Debtor's estate assets and is in the best interest of the Debtor, the estate, and creditors and other parties-in-interest, and should be approved by this Court.

### D. Application for First Enlargement of Time to File Schedules and Statement of Financial Affairs (the "Enlargement of Time Motion")

26.     To prepare the Debtor's schedules and statement of financial affairs required by the Bankruptcy Code (the "**Schedules**"), the Debtor must gather information from books, records, and documents relating to a multitude of transactions.  Consequently, collection of the necessary information requires the expenditure of substantial time and effort of the part of the Debtor's employees.  The efforts of the Debtor's employees during the initial stages of this case

are critical and need to be focused on attending to complying with the Bankruptcy Code, the

Business, and maximizing the value of the Debtor's estate.

27.     For these reasons, I believe the Debtor will be unable to compile all the

information necessary for the preparation and filing of the Schedules within fourteen (14) days

after the entry of the order for relief, as required by Bankruptcy Rule 1007(c).  The Debtor's

employees will begin working diligently to assemble and collate the necessary information, and I

anticipate that they will need a minimum of fourteen (14) additional days beyond that otherwise

prescribed by the Bankruptcy Rules in order to prepare and file its Schedules in the appropriate

format.

### E.  Motion for an Order Limiting Notice and Establishing Notice Procedures (the "Motion to Limit Notice")

28.     Currently, approximately three hundred and fifty seven (357) creditors and

parties-in-interest may be technically entitled to receive notice in this case.  To require the

Debtor to provide notice of all pleadings and other papers filed in this case to each of these

parties-in-interest would be extremely burdensome and costly to the Debtor's estate, as a result

of photocopying and postage expenses as well as other expenses associated with such large

mailings.  Moreover, Debtor believes that to individually notice over one hundred and fifty (150)

current and former employees on matters not impacting such, would not only result in an

additional administrative burden, but would also confuse, rather than enlighten such parties,

about matters that do not pertain to them.  Establishing a limited notice and administrative

procedure consistent with that requested in the Motion to Limit Notice is in the best interest of

the Debtor's estate and creditors, and will not prejudice the rights of any party-in-interest in this

case.

### F.  Motion of Debtor for Order Authorizing (i) Continued Use of Existing Bank

**Accounts, (ii) Authorizing Continued Use of Existing Business Forms, and (iii) Granting Waiver of Investment and Deposit Requirements (the "Bank Account Motion")**

29.     Prior to the commencement of this case, the Debtor maintained a number of bank accounts (the "**Accounts**"). Those accounts are held in the name of the Debtor at Wells Fargo Bank, N.A., Bank of America, N.A, Albany Bank & Trust, Suntrust Bank, N.A., and PNC Bank, N.A. for the purposes of, among other things, general business operations, payroll obligations, restricted escrow accounts for customer deposits, and international wire transfers. The Accounts are further described in the Bank Account Motion and in Exhibit "A" attached thereto.  The Debtor respectfully requests that it be permitted to continue using the Accounts as described in the Bank Account Motion, so as to avoid any disruption or delay in making and receiving payments.

30.     By virtue of the nature and scope of the Debtor's business, and its numerous employees, suppliers of goods and services, and others with whom the Debtor transacts business, it is important that the Debtor be permitted to continue to use existing business forms, including checks.  A substantial amount of time and expense would be required to print new business forms and stationery and being required to obtain new business forms would also likely result in a substantial risk of disruption of the Debtor's ordinary business affairs.

31.     Because of the disruption to the Debtor's business that would result if the Debtor were forced to open one or more new accounts, in the Bank Account Motion, the Debtor requests that this Court allow it to maintain its existing bank accounts, business forms, and permit Debtor to maintain accounts which contain funds in excess of the current Federal Deposit Insurance Corporation maxim insured limits.

**G. Motion for Order Authorizing Payment of Wages, Salaries, and Other Employee Benefits and Payment of Related Taxes and Withholdings ("Employee Obligations Motion")**

32.    As of the Petition Date, the Debtor directly employed 50 Employees.  Of the Employees, 27are employed on a full-time salaried basis and 23 are employed on a full-time hourly basis. Debtor has no employees that are employed on a commissioned basis.

29.    In the Employee Obligation Motion, the Debtor seeks authority to pay certain wages, compensation, and benefits more fully described below (the "**Employee Obligations**") that became payable prior to and during the pendency of this chapter 11 case and to continue at this time its practices, programs, and policies with respect to the Employees, as such practices, programs, and policies were in effect as of the Petition Date.

30.    Even though the Debtor has incurred certain Employee Obligations prior to the Petition Date, certain of the Employee Obligations will become due and payable in the ordinary course of the Debtor's business on and after the Petition Date.  The Employee Obligations includes, without limitation: (i) wages, salaries, and other compensation; (ii) payroll taxes; (iii) vacation programs; (iv) qualified 401(k) plan obligations; and (v) health and welfare benefits. The Employee Obligations are more specifically described as follows:

- *Wages, salaries, and other compensation*.  These obligations consist of pre-petition wages, salaries, and commissions owed to the Employees (the "**Payroll Obligations**"). The Debtor pays payroll biweekly for salaried and hourly Employees.  The average biweekly gross amount of the Payroll Obligations is approximately $140,516.15.  This gross amount includes certain deductions described separately below, such as payroll taxes owned by the Employees and 401(k) contributions.  The Payroll Obligations due to Employees are deposited directly into the Employees' bank accounts and are not paid by check, with the exception of a new hire's first paycheck.  As of the Petition Date, the Debtor estimates that it owes approximately $7,322.66 in Payroll Obligations.  These amounts do not include employer payroll taxes.

- *Payroll Taxes*.  These obligations consist of federal, state, and local income taxes, social

security, and Medicare taxes.  The payroll taxes include the amounts owed by Employees that the Debtor withholds from the gross amount of the Employees' wages or salary as well as the amounts separately owed by the Debtor.  The Debtor's average biweekly payroll tax liability is approximately $37,574.00.  This includes approximately $9,582.00 for the employer obligations and $27,992.00 for the Employee component.  As of the Petition Date, the Debtor estimates that it owes no payroll taxes.

- *Unemployment taxes*.  The Debtor also pays certain state and federal unemployment taxes.  However, as of the Petition Date, the Debtor is current on its unemployment tax obligations.

- *Vacation, sick leave and holiday programs*.  These obligations consist of time off for vacation, sick leave and company holidays.  The Debtor recognizes six(6) holidays per year.  In addition, Employees received paid time off ("**PTO**"). As of the Petition Date, the Debtor estimates that it owes approximately $108,117.00 on total unused PTO pay.

- *401(k) Plan Obligations*.  The Debtor formerly maintained a 401(k) plan, under which Employees were permitted to defer a portion of their salary.  Beginning six months after the start of employment, employees were able to contribute any portion of their annual pay (up to the annual maximum deferral amount permitted by law).  The Debtor made matching contributions of up to 40%, which were defined on an annual basis.  As of the Petition Date, the Debtor had suspended its 401(k) program.

- *Expense Reimbursements*.  The Debtor reimburses certain of its Employees and Officers for certain expenses incurred in connection with Employees' work, including travel expenses.  As of the Petition Date, the Debtor estimates that it owes approximately $2,800.00in expense reimbursements.

- *Health and Welfare Benefits*.  The Debtor provides several health and welfare benefit plans for the Employees, including insurance plans relating to medical, health, prescription, dental, disability, and life insurance.

- *Health Care Plan*.  The Debtor maintains and provides a modified self-insurance medical health plan (the "**Health Plan**") administered by Anthem (Blue Cross/Blue Shield).  The Debtor's average monthly premiums and administration fees are approximately $77,575.00.  The Debtor believes that approximately $28,984.00 is due and outstanding under the Health Plan for services provided prior to the Petition Date.  For the remainder of 2019, the Debtor estimates that the Health Plan will cost $810,300.00, which includes the monthly premiums, administration fess, and estimated costs of claims.

- *Dental*.  The Debtor maintains and provides a dental plan for all Employees, which is paid 100% by the Employee. As of the Petition Date, the Debtor owes approximately $5,865.00for services provided prior to the Petition Date.

- *Basic Life Insurance, Optional Life Insurance, Accident Death and Dismimeberment*.  The Debtor provides life insurance to Employees, with the premiums being paid by the

14

Employees. The Debtor's average monthly premium is approximately $829.99. As of the Petition Date, the Debtor owes approximately $829.99. Employees are also able to purchase additional optional life insurance. As of the Petition Date, approximately $3,289.69 is due in premiums for optional life insurance.

- *Accident Death and Dismemberment*. Debtor also provides Accident Death and Dismemberment Insurance ("**AD&D Insurance**") to all Employees at no cost to the Employee. The average monthly cost to the Debtor is $148.00. As of the Petition Date, the Debtor owes approximately $148.00. Employees are able to purchase additional coverage and the amount due as of the Petition Date is approximately $282.00.

- *Short Term Disability.* The Debtor provides Short Term Disability Insurance to Employees at no cost to the Employee. The Short Term Disability Insurance pays 60% of the Employee's salary up to 6 months. As of the Petition Date, the Debtor owes approximately $4,289.00.

- *Long Term Disability.* The Debtor provides Long Term Disability Insurance to Employees with an option to buy additional coverage. As of the Petition Date, the Debtor holds approximately $3,182.00 in premiums collected from Employees but not yet remitted to the carrier.

- The following are "pass-through" programs for which the Debtor makes no contribution or payment: dental, vision, short term disability, life insurance (employee, spouse, and employee children), and AFLAC. The Debtor withholds the necessary amounts from the employee's paycheck and remits the amounts to the benefit providers. Accordingly, the Debtor requests authority to remit amounts collected from the Employees before the Petition Date but not yet remitted to the carrier.

| | |
|---|---|
| Vision | $2,575.10 |
| Dental | $5,865.95 |
| Short Term Disability | $4,288.51 |
| Employee Dependent Life Insurance | $71.00 |
| Employee Spouse Life Insurance | $362.73 |
| Employee Life Insurance | $2,855.92 |
| AFLAC | $3,792.48 |

31.     Any delay in paying the Employee Obligations will adversely impact the Debtor's relationship with its Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtor relies in order to operate the Business. The Debtor must have support of the Employees in order for the Debtor's efforts in this case to succeed.

32.     Moreover, absent an order granting the relief requested in the Insurance Motion, the Employees will suffer undue hardship and in many instances serious financial difficulties. The stability of the Debtor will thus be undermined, perhaps irreparably, by the possibility that otherwise loyal Employees will seek other employment alternatives.

33.     The Debtor does not seek to alter the compensation, vacation, and other benefit programs and policies in the Employee Obligations Motion, and the motion is not to be deemed an assumption or adoption of any agreement or policy providing for any such benefits.  Instead, the Employee Obligations Motion is intended only to permit the Debtor, in its sole discretion, to make payments consistent with those policies, and to permit the Debtor, in its sole discretion, to continue to honor the practices, programs, and policies with respect to Employees, as were in effect as of the Petition Date.

**H.  Motion for Authority to Continue Pre-Existing Insurance Programs, To Maintain Insurance Premium Financing Programs and to Pay Pre-Petition Premiums and Related Obligations ("Insurance Motion")**

34.     In connection with the operation of its business, Debtor maintains various insurance policies and programs with several different insurance carriers (the "**Insurance Carriers**").  The policies insure Debtor against various forms of losses associated with operating an aircraft design and manufacturing business.  The policies provide the Debtor, among other things, with general liability insurance coverage, aircraft liability, auto liability, employee

liability, and ocean cargo coverage (the "**Policies**"). The Insurance Carriers bill Debtor annually for the Policies. All insurance policies covering the Debtor are listed on Exhibit "A" of the Insurance Motion, together with a list of the Debtor's insurance carriers, policy terms, and total annual premiums due thereunder.

35.     Prior to the Petition Date, the Debtor determined in the exercise of its business judgment, to pay the premiums on certain of the policies in monthly installments. Accordingly, the Debtor entered into two insurance premium financing agreement with IPFS Corporation, Inc. ("**IPFS**") to finance the premium payments on certain of its Policies.   The terms of the premium financing agreements, which are further described in the Insurance Motion, allow Debtor to better manage its cash flow requirements.

36.     As of the Petition Date, the Debtor believes that it is current on its insurance premiums with respect to the pre-petition period.  However, to the extent there is an outstanding insurance policy premium that relates (in whole or in part) to the pre-petition period, the Debtor seeks authority to pay these pre-petition premiums in the ordinary course of business as such payments are necessary to keep the Debtor's insurance policies and programs in force.

37.     It is essential to the Debtor's efforts in this case that the Insurance Programs be maintained on an ongoing and uninterrupted basis.  The failure to pay premiums when due will result in a lapse in coverage and may affect the Debtor's ability to renew the policies.  If the insurance policies are allowed to lapse, the Debtor could be exposed to substantial administrative liability for damages resulting to persons and property of the Debtor, which would place the estate and assets at risk.  Moreover, under Georgia law, the Debtor is required to maintain workers' compensation policies.

**I.    Debtor's Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Pre-Petition Invoices,**

**(B) Deeming Utilities Adequately Assured of Future Performance, and (C)
Establishing Procedures for Determining Adequate Assurance of Payment
("Utilities Motion")**

38.     Utility services are essential to the Debtor's ability to sustain operations while in

this case.  In the normal conduct of its business, the Debtor has direct relationships with three (3)

utility companies (collectively, the "**Utility Companies**") for the provision of telephone,

internet, water, power and other services (the "**Utility Services**").  A list identifying the Utility

Companies and their notice addresses is attached to the Utilities Motion as Exhibit A (the

"**Utilities Service List**").

42.     At all relevant times, the Debtor has attempted to remain current with regard to its

utility bills.  Furthermore, to the best of the Debtor's knowledge, the Debtor is current on all

amounts owing to the Utility Companies, other than payment interruptions that may be caused by

the commencement of this chapter 11 case.

43.     Continuing an uninterrupted Utility Service is vital to the Debtor's ability to

sustain its operations during this case.  Because of the nature of the Debtor's operations,

termination or interruption of the Debtor's utility service would dramatically impair the Debtor's

ability to conduct business and would cause considerable economic harm.

44.     The relief requested in the Utilities Motion will ensure that the Debtor's

operations will not be disrupted by the suspension or termination of vital Utility Services or the

requests by the Utility Companies of unnecessarily large deposits that could endanger the

Debtor's liquidity.  If a disruption occurs, the impact of the Debtor's business operations and

revenues would be extremely harmful to the Debtor and all of its creditors.  Without the

requested relief, any interruption in services by the Utility Companies could bring the Debtor's

operations to a grinding halt.

**J.  Motion for Interim and Final Orders Authorizing Debtor to Obtain Financing
from HHM Aviation Financing, LLC Pursuant to 11 U.S.C. § 364(c) and the
Assumption of the Management Services Agreement Pursuant to 11 U.S.C. §
365(a) (the "DIP Financing Motion")**

45.    The Debtor requires, on an immediate basis, post-petition financing to operate
during this chapter 11 case, and to proceed to a sale to preserve operations and jobs and provide
a distribution to creditors.

46.    The Debtor does not generate sufficient amounts to fund this chapter 11 case and
will require post-petition financing.  HHM Aviation Financing, LLC (the "**DIP Lender**") is
willing to provide the debtor-in-possession financing on the usual and customary protections
granted to a third-party post-petition lender, as specified in the DIP Financing Motion and the
accompanying proposed interim order.  This financing would be through a credit facility in the
amount of $1,200,000.00 (the "**DIP Loan**").

47.    The Financing Motion also includes a budget (the "DIP **Budget**") to which the
Debtor must comply under the terms of the DIP Loan.  The Debtor and its professionals have
negotiated thoroughly and in good faith with the DIP Lender to ensure that, absent unforeseen
circumstances, the DIP Budget will cover the post-petition costs and expenses to continue
limited operations and expenses for this chapter 11 case.

48.    As a condition to the DIP Loan, the DIP Lender has requested and the Debtor has
agreed to enter into that certain Management Services Agreement.  The Debtor seeks to assume
the Management Services Agreement, allowing the DIP Lender to manage and consult with the
Debtor on its operations as outlined therein.

49.    The Debtor is currently negotiating and has had extensive discussions with the
DIP Lender about purchasing substantially all of the Debtor's assets through a 363 sale under the
Bankruptcy Code.  In such event, the DIP Lender will have a right to credit bid any amounts

extended under the DIP Loan towards the purchase price.

50.    The Debtor requests, by the DIP Financing Motion, immediate authority to incur

post-petition indebtedness on an interim basis, which is critical to ongoing operations.

**K.    Motion for Interim and Final Orders (A) Authorizing the Use of Cash Collateral
Pursuant to Section 363(c) of the Bankruptcy Code; (B) Requesting an
Expedited Interim hearing Thereon; and (C) Scheduling a Final Hearing on the
Valuation and Use of Cash Collateral (the "Cash Collateral Motion").**

51.    The Debtor requires the immediate and continued use of cash collateral to ensure

its continued operations during the pendency of this Case and to allow it to proceed to a sale of

substantially all of its assets, preserve current employee jobs, and create a distribution for

unsecured creditors.

52.    As outlined above, the Debtor seeks to enter into the DIP Loan with the DIP

Lender to supplement its cash needs during the pendency of this case. The DIP Loan by itself,

however, is not sufficient to allow the Debtor to continue its daily operations, even at its reduced

workforce capacity. The Debtor requires the use of its cash on hand and the proceeds generated

from the sale of aircraft.

53.    Wells Fargo claims a lien on, among other items, all of Debtor's cash, accounts

receivable, and inventory (the "**Cash Collateral**"). Whelen Engineer Company, Inc. ("**Whelen**")

also claims an interest in the Cash Collateral. Wells Fargo and Whelen are collectively referred

to as the Cash Collateral Respondents.

54.    As outlined in the Cash Collateral Motion, the Debtor proposes to use the Cash

Collateral in accordance with the budget attached to the Cash Collateral Motion (the "**Cash

Collateral Budget**") to (a) maintain its limited operations to enhance the prospects of a sale of

substantially all of its assets and (b) to pay disbursements as more fully described in the Cash

Collateral Budget.

55.     For the reasons outlined in the Cash Collateral Motion, without the use of the

Cash Collateral, the Debtor will be unable to carry on the operation of its business as a going

concern and the value of Debtor's business and the prospects of sale would be greatly

diminished.

56.     To the extent any Cash Collateral Respondent has a valid, perfected security

interest in the Cash Collateral, Debtor proposes to adequately protect such interest as follows:

(i)   The payment of all post-petition property taxes on any collateral held by the Cash
      Collateral Respondents;

(ii)  Maintaining adequate insurance on the Cash Collateral Respondents' collateral;

(iii) Continuing to repair and maintain such collateral, as necessary;

(iv)  Providing replacement liens or adequate protection payments to the extent such Cash
      Collateral is diminished by use pending the sale of the Debtor's business; and

(v)   Operating in substantial compliance with the Cash Collateral Budget.

57.     The Debtor requests, by the Cash Collateral Motion, immediate authority to use
the Cash Collateral on an interim basis, which is critical to ongoing operations.

**K.  Motion for Expedited Hearing on Debtor's First Day Motions.**

51.     The Debtor's ability to operate will be irreparably harmed unless expedited

hearings are held on the following First Day Motions:

(i)    Application for First Enlargement of Time to File Schedules, Statements, Lists,
       and Initial Reports;

(ii)   Motion to for an Order Limiting Notice and Establishing Notice Procedures;

(iii)  Motion for Order Authorizing (i)Continued Use of Existing Bank Accounts, (ii)
       Authorizing Continued Use of Existing Business Forms, and (iii) Granting
       Interim Waiver of Investment and Deposit Requirements;

(iv)   Motion for Order Authorizing Payment of Wages, Salaries, and Other Employee
       Benefits and Payment of Related Taxes and Withholdings;

(v)     Motion for Authority to Continue Pre-Existing Insurance Programs, to Maintain Insurance Premium Financing Programs, and to Pay Pre-Petition Premiums and Related Obligations;

(vi)    Motion for Interim and Final Orders Authorizing Debtor to Obtain Financing from HHM Aviation Financing, LLC Pursuant to 11 U.S.C. § 364(c) and the Debtor's Assumption of the Management Services Agreement Pursuant to 11 U.S.C. § 365(a).

(vii)   Motion for Interim and Final Orders (A) Authorizing The Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code; (B) Requesting an Expedited Interim hearing Thereon; and (C) Scheduling a Final Hearing on the Valuation and Use of Cash Collateral.

(the "**Expedited First Day Motions**").

52.     The Expedited First Day Motions seek relief necessary to enable the Debtor to continue to operate until such further notice as the Court may require can be given. Additionally, the relief requested in the First Day Motions is the product of the Debtor's exercise of sound business judgment.

53.     It is my understanding that the relief requested by the Debtor is consistent with the relief routinely granted in other Chapter 11 bankruptcy cases.

54.     For all of the foregoing reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed contemporaneously with this Declaration.

[SIGNATURE PAGE ON FOLLOWING PAGE]

I declare under penalty of perjury that the forgoing is true and correct.

_____
K. Payne Hughes, Declarant

Executed on 9/4/19.