# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| THRUSH AIRCRAFT, INC., | : | Chapter 11 Case No. 19-10976 |
| | : | |
| Debtor. | : | |

---

| | | |
|---|---|---|
| THRUSH AIRCRAFT, INC. | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | CONTESTED MATTER |
| | : | |
| WELLS FARGO BANK, N.A.; WELLS FARGO EQUIPMENT FINANCE, INC.; LEAF CAPITAL FUNDING, LLC; K. PAYNE HUGHES; TRUMPF FINANCE, INC.; WHELEN ENGINEERING COMPANY, INC.; SYNOVUS BANK; WINTHROP RESOURCES CORPORATION, INC.; TOYOTA INDUSTRIES COMMERCIAL FINANCE, INC.; HON. SHONNA COLLEY JOSEY, DOUGHERTY COUNTY TAX DIRECTOR; ALBANY-DOUGHERTY COUNTY PAYROLL DEVELOPMENT AUTHORITY, AB&T NATIONAL BANK, ONE GEORGIA AUTHORITY, HON. MARK BUTLER, COMMISSIONER GEORGIA DEPARTMENT OF LABOR | : : : : : : : : : : : : : : | |
| | : | |
| Respondents. | : | |
| | : | |

---

**MOTION FOR ORDERS APPROVING (I) (A) BID PROCEDURES, (B) PROCEDURES AND NOTICE RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) BREAK-UP FEE; AND (II) (A) FORM OF ASSET PURCHASE AGREEMENT, (B) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (C) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) WAIVER OF THE 14-DAY STAY OF FED. R. BANKR. P. 6004(h) AND 6006(d)**

Thrush Aircraft, Inc., debtor and debtor in possession (the "**Debtor**" or "**Seller**" or "**Thrush**") submits this motion pursuant to sections 105, 363, 365, 503, and 506 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), and Rules 2002, 3012, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of orders seeking various types of relief in conjunction with the proposed sale of substantially all of its assets (the "**Motion**"). In support of this Motion, the Debtor respectfully represents as follows:

## Preliminary Statement and Relief Requested

1.      This Motion, and the accompanying Chapter 11 bankruptcy filing by the Debtor, represents the culmination of an effort by the Debtor and its professionals to preserve the going concern value of the Debtor for the benefit of its customers, creditors, vendors, employees, and the Albany community as a whole.

2.      To accomplish this, the Debtor seeks two types of relief by this Motion. First, the Debtor seeks approval of procedures to allow for an auction of substantially all of its assets, including certain bidding protections for the proposed Stalking Horse Bidder (as defined below). Second, upon conclusion of the auction, the Debtor seeks a hearing in which it will request that this Court approve the sale, free and clear of all liens, approve the assumption and assignment of contracts to the winning bidder, and waive the automatic supersedeas provisions of Bankruptcy Rules 6004 and 6006 so that the sale can close promptly upon the satisfaction of all closing conditions.

3.      As to the first relief requested, the Debtor requests that the Court hold a hearing (the "**Bid Procedures Hearing**") and enter an order (the "**Bidding Procedures Order**") no later than seven (7) days after the date hereof, approving (i) the proposed bid procedures (the "**Bid Procedures**"), (ii) the form of notice and procedures relating to the assumption and assignment of certain executory contracts and unexpired leases (the "**Procedures for Assumption and Assignment**"), and (iii) the Break-Up Fee (as defined below).

2

4.      A copy of the proposed Bidding Procedures Order is attached hereto as **Exhibit A**. If the Bidding Procedures Order is not entered within seven (7) days of the date hereof, the Debtor will likely be in a precarious financial position as it only has limited funds to continue to operate during the limited production period.  Additionally, under the terms of the Agreement, the Stalking Horse Bidder has agreed to add $100,000.00 to the Purchase Price as an additional incentive if the transaction is approved by the Court on or before Friday, November 1, 2019.

5.      As to the second relief requested, the Debtor further requests that the Court conduct a second hearing (the "**Sale Hearing**") to be held no later than three (3) days after the Auction, if any, and enter an order (the "**Sale Order**") approving (i) the Agreement (as defined below), (ii) the sale of the assets of the Debtor outside the ordinary course of business, free and clear of any and all interest, liens, claims, and encumbrances, (iii) the assumption and assignment of certain executory contracts and unexpired leases in connection with such sale, (iv) valuation of various claims in connection with the proposed disposition, and (v) the waiver of the stay provisions of Bankruptcy Rules 6004(h) and 6006(d).  Additionally, the Agreement contains an incentive of $100,000.00 added to the Purchase Price if the transaction is approved by the Court on or before Friday, November 1, 2019.  The Debtor believes that this timeframe is sufficient in light of the exhaustive efforts already put forth by the Debtor to market the business.

### Jurisdiction, Venue and Background

6.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

7.      The statutory predicates for the relief requested in this Motion are Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

8.      On September 4, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition with the United States Bankruptcy Court for the Middle District of Georgia, Albany Division under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has operated and

managed its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

9.      As the date hereof, an official committee of unsecured creditors has been appointed and organized (the "**Unsecured Creditors Committee**").

10.     Thrush is a manufacturer of single engine turbine powered aircraft (the "**Business**"). Headquartered in Albany, Georgia, Thrush manufacturers and sells a full range of aerial application aircraft utilized in agriculture, forestry, and firefighting roles worldwide. Thrush currently offers and actively sells to customers throughout the world five different models of aircraft, utilizing engines manufactured by both Pratt & Whitney and General Electric. Moreover, Thrush's agricultural models have evolved into new uses in other industries, such as border patrol and reconnaissance for world governments.

11.     In 2017, due to a lack of operating capital and various defaults with its primary secured lender, Wells Fargo Bank, National Association ("**Wells Fargo**"), it became abundantly clear that Thrush needed to find a buyer for the Business through a sale of assets or an equity exchange. Thrush embarked on a widely announced marketing effort that it was in search for a potential purchaser. During the course of time, many interested investors showed interest in acquisition of the Business, but none came to a final offer and some even said they would not be interested in purchasing unless the Assets of Thrush are sold through a bankruptcy case. During this marketing period, Thrush continued to operate to yield the highest value for the Business. The reason for the continued operation is twofold. First, if the Business were to close the FAA Production Certificate for the facility in Albany could be revoked by the FAA, thereby substantially reducing the marketability of the Business and causing a purchaser great expense to obtain the same again from the FAA thereby reducing the value for Thrush's creditors. Second, if the Business were to close many of the highly skilled employees would simply leave Albany and it would be difficult for a purchaser to rehire employees or retrain new employees for continued production.

12.    In October 2017, Thrush engaged Nexa Capital Partners, LLC ("**Nexa**") to develop a list of potential purchasers for a limited six month period.  Nexa's efforts yielded a list of 30 potential purchasers, of which nine expressed an interest and three prepared some form of verbal or written offer.  Nonetheless, a transaction never came to fruition.  The Stalking Horse Bidder was not among the parties interested at such time.

13.    With such a long marketing period, Thrush continued to incur substantial losses resulting in the drastic measures to reduce expenses including implementing many costs reductions and the eventual and unfortunate reduction of 110 employees on August 28, 2019, following dissemination of a notice under the WARN Act.  Since August 28, 2019, Thrush has continued to operate on a limited basis with 50 employees in order to continue to build out six aircraft and maintain the value of the Business for creditors and other stake holders.

14.    The primary objective of this case to liquidate through a sale of substantially all of the Debtor's assets as a going concern.  Since the Petition Date, Thrush has received an offer for the Business from HHM Aviation Financing, LLC (the "**Stalking Horse Bidder**").  In order to yield the highest and best value for the Business, Thrush files this Motion.

### Stalking Horse Bidder's Asset Purchase Agreement

15.    The Debtor has engaged in extensive, good faith and arm's length negotiations with the Stalking Horse Bidder regarding the terms of an asset purchase agreement.  These negotiations culminated in that certain Asset Purchase Agreement between the Debtor and the Stalking Horse Bidder (the "**Agreement**"),[1] a copy of which is attached hereto as **Exhibit B**, pursuant to which, and subject to Court approval, the Stalking Horse Bidder has agreed to purchase substantially all of the Debtor's assets (the "**Acquired Assets**") on an "as is, where is, with all faults" basis in exchange for:

---

[1] Capitalized terms used but not otherwise defined in this Sale Motion shall have the meanings ascribed to them in the Agreement attached hereto as Exhibit B.

a. $3,900,000.00 (subject to the adjustments described below, **"Cash Price to Wells Fargo"**), which includes $250,000.00 for satisfaction of Seller's P-Card indebtedness to Wells Fargo, *plus*

b. a promissory note in the principal amount of $1,150,000.00, payable by Purchaser to the order of Wells Fargo (or Ex-Im Bank, as assignee), in the form attached as <u>Schedule 2.3(b)(iii)</u> to the Agreement, with interest to accrue annually on the unpaid principal amount of 5.00% per year, principal and interest shall be payable in one installment of interest only due one year after the Closing Date, three consecutive semi-annual installments thereafter of interest only, and the final installments of the full balance of principal and accrued but unpaid interest due and payable on the first day of the 36th month after the Closing Date (**"Promissory Note Purchase Price"**), *plus*

c. the forgiveness or assumption of Seller's obligations under the DIP Indebtedness (**"DIP Forgiveness Amount"**), *plus*

d. the aggregate sum of the amounts that Purchaser and the payees of those promissory notes identified on Schedule 2.2(a) ("**Promissory Notes Payment**") have negotiated as the amount to be received by the payees of the promissory notes, as identified and reported to the Bankruptcy Court prior to seven (7) days before the Auction Date (whether paid at Closing or through delivery of Purchaser's promissory note to the payee), and *plus*

e. the aggregate amount of money necessary to cure all pre-Closing defaulted obligations owed under the Assigned Contracts to be assumed by the Debtor and assigned to the Stalking Horse Bidder, as such contracts and cure amounts are identified on <u>Schedule 2.1(a)(ii)</u> to the Agreement ("**Assigned Contracts Cure Amount**"); provided, however, that the Assigned Contracts Cure Amount shall not be taken into account for purposes of determining the Topping Bid under Section 8.3 of the Agreement, but the Promissory Notes Payment shall be taken

into account for purposes of determining the Topping Bid under Section 8.3 of the Agreement.

The Cash Price to Wells Fargo (as increased or decreased in accordance with the adjustments described in this Section 15), the Promissory Note Purchase Price, the DIP Forgiveness Amount and the Promissory Notes Payment are collectively referred to as **"Aggregate Purchase Price"**).

The Cash Price to Wells Fargo payable at Closing shall be subject to the following adjustments: (i) the Cash Price to Wells Fargo shall be *reduced* by an amount equal to the gross sales proceeds received by Seller for the sale of a certain experimental aircraft currently being utilized in connection with a new engine certification program for General Electric (the **"Experimental Aircraft"**), if the Experimental Aircraft is sold and the sales proceeds are received by Seller before the Closing Date; (ii) the Cash Price to Wells Fargo shall be *increased* by $100,000.00 if the Sale Order is entered by the Bankruptcy Court no later than November 1, 2019; (iii) the Cash Price to Wells Fargo shall be *increased* by $100,000.00 if Wells Fargo Equipment Finance, Inc. (**"WFEF"**) agrees to accept such payment in satisfaction in full of its promissory notes and to release all its liens on equipment identified as 001-0331232-703 and 001-0331232-704, with such $100,000.00 to be paid to WFEF, and (iv) the Cash Price to Wells Fargo shall be *increased* by an amount equal to $75,000 for each of the five aircraft identified in the budget attached to the Debtor's first-day pleadings (the **"Designated Aircraft"**) that has not been sold by Seller before the Closing Date, provided, however, that the amount payable for each unsold Designated Aircraft shall be paid to Wells Fargo, after the Closing Date, upon the receipt of sales proceeds for such Designated Aircraft but in no event later than 90 days after the Closing Date.

All amounts payable to Wells Fargo or WFEF shall be payable and paid without defense, offset, deduction, or counterclaim .

16.     The Debtor has determined that the Stalking Horse Bidder's offer for the Acquired Assets, pursuant to the Agreement, is fair, reasonable, and in the best interest of the

Debtor's estate, its creditors, and all other parties in interest, and that the floor established for the proposed sale of the Acquired Assets, subject to higher and better bids pursuant to an open auction process approved by the Court, affords the Debtor the best opportunity to maximize value for its creditors.

17.    To ensure that the Debtor has maximized the value of the Acquired Assets, the Stalking Horse Bidder has agreed that the sale of the Acquired Assets must be subject to the Bid Procedures below, which are incorporated into the Agreement and the Bidding Procedures Order.

18.    The Bid Procedures contemplate entry of the Bidding Procedures Order by the Court approving the Bid Procedures no later than seven (7) days of the date hereof and that the Court will conduct a sale hearing and enter the Sale Order no later than one (1) day after the Auction, if any.    The Debtor believes that the timeframe set forth in the Bid Procedures is reasonable and permits other entities sufficient time to satisfy the criteria to become a Qualified Bidder (as defined in the Bid Procedures).    While the Debtor does contemplate a sales process that is quick when measured from the date hereof, this sale process has been on-going since 2017, and the parties most likely to submit a higher or better bid are already well aware of the Debtor and its assets, and should be able to move quickly, if they are interested.

19.    In order to induce the Stalking Horse Bidder to enter into the Agreement, and as a part of extensive negotiations between the Stalking Horse Bidder and the Debtor, the Stalking Horse Bidder required (and the Debtor agreed to grant, subject to this Court's approval), a combined breakup fee and expense reimbursement in the amount of $200,000.00 (the "**Break-Up Fee**").

### The Bid Procedures and Auction Procedures

20.    The Bid Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among Qualified Bidders (as defined below) and the Debtor, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of the Prevailing Bid (as defined below).    The Bid Procedures and Auction Procedures were developed consistent with the

Debtor's competing needs to promote participation and active bidding, and to comply with the terms and conditions of the Agreement, and the risk of business disruption associated with a prolonged stay in bankruptcy.

21.     The Debtor requests that this Court authorize the Debtor to solicit bids for and conduct the sale of the Acquired Assets using the following procedures:

**A.     Requirements Applicable to all Qualified Bids**:   These procedures govern offers for the Acquired Assets ("**Bids**") submitted both prior to and during the Auction.  Bids submitted in conformity with the requirements specified in subsections (1) through (5), below, are Qualified Bids and may be considered by the Seller.  Defined terms in these Bid Procedures shall have the meanings assigned in the Template APA (defined below).

(1)     **Bidder Qualifications**.  The Stalking Horse Bidder is deemed to be a Qualified Bidder at the Auction.  No other prospective bidder will be permitted to bid pre-Auction or at the Auction unless such party has been deemed "financially qualified" by the Debtor and its counsel Stone & Baxter, LLP ("**S&B**").  A "financially qualified" bidder is one who has demonstrated to the satisfaction of the Debtor and S&B that it has the financial and other wherewithal and is properly authorized to consummate the transaction contemplated by the bid and to Close on or before November 15, 2019, or who has provided satisfactory proof of authorization and committed lending sufficient to consummate the transaction (a "**Qualified Bidder**").  All Bids and inquiries prior to the Auction must be submitted through S&B.

(2)     **Bids to be written and substantially uniform.**  Bids submitted pre-Auction and at the Auction must be substantively in the form of the template asset purchase agreement attached to the Motion as **Exhibit B** (the "**Template APA**").  The Bid must be delivered to the Seller, through S&B, in the form of an executed "clean" version of the Template APA, accompanied by a redlined version to reflect any proposed changes to the terms and conditions of the Template APA.  A Microsoft Word® Version of the Template APA may be obtained by contacting S&B.

(3)     **Absence of Contingencies**.  Submission of a Qualified Bid shall not constitute a waiver of any unsatisfied condition precedent described in Section 3.1 of the Template APA, except that the following conditions shall be waived by the submission of a Qualified Bid: (1) any due diligence contingency, (2) any financing contingency; and (3) approval from any board of directors, shareholders, or otherwise. No Qualified Bid may be reduced, revoked, or withdrawn prior to the end of the Auction. Except for the Stalking Horse Bid and any Qualified Bid announced as the

opening Qualified Bid at the Auction, Bids delivered prior to the beginning of the Auction will not be shared among Bidders.

(4) **The Bid Deadline and the Topping Bid**. All Qualified Bids must be received prior to 5:00 p.m. local time in Macon, Georgia on Friday, October 25, 2019 (the "**Bid Deadline**"). Topping Bid means a Qualified Bid that provides a purchase price equal to or greater than the sum of (1) the Cash Price to Wells Fargo, plus (2) the Promissory Note Purchase Price, plus (3) the DIP Forgiveness Amount, plus (4) the Promissory Notes Payment (as identified and reported to the Bankruptcy Court prior to seven (7) days before the Auction Date), and plus (5) $250,000.00 (the "**Topping Bid**"). The amount of the Topping Bid will be announced to all known Qualified Bidders on or before **October 23, 2019**. If a Qualified Bid that is a Topping Bid is received, the Auction will be held in accordance with the procedures below. If a Topping Bid is not received by the Bid Deadline, the Debtor will dispense with the Auction.

(5) **Good Faith Deposit.** Bids submitted pre-Auction must be accompanied by a cash or cash-equivalent earnest money deposit in the amount of $250,000.00 (the "**Good Faith Deposit**") under substantially similar terms as the Agreement. The Good Faith Deposit must be tendered by each Qualified Bidder by the time of submittal of such party's Topping Bid, by wire transfer or in cash-equivalent certified funds. The Good Faith Deposit will be forfeited in the event the Bidder of a Prevailing Bid or Back-Up Bid defaults under the terms of Template APA (or, if applicable, the Stalking Horse APA) evidencing the Accepted or Provisionally Accepted Bid. Good Faith Deposits will be refunded to unsuccessful Bidders, other than Back-Up Bids, within one (1) business day following Court Approval. Refunds to Back-Up Bids will be made within one (1) Business Day following the Closing of the Prevailing Bid. Qualified Credit Bidders shall not be required to tender a Good Faith Deposit.

**B.** **The Auction**. Subject to subparagraph A(4) above, the Acquired Assets will be offered for sale at Auction. Bids will be solicited and entertained by the Seller substantially in accordance with the provisions of these Procedures, subject to announcements at the beginning of the Auction. Announcements by the Seller at the Auction will supplement the following Procedures, unless inconsistent with an express requirement set out below. Announcements and Bids made at the Auction will be recorded and transcribed by a Certified Court Reporter(s) (the "**Bid Record**").

(1) **Simultaneous Auction.** All assets of the Debtor will be auctioned simultaneously, with Qualified Bids sought in each round. Qualified Bidders may select which executory contracts and Promissory Note Payments of the Debtor they wish to have included in their bids as each round of bids is submitted. Rounds will continue until such time as no higher or better Qualified Bids are offered. Any Bid not designated as the

Prevailing Bid or a Back-Up Bid shall be deemed rejected at the time Court Authorization is obtained on the Prevailing Bid and Back-Up Bid.

(2)  **Announcement of Highest and Best Qualified Bid at Beginning of Auction.**  The highest and best Qualified Bid received prior to the beginning of the Auction will be announced as the opening bid.  At the Auction, Qualified Bidders and/or the Stalking Horse Bidder (it being understood that the Stalking Horse Bidder shall be deemed to be a Qualified Bidder) may submit successive bids in increments of at least $50,000.00 ("**Incremental Bids**") cash greater than the prior bid for the purchase of the Acquired Assets until there is only one offer that the Debtor determines (in the exercise of its reasonable discretion) is the highest or best offer for the Acquired Assets (the "**Prevailing Bid**").

(3)  **Conduct of Auction**.  The Auction will continue until bidding is complete and the Seller, after consulting with Wells Fargo and the Unsecured Creditors Committee, selects the Prevailing and Back-Up Bid(s), and determines that such bid(s) are from Qualified Bidders.  Qualified Bidders will be polled for bids in each round in the order in which bids were received, ending with the Stalking Horse Bidder.

(4)  **Qualified Bidder Representative Must Be Present at the Auction**.  Qualified Bidders must be represented by a representative who is physically present at the Auction with authority to sign all written amendments to the Template APA submitted in advance of or at the Auction that are necessary to conform the Template APA to each bid made by such Qualified Bidder at the Auction (a "**Qualified Bidder Representative**").  Qualified Bidder Representatives must register with and be certified by S&B prior to being able to participate in the Auction.

(5)  **Bids at the Auction Must Be in Writing**.  Incremental Bids submitted by Qualified Bidders at each round of the Auction must be announced from a designated podium and recorded in the Bid Record.  Verbal bids must be conformed to each Qualified Bidder's Template APA and initialed by the bidder's authorized representative before the next round of bidding.  Adequate time between rounds of bidding will be granted to allow the written bids to be conformed to reflect the increased bids offered through the preceding round.

(6)  **Bid Value of Assumed Liabilities**.  The bid value of Assumed Liabilities included in any bids (which, solely for purposes of determining the Prevailing Bid, shall be deemed to include the Promissory Notes Payment described the Agreement with the Stalking Horse Bidder) will be determined by the Debtor in its absolute discretion, provided that the Debtor shall determine the bid value of each Assumed Liability consistently for all Bids submitted which include such Assumed Liability

in the Aggregate Purchase Price.

(8) **Rejection of Bids**.  The Debtor reserves the right to reject any or all Qualified Bids at any time before a Qualified Bid is accepted as a Prevailing Bid.

(9) **Credit Bids**.  A Bidder holding a claim found by the Bankruptcy Court to be an allowed claim that is secured by property of the Debtor's estate may "credit bid" at the Auction (a "**Qualified Credit Bid**"), to the extent authorized by 11 U.S.C. § 363 (k) (a "**Credit Bidder**"), provided that such Credit Bidder has filed a proof of claim in the bankruptcy case and been financially qualified by S&B with respect to their ability to pay or otherwise satisfy at Closing: (i) all amounts required to be paid at the Closing under the Template APA and (ii) the amount of the Bid in excess of the Credit Bid ("**Qualified Credit Bidder**"). Qualified Credit Bids are subject to all requirements of these Sales Procedures.

(10) **Announcement of Provisionally Accepted Bids**.  At the conclusion of the Auction, the Debtor will announce the highest and best bid or Prevailing Bid.  The Debtor will then accept the second highest and best bid as the Back-Up Bid (the "**Back-Up Bid**").  Final Asset Purchase Agreements will be executed by the Debtor and each of the parties constituting the Prevailing Bid and the Back-Up Bid before leaving the Auction.

(11) **Location of and Admission to the Auction**.  The Auction will be conducted at the at the Cherry Blossom Suite, Fickling & Co. Building, Suite 1600, 577 Mulberry Street, Macon, Georgia 31201, or at such other location as may be designated by the Debtor **commencing at 10:00 o'clock, a.m. Eastern Time on the 29th day of October, 2019** and will continue from day-to-day or time-to-time until the Prevailing Bid and Back-Up Bid are announced.  The Auction will be a private sale.  Only Qualified Bidders and parties in interest in the Bankruptcy Case, or their authorized representatives or attorneys, will be admitted, in person, to the Auction.  There will be no provision for general telephone monitoring of the Auction, but Qualified Bidder Representatives may communicate by electronic or any other means with Qualified Bidders between each round of bidding.

(13) **Interested Party Consultations**.  The Official Committee of Unsecured Creditors (the "**Unsecured Creditors Committee**"), holders of claims filed as secured in the Bankruptcy Case (whether or not "allowed" by order of the Court as of the time of the Auction), parties to Capital Leases with the Debtor, and the United States Trustee or her representative may attend the Auction, and provided such parties are in attendance at the Auction, are "Interested Parties" for the purpose of these Bid Procedures.

Before the beginning of the Auction and between any round of bidding, upon request of any Interested Party or its authorized counsel in attendance at the Auction, the Seller and S&B will consult with such Interested Party concerning any matter pertaining to the Auction. The consultations will be held outside of the bidding room and shall not unduly delay the Auction. No objection by an Interested Party to any announcement made at the Auction or to any Bid or other occurrence during the Auction shall be stated on the Bid Record or communicated to a Qualified Bidder, but shall be directed solely to the Debtor and to S&B and, if so directed and not resolved, shall be stated on the Bid Record following the final round of bidding and shall thereupon be deemed preserved until the conclusion of opening statements at the Sale Hearing (as defined below).

(14) **Hearing on Approval of Sale**. Following the conclusion of the Auction, pursuant to the Motion Seeking Authority to Sell the Assets, the Seller will seek authorization from the Bankruptcy Court to sell the Acquired Assets to the Qualified Bidder submitting the Prevailing Bid or Back-Up Bid, as applicable, and to consummate the sale. Such hearing will be held in the United States Bankruptcy Court for the Middle District of Georgia, in the Courtroom B of such Court, located at 433 Cherry Street, Macon, GA 31201, or at such other location as may be designated by the Court, commencing at **10:00 a.m. Eastern Time on the 30th day of October, 2019**, or such later date and time set by the Bankruptcy Court, (the "**Sale Hearing**"). The Bankruptcy Court will be requested to enter an Order authorizing the Seller to consummate the sale under 11 U.S.C. § 363, which Order will constitute Court Approval of the Sale ("**Court Authorization**"). No person shall have standing to appear and be heard at the Sale Hearing except as provided by law. No provision of these Bid Procedures, the certification of any person as a Qualified Bidder, attendance at the Auction, or the submittal of any Bid at the Auction, shall be construed to confer standing upon any person to appear and be heard at the Sale Hearing.

(15) **Closing; Back-Bids**. If the Closing and receipt by the Debtor's estate of the cash consideration does not occur with respect to any Prevailing Bid on or before December 1, 2019, then the Debtor may close with Back-Up Bid.

22. The Debtor believes that these Bid Procedures provide an appropriate framework for selling the Acquired Assets in a uniform fashion and will enable the Debtor to review, analyze and compare all bids received to determine the highest and best bid.

**Procedures for Assumption and Assignment of Contracts and Unexpired Leases**

23.     To facilitate and consummate the sale of the Acquired Assets, the Debtor seeks approval of the assumption and assignment to the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtor pursuant to the Bid Procedures) of certain executory contracts and unexpired leases related to the Acquired Assets (all such executory contracts and unexpired leases being collectively referred to as the "**Assigned Contracts**"). The Assigned Contracts subject to assumption and assignment, unless the Stalking Horse Bidder revises such list in its discretion, are an exhibit to the Agreement.

24.     No later than three (3) business days after entry of the Bidding Procedures Order, the Debtor will serve the counterparties (the "**Counterparties**") to the Assigned Contracts with a detailed notice (the "**Notice of Assumption and Assignment of Contract**") that contains the following information: (a) notice of the Debtor's intent to assume and assign certain of the Assigned Contracts to the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtor pursuant to the Bid Procedures), effective as of the date of the closing of the transaction with such party (the "**Closing**"), (b) a list of the Assigned Contracts, including the Assigned Contracts Cure Amount for each Assigned Contract that is designated to be assigned and assumed and that is required to be cured pursuant to Section 365 of the Bankruptcy Code, (c) the procedures for filing any objections to the assumption and assignment of the Assigned Contracts or the proposed Assigned Contracts Cure Amount. The form of the Notice of Assumption and Assignment of Contract, attached as **Schedule 1** to the Bidding Procedures Order shall be subject to prior Court approval. Each Notice of Assumption and Assignment of Contract shall be deemed a contested matter in accordance with Bankruptcy Rule 6006. The presence of a contract, lease, or agreement on the Notice of Assumption and Assignment of Contract does not constitute an admission that such contract, lease, or agreement is an executory contract. The Debtor reserves all of its rights, claims, defenses, and causes of action with respect to all contracts, leases, and agreement listed on the Notice of Assumption and Assignment of Contract.

25.    The Notice of Assumption and Assignment of Contract shall also provide that objections to any Assigned Contracts Cure Amount or to assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Debtor.  If the Prevailing Bid is not that of the Stalking Horse Purchaser, then the deadline to object to assumption and assignment (including on grounds of adequate assurance of future performance) shall be extended to the date of the Sale Hearing; provided, however, that the deadline to object to the Assigned Contracts Cure Amounts shall not be extended.

26.    Prior to the Sale Hearing, the Debtor shall designate the final list of Assigned Contracts to be assigned to and assumed by the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtor pursuant to the Bid Procedures) at Closing pursuant to the Sale Order (the "**Assigned Contracts**").

**Basis for Relief**

**A. The Bid Procedures Are Appropriate and in the Best Interest of the Debtor, the Estate, and Creditors.**

   **i.  The Bid Procedures are reasonable, appropriate, and will maximize value.**

27.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir, 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objection of the Code [is] to enhance the value of the estate at hand").

28.    To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v.*

*Integrated Res. Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding…maximize the value of the debtor's assets").

29.    The Debtor believes that the Bid Procedures will increase the likelihood that the Debtor will receive the greatest possible price for the Acquired Assets because such procedures will ensure a competitive and fair bidding process.  Debtor also believes that the Bid Procedures will promote active bidding from seriously interested parties and will generate the highest or otherwise best offer reasonably available for the Acquired Assets.  The Bid Procedures will allow the Debtor to conduct the Auction in a controlled, fair and open manner that will encourage participation by financially capable bidders that demonstrate the ability to close the sale.  The Debtor believes that the Bid Procedures will encourage bidding, are consistent with other procedures previously approved by courts in this and other districts, and are appropriate under the relevant standard governing auction proceedings and bidding incentives in bankruptcy proceedings. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537.

30.    Additionally, the Debtor is required to complete the auction and sale process on the timetable set forth in the Bid Procedures and required under the Agreement, which timetable is integral to the sale process and, the Debtor submits, is fair and reasonable in light of the circumstances of this Chapter 11 case.

31.    The Debtor requests that the Court approve the Bid Procedures as fair and reasonable under the circumstances and authorize and direct the Debtor to proceed in accordance with them.

### ii.  The Break-Up Fee amount is reasonable and appropriate.

32.    In order to induce the Stalking Horse Bidder to enter into the Agreement, and as a part of extensive negotiations between the Stalking Horse Bidder and the Debtor, the Stalking Horse Bidder required (and the Debtor agreed to grant), the Break-Up Fee in the amount of $200,000.00 as provided in and subject to the terms and conditions set forth in the Agreement and Bidding Procedures.

33.    In the context of bankruptcy cases, it is appropriate to grant buyer protections to prospective purchasers.  Buyer protections (including expense reimbursements and breakup fees) are designed to compensate a prospective purchaser for the costs and risk involved in preparing and proposing a bid that will establish a minimum standard for competing bids.  *See Integrated Resources*, 147 B.R. at 658 (breakup fees are "important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (breakup fees compensate a prospective purchaser "for the time, efforts, resources, lost opportunity costs and risks incurred.").

34.    In *Integrated Resources*, the court identified the following facts in determining whether to approve a breakup fee: (1) whether the negotiations of the fee are tainted by self-dealing or manipulation, (2) whether the existence of the fee hampers rather than encourages other bidding, and (3) whether the amount of the fee is reasonable relative to the proposed purchase price.  *Integrated Resources*, 147 B.R. at 662.  *See also APP Plus*, 223 B.R. at 875.

35.    With respect to the first *Integrated Resources* factor, the Break-Up Fee is the result of arm's length negotiations involving the Debtor and the Stalking Horse Bidder, in consultation with their respective counsel.

36.    Second, the Agreement will enhance the bidding for the Acquired Assets by generating increased interest among other potential bidders and providing a baseline by which the Debtor can evaluate competing bids, including the minimum acceptable terms on which the proposed transaction can proceed.  *Id.*  Therefore, rather than "chilling" the bidding process, the Debtor believes that the Break-Up will initiate the bidding process, will continue to encourage this process, and should be approved by the Court.  *See In re Wintz Companies*, 230 B.R. 840, 846 (8th Cir. B.A.P. 1999) (noting that courts have permitted breakup fees when they encourage rather than discourage bidding).

37.    As to the third factor, the amount of the Break-Up Fee is not unreasonable in comparison to the size of the transaction.  In light of this total transaction value, the Break-Up Fee (including reimbursement of expenses) will be approximately 3.2% to 3.4% of the total

consideration (not including the payment by the Stalking Horse Bidder of the Assigned Contracts
Cure Amount and the Promissory Notes Payment, each of which will increase the total
consideration and lower the aforementioned percentage). This is in line with other case law.
*See, e.g. Integrated Resources*, 147 B.R. at 662 (breakup fee of up to 3.2%, plus reimbursement
of expenses, found to be reasonable; expert testimony acknowledged that the average breakup
fee is 3.3%); *In re Firstline Corporation*, No. 06-70145 (Bankr. M.D. Ga. Aug. 16, 2006) (J.
Walker) (approving breakup fees equal to 2.25% and 2.6% of the cash purchase price); *In re
AtheroGenics, Inc.*, No. 08-78200 (Bankr. N.D. Ga. March 17, 2009) (J. Massey) (approving
breakup fee equal to 10% of the cash purchase price and approving additional expense
reimbursement in an amount up to 10% of the case purchase price); *In re Dan River, Inc.*, No.
04-10990 (Bankr. N.D. Ga. Dec. 17, 2004) (J. Drake) (approving a breakup fee equal to 5.3% of
the cash purchase price).

38.    The Third Circuit Court of Appeals has also addressed the appropriate standard
for determining whether proposed bidding incentives in the bankruptcy context are appropriate.
In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the Court of
Appeals held that even though bidding incentives are measured against a business judgment
standard in non-bankruptcy transactions, the administrative expense provisions of Section 503(h)
of the Bankruptcy Code govern bidding incentives in the bankruptcy context. Finding no
"compelling justification" for treating an application for breakup fees and expenses under
Section 503(b) any differently from other applications for administrative expenses, the Court
concluded that,

> the determination whether break-up fees or expenses are allowable under § 503(b)
> must be made in reference to general administrative expense jurisprudence. In
> other words, the allowability of break-up fees, like that of other administrative
> expenses, depends upon the requesting party's ability to show that the fees were
> actually necessary to preserve the value of the estate.

*Id.* at 535.

39.     In *O'Brien*, the Third Circuit identified at least two circumstances in which bidding incentives may provide actual benefit to the estate, justifying administrative expense status.  First, there exists an actual benefit to the estate whether "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, where the availability of budding incentives induces a prospective buyer to research the value of the debtor and submit a bid that serves as a minimum bid on which other bidders can rely, the initial "bidder may have provided a benefit to the estate by increases the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*  Both of those circumstances exist in this case, because the inducement of the Break-Up Fee was critical in persuading the Stalking Horse Bidder to make an initial offer, which will serve as a "floor" for other bidders in connection with the proposed sale process, and to expend the time and resources associated with conducting due diligence regarding the Acquired Assets and with negotiating and entering into the Agreement.

40.     Under the "administrative expense standard enunciated in *O'Brien*, as well as the "sound business judgment" standard followed in other jurisdictions, the Bid Procedures proposed by the Debtor should be approved as fair and reasonable.

### iii.  The Topping Bid and Subsequent Overbids are reasonable and appropriate.

41.     The same is true with respect to the other monetary matters in the Bid Procedures. The Bid Procedures provide that the topping bid (the **"Topping Bid"**) must equal or exceed the sum of the amount of (1) the Cash Price to Wells Fargo, plus (2) the Promissory Note Purchase Price, plus (3) the DIP Forgiveness Amount, plus (4) the Promissory Notes Payment, and plus (5) $250,000.00.  As with Break-Up Fee, the Topping Bid amount is not excessive when taking into account the total transaction value plus the other amounts the Stalking Horse Bidder is paying.

42. The amount of the Topping Bid will be announced to all known Qualified Bidders on or before October 23, 2019.

43. In the event that the Auction is held, bidding shall commence at the amount of the Topping Bid, and the Qualified Bidders may submit successive bids in increments of at least $50,000.00 above the then highest or otherwise best bid.

44. The Debtor believes that such bid increments are reasonable under the circumstances and will enable the Debtor to maximize the value for the Acquired Assets without chilling the bidding process. The Debtor believes that setting the bid increments at $50,000.00 strikes the appropriate balance between maximizing value for creditors and avoiding prohibitively large bid increments that would discourage potential bidders from participating in the sale process.

### iv. The Notice and Procedures for Assumption and Assignment are reasonable and appropriate.

45. As part of the relief requested herein, the Debtor also seeks authority under Sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assigned Contracts to the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtor pursuant to the Bid Procedures). The Bidding Procedures Order specifies the Procedures for Assumption and Assignment, the process by which the Debtor will serve the Notice of Assumption and Assignment of Contracts, and the procedures and deadlines for counterparties to the Assigned Contracts to file objections.

46. The Assumption and Assignment Procedures ensure that each counterparty will have sufficient notice of such assumption and assignment, and an opportunity to contest the Assigned Contracts Cure Amount, if any, for its Assigned Contract, as well as the ability of the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtor pursuant to the Bid Procedures) to provide adequate assurance of future performance with respect to such Assigned Contract.

47.     Accordingly, the Debtor submits that the Procedures for Assumption and Assignment are fair and reasonable and respectfully requests that the Court approve such procedures.   Assumption and assignment of the Assigned Contracts will be governed by Bankruptcy Rule 6006.

## B.  Approval of the Sale is Appropriate and in the Best Interest of the Estate.

### i.  The sale is authorized by Section 363 of the Bankruptcy Code as a sound exercise of the Debtor's business judgment.

48.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  *See also* Fed. R. Bankr. Proc. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or public auction").  This section generally permits a debtor to sell property of the estate outside of the ordinary course of business where the proposed sale is a sound exercise of the debtor's business judgment and when such sale is proposed in good faith.  *See Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("[A] bankruptcy court can authorize a sale of all of a Chapter 11 debtor's asserts under § 363(b)(1) when a sound business purpose dictates such action").

49.     In the present case, the proposed sale of the Acquired Assets pursuant to the Agreement constitutes a sound exercise of the Debtor's business judgment and has been proposed in good faith.  An expedited sale of the Acquired Assets should aid in minimizing the administrative expenses of the Debtor's estate.  Further, the sale represents the best opportunity for the Debtor to maximize the value of the Acquired Assets for the estate's creditors and other interested parties.

50.     The Debtor submits that the factors described above, which require an expedited sale of the Acquired Assets to maximize value for the Debtor's estate, are consistent with the traditional rationale for authorizing a sale outside of a Chapter 11 plan.

**ii.  The sale of the Acquired Assets free and clear of all encumbrances (except for Permitted Encumbrances) is authorized by Section 363(f) of the Bankruptcy Code.**

51.  In the interest of attracting the best bids for the Acquired Assets, the Debtor submits that the sale should be free and clear of all liens, claims, and encumbrances (except for Permitted Encumbrances) in accordance with Section 363(f) of the Bankruptcy Code, with any such liens, claims, and encumbrances (except for Permitted Encumbrances) attaching to the proceeds of the sale of the Acquired Assets ultimately attributable to the property against or in which such interest, lien, claim, or encumbrance is asserted.

52.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if (a) applicable non-bankruptcy law permits sale of such property free and clear of such interests; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  Moreover, Section 363(f) is supplemented by Section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

53.  Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of all liens, claims and encumbrances (except for Permitted Encumbrances).  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all lines."); *see also Citicorp Homeowners Servs., Inc. v. Elliott*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

54.  The Debtor submits that one or more of the conditions set forth in Section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale including the consent of lienholders.  Approval of the sale free and clear of all interest, liens, claims, and encumbrances is

in the best interests of the Debtor's estate, creditors, and other parties in interest.  Any proceeds shall be applied in accordance with further order of this Court.

55.     Accordingly, the Debtor respectfully requests that the Acquired Assets be sold free and clear of any liens, claims, and encumbrances (except for Permitted Liens and Assigned Contracts, as defined in the Agreement) pursuant to Section 363(f) of the Bankruptcy Code.

> ### iii. The Stalking Horse Bidder (or such other successful bidder ultimately selected by the Debtor pursuant to the Bid Procedures) is entitled to the full protection of Section 363(m) and the sale does not violate Section 363(n).

56.     The Agreement and the transactions related thereto were negotiated and have been and are undertaken by the Debtor and the Stalking Horse Bidder at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and the Debtor accordingly requests that the Court determine that the entire sale process was conducted in good faith within the meaning of Section 363(m) of the Bankruptcy Code and that the Debtor and the Stalking Horse Bidder are entitled to the protections of Section 363(m) of the Bankruptcy Code. *See In re Apex Oil Co.*, 92 B.R. 847, 874 (Bankr. E.D. Mo. 1988).

57.     In the Debtor's view, the Agreement represents substantial value to the Debtor's estate inasmuch as it provides favorable terms for the disposition of the Acquired Assets at a price that represents fair and reasonable consideration having a certain value. *See id.* at 869.  At the conclusion of the bid process and auction opportunity, the Debtor will have the highest and best offer to submit to this Court for approval.

### C. Assumption and Assignment of the Assigned Contracts is Authorized by Section 365 of the Bankruptcy Code.

> #### i. The Debtor's sound business judgment supports the assumption and assignment of the Assigned Contracts.

58.     Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume any executory contract or unexpired lease subject to the bankruptcy court's approval.

Section 365(b) of the Bankruptcy Code and Bankruptcy Rule 6006 requires such debtor-in-possession to satisfy certain requirements at the time of assumption of if default exists under the contract or unexpired lease to be assumed.

59.     The standard for determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that assumption is in its economic best interest. *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 567 n.16 (8th Cir. 1996).

60.     The Debtor's assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtor pursuant to the Bid Procedures) meets the business judgment standard and satisfies the requirements of Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006 because the assumption and assignment is necessary for the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtor pursuant to the Bid Procedures) to conduct business going forward.   Since no purchaser would take the Acquired Assets without certain executory contractors and unexpired leases, the assumption and assignment of such Assigned Contract is essential to securing the highest or otherwise best offer for the Acquired Assets. Further, upon consummation of the sale, the Debtor will no longer continue to operate its business and will therefore have no use for any of the Assigned Contracts previously utilized in the ordinary course of its business operations.

### ii. Adequate assurance of future performance will be demonstrated with respect to the Assigned Contracts.

61.     Once an executory contract is assumed, the debtor-in-possession may elect to assign such contract if it provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C, § 365(c)(2).

62.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp.*, 139 B.R. 585, 592 (S.D.N.Y. 1992),

*aff'd*, 993 F.2d 300 (2d Cir. 1993); *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D.Fla. 1994).   Typically, "the assurance of future performance is likely (i.e. more probable than not)," which notable "falls considerably short of an absolute guarantee of performance." *Prime Motor Inns*, 166 B.R. at 997.

63.   At the Sale Hearing, the Debtor will establish that the Stalking Horse Bidder (or other successful bidder) has demonstrated adequate assurance of future performance.

64.   Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts as set forth herein should be approved pursuant to Section 365 of the Bankruptcy Code.

### D.   Elimination of the 14 Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)

65.   Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bank. P. 6004(h).

66.   Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the [debtor] to assign an executory contract or unexpired…is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." *Id.* at 6006(d).

67.   The Debtor submits that ample cause exists to justify a waiver of the 14 day stays under Bankruptcy Rules 6004(h) and 6006(d) in connection with this sale.   Time is of the essence in approving and closing the sale, and any unnecessary delay in closing the sale could result in changes in circumstance, or events that could preclude the closing of the sale.   The Debtor therefore requests that the Sale Order be effective immediately by providing that the 14 day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Notice

68.   The Debtor has provided notice of this Motion by via the CM/ECF system or regular mail to:  (i) the Office of the United States Trustee for the Middle District of Georgia; (ii) each of the Debtor's creditors, including Respondents hereto; (iii) counsel to the Unsecured Creditors Committee; (iv) the Internal Revenue Service; (v) other relevant taxing authorities; (vi)

counsel to the Stalking Horse Bidder; (vii) other prospective bidders for the Acquired Assets known to the Debtor, including all persons who previously expressed an interest as a potential purchaser; and (viii) all parties registered on the CM/ECF system.  The Debtor respectfully submits that no further notice of this Motion is required.

69.     Upon the entry thereof by the Court, the Debtor will serve the Bid Procedures Order on all persons provided with notice of this Motion.

70.     The Debtor will, in accordance with the Sale Order, provide notice to counterparties of the possible assumption and assignment of executory contracts and leases by serving the Notice of Assumption and Assignment of Contract on such counterparties.

71.     The Debtor submits that these notice periods comply with Bankruptcy Rule 6006 and 9014.

**WHEREFORE**, the Debtor respectfully requests that the Court (i) enter the Bid Procedures Order substantially in the form attached hereto as **Exhibit A**, (ii) after the Sale Hearing, enter a Sale Order in a form to be submitted to the Court at the Sale Hearing, and (iii) grant such other and further relief as the Court may deem proper.

Respectfully submitted this 2nd day of October, 2019.

**STONE & BAXTER, LLP**
By:

*/s/ Ward Stone, Jr.*
Ward Stone, Jr.
Georgia Bar No. 684630
Matthew S. Cathey
Georgia Bar No. 759547
G. Daniel Taylor
Georgia Bar No. 528521
wstone@stoneansbaxter.com
mcathey@stoneandbaxter.com
dtaylor@stoneandbaxter.com

Fickling & Co. Building, Suite 800
577 Mulberry Street
Macon, Georgia 31201
478.750.9898

Counsel for Debtor

g:\clients\thrush aircraft\stalking horse\bid and sale motion\final\sale motion (including exhibits).10.1.2019.final.docx

# EXHIBIT A

## PROPOSED BID PROCEDURES ORDER

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | |
|---|---|
| IN RE: | : |
| | : |
| THRUSH AIRCRAFT, INC., | :   Chapter 11 Case No. 19-10976 |
| | : |
| Debtor. | : |
| | : |
| | : |
| THRUSH AIRCRAFT, INC. | : |
| | : |
| Movant, | : |
| | : |
| v. | :   CONTESTED MATTER |
| | : |
| WELLS FARGO BANK, N.A.; WELLS | : |
| FARGO EQUIPMENT FINANCE, INC.; LEAF | : |
| CAPITAL FUNDING, LLC; K. PAYNE | : |
| HUGHES; TRUMPF FINANCE, INC.; | : |
| WHELEN ENGINEERING COMPANY, INC.; | : |
| SYNOVUS BANK; WINTHROP RESOURCES | : |
| CORPORATION, INC.; TOYOTA | : |
| INDUSTRIES COMMERCIAL FINANCE, | : |
| INC.; HON. SHONNA COLLEY JOSEY, | : |
| DOUGHERTY COUNTY TAX DIRECTOR; | : |
| ALBANY-DOUGHERTY COUNTY | : |
| PAYROLL DEVELOPMENT AUTHORITY, | : |
| AB&T NATIONAL BANK, ONE GEORGIA | : |

AUTHORITY, HON. MARK BUTLER, :
COMMISSIONER GEORGIA DEPARTMENT :
OF LABOR :
                                        :
                    Respondents.        :

---

**ORDER (A) APPROVING BID PROCEDURES AND AUTHORIZING AND
SCHEDULING AN AUCTION AT WHICH THE DEBTOR WILL SOLICIT THE
HIGHEST OR BEST BID FOR THE SALE OF SUBSTANTIALLY ALL OF ITS
ASSETS, (B) APPROVING NOTICE PROCEDURES RELATING TO THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (C) APPROVING BREAK-UP FEE**

Thrush Aircraft, Inc., having filed a motion (the "**Motion**") seeking various types of
relief, including seeking the entry of an order (A) approving a sale and bidding process as
hereinafter described to be used in connection with the proposed sale of substantially all of the
Debtor's assets (the "**Acquired Assets**")[2], (B) approving procedures relating to the assumption
and assignment of certain executory contracts and unexpired leases, including a notice of
proposed cure amounts and procedures for filing any objection to the assumption and assignment
of the Assigned Contracts or the proposed cure amounts (the "**Notice of Assumption and
Assignment of Contract**," attached as **Schedule 1** hereto), (C) approving certain Stalking Horse
Bidder protections consisting of a Break-Up Fee, (D) scheduling a hearing (the "**Sale Hearing**")
to approve the sale by the Debtor of the Acquired Assets to the Stalking Horse Bidder (or to such
other successful bidder that is ultimately selected by the Debtor pursuant to the Bid Procedures),
and (E) approving the form and manner of proposed notice in connection with the foregoing.

The Court held a hearing regarding the Motion on October 8, 2019 (the "**Bid Procedures
Hearing**"); and based upon all of the evidence proffered or adduced at the Bid Procedures
Hearing; and after consideration any memoranda, objections, or other pleadings filed in
connection with the Bid Procedures Hearing; and after consideration of the arguments of counsel
made at the Bid Procedures Hearing; and upon the entire record of this case; and it appearing that

---

[2] Capitalized terms used but not defined herein shall have the meanings set forth to them in the Sale Motion.

the approval of the Bid Procedures as requested in the Motion and as set forth in this Order are in the best interest of the Debtor, its estate, creditors, and other parties in interest; and after due deliberation thereon, and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:

A.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

B.    The relief granted herein is in the best interest of the Debtor, its estate, creditors, and other parties in interest.

C.    The Debtor has articulated good faith and sufficient business reasons for the Court to (i) approve the Bid Procedures, (ii) approve the Procedures for Assumption and Assignment, (iii) approve the Stalking Horse Bidder's Break-Up Fee in the amount of $200,000.00, (iv) approve the form of Notice of Assumption and Assignment of Contract, and (v) set the date of the Auction and Sale Hearing.

D.    Due, sufficient, and adequate notice of the Bid Procedures Hearing, the relief requested in the Motion, the relief granted herein, the Bid Procedures, and the Procedures for Assumption and Assignment have been given in light of the circumstances and the nature of the relief requested, and no further notice in connection with the entry of this Order is or shall be required.

E.    The Bid Procedures are fair and reasonable and were negotiated in good faith and at arm's length by the Debtor and the Stalking Horse Bidder with the goal of maximizing the value of the Acquired Assets for the benefit of all creditors of the Debtor's estate.

F.    The form of the Notice of Assumption and Assignment of Contract is reasonable and appropriate and ensures that each counterparty to each Assigned Contract will have sufficient notice of the potential assumption and assignment of such Assigned Contract and an opportunity to contest the Assigned Contracts Cure Amount, as well as the ability of the Stalking Horse Bidder (or such other successful bidder ultimately selected by the Debtor pursuant to the

30

Bid Procedures) to provide adequate assurance of future performance with respect to such Assigned Contract.

G.    The approval of the Break-Up Fee and entry of this Order are (i) necessary and appropriate to induce the Stalking Horse Bidder (1) to make an initial offer that will serve as a "floor" for further bidding, and (2) to negotiate and enter into the Agreement and consummate the transactions contemplated thereby; and (ii) a condition precedent to closing the transactions contemplated by the Agreement.

NOW THEREFORE IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is granted to the extent set forth in this Order.  Any objections to the Motion that pertain to the relief granted by this Order that have not been resolved or withdrawn are hereby overruled on the merits.

2.    The following "Bid Procedures" are hereby approved and shall be used in connection with the proposed sale of the Acquired Assets:

A.    **Requirements Applicable to all Qualified Bids**:   These procedures govern offers for the Acquired Assets ("**Bids**") submitted both prior to and during the Auction.  Bids submitted in conformity with the requirements specified in subsections (1) through (5), below, are Qualified Bids and may be considered by the Seller.  Defined terms in these Bid Procedures shall have the meanings assigned in the Template APA (defined below).

(1)    **Bidder Qualifications**.  The Stalking Horse Bidder is deemed to be a Qualified Bidder at the Auction.  No other prospective bidder will be permitted to bid pre-Auction or at the Auction unless such party has been deemed "financially qualified" by the Debtor and its counsel Stone & Baxter, LLP ("**S&B**").  A "financially qualified" bidder is one who has demonstrated to the satisfaction of the Debtor and S&B that it has the financial and other wherewithal and is properly authorized to consummate the transaction contemplated by the bid and to Close on or before November 15, 2019, or who has provided satisfactory proof of authorization and committed lending sufficient to consummate the transaction (a "**Qualified Bidder**").  All Bids and inquiries prior to the Auction must be submitted through S&B.

(2)    **Bids to be written and substantially uniform.**  Bids submitted pre-

Auction and at the Auction must be substantively in the form of the template asset purchase agreement attached to the Motion as **Exhibit B** (the "**Template APA**"). The Bid must be delivered to the Seller, through S&B, in the form of an executed "clean" version of the Template APA, accompanied by a redlined version to reflect any proposed changes to the terms and conditions of the Template APA. A Microsoft Word® Version of the Template APA may be obtained by contacting S&B.

(3)     **Absence of Contingencies**.   Submission of a Qualified Bid shall not constitute a waiver of any unsatisfied condition precedent described in Section 3.1 of the Template APA, except that the following conditions shall be waived by the submission of a Qualified Bid: (1) any due diligence contingency, (2) any financing contingency; and (3) approval from any board of directors, shareholders, or otherwise. No Qualified Bid may be reduced, revoked, or withdrawn prior to the end of the Auction. Except for the Stalking Horse Bid and any Qualified Bid announced as the opening Qualified Bid at the Auction, Bids delivered prior to the beginning of the Auction will not be shared among Bidders.

(4)     **The Bid Deadline and the Topping Bid**.   All Qualified Bids must be received prior to 5:00 p.m. local time in Macon, Georgia on Friday, October 25, 2019 (the "**Bid Deadline**"). Topping Bid means a Qualified Bid that provides a purchase price equal to or greater than the sum of (1) the Cash Price to Wells Fargo, plus (2) the Promissory Note Purchase Price, plus (3) the DIP Forgiveness Amount, plus (4) the Promissory Notes Payment (as identified and reported to the Bankruptcy Court prior to seven (7) days before the Auction Date), and plus (5) $250,000.00 (the "**Topping Bid**"). The amount of the Topping Bid will be announced to all known Qualified Bidders on or before **October 23, 2019**. If a Qualified Bid that is a Topping Bid is received, the Auction will be held in accordance with the procedures below. If a Topping Bid is not received by the Bid Deadline, the Debtor will dispense with the Auction.

(5)     **Good Faith Deposit.** Bids submitted pre-Auction must be accompanied by a cash or cash-equivalent earnest money deposit in the amount of $250,000.00 (the "**Good Faith Deposit**") under substantially similar terms as the Agreement. The Good Faith Deposit must be tendered by each Qualified Bidder by the time of submittal of such party's Topping Bid, by wire transfer or in cash-equivalent certified funds. The Good Faith Deposit will be forfeited in the event the Bidder of a Prevailing Bid or Back-Up Bid defaults under the terms of Template APA (or, if applicable, the Stalking Horse APA) evidencing the Accepted or Provisionally Accepted Bid. Good Faith Deposits will be refunded to unsuccessful Bidders, other than Back-Up Bids, within one (1) business day following Court Approval. Refunds to Back-Up Bids will be made within one (1) Business Day following the Closing of the Prevailing Bid. Qualified

32

Credit Bidders shall not be required to tender a Good Faith Deposit.

**B.**    **The Auction**.  Subject to subparagraph A(4) above, the Acquired Assets will be offered for sale at Auction.  Bids will be solicited and entertained by the Seller substantially in accordance with the provisions of these Procedures, subject to announcements at the beginning of the Auction.    Announcements by the Seller at the Auction will supplement the following Procedures, unless inconsistent with an express requirement set out below. Announcements and Bids made at the Auction will be recorded and transcribed by a Certified Court Reporter(s) (the "**Bid Record**").

(1)    **Simultaneous Auction.**  All assets of the Debtor will be auctioned simultaneously, with Qualified Bids sought in each round.   Qualified Bidders may select which executory contracts and Promissory Note Payments of the Debtor they wish to have included in their bids as each round of bids is submitted.  Rounds will continue until such time as no higher or better Qualified Bids are offered.  Any Bid not designated as the Prevailing Bid or a Back-Up Bid shall be deemed rejected at the time Court Authorization is obtained on the Prevailing Bid and Back-Up Bid.

(2)    **Announcement of Highest and Best Qualified Bid at Beginning of Auction.**    The highest and best Qualified Bid received prior to the beginning of the Auction will be announced as the opening bid.  At the Auction, Qualified Bidders and/or the Stalking Horse Bidder (it being understood that the Stalking Horse Bidder shall be deemed to be a Qualified Bidder) may submit successive bids in increments of at least $50,000.00 ("**Incremental Bids**") cash greater than the prior bid for the purchase of the Acquired Assets until there is only one offer that the Debtor determines (in the exercise of its reasonable discretion) is the highest or best offer for the Acquired Assets (the "**Prevailing Bid**").

(3)    **Conduct of Auction**.  The Auction will continue until bidding is complete and the Seller, after consulting with Wells Fargo and the Unsecured Creditors Committee, selects the Prevailing and Back-Up Bid(s), and determines that such bid(s) are from Qualified Bidders.  Qualified Bidders will be polled for bids in each round in the order in which bids were received, ending with the Stalking Horse Bidder.

(4)    **Qualified Bidder Representative Must Be Present at the Auction**. Qualified Bidders must be represented by a representative who is physically present at the Auction with authority to sign all written amendments to the Template APA submitted in advance of or at the Auction that are necessary to conform the Template APA to each bid made by such Qualified Bidder at the Auction (a "**Qualified Bidder Representative**").  Qualified Bidder Representatives must register with and be certified by S&B prior to being able to participate in the Auction.

(5)   **Bids at the Auction Must Be in Writing**.  Incremental Bids submitted by Qualified Bidders at each round of the Auction must be announced from a designated podium and recorded in the Bid Record.  Verbal bids must be conformed to each Qualified Bidder's Template APA and initialed by the bidder's authorized representative before the next round of bidding. Adequate time between rounds of bidding will be granted to allow the written bids to be conformed to reflect the increased bids offered through the preceding round.

(6)   **Bid Value of Assumed Liabilities**.  The bid value of Assumed Liabilities included in any bids (which, solely for purposes of determining the Prevailing Bid, shall be deemed to include the Promissory Notes Payment described the Agreement with the Stalking Horse Bidder) will be determined by the Debtor in its absolute discretion, provided that the Debtor shall determine the bid value of each Assumed Liability consistently for all Bids submitted which include such Assumed Liability in the Aggregate Purchase Price.

(8)   **Rejection of Bids**.  The Debtor reserves the right to reject any or all Qualified Bids at any time before a Qualified Bid is accepted as a Prevailing Bid.

(9)   **Credit Bids**.  A Bidder holding a claim found by the Bankruptcy Court to be an allowed claim that is secured by property of the Debtor's estate may "credit bid" at the Auction (a "**Qualified Credit Bid**"), to the extent authorized by 11 U.S.C. § 363 (k) (a "**Credit Bidder**"), provided that such Credit Bidder has filed a proof of claim in the bankruptcy case and been financially qualified by S&B with respect to their ability to pay or otherwise satisfy at Closing: (i) all amounts required to be paid at the Closing under the Template APA and (ii) the amount of the Bid in excess of the Credit Bid ("**Qualified Credit Bidder**"). Qualified Credit Bids are subject to all requirements of these Sales Procedures.

(10)   **Announcement of Provisionally Accepted Bids**.  At the conclusion of the Auction, the Debtor will announce the highest and best bid or Prevailing Bid.  The Debtor will then accept the second highest and best bid as the Back-Up Bid (the "**Back-Up Bid**").  Final Asset Purchase Agreements will be executed by the Debtor and each of the parties constituting the Prevailing Bid and the Back-Up Bid before leaving the Auction.

(11)   **Location of and Admission to the Auction**.  The Auction will be conducted at the at the Cherry Blossom Suite, Fickling & Co. Building, Suite 1600, 577 Mulberry Street, Macon, Georgia 31201, or at such other location as may be designated by the Debtor **commencing at 10:00 o'clock, a.m. Eastern Time on the 29th day of October, 2019** and will

continue from day-to-day or time-to-time until the Prevailing Bid and Back-Up Bid are announced.  The Auction will be a private sale.  Only Qualified Bidders and parties in interest in the Bankruptcy Case, or their authorized representatives or attorneys, will be admitted, in person, to the Auction.  There will be no provision for general telephone monitoring of the Auction, but Qualified Bidder Representatives may communicate by electronic or any other means with Qualified Bidders between each round of bidding.

(13)  **Interested Party Consultations**.   The Official Committee of Unsecured Creditors (the "**Unsecured Creditors Committee**"), holders of claims filed as secured in the Bankruptcy Case (whether or not "allowed" by order of the Court as of the time of the Auction), parties to Capital Leases with the Debtor, and the United States Trustee or her representative may attend the Auction, and provided such parties are in attendance at the Auction, are "Interested Parties" for the purpose of these Bid Procedures. Before the beginning of the Auction and between any round of bidding, upon request of any Interested Party or its authorized counsel in attendance at the Auction, the Seller and S&B will consult with such Interested Party concerning any matter pertaining to the Auction. The consultations will be held outside of the bidding room and shall not unduly delay the Auction.   No objection by an Interested Party to any announcement made at the Auction or to any Bid or other occurrence during the Auction shall be stated on the Bid Record or communicated to a Qualified Bidder, but shall be directed solely to the Debtor and to S&B and, if so directed and not resolved, shall be stated on the Bid Record following the final round of bidding and shall thereupon be deemed preserved until the conclusion of opening statements at the Sale Hearing (as defined below).

(14)  **Hearing on Approval of Sale**.  Following the conclusion of the Auction, pursuant to the Motion Seeking Authority to Sell the Assets, the Seller will seek authorization from the Bankruptcy Court to sell the Acquired Assets to the Qualified Bidder submitting the Prevailing Bid or Back-Up Bid, as applicable, and to consummate the sale.  Such hearing will be held in the United States Bankruptcy Court for the Middle District of Georgia, in the Courtroom B of such Court, located at 433 Cherry Street, Macon, GA 31201, or at such other location as may be designated by the Court, commencing at **10:00 a.m. Eastern Time on the 30th day of October, 2019**, or such later date and time set by the Bankruptcy Court, (the "**Sale Hearing**").  The Bankruptcy Court will be requested to enter an Order authorizing the Seller to consummate the sale under 11 U.S.C. § 363, which Order will constitute Court Approval of the Sale ("**Court Authorization**").  No person shall have standing to appear and be heard at the Sale Hearing except as provided by law.  No provision of these Bid Procedures, the certification of any person as a Qualified Bidder,

attendance at the Auction, or the submittal of any Bid at the Auction, shall be construed to confer standing upon any person to appear and be heard at the Sale Hearing.

(15)   **Closing; Back-Bids**.   If the Closing and receipt by the Debtor's estate of the cash consideration does not occur with respect to any Prevailing Bid on or before December 1, 2019, then the Debtor may close with Back-Up Bid.

3.     Objections (if any) to approval of any Prevailing Bid or Back-Up Bid, approval of the sale of the Acquired Assets, or any proposed assumption and assignment of executory contracts or unexpired leases (including the amount of any Assigned Contracts Cure Amount) pursuant to any Prevailing Bid or Back-Up Bid, shall be in writing, shall set forth the name of the objecting party, the basis for the objection and the specific grounds therefor, and shall be filed with the Court and served upon each of the following on or before October 29, 2019:

a.   counsel to the Debtor, Stone & Baxter, LLP, Fickling & Co. Building, Suite 800, 577 Mulberry Street, Macon, Georgia 31201, Attention: Ward Stone, Jr. and Matthew S. Cathey (Emails: wstone@stoneandbaxter.com; mcathey@stoneandbaxter.com);

b.   counsel to Wells Fargo Bank, National Association and Wells Fargo Equipment Finance, Inc., Parker, Hudson, Rainer & Dobbs, LLP, 303 Peachtree Street, NE, Suite 3600, Atlanta, Georgia 30308, Attention: C. Edward Dobbs (Email: edobbs@phrd.com);

c.   counsel to the Office Committee of Unsecured Creditors, Horwood Marcus & Berk Chartered, 500 W. Madison, Suite 3700, Chicago, Illinois, 60661, Attention: Aaron L. Hammer and John W. Guzzardo (Emails: ahammer@hmblaw.com; jguzzardo@hmblaw.com);

d.   counsel to the Stalking Horse Bidder, Martin Snow, LLP, 240 Third Street, Post Office Box 1606, Macon, Georgia 31202, Attention: John T. McGoldrick, Jr. (Email: jtmcgoldrick@martinsnow.com); and

e.  the Office of the United States Trustee, 440 Martin Luther King Jr. Boulevard, Suite 302, Macon, Georgia 31201, Attention: Elizabeth A. Hardy (Email: Elizabeth.A.Hardy@usdoj.gov).

Any objection not filed and served in accordance with this Paragraph 3 shall be deemed waived and shall be forever barred.

4.      The failure of any third party to file and serve an objection as ordered and directed herein shall be deemed the consent of such party to the granting of the Motion and the sale and transfer of the Acquired Assets (including the assumption and assignment of executory contracts and unexpired leases and the applicable cure costs, under the Prevailing Bid).

5.      The Debtor is authorized and directed to pay the Stalking Horse Bidder an amount equal to $200,000.00 as a breakup fee and expense reimbursement (the "**Break-Up Fee**") provided, however, that the Break-Up Fee shall be due and payable to the Stalking Horse Bidder only upon: (a) the closing of a sale of the Acquired Assets (or any part thereof) to a party other than the Stalking Horse Bidder for an amount equal to or exceeding the Topping Bid and the Stalking Horse Bidder had not terminated the Agreement, with the payment of the Break-Up Fee being paid from the proceeds received upon the closing of such sale to a party other than the Stalking Horse Bidder; or (b) the confirmation of a stand-alone plan of reorganization.

6.      If the Break-Up Fee becomes due and payable to the Stalking Horse Bidder under clause (a) of the preceding paragraph, no lien of any third party shall attach to the portion of the sale proceeds representing the Break-Up Fee.

7.      The Bid Procedures (including the Break-Up Fee) are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Acquired Assets, and will confer actual benefits upon the Debtor's bankruptcy estate.  The Bid Procedures (including payment of the Break-Up Fee, if applicable) represent an exercise of the Debtor's sound business judgment and will facilitate an orderly sale process.

8.      The procedures for assumption and assignment of Assigned Contracts, as described in the Motion, are approved and incorporated into this Order by reference, as though full set forth herein.

9.      The form of Notice of Assumption and Assignment of Contract attached hereto as **Schedule 1** is approved, and shall be served by the Debtor no later than three (3) business days after entry of this Order upon the counterparties to the Assigned Contracts.  Any counterparty to a contract that receives the Notice of Assumption and Assignment of Contract and does not timely file and serve an objection in accordance with its terms, shall be forever barred from later challenging or disputing the assumption and assignment of any Assigned Contract, the Assigned Contracts Cure Amount due thereunder, and all other matters set forth in the Notice of Assumption and Assignment of Contract.

10.     Within three (3) business days after the entry of this Order, the Debtor's counsel shall serve via first-class mail (addressed to the business address of such persons appearing the Debtor's records) a copy of this Order on all parties served with a copy of the Motion.

11.     The Debtor shall continue to market and solicit interest in the sale of the Acquired Assets in accordance with the Bid Procedures.

12.     Pursuant to Bankruptcy Rule 2002, service of this Order shall constitute good and sufficient notice of the Bid Procedures, the Auction, this Order, the Procedure for Assumption and Assignment, the Motion, and the Sale Hearing on all known and unknown creditors and parties in interest.

13.     Notwithstanding the possible applicability of the Bankruptcy Rules 6004(a), 6004(h), 6006(d), or otherwise, the terms and conditions of this Order shall be immediately and effective and enforceable upon its entry and the requirements of Bankruptcy Rules 6004(a), 6004(h), and 6006(d) are hereby waived.

14.     This Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the implementation of this Order.

**END OF DOCUMENT**

**Prepared and presented by:**

*/s/ Ward Stone, Jr.*
Ward Stone, Jr.
Georgia Bar No. 684630
Stone & Baxter, LLP
577 Mulberry Street, Suite 800
Macon, Georgia  31201
(478) 750-9898; (478) 750-9899 (fax)
wstone@stoneandbaxter.com
Counsel for Debtor

# SCHEDULE 1

## TO

## PROPOSED BID PROCEDURES ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| THRUSH AIRCRAFT, INC., | : | Chapter 11 Case No. 19-10976 |
| | : | |
| Debtor. | : | |
| | : | |

---

| | | |
|---|---|---|
| THRUSH AIRCRAFT, INC. | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | CONTESTED MATTER |
| | : | |
| WELLS FARGO BANK, N.A.; WELLS FARGO EQUIPMENT FINANCE, INC.; LEAF CAPITAL FUNDING, LLC; K. PAYNE HUGHES; TRUMPF FINANCE, INC.; WHELEN ENGINEERING COMPANY, INC.; SYNOVUS BANK; WINTHROP RESOURCES CORPORATION, INC.; TOYOTA INDUSTRIES COMMERCIAL FINANCE, INC.; HON. SHONNA COLLEY JOSEY, DOUGHERTY COUNTY TAX DIRECTOR; ALBANY-DOUGHERTY COUNTY PAYROLL DEVELOPMENT AUTHORITY, AB&T NATIONAL BANK, ONE GEORGIA AUTHORITY, HON. MARK BUTLER, COMMISSIONER GEORGIA DEPARTMENT OF LABOR | : | |
| | : | |
| Respondents. | : | |
| | : | |

**NOTICE OF (A) POTENTIAL ASSUMPTION AND ASSIGNMENT OF CONTRACTS
AND UNEXPIRED LEASES, (B) DEADLINE TO OBJECT TO CURE AMOUNTS,
ASSUMPTION, OR ASSIGNMENT, AND (C) HEARING TO APPROVE THE
ASSUMPTION AND ASSIGNMENT**

1.      On October 2, 2019, Thrush Aircraft, Inc. filed a motion (the "**Sale Motion**") (Dkt.___) with the Bankruptcy Court seeking, among other things, entry of an order (a) approving (i) bid procedures (the "**Bid Procedures**"), (ii) notice procedures relating to the potential assumption and assignment of certain executory contracts and unexpired leases (the "**Assigned Contracts**"), and (iii) Break-Up Fee[3]; and (b) authorizing (i) the sale of the Acquired Assets to HHM Aviation Financing, LLC (the "**Stalking Horse Bidder**") or to the successful bidder ultimately selected by the Debtor pursuant to the Bid Procedures (collectively, the "**Purchaser**") free and clear of any and all interests, liens, claims, and encumbrances, and (ii) the assumption and assignment of certain Assigned Contracts to the Purchaser, and (c) the immediate effectiveness of the sale and the waiver of the stay provisions of Bankruptcy Rules 6004(h) and 6006(d).

2.      On October _____, 2019, the Court entered an order (the "**Bidding Procedures Order**") (Dkt. ___) approving, among other things, the procedures set forth in the Sale Motion for proposed assumption and assignment of the Assigned Contracts and the form of this Notice.

3.      Copies of the Sale Motion and the Bidding Procedures Order were previously sent to you.  If you need a copy of either or both, please contact Ward Stone, Jr. or Matthew S. Cathey of Stone & Baxter, LLP via email or by other form of writing (using the contact information at the end of this Notice) and one of them will send a copy to you.

4.      A hearing to approve the Sale Motion, **which shall also address the Debtor's request for approval of the assumption and assignment of Assigned Contracts and of the Assigned Contracts Cure Amounts** (the "**Sale Hearing**"), will be convened on October 30, 2019 at 10:00 a.m. (Eastern Time) at the United States Bankruptcy Court for the Middle District of Georgia, 433 Cherry Street, Macon, Georgia 31201, before the Honorable Austin E. Carter, Bankruptcy Judge for the United States Bankruptcy Court for the Middle District of Georgia.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

5.    At the Sale Hearing, the Debtor **may** seek to assume and assign to the Purchaser those Assigned Contracts that are identified on **Exhibit 1** attached hereto (the "**Potential Assignment Schedule**"). The Potential Assignment Schedule identifies, among other things, the amount, if any, determined by the Debtor that must be paid to cure any existing default or pay any amount due under each Assigned Contract as of the expected date of Closing on the sale to the Purchaser (the "**Assigned Contracts Cure Amount**"). The Debtor reserves the right to delete items from, supplement, and modify the Potential Assignment Schedule at any time, or adjust the Assigned Contracts Cure Amount associated with any Assigned Contract listed on it. However, to the extent that the Debtor adds an Assigned Contract to the Potential Assignment Schedule or modifies any Assigned Contracts Cure Amount, the affected party shall receive a separate notice, and a new opportunity to object to such addition or modification.

6.    Please be advised that the inclusion of any Assigned Contract on the Potential Assignment Schedule shall not be construed as an admission by the Debtor that such Assigned Contract is an executory contract or unexpired lease as such terms as used in Section 365 of the Bankruptcy Code. In addition, until the entry of any order on the Sale Motion, the Debtor may also remove any Assigned Contract from the Potential Assignment Schedule.

7.    If a non-debtor party to any Assigned Contract listed on the Potential Assignment Schedule does not timely file a written objection in accordance with this notice and thereafter appear at the Sale Hearing to prosecute such objection, then

(a)    such non-debtor shall be deemed to have consented to the Debtor's assumption of the Assigned Contract;

(b)    such non-debtor party shall be deemed to have consented to the assignment of the Assigned Contract to the Purchaser;

(c)    the Assigned Contracts Cure Amount shall represent the sole and exclusive amount due under the Assigned Contract as of the Closing on the Sale;

(d)        such non-debtor party to the Assigned Contract shall be forever barred from objecting to the Assigned Contracts Cure Amount, and forever barred and estopped from asserting any amount owed as of Closing (other than the Assigned Contracts Cure Amount) against the Debtor, the Purchaser, or any other party which might be liable under the Assigned Contract;

(e)        on and after Closing, the Purchaser shall enjoy all of the Debtor's rights and benefits under the Assigned Contract without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof; and

(f)        such non-debtor party to the Assigned Contract will be forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach, or claim or pecuniary loss, or condition to assignment, arising under or related to the Assigned Contract as of the Closing or arising by reason of the Closing.

8.        Objection to any Assigned Contracts Cure Amount or to assumption and assignment of the Assigned Contract to the Purchaser, including with respect to adequate assurance of future performance under the Assigned Contract by the Purchaser (an "**Objection**"), must be filed with the Court and served on (a) counsel to the Debtor, Stone & Baxter, LLP, Fickling & Co. Building, Suite 800, 577 Mulberry Street, Macon, Georgia 31201, Attention: Ward Stone, Jr. and Matthew S. Cathey (Email: mcathey@stoneandbaxter.com);   (b) counsel to Wells Fargo Bank, N.A., Parker, Hudson, Rainer & Dobbs, LLP, 303 Peachtree Street, NE, Suite 3600, Atlanta, Georgia 30308, Attention: C. Edward Dobbs (Email: edobbs@phrd.com);   (c) counsel to the Office Committee of Unsecured Creditors, Horwood Marcus & Berk Chartered, 500 W. Madison, Suite 3700, Chicago, Illinois, 60661, Attention: Aaron L. Hammer and John W. Guzzardo (Email: ahammer@hmblaw.com; jguzzardo@hmblaw.com); (d) counsel to the Stalking Horse Bidder, Martin Snow, LLP, 240 Third Street, Post Office Box 1606, Macon, Georgia 31202, Attention: John T. McGoldrick, Jr. (Email: jtmcgoldrick@martinsnow.com); and (e) the Office of the United States Trustee, 440 Martin Luther King Jr. Boulevard, Suite 302, Macon, Georgia 31201, Attention: Elizabeth A. Hardy (Email: Elizabeth.A.Hardy@usdoj.gov).

9.      An Objection must state the basis for such objection and state with specificity what Assigned Contracts Cure Amount the party to the Assigned Contract believes is required to by paid as of Closing, with appropriate documentation, as well as any other bases for the Objection, including any ground for opposing the Purchaser's assumption of the Assigned Contract.

Dated: _____

STONE & BAXTER, LLP
By:

/s/ Matthew S. Cathey
Ward Stone, Jr.
Georgia Bar No. 684630
Matthew S. Cathey
Georgia Bar No. 759547
G. Daniel Taylor
Georgia Bar No. 528521
wstone@stoneansbaxter.com
mcathey@stoneandbaxter.com
dtaylor@stoneandbaxter.com

Fickling & Co. Building, Suite 800
577 Mulberry Street
Macon, Georgia 31201
478.750.9898

# EXHIBIT 1

## TO

## NOTICE OF ASSUMPTION AND ASSIGNMENT OF CONTRACT

| Counterparty | Description of Contract | Proposed Cure Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**EXHIBIT B**

**ASSET PURCHASE AGREEMENT**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**THRUSH AIRCRAFT, INC.,**
**AS SELLER,**

**AND**

**HHM AVIATION FINANCING, LLC,**
**AS PURCHASER**

**DATED AS OF OCTOBER 2, 2019**

## Index of Schedules

**2.1(a)(i)**    —    **Real Property**

**2.1(a)(ii)**    —    **Assigned Contracts**

**2.1(a)(iii)**    —    **Excluded Accounts Receivable**

**2.1(a)(x)**    —    **Acquired IP Assets**

**2.2(a)**    —    **Promissory Notes & Associated Collateral**

**2.2(a)(i)**    —    **Wells Fargo Equipment Finance, Inc. Promissory Notes & Associated Collateral**

**2.3(b)(iii)**    —    **Promissory Note to Wells Fargo Bank, National Association**

**3.1(e)**    —    **Filings, Authorizations, and Approvals**

**5.11**    —    **Litigation**

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT (“Agreement”)** is entered into as of October 2, 2019 **(“Effective Date”)**, by and between **THRUSH AIRCRAFT, INC.,** a corporation organized and existing under the laws of the State of Georgia **(“Seller”)**, and **HHM Aviation Financing, LLC (“HHM”)**, a limited liability company organized and existing under the laws of the State of Georgia **(“Purchaser”)**. Seller and Purchaser are sometimes referred to herein together as the **“Parties”**, and individually as a **“Party.”**

## RECITALS:

WHEREAS, on September 4, 2019, Seller filed a voluntary petition **(“Chapter 11 Petition”)** for relief under chapter 11 of title 11, United States Bankruptcy Code, as amended **(“Bankruptcy Code”)** in the United States Bankruptcy Court for the Middle District of Georgia, Albany Division **(“Bankruptcy Court”)** commencing a chapter case known as Case Number 19-10976 **(“Bankruptcy Case”)**;

WHEREAS, in accordance with sections 1107 and 1108 of the Bankruptcy Code, Seller continues to manage its property and operate its business as a debtor-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, Seller manufactures a full range of aerial application aircraft used in agriculture, forestry and firefighting roles worldwide **(“Business”)**;

WHEREAS, upon the terms and subject to the conditions set forth herein, Seller intends to request that the Bankruptcy Court authorize the transactions contemplated by this Agreement pursuant to sections 105, 363, and 365 of the Bankruptcy Code;

WHEREAS, subject to the terms and conditions hereof, if no higher and better Bid for the Assets is accepted by Seller at the Auction, (a) Seller desires to sell, transfer and assign to Purchaser and Purchaser desires to purchase from Seller, the properties and assets of Seller used primarily in or held for use primarily in the Business, other than the Excluded Assets, and (b) Seller desires to transfer and assign to Purchaser and Purchaser desires to assume from Seller certain liabilities of Seller relating to the Business;

WHEREAS, the Parties desire to make certain representations, warranties, covenants and agreements in connection with this Agreement; and

WHEREAS, unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in Section 1.

NOW, THEREFORE, for and in consideration of the Aggregate Purchase Price, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound as provided herein, agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1    Definitions**. Unless defined elsewhere in this Agreement, the following capitalized terms shall have the following meanings:

"Accepted Bid" means that Bid or Bids for any or all the Acquired Assets and Assigned Contracts accepted by Seller, after consultation required under the approved bid procedures, at the close of the Auction, whether or not such Bid was the subject of a Provisional Acceptance by Seller.

"Accounts or Accounts Receivable" mean a right to payment of monetary obligations, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for or under a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State. The term includes healthcare insurance receivables. For the purposes of this Agreement, the term "Accounts" also includes rights to payments evidenced by chattel paper or an instrument, deposit accounts, investment property, interest and letters of credit or rights and letters of credit, and rights to payment of money for funds advanced or sold, and all other notes or accounts receivable of Seller in any form, including disputed accounts, choses in action, or other intangible rights to receive money or other value.

"Acquired Assets" means those Assets identified in Section 2.1(a) acquired by Purchaser from Seller under this Agreement.

"Affiliate" of any Person means any other Person controlling, controlled by, or under common control with, such first Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Aggregate Purchase Price" has the meaning ascribed to it in Section 2.2(a).

"Agreement" means this Asset Purchase Agreement, including all Schedules attached or to be attached hereto, as it may be amended from time to time in accordance with its terms.

"Assets" means all title, rights, and interests of Seller in real, personal, or intangible property as of the Auction Date, whether or not such interests in property are included in the Acquired Assets, and used by Seller in operating the Business.

"Auction" means the auction undertaken pursuant to Bidding Procedures Order.

2

"Auction Date" means the date of the commencement of the Auction, if any, and from day to day or time to time until the Auction is completed.

"Auction Hearing" means that hearing to be held before the Bankruptcy Court on or before October 29, 2019, or on such other date as may be set by the Bankruptcy Court that is acceptable to Purchaser, with respect to Seller's seeking authorization to enter into and consummate a sale of Acquired Assets to the purchaser who submitted the Accepted Bid at the close of the Auction Date.

"Bankruptcy Case" means that certain case filed by the Debtor under chapter 11 of the Bankruptcy Code captioned *In re Thrush Aircraft, Inc.* (Case No.19-10976), pending in the Bankruptcy Court.

"Bankruptcy Causes of Action" means all causes of action of a trustee or debtor-in-possession arising under Bankruptcy Code sections 510, 544, 545, 546, 547, 548, 549, 550, 551 and 553 or otherwise under the Bankruptcy Code or under similar state laws for the recovery of money or property, seeking modification, disallowance, equitable subordination of claims, rights of set off or other relief.

"Bankruptcy Code" means Title 11 of the United States Code, as in effect on the date of this Agreement.

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Georgia, Albany Division.

"Bid" or "Bids" means an offer to purchase an Asset communicated to Seller in writing before the Auction, or in writing or verbally during the Auction, provided that such Bid complies with the Bid Procedures and has not been withdrawn prior to its Provisional Acceptance.

"Bid Procedures" means those procedures for Purchaser and others to submit bids for the Assets as set out in the Bidding Procedures Order.

"Bidding Procedures Order" means that certain Order of the Bankruptcy Court approving bidding procedures as entered by the Bankruptcy Court in the Bankruptcy Case, which, among other things, establishes (a) procedures for the Auction process and (b) the date for the Auction.

"Books and Records" means all lists, records, and other information pertaining to accounts, personnel, and referral sources of Seller; all lists and records pertaining to suppliers and customers of Seller; and all books, ledgers, files, and business records of Seller of every kind, whether evidenced in writing, electronically (including, without limitation, by computer) or otherwise, and all office supplies of Seller, wherever located.

"Break-Up Fee" shall have the meaning ascribed in Article VIII.

"Business" has the meaning set forth in the recitals.

3

"Business Day" means a day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the United States or the State of Georgia. If any "Day" or date for performance or delivery falls on a day which is not a "Business Day," then such Day or date for performance or delivery will automatically be extended to the next Business Day.

"Cash Price to Wells Fargo" has the meaning ascribed to it in Section 2.2(a).

"Claim" has that meaning as defined in section 101(5) of the Bankruptcy Code.

"Closing" is defined in Section 2.3(a).

"Closing Date" means the date to be established for the Closing under Section 2.3(a).

"Court Approval" occurs on the date that the Sale Order has been entered by the Bankruptcy Court and has become a final, non-appealable order that has not been stayed and is not subject to a pending appeal or motion for rehearing or reconsideration or motion to alter or amend.

"Creditors' Committee" means any Official Committee of Unsecured Creditors appointed by the United States Trustee in the Bankruptcy Case.

"Debtor" means Thrush Aircraft, Inc., as a debtor-in-possession in the Bankruptcy Case.

"Definitive Sale Documents" has the meaning set forth in Section 2.3(b)(i).

"DIP Financing" means that certain debtor-in-possession credit facility in the maximum principal amount of $1,200,000.00, as the same may be increased with the prior approval of the Bankruptcy Court, extended by HHM Aircraft Financing, LLC, as lender, to Thrush Aircraft, Inc., as borrower, subject to the terms and conditions of that Post-Petition Credit Agreement dated September 4, 2019 between HHM Aircraft Financing, LLC and Thrush Aircraft, Inc.

"Encumbrance" means any lien, pledge, hypothecation, charge, mortgage, security interest, option to purchase, easement, or other encumbrance or similar restriction, but the term Encumbrance does not include any non-exclusive license agreements with third parties entered into in the ordinary course of business of Seller.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means Chicago Title Insurance Company, or such other Person designated as the Escrow Agent in the Escrow Agreement, serving under this Agreement.

"Escrow Agreement" means an Escrow Agreement, executed by Seller and the Escrow Agent, and acknowledged by Purchaser, governing the holding and release of the Good Faith Deposit and the disbursement at Closing of the Cash Price to Wells Fargo and the Good Faith Deposit.

"Excluded Assets" means those Assets described in Section 2.1(b) of this Agreement.

"Ex-Im Bank" means the Export-Import Bank of the United States.

"Ex-Im Bank Note Program" means the note purchase guaranty program made available to qualifying financial institutions with regard to the export and sale to foreign purchasers.

"FAA" means the Federal Aviation Administration.

"Facility" means the manufacturing plant leased by Seller for the manufacture of aircraft and parts and located at 300 Old Pretoria Rd, Albany, GA 31721.

"GAAP" means United States generally accepted accounting principles, consistently applied, as in effect on the date of the act specified, or on the date of the completion of the document referenced.

"Good Faith Deposit" means the sum of $250,000.00, deposited with the Escrow Agent pursuant to an Escrow Agreement.

"Goodwill" includes all Books and Records related to the production, marketing and sale of products utilizing the Acquired Assets and the Business, including, but not limited to supplier lists and copies of former agreements with suppliers, inventory records, production records and test results, equipment specifications, warranties, instructions and records, marketing materials, customer lists, customer records, shipping, transportation and employee-related records, all in-force and transferable permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies; but if and to the extent that Goodwill is an Acquired Asset, such Goodwill will exclude Books and Records relating to Accounts Receivable and Bankruptcy Causes of Action.

"Improvements" means all of the buildings, warehouses, fixtures, pipes, lines, and other improvements owned by Seller or Seller's Affiliate and located on the Real Property.

"Intellectual Property" or "IP Assets" means collectively, all U.S. and foreign intellectual property rights, including (a) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, Internet domain names, logos, designs, symbols, trade dress, Trade Names, and other indicia of origin, all applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby, including all renewals of them; (b) patents, patent applications, and invention disclosures, including divisions, continuations, continuations-in-part, extensions, reissues, reexaminations, and any other governmental grant for the protection of inventions or industrial designs; (c) trade secrets; (d) type certificates, and (e) copyrights, and registrations and applications thereof, and all renewals, extensions, restorations and reversions thereof utilized in the Business.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Inventory" means all inventory of Seller, whether raw materials, spare parts, work-in-process, or finished goods inventories, wherever located and however contained.

"Knowledge" means, when used in connection with the Seller with respect to any matter in question, the actual knowledge of Seller, KPH, and Seller's Transition Team, and when used in connection with the Purchaser with respect to any matter in question the actual knowledge of Purchaser.

"Leases" includes leases for real or personal property between Seller and any third party, in effect on the Closing Date.

"Licenses" means all permits, licenses, franchises, certificates, approvals and other authorizations of foreign, federal, state and local governments or other similar rights in effect on the Closing Date.

"Liens" means all (i) mortgages, pledges, security interests, encumbrances, liens or charges of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof), (ii) filings or agreements to file a financing statement as debtor under the Uniform Commercial Code or any similar statute other than to reflect ownership by a third party of property leased to Seller under a lease which is not in the nature of a conditional sale or title retention agreement, (iii) subordination arrangements in favor of another Person, (iv) obligations, liabilities, interests, contractual commitments, claims, claims or rights of possession, rights of way, licenses, easements, or restrictions of any kind or nature whatsoever, whether based in law or equity, and including, without limitation, any claim or interest based on or related to any employee benefit obligations, patent or trademark laws, revenue, pension and tax laws, ERISA, Environmental Law, or product liability law, and (v) claims or interests based on any theory of successor liability, de facto merger, substantial continuity, or similar theory.

"Machinery and Equipment" means all merchantable machinery or equipment, trade fixtures, tools, dyes, jigs or other similar items, spare parts, office or other furniture and equipment owned by Seller on the Effective Date, wherever located and all accessions thereto, which are located in any manufacturing plant, other building, warehouse, office or other space leased, owned or occupied by Seller.

"Ordinary Course of Business" means the ordinary course of business of the business of Seller consistent with past practice (including, without limitation, with respect to collection of accounts receivable, purchases of inventory and supplies, repairs and maintenance, payment of accounts payable and accrued expenses, levels of capital expenditures and operation of cash management practices generally).

"Permitted Encumbrance" means (a) statutory Encumbrances for Taxes or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and which are adequately reserved in accordance with GAAP; (b) mechanics', materialmen's, architects', carriers', workers', repairers', warehousemen's, landlords' and other similar statutory Encumbrances arising in, or incurred in the ordinary course of, Seller's business, either securing payments not yet due or that are being contested in good faith by appropriate proceedings; (c) Encumbrances in favor of the lessors under equipment leases with third parties entered into in the ordinary course of business,

but only to the extent that such equipment leases are Assigned Contracts; (d) any liens in favor of GE and Pratt & Whitney that have attached to aircraft engines sold to Seller by GE and Pratt & Whitney; and (e) such Encumbrances as do not, individually or in the aggregate, materially impair the ownership, use, or operation of the assets to which they relate.

"Person" means a natural person, partnership, corporation, association, limited liability company, joint stock company, trust, joint venture, unincorporated organization, governmental entity, or any department, agency, or political subdivision thereof, and any other entity.

"Production Certificate" means the written authorization issued to Seller by the FAA authorizing Seller to manufacture the aircraft for which Seller holds Type Certificates at the Facility. The Parties acknowledge and agree that such certificate is not transferrable and that Purchaser must apply for and be awarded its own production certificate in order to be able to manufacture aircraft or parts at the Facility.

"Proprietary Rights" means, with respect to Seller, all of the following owned by, issued to or licensed to Seller and used by Seller in connection with or relating to the operation of the Acquired Assets which can be transferred: (i) all patents, patent applications, patent disclosures and inventions; (ii) all computer software, data, data bases and documentation thereof; (iii) all trade secrets and other confidential information (including, without limitation, ideas, formulas, compositions, inventions (whether patentable or not and whether or not reduced to practice), manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, financial and marketing plans and customer and supplier lists and information); (iv) all other intellectual property rights; and (vi) all copies and tangible embodiments thereof (in whatever form or medium), wherever located, including, without limitation, information filed or recorded with the FAA.

"Provisional Acceptance" with respect to a Bid, means that the Bid has been accepted by Seller, subject to the requirements of the Bid Procedures, this Agreement, and Bankruptcy Court authorization.

"Purchaser" means HHM Aviation Financing, LLC, or its assignees, as authorized by Section 11.3.

"Sale Order" means an Order entered in the Bankruptcy Case that is in form and substance reasonably satisfactory to Purchaser and that includes (without limitation) provisions (i) authorizing Purchaser and Seller to perform all of their respective obligations under the Transaction Documents, and (ii) making express findings of fact that Purchaser shall receive the Acquired Assets free and clear of all Liens (except Permitted Encumbrances) and in good faith, in accordance with 11 U.S.C. §§ 363(m) and 1123(b)(4), that Purchaser has engaged in no activity prohibited under 11 U.S.C. § 363(n), that Purchaser is entitled to the protection afforded good faith, arm's length purchasers, that this Agreement was negotiated at arm's length, that Seller's entry into this Agreement represents a sound exercise of business judgment and is in the best interests of the Debtor and its estate.

"Tax Returns" means returns, declarations, reports, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information)

filed or required to be filed in connection with the determination, assessment or collection of Taxes of any party or the administration of any laws, regulations or administrative requirements relating to any Taxes.

"Taxes" means monies owed to any federal, state, local, governmental unit under any statute, rule, regulation or ordinance enacted for the sole purpose of raising public revenue, or any related fee, assessment or charge of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not. Taxes do not include any fine, obligation, or assessment arising out of the police or regulatory powers of governmental units.

"Topping Bid" has the meaning ascribed to it in Section 8.3.

"Trade Names" means (i) all trademarks, service marks, trade dress, trade names, logos, Internet domain names and corporate names and registrations and applications for registration thereof together with all of the goodwill associated therewith; (ii) all copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof; and (iii) all mask works and registrations and applications for registration thereof; as all of the foregoing are owned by Seller as of the Closing.

"Transaction Documents" means this Agreement and all Definitive Sale Documents, whether described in this Agreement, delivered at Closing, or otherwise.

"Transition Team" means employees or agents of Seller designated under this Agreement to work with Purchaser's designated Transition Team to prepare for Closing and implementation of this Agreement. No employee or agent of Seller shall be deemed to have breached any duty of loyalty to Seller or any fiduciary duty to Seller as a Debtor-in-Possession by carrying out duties as a member of the Transition Team.

"Uniform Commercial Code" means the Uniform Commercial Code, as enacted and in force in the State of Georgia on the Closing Date.

"Wells Fargo" means Wells Fargo Bank, National Association.

**1.2   Other Definitional Provisions.**

  **(a)   Accounting Terms.** Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under the Bankruptcy Code, the IRC, the Uniform Commercial Code, or under GAAP, in that descending order of priority. To the extent that the definition of an accounting term that is defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

  **(b)   Hereof, etc.** The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule references contained in this Agreement are references to Sections, clauses, and Schedules in or to this Agreement, unless otherwise specified.

(c)    **Construction.**  Unless the context of this Agreement otherwise clearly requires: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) references to any gender include the other gender, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation," (d) the term "or" has the inclusive meaning represented by the phrase "and/or," (e) the terms "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (f) the terms "day" and "days" mean and refer to calendar day(s); (g) any reference in the Agreement to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to the Agreement; (h) the words "herein," "hereunder," and "hereto" refer to the Agreement in its entirety rather than to a particular portion of the Agreement; and (i) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Agreement.

**ARTICLE II**
**PURCHASE AND SALE;**
**ASSUMPTION OF CERTAIN LIABILITIES; CLOSING**

**2.1**    **Purchase and Sale of Assets**.

(a)    **Acquired Assets.**  Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code and the Bankruptcy Rules, and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser (or any entity or person designated by Purchaser), "as is, where is, with all faults," and Purchaser shall purchase, acquire and accept from Seller, "as is, where is, with all faults," all of Seller's right, title and interest in, to and with respect to the Business, including the following **(collectively, "Acquired Assets")**, but excluding the Excluded Assets, as of the Closing:

(i)    all of Seller's assets (other than the Excluded Assets) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, contingent, owned, leased, or licensed, for use in or relating to the Business or otherwise owned by Seller, including any assets formerly used in the Business that are owned by Seller but no longer used in the Business, whether or not reflected on the books and records of Seller, as the same shall exists on the Closing Date; including, but not limited the real property described on Schedule 2.1(a)(i).

(ii)    (A) all Contracts set forth on <u>Schedule 2.1(a)(ii)</u>, which may be added to or subtracted from by Purchaser, in its sole discretion, prior to seven (7) days before the Auction Date with any added Contracts automatically becoming an Assigned Contract and with any subtracted Contract automatically becoming an Excluded Asset, which Assigned Contracts Seller shall assume and assign to Purchaser pursuant to section 365 of the Bankruptcy Code; and (B) to the extent assignable pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, all rights under any lease for assumed leased real property and any renewal rights, but

excluding any obligations outstanding under the DIP Financing to be forgiven by Purchaser at Closing, each as listed on Schedule 2.1(a)(ii) (collectively, "Assigned Contracts");

(iii)    to the extent related to the Business, all trade and non-trade accounts receivable, notes receivable, and negotiable instruments of Seller ("Accounts Receivable"), except for those set forth on Schedule 2.1(a)(iii) ("Excluded Accounts Receivable");

(iv)    all Documents relating to the Acquired Assets or Assigned Contracts;

(v)    all tangible assets of Seller relating to the Business, including, without limitation, the tangible assets of Seller located at any assumed leased real property;

(vi)    all personnel files for the Employees except as prohibited under Law; provided, however, that Seller has the right to retain copies of such files to the extent not prohibited by Law;

(vii)    any chattel paper owned or held by Seller relating to the Business or the Acquired Assets, except to the extent constituting an Excluded Asset;

(viii)    all Permits relating to the Business or the Acquired Assets, and all pending applications therefor, including without limitation, to the extent transferrable hereunder, the Aircraft Certificates (as defined below);

(ix)    all express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action, or rights of set off against third parties relating to the Acquired Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to the Assigned Contracts), including rights under vendors' and manufacturers' warranties, indemnities, guaranties and claims and causes of action under applicable Law that are not possessed by Seller (excluding Avoidance Actions);

(x)    all Patents, Copyrights, Marks, inventions (whether or not patentable), trade secrets, Net Names, the internet web site located at "www.thrushaircraft.com" and all other Marks and other intangible assets used by Seller, including the right to use all Trade Names, including "Thrush" and "Thrush Aircraft," and also including the right to use those registrations and applications, if any, set forth on Schedule 2.1(a)(x), which may be added to or subtracted prior to seven (7) days before the Auction Date (collectively, "Acquired IP Assets");

(xi)    the Intellectual Property, including all claims (including all rights to bring claims for past, present or future infringement of the Intellectual Property owned by Seller) and causes of action of Seller at Closing against any Persons (regardless of whether or not such claims and causes of action have been asserted by Seller) related thereto, including but not limited to all FAA authorizations such as Type Certificates and related drawings, documents, and tooling;

(xii)   all Goodwill, payment intangibles, general intangibles, and other assets and rights of Seller to the extent associated with the Business and the Acquired Assets, including Seller's customer lists;

(xiii)   all Inventory, including raw materials, work in process, parts, subassemblies, and finished goods, wherever located and whether or not obsolete or carried on Seller's books and records, in each case with any transferrable warranty and service rights of Seller with respect to such Acquired Assets to the extent owned by Seller;

(xiv)   to the extent permitted by Law, Seller's Documents, and without limiting the foregoing, each of the following: financial, accounting, and other books and records, correspondence, and all customer sales, marketing, advertising, packaging, and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data, and other technical information and data, and all other business and other records, in each case arising under or relating to the Acquired Assets, the Assigned Contracts, or the Business; provided, however, that Seller may retain copies of Seller's financial and accounting records after the Closing for the limited purpose of facilitating Seller's preparation and filing of tax returns, and Seller shall be granted access to Seller's drawings, engineering and manufacturing data, and other technical information and data to the extent necessary to permit Seller to prosecute or defend litigation concerning claims that arise from or relate to aircraft sold or repaired before the Closing;

(xv)   to the extent transferrable, all rights and obligations under or arising out of all insurance policies relating to the Business or any of the Acquired Assets or Assigned Contracts (including returns and refunds of any premiums paid, or other amounts due back to Seller, with respect to cancelled policies);

(xvi)   all rights and obligations under non-disclosure or confidentially, key employee retention plans and similar arrangements with (or for the benefit of) employees and agents of Seller or with third parties; and

(xvii)   all product and Inventory testing information.

The transfer of the Acquired Assets pursuant to this Agreement shall not include the assumption of any liability related to the Acquired Assets unless Purchaser expressly assumes that liability or obligation pursuant to this Agreement.

**(b)**   **Excluded Assets.** Nothing herein shall be deemed to sell, transfer or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. Excluded from Purchaser's purchase of Seller's assets under this Agreement are the following assets of Seller (**"Excluded Assets"**):

(i)   the minute book or books of Seller;

(ii)   all claims and causes of action of Seller against Wells Fargo or the Export-Import Bank of the United States;

11

(iii)    any Bankruptcy Avoidance Actions of Seller, and all Contracts other than the Assigned Contracts; and

(iv)    (a) all collateral identified on Schedule 2.2(a), which secure the repayment of promissory notes with respect to which Purchaser and the note payee have not negotiated an acceptable amount to be received by the payees of the notes, as identified and reported to the Bankruptcy Court in accordance with Section 2.2(a) of this Agreement, and (b) the collateral securing the repayment of the WFEF promissory notes identified on Schedule 2.2(a)(i), if and to the extent that WFEF has declined to accept the $100,000 payment described in Section 2.2(a) in full satisfaction of its promissory notes identified on Schedule 2.2(a)(i).

(c)    **Assumed Liabilities.** Upon the terms and subject to the conditions set forth in this Agreement, Purchaser agrees, effective on the Closing Date, that Purchaser shall assume only the following obligations or liabilities of Seller:

(i)    all obligations and liabilities arising from the Assigned Contracts (reflected on Schedule 2.1(a)(ii), which amounts include any costs to cure any defaulted obligations under the Assigned Contracts as of the Effective Date), it being understood and agreed that the assumption of liabilities by any party shall not enlarge any rights of third parties under contracts or arrangements with Purchaser or Seller and nothing herein shall prevent any party from contesting in good faith with any third party any of such liabilities;

(ii)    Seller's obligations to GE and Pratt & Whitney that are secured by liens in favor of GE & Pratt & Whitney against aircraft engines sold to Seller by GE and Pratt & Whitney;

(iii)    all of Seller's obligations outstanding as of Closing under the DIP Financing;

(iv)    all of Seller's obligations for real and personal property ad valorem taxes; and

(v)    notwithstanding any other provision of this Agreement to the contrary, Purchaser shall not assume any Liabilities under any the Assigned Contracts to the extent that such Liabilities arise as a result of a breach of, or obligation arising under, such Assigned Contracts occurring prior to, as of, or as a result of, the Closing.

(d)    **Excluded Liabilities.** Except for liabilities arising under the Assigned Contracts, Purchaser is not assuming any Liabilities of Seller, whatsoever, known or unknown, accrued or contingent, now existing or hereafter arising. The following liabilities (**"Excluded Liabilities"**) shall remain the sole responsibility of Seller and shall include the following:

(i)    any Liability arising out of or relating to products of Seller to the extent manufactured or sold prior to the Closing;

(ii)     any Liability under any customer purchase order or vendor purchase order entered into by Seller prior to Closing (unless such Liability constitutes an Assumed Lability under this Agreement);

(iii)    except for taxes assumed in Section 2.1(c), any Liability of Seller for Taxes, including (A) any Taxes of Seller arising as a result of Seller's operation of the Business or ownership of the Acquired Assets prior to the Closing; (B) any deferred Taxes of Seller of any nature, and (C) any income tax liabilities of Seller;

(iv)    except as otherwise expressly provided in this term sheet, any Liability of Seller relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits or any other employee plans or benefits of any kind for Seller's employees or former employees or both;

(v)     any Liability of Seller under any employment, severance, retention or termination agreement with any employee of Seller or any of its Affiliates;

(vi)    any Liability of Seller to any shareholder of Seller, Affiliate of Seller or Affiliate of any shareholder of Seller;

(vii)   any Liability of Seller arising out of any proceeding pending as of the Closing or any Liability of Seller arising out of any proceeding commenced after the Closing and arising out of or relating to any occurrence or event happening prior to the Closing;

(viii)  any Liability of Seller arising out of or resulting from Seller's compliance or noncompliance with any legal requirement or Order of any Governmental Body;

(ix)    any Liability of Seller under this Agreement or any other document executed in connection with the transactions contemplated by this Agreement;

(x)     any Liability of Seller based upon Seller's acts or omissions occurring after the Closing;

(xi)    any Liability arising out of or relating to any Acquired IP Assets to the extent relating to activities undertaken by Seller prior to the Closing; and

(xii)   any Liability under any real or personal property leases that do not constitute an Assigned Contract.

(e)     **Real Estate Leased by Seller from Seller's Affiliate.** Seller currently leases real property located at 300 Old Pretoria Road in Dougherty County, Georgia (**"Property"**) from its owner KPH Properties II, Inc. (**"KPH"**), which entity is owned by K. Payne Hughes, the sole shareholder of Thrush. A condition to Closing is that KPH and the Seller will enter into amendments to the current lease agreement between KPH and Seller dated January 1, 2014 to extend the term of the lease agreement to and including December 31, 2023, with 5 consecutive options on the part of the Purchaser to renew the lease for additional 5-year

terms but otherwise on the same terms and conditions as are currently provided for in the lease agreement, except that beginning on January 1, 2024, and annually thereafter, the rental amount will be increased by multiplying the then-current rental amount by a fraction whose numerator is the then-prevailing Consumer Price Index for All Urban Consumers (CPI-U), CUUR0300SA0, South, and whose denominator is a base CPI agreed upon by the parties. KPH will consent to the transfer of those leases, as amended, to the Purchaser at Closing, and the Purchaser will assume the obligations of the Seller thereunder. In addition, prior to Closing, KPH shall grant to the Purchaser an option to purchase the subject real estate and improvements thereon for the sum of $500,000.00 more than the payoff amount furnished by Synovus Bank as of the Effective Date, which option may be exercisable at any time within 2 years of the Closing Date (**"KPH Condition"**). The new lease terms will be subject to the approval of Synovus Bank, holder of the senior lien on the Property.

    **2.2**    <u>**Aggregate Purchase Price; Good Faith Deposit.**</u>

        **(a)**    <u>**Aggregate Purchase Price.**</u> As consideration for the sale by Seller to Purchaser of the Acquired Assets, Purchaser will deliver to Seller at Closing an aggregate purchase price consisting of (i) $3,900,000.00 **(subject to the adjustments described below, "Cash Price to Wells Fargo")** (which includes $250,000.00 for satisfaction of Seller's P-Card indebtedness to Wells Fargo), plus (ii) a promissory note in the principal amount of $1,150,000.00, payable by Purchaser to the order of Wells Fargo (or Ex-Im Bank, as assignee), in the form attached as <u>Schedule 2.3(b)(iii)</u>, with interest to accrue annually on the unpaid principal amount of 5.00% per year. Principal and interest shall be payable in one installment of interest only due one year after the Closing Date, three consecutive semi-annual installments thereafter of interest only, and the final installment of the full balance of principal and accrued but unpaid interest due and payable on the first day of the 36th month after the Closing Date (**"Promissory Note Purchase Price"**), plus (iii) the forgiveness or assumption of Seller's obligations under the DIP Indebtedness (**"DIP Forgiveness Amount"**) (the Cash Price to Wells Fargo (as increased or decreased in accordance with the adjustments described in the following paragraph), the Promissory Note Purchase Price, and the DIP Forgiveness Amount are collectively referred to as **"Aggregate Purchase Price"**). As further consideration for the sale contemplated by this Agreement, Purchaser will assume at Closing all obligations of Seller under the Assigned Contracts (as added to or subtracted from), as identified on Schedule 2.1(a)(ii).

The Cash Price to Wells Fargo payable at Closing shall be subject to the following adjustments: **(i)** the Cash Price to Wells Fargo shall be *reduced* by an amount equal to the gross sales proceeds received by Seller for the sale of the Experimental Aircraft, if the Experimental Aircraft is sold and the sales proceeds are received by Seller before the Closing Date; **(ii)** the Cash Price to Wells Fargo shall be *increased* by $100,000.00 if the Sale Order is entered by the Bankruptcy Court no later than November 1, 2019; **(iii)** the Cash Price to Wells Fargo shall be *increased* by $100,000.00 if Wells Fargo Equipment Finance, Inc. ("WFEF") agrees to accept such payment in satisfaction in full of its promissory notes and to release all its liens on equipment identified as 001-0331232-703 and 001-0331232-704, and the $100,000.00 shall be paid to WFEF, and **(iv)** the Cash Price to Wells Fargo shall be *increased* by an amount equal to $75,000 for each Designated Aircraft that has not been sold by Seller before the Closing Date, provided, however, that the amount payable for each unsold Designated Aircraft shall be paid to Wells Fargo, after

the Closing Date, upon the receipt of sales proceeds for such Designated Aircraft but in no event later than 90 days after the Closing Date.

In addition, the Aggregate Purchase Price shall be *increased* by (i) the aggregate sum of the amounts that Purchaser and the payees of those promissory notes identified on Schedule 2.2(a) have negotiated as the amount to be received by the payees of the promissory notes, as identified and reported to the Bankruptcy Court prior to seven (7) days before the Auction Date (whether paid at Closing or through delivery of Purchaser's promissory note to the payee) (**"Promissory Notes Payment"**), and (ii) the aggregate amount of money necessary to cure all pre-Closing defaulted obligations owed under the Assigned Contracts, as such amounts are identified on Schedule 2.1(a)(ii) (**"Assigned Contracts Cure Amount"**); provided, however, that the Assigned Contract Cure Amount will not be taken into account for purposes of determining the Topping Bid under Section 8.3 of this Agreement, but the Promissory Notes Payment will be taken into account for purposes of determining the Topping Bid under Section 8.3 of this Agreement.

All amounts payable to Wells Fargo or WFEF shall be payable and paid without defense, offset, deduction, or counterclaim.

      **(b)**   **Good Faith Deposit**. Upon execution of this Agreement, Purchaser shall deposit with the Escrow Agent $250,000.00 (**"Good Faith Deposit"**) by wire transfer of immediately available funds. The Good Faith Deposit (together with all accrued investment income thereon, if any) shall be released and distributed by the Escrow Agent to Seller or the Purchaser in accordance with the Escrow Agreement and this Agreement. The Good Faith Deposit (together with all accrued investment income thereon, if any) shall be distributed as follows (and in accordance with the terms of the Escrow Agreement):

      (i)   If the Closing occurs, the Good Faith Deposit (and all accrued investment income thereon, if any) shall be applied as a credit against the Aggregate Purchase Price owed at Closing by the Purchaser.

      (ii)   If this Agreement is terminated by Seller because the Purchaser fails, neglects, or refuses to perform any of the Purchaser's obligations under this Agreement (and such failure is not cured within any applicable cure period) or materially breaches any representation or warranty under this Agreement, then the Good Faith Deposit (and all accrued investment income thereon, if any) shall be delivered to Seller and retained by Seller as Seller's exclusive remedy.

      (iii)   If this Agreement is terminated for any reason other than a breach by the Purchaser of the Purchaser's obligations, then the Good Faith Deposit (and all accrued investment income thereon, if any) shall be delivered to and retained by the Purchaser.

      **(c)**   **Good Faith Deposit Applied at Closing.** At Closing, Purchaser shall pay the Cash Price to Wells Fargo and the Assigned Contracts Cure Amount by wire transfer of immediately available funds into the Escrow Account, less the Good Faith Deposit and all accrued investment income thereon, if any, which shall be released to Seller by the Escrow Agent. The funds in the Purchase Price Escrow Account will be distributed to Seller and/or

Purchaser in accordance with the terms of the Escrow Agreement and this Agreement, as shown upon the closing statement.

**(d)**    **Allocation of Aggregate Purchase Price.** The Aggregate Purchase Price shall be allocated as agreed to by the parties on or before the Closing Date. After the Closing, the parties shall make consistent use of the allocation for all tax purposes and in all filings, declarations, and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the Internal Revenue Code. Purchaser shall prepare and deliver IRS Form 8594 to Seller, and both parties shall file such IRS Form 8594 with the IRS. In any proceeding related to the determination of any Tax, neither Purchaser nor Seller shall contend that such allocation is not a correct allocation.

**2.3**    **Closing Transactions.**

**(a)**    **Closing.** Subject to the satisfaction of all conditions to closing set forth in this Agreement (or the waiver thereof by the party entitled to waive that condition), the closing of the transaction contemplated by this Agreement (**"Closing"**) shall take place at the offices of Stone & Baxter, LLP, Fickling & Co. Building, Suite 800, 577 Mulberry Street, Macon, Georgia 31201, on November 1, 2019 or such later date as the Parties may agree on in writing, but not later than December 1, 2019, unless further extended by the Parties in writing. The date on which the Closing shall be held is referred to in this Agreement as the **"Closing Date"** and the Closing shall be deemed effective at 5:00 p.m. (Eastern Time) on the Closing Date.

**(b)**    **Closing Transactions.** Subject to all the conditions set forth in this Agreement, Seller and Purchaser shall consummate the following transactions (**"Closing Transactions"**) on the Closing Date:

**(i)**    Seller shall convey to Purchaser good title to the Acquired Assets, free and clear of all Liens and Encumbrances (other than the Permitted Encumbrances), and execute and deliver to Purchaser all documents, instruments and agreements necessary or appropriate to consummate the transactions contemplated by this Agreement (**"Definitive Sale Documents"**), including, without limitation:

**(A)**    a bill of sale for all of the Acquired Assets that are items of tangible personal property, duly executed by Seller;

**(B)**    a counterpart, duly executed by Seller, of an assignment and assumption agreement of the Assigned Contracts, which assignment will also contain Purchaser's undertaking and assumption of the Assigned Contracts, including but not limited to any cure costs (**"Assignment and Assumption Agreement"**);

**(C)**    assignments executed by Seller of all registered and applied for Trademarks, Patents, and Copyrights transferred to Purchaser under this Agreement (**"IP Assignment Agreements"**);

(D)    such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by Purchaser to transfer the Acquired Assets, each in form and substance satisfactory to the parties and their respective legal counsel and executed by Seller;

(E)    an amendment to Seller's articles of incorporation changing Seller's name from Thrush Aircraft to a name not including or confusingly similar to "Thrush" or "Thrush Aircraft"; provided, however, that to the extent required by the Bankruptcy Court the name of the Debtor in the Bankruptcy Case shall remain "Thrush Aircraft";

(F)    A duly executed certificate with respect to Internal Revenue Code Section 1445 stating that Seller is not a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the IRC and Income Tax Regulations);

(G)    A Closing statement;

(H)    A bringdown certificate and reaffirmation of the warranties and representations made and given by Seller in this Agreement;

(I)    Evidence of authority of the persons executing and delivering documents at Closing on behalf of Seller in such form as Purchaser shall reasonably require; and

(J)    Such other documents as may be reasonably required by Purchaser to carry out the intent and purposes of this Agreement and consummate the sale and purchase contemplated hereunder.

(ii)    at the Closing, Purchaser shall deliver to Seller (either directly or through an Escrow Agent) the Cash Price to Wells Fargo, by wire transfer of immediately available funds, with a credit against the amount of the Cash Price to Wells Fargo equal to the amount of the Good Faith Deposit;

(iii)    at the Closing, Purchaser shall deliver a promissory note payable to the order of Wells Fargo (or Ex-Im Bank, as assignee), whose principal amount shall equal the Promissory Note Purchase Price, in the form attached as Schedule 2.3(b)(iii).

(iv)    Seller and Purchaser, as applicable, shall deliver the opinions, certificates, and other documents and instruments required to be delivered by or on behalf of such Party under Article III.

**2.4    Due Diligence.** The Purchaser shall have the lesser of (i) 21 days from the date that the Bankruptcy Court enters the Bidding Procedures Order, or (ii) the number of days between the Effective Date and the Auction Date, within which to complete its due diligence, during which time the Purchaser may terminate this Agreement if the results of its due diligence are unsatisfactory for any reason.

# ARTICLE III
## CONDITIONS TO CLOSING

**3.1** <u>**Conditions to Purchaser's Obligations.**</u> The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction of each of the following conditions on or before the Closing Date, unless waived by Purchaser in writing, to the extent such waiver is permissible:

(a)    The Sale Order shall have been entered by the Bankruptcy Court (non-waivable), after due and proper notice to all interested parties, and shall have become final and non-appealable;

(b)    Satisfaction of the KPH Condition (non-waivable);

(c)    Seller's representations and warranties shall be true and correct in all material respects, when made and at and as of the Closing Date;

(d)    Seller shall have performed and complied with all of the required covenants and agreements on or prior to the Closing Date;

(e)    All required consents by third parties and Governmental Authorizations that are required for the transfer of the Acquired Assets to the Purchaser and the consummation of the other transactions contemplated shall have been obtained or are reasonably anticipated to be received following the Closing Date in the normal course of such approvals, or in the event of an objection by a third party to the transfer of any Acquired Asset, such objection has been overruled, all on terms reasonably satisfactory to the Purchaser; a schedule of such Filings, Authorizations, and Approvals to be attached as <u>Schedule 3.1(e)</u> (provided, however, that nothing in this condition shall be construed to require Seller to assign, convey, or otherwise transfer to the Purchaser any Production Certificate currently issued to Seller);

(f)    the purchase of the Acquired Assets by the Purchaser hereunder shall not be prohibited by any applicable law or governmental regulation;

(g)    Purchaser shall have received an opinion, dated the Closing Date, of Stone & Baxter, LLP, counsel to Seller, in form and substance consistent with the Interpretative Standards Applicable to Legal Opinions to Third Parties in Corporate Transactions adopted by the Legal Opinion Committee of the Corporate and Banking Law Section of the State Bar of Georgia, and otherwise reasonably satisfactory to Purchaser;

(h)    the Purchaser shall have received reasonable assurances (in a form reasonably satisfactory to the Purchaser) from FAA personnel that the FAA will issue to Purchaser, if the Purchaser is the successful bidder at auction, a Production Certificate covering the Albany, Georgia premises at which aircraft will be manufactured;

(i)    the FAA, after reasonable notice, shall not have objected to the transfer by Seller to the Purchaser of all Type Certificates currently issued to Seller;

(j)     On or prior to the Closing Date, Seller shall have delivered to Purchaser all of the following:

(i)     a certificate from Seller in a form reasonably satisfactory to the Purchaser, dated the Closing Date, stating that the preconditions applicable to Seller specified in this Section 3.1 have been satisfied;

(ii)     copies of all third party and governmental consents, approvals, filings, releases and terminations required in connection with the conveyance of the Acquired Assets (this provision shall not be construed as requiring Seller to deliver to the Purchaser any consent by the FAA to the reissuance of a Production Certificate in the name of the Purchaser);

(iii)     all of the other Definitive Sale Documents; and

(iv)     Since the Effective Date, there shall not have occurred any material adverse condition or event with respect to any of the Acquired Assets, including, without limitation, any material damage or destruction to any or all of the Acquired Assets;

(k)     All actions to be taken by Seller in connection with the consummation of the Closing Transactions and the other transactions contemplated hereby and all certificates, opinions, instruments and other documents required to be delivered by Seller to effect the transactions contemplated hereby reasonably requested by the Purchaser shall be reasonably satisfactory in form and substance to the Purchaser;

(l)     The execution of a Covenant Not To Compete by K. Payne Hughes, Sr. prohibiting him for a period of five (5) years subsequent to the Closing Date from engaging in any activity comparative with the Business to be acquired by Purchaser; and

(m)     The 14-day stay period imposed by Bankruptcy Rule 6004(h) on the Sale Order shall have expired or the Bankruptcy Court shall have determined that there shall be no stay of the Sale Order.

Unless otherwise provided in this Agreement, any condition set forth in this Section 3.1 may be waived by Purchaser in its sole discretion; provided, however, that no such waiver shall be effective unless it is set forth in a writing executed by Purchaser.

**3.2     Conditions to Seller's Obligation.** The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions as of the Closing Date:

(a)     The payment of the Aggregate Purchase Price due at Closing as set forth in Section 2.2(a);

(b)     The Sale Order shall have been entered by the Bankruptcy Court (non-waivable), after due and proper notice to all interested parties, and there shall be no stay pending appeal in place at the time of Closing; and

(c)    The representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects at and as of the Closing Date.

Any condition specified in this Section 3.2 may be waived by Seller in its sole discretion; provided, however, that no such waiver shall be effective unless it is set forth in a writing executed by Seller.

## ARTICLE IV
## COVENANTS PRIOR TO CLOSING

**4.1    Affirmative Covenants of Seller.** Prior to the Closing, unless Purchaser otherwise agrees in writing and except as expressly provided otherwise in this Agreement, Seller shall form the Transition Team which shall:

(a)    cooperate with Purchaser and use reasonable best efforts to work directly with members of Purchaser's organization to develop and implement a transition plan and to cause the conditions to Purchaser's obligations to close to be satisfied (including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered and the making and obtaining of all third party and governmental notices, filings, authorizations, approvals, consents, releases and terminations);

(b)    use reasonable best efforts to assist Purchaser to obtain all third party and governmental approvals and consents necessary or desirable to convey the Acquired Assets contemplated hereby and to cause the other conditions to Purchaser's obligations hereunder to be satisfied;

(c)    comply with all applicable laws, ordinances, and regulations respecting the preservation of the Acquired Assets up to the Closing;

(d)    permit Purchaser and its employees, agents, accounting, legal and other authorized representatives to (i) have full access to the premises, Books and Records of the Debtor at reasonable hours, (ii) visit and inspect the Facility, and (iii) discuss the affairs, finances and accounts of the Debtor with the directors, officers, partners, key employees, key customers, key sales representatives, key suppliers and independent accountants of Seller;

(e)    file the appropriate Motion for entry of the Sale Order, with timely service on all interested parties, on or before October 2, 2019 to approve all transactions contemplated by this Agreement and diligently prosecute same;

(f)    promptly (once it obtains knowledge thereof) inform Purchaser in writing of any material variances from the representations and warranties contained in this Agreement or of any breach of any covenant hereunder by Seller;

(g)    cooperate in good faith with Purchaser to allow Purchaser to satisfy and use its reasonable best efforts to cause the conditions to Purchaser's obligation to close as set forth in Section 3.1 to be satisfied (including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered and the making and

obtaining of required third party and governmental filings, authorizations, approvals, consents, releases and terminations);

(h)    between the Effective Date and the Closing Date, and upon reasonable advance notice received from Purchaser, Seller shall (i) afford Purchaser and its representatives **(collectively, "Purchaser Group")** access, during regular business hours, to Seller's personnel, properties, contracts, permits, books, and records and other documents and data, such rights of access to be exercised in a manner that does not unreasonably interfere with the operations of the Business; (ii) furnish Purchaser Group with copies of all such contracts, permits, books and records and other existing documents and data as Purchaser Group may reasonably request; (iii) furnish Purchaser Group with such additional financial, operating and other relevant data and information as Purchaser Group may reasonably request; and (iv) otherwise cooperate and assist, to the extent reasonably requested by Purchaser, with Purchaser's investigation of the properties, assets and financial condition of Seller. Purchaser Group may also contact and seek assurances and comfort from key contract counterparties (including but not limited to GE Aviation and Pratt & Whitney) that such parties are likely to support the assignment and assumption of the Assigned Contracts, key suppliers and other parties. Purchaser Group acknowledges and agrees that any access granted or information provided pursuant to this paragraph shall also be made available to any other bidder under the Bid Procedures, and that such information shall be deemed to be due diligence information available to such bidders.

(i)    permit Purchaser to take such action as Purchaser may reasonably require to establish as a matter of public record that Seller is the owner of fee simple title to the Acquired Assets at the time of the Auction and at Closing;

(j)    (i) keep the Acquired Assets and material Acquired IP Assets adequately insured and not cancel or permit cancellation of any hazard or liability insurance carried with respect to the Acquired Assets; (ii) remedy all material violations of laws, ordinances, orders or requirements relating to the Acquired Assets which are not caused by Purchaser and of which Seller has received (or receives prior to Closing) actual written notice and provide Purchaser with evidence of curing of same; and (iii) operate the Business and the Acquired Assets on a basis consistent with historical operations including, without limitation, undertaking all reasonably required ordinary maintenance, safeguarding and repair of the Acquired Assets and Acquired IP Assets, as appropriate;

(k)    without the prior written consent of Purchaser, (i) sell, transfer or dispose or become obligated to sell, encumber, transfer or dispose of any of the Acquired Assets or Acquired IP Asset, except for the use and consumption of inventory, office and other supplies and spare parts, and the replacement of worn out, obsolete and defective tools, equipment and appliances, and the replacement of any such items, all in the Ordinary Course of Business, and except to a higher and better bidder at the Auction in accordance with the Bidding Procedures Order, (ii) enter into any transaction, or make any commitment with respect to the Acquired Assets or Acquired IP Asset other than in the Ordinary Course of Business or pursuant to the Bidding Procedures Order, or (iii) enter into, amend, renew, extend, modify or terminate any contract, permit or lease except as contemplated by this Agreement;

(l)     cause to be paid when due out of the DIP Financing all taxes, license fees, trade accounts and costs and expenses of operation and maintenance of the Acquired Assets incurred through the Closing;

(m)     promptly notify Purchaser of (i) any actual or anticipated material adverse change in or to the Acquired Assets, including, without limitation, any notice relating to any insurance contract or policy now held or owned by Seller to cancel or materially increase any premiums relating thereto; (ii) any actual or anticipated dispute, litigation or proceeding (including, but not limited to, any condemnation, eminent domain or similar proceeding) or any default under any leases or contracts; and (iii) any actual or anticipated violation of any law, regulation, code or ordinance relating to the Acquired Assets, and any actual or anticipated notice from any governmental or quasi-governmental entity having jurisdiction over the Acquired Assets;

(n)     **Bankruptcy Court Approval.** Prior to the Closing, Seller shall take the following actions to obtain approval of the Contemplated Transactions from the Bankruptcy Court:

(i)     Seller will file a motion with the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and any other applicable Law (**"Sale Motion"**) requesting the Bankruptcy Court to enter the Sale Order (i) authorizing the sale of the Acquired Assets to Purchaser (if Purchaser is deemed to have made the highest and best offer for the Acquired Assets) in accordance with section 363 of the Bankruptcy Code, (ii) providing that the purchase price for the Acquired Assets shall be the Aggregate Purchase Price, or such greater sum as may be bid in accordance with the Bid Procedures (as defined below), (iii) finding that Purchaser is a "good faith purchaser" as that term is defined in section 363(m) of the Bankruptcy Code; (iv) providing all Acquired Assets will be transferred to Purchaser free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code; (v) providing that Purchaser shall not be deemed a successor of Seller and shall acquire no successor liability for any obligation of Seller for any claims against Seller as a result of the sale of the Acquired Assets to Purchaser except for Assigned Contracts and cure costs; (vi) authorizing Seller to assume the Assigned Contracts to Purchaser pursuant to section 365 of the Bankruptcy Code; and (vii) waiving the fourteen (14) day stay of such sale imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure. Purchaser will cooperate with Seller in the filing of the Sale Motion and seeking the Sale Order, and the Sale Order will be submitted to Purchaser for its review and approval at least two (2) days before it is filed with the Bankruptcy Court. The hearing at which the Bankruptcy Code considers the Sale Order shall be referred to as the **"Sale Hearing."**

(ii)     The Sale Motion shall, among other things, specifically request that the Bankruptcy Court approve after a hearing those certain bid procedures that provide for the establishment of the bid procedures as set forth in the Bidding Procedures Motion (as amended) to be filed with the Bankruptcy Court on October 2, 2019, which is subject to Bankruptcy Court approval (**"Bid Procedures"**).

(o)     As part of the Bid Procedures, the Parties have agreed to implement certain Bidding Protections, including but not limited to:

22

(i)    initial overbid minimum and subsequent bidding increment requirements, initially proposed as $250,000 and $50,000 respectively;

(ii)    a Break-Up Fee (as defined in Article VIII); and

(iii)    other appropriate and customary protections to a Stalking Horse Bidder (**"Stalking Horse Bid Protections"**).

(p)    Seller and Purchaser acknowledge and agree that the transactions contemplated by this Agreement will become subject to higher or better offers that may be made by other parties at auction to be scheduled for a date prior to the Sale Hearing.

(q)    Seller shall timely serve a copy of the Bid Procedures and sale notice on all parties required to receive notice thereof.

(r)    For each Assigned Contract, Purchaser shall pay the applicable cure costs directly to the applicable contract counterparty in respect of such Assigned Contract.

**4.2**    **Affirmative Covenants of Purchaser.** Purchaser shall:

(a)    during the term of this Agreement and prior to Closing, promptly (once it obtains knowledge thereof) inform Seller in writing of any material variances from the representations and warranties contained in this Agreement or any breach of any covenant hereunder by Purchaser; and

(b)    cooperate in good faith with Seller at no material expense to Purchaser to allow Seller to satisfy and use its reasonable best efforts to cause the conditions to Seller's obligation to close as set forth in Section 3.2 to be satisfied (including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered and the making and obtaining of all third party and governmental filings, authorizations, approvals, consents, releases and terminations, provided that this Section 4.2(b) shall not be construed to enlarge the time periods provided hereunder for the satisfaction of such conditions).

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

As a material inducement to Purchaser to enter into this Agreement, Seller represents and warrants as follows:

**5.1**    **Organization and Corporate Power.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Georgia with full corporate power and authority to conduct the Business as it is now being conducted, to own or use the assets of the Business that it purports to own or use, and to perform all its obligations under the Assigned Contracts. Seller does not conduct the Business through any subsidiaries. KPH is a corporation duly organized, validly existing and in good standing under the laws of the State of Georgia with full corporate power and authority to conduct the Business as it is now being conducted, to own or use the assets of the Business that it purports to own or use, and to perform

all its obligations under the Assigned Contracts. Seller does not conduct the Business through any subsidiaries.

**5.2** **Authorization of Transactions**. Subject to the Court Approval, Seller and KPH have full power and authority to execute and deliver the Transaction Documents to which they are a party and to consummate the transactions contemplated hereby and thereby. Seller and KPH have duly approved the Transaction Documents to which they are a party and has duly authorized the execution and delivery of such Transaction Documents and the consummation of the transactions contemplated thereby. No other proceedings on the part of Seller or KPH are necessary to approve and authorize the execution and delivery of the Transaction Documents to which Seller or KPH is a party, and the consummation of the transactions contemplated thereby. All Transaction Documents to which Seller and KPH is a party have been duly executed and delivered by Seller and KPH and constitute the valid and binding agreements of Seller and KPH, enforceable against Seller in accordance with their terms.

**5.3** **Assets.** After the Closing, Purchaser will have good and marketable title to the Acquired Assets, except that those aircraft engines sold to Seller by GE and Pratt & Whitney will continue to be subject to the liens in favor of GE and Pratt & Whitney, which secure the payment of Seller's obligations to GE and Pratt & Whitney. The Acquired Assets shall otherwise be conveyed free and clear of any Interests, claims, rights of possession or other interests of any kind or nature in favor of third parties.

**5.4** **Delivery of Schedules and Associated Documents and Information.** Seller has furnished to Purchaser or caused to be furnished to Purchaser all Schedules required to be disclosed by this Agreement and all information and other related documentation related to such Schedules.

**5.5** **Enforceability; Authority; No Conflict**. Upon entry of the Sale Order, (a) this Agreement constitutes the legal, valid, and binding obligation of Seller, and (b) upon the execution and delivery by Seller of the other documents and agreements to be entered into by Seller as part of the Contemplated Transactions **("Seller's Closing Documents")**, Seller's Closing Documents will constitute the legal, valid, and binding obligation of Seller. Subject to Bankruptcy Court approval, Seller has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and Seller's Closing Documents to which it is a party and to perform its obligations under this Agreement and Seller's Closing Documents, and such action has been duly authorized by all necessary action by Seller's board of directors.

**5.6** **Contravention**. Neither the execution, delivery, and performance of this Agreement nor Seller's Closing Documents by Seller nor the consummation of the transactions by Seller will (with or without notice or lapse of time or both) (a) assuming entry of the Sale Order, violate or breach any provision of Seller's articles of incorporation, bylaws, or other similar organizational documents, (b) violate, conflict with, or breach of any law or permit applicable to Seller, the Business or any of the Acquired Assets, or (c) result in or require the creation or imposition of any Encumbrance on any of the Acquired Assets.

**5.7** **Product Liability**. No product liability claims have been received orally or in writing by Seller, and to Seller's Knowledge no such claims have been threatened against Seller

24

relating to any of the products currently being developed, tested, manufactured, marketed, distributed, or sold by Seller to Purchaser. To Seller's Knowledge, there is no factual basis for any product liability claims. There is no order or judgment outstanding against Seller relating to product liability claims.

**5.8    Sufficiency of Acquired Assets.** Except for the Excluded Assets, the Acquired Assets constitute all of the assets, tangible and intangible, of any nature whatsoever necessary to operate the Business in the manner presently operated by Seller and operated by Seller over the past year.

**5.9    Legal Proceedings; Orders.**

(a)    There is no pending or, to Seller's Knowledge, threatened proceeding: (i) by or against Seller or that otherwise relates to or may affect the Business or any of the Acquired Assets except those that existed on the Chapter 11 Petition; or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the transactions contemplated by this Agreement. To the Knowledge of Seller, no event has occurred and no circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any such proceeding.

(b)    There is no Order to which Seller, the Business, or any of the Acquired Assets is subject. To the Knowledge of Seller, no officer, director, agent, or employee of Seller is subject to any Order that prohibits such officer, director, agent, or employee from engaging in or continuing any conduct, activity or practice relating to the Business.

**5.10    Acquired IP Assets.** At the Closing, Seller owns valid title to the Acquired IP Assets free and clear of any Encumbrances, except those that existed on the Chapter 11 Petition, and has the right to use and register, without payment to a Third Party, all of the Acquired IP Assets, including those registrations and applications for Acquired IP Assets set forth on Schedule 2.1(a)(x), Seller's trade names, registered and unregistered trademarks, service marks, trade dress, logos and slogans, all goodwill associated with any of the foregoing, all common law rights therein, and all registrations and applications therefor that are included in the Acquired Assets are referred to, collectively, as the "Marks." All Marks shown as having been registered or applied for have been registered or applied for with the Patent and Trademark Office of the corresponding country or jurisdiction shown on Schedule 2.1(a)(x), are currently in compliance with all material Legal Requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), and are valid and enforceable. No Mark is now, and to Seller's Knowledge no Mark has been, involved in any opposition, invalidation, cancellation or other proceeding; no such action has been threatened in writing with respect to any of the Marks. To Seller's Knowledge, there is no interfering trademark or trademark application of any other Person. None of the Marks has been alleged in writing to infringe or otherwise violate, and to Seller's Knowledge none of the Marks infringes or otherwise violates, any trade name, registered or unregistered trademark, service mark, trade dress, logo or slogan of any other Person; to Seller's Knowledge, no Mark is infringed or otherwise violated. All products and materials containing a Mark bear the proper registration notice where permitted by law. Seller's original works of authorship related solely to the Business, including all registered and unregistered copyrights in both published works and unpublished works that are included in

the Acquired Assets are refereed to collectively as the **"Copyrights."** Except as set forth on Schedule 2.1(a)(x):

      (a)    All of the registered Copyrights are currently in compliance with material Legal Requirements and are valid and enforceable;

      (b)    None of the subject matter of any of the Copyrights has been alleged in writing to infringe or otherwise violate any copyright or other right of any Person, and to Seller's Knowledge none of the subject matter of any of the Copyrights infringes or otherwise violates or is a derivative work based upon the work of any other Person; to Seller's Knowledge, no Copyright is infringed or otherwise violated; and

      (c)    All works encompassed by the Copyrights have been marked with the proper copyright notice. Seller's patents (including certificates of invention and other patent equivalents), utility models, provisional applications, patent applications and patents issuing therefrom, as well as any division, continuation or continuation in part, reissue, extension, reexamination, certification, revival, renewal or equivalent thereof, and all subject matter related to such patents that are included in the Acquired Assets are referred to collectively as the **"Patents."** Except as set forth on Schedule 2.1(a)(x):

      (i)    All Patents shown as having been issued by the United States Patent and Trademark Office are currently in compliance with material Legal Requirements and are valid and enforceable;

      (ii)    No Patent is now, and to Seller's Knowledge no Patent has been, involved in any interference or other proceeding; no such action has been threatened in writing with respect to any of the Patents;

      (iii)    To Seller's Knowledge, there is no interfering patent or patent application of any other Person;

      (iv)    None of the Patents has been alleged in writing to infringe or otherwise violate, and to Seller's Knowledge none of the Patents infringes or otherwise violates, any patent or other right of any Person; to Seller's Knowledge, no Patent is infringed or otherwise violated;

      (v)    All products and materials for an invention that is the subject of a Patent bear the proper notice where permitted by law.

Seller's rights in internet web sites and internet domain names presently used by Seller and that are included in the Acquired Assets are referred to collectively as the **"Net Names."**

      (d)    All Net Names have been registered in the name of Seller and are in compliance with all material Legal Requirements;

      (e)    No Net Name is now, and to Seller's Knowledge no Net Name has been, involved in any dispute, opposition, invalidation, cancellation or other proceeding; no such action has been threatened in writing with respect to any Net Name;

(f)    To Seller's Knowledge, there is no domain name registration of any other Person which interferes with or infringes any Net Name; and

(g)    No Net Names has been alleged in writing to infringe or otherwise violate, and to Seller's Knowledge no Net Name infringes or otherwise violates, the trademark, copyright, domain name or other right of any other Person; to Seller's Knowledge, no Net Name is infringed or otherwise violated.

**5.11    Governmental Authorities and Consents.** Other than the Court Approval, and approvals necessary to effect the transfer of the FAA Type Certificates necessary to the implementation of this Agreement and any other governmental approvals expressly called for in this Agreement **(collectively, "Governmental Authorizations")**, Seller is not required to submit any notice, report or other filing with any governmental authority in connection with the execution or delivery by it of this Agreement and the other agreements contemplated hereby to which Seller is a party or the consummation of the sale of the Acquired Assets as called for in this Agreement and pursuant to the terms of this Agreement. Other than the Governmental Authorizations, no consent, approval or authorization of any governmental or regulatory authority or any other party or person is required to be obtained by Seller in connection with its execution, delivery and performance of this Agreement and the other agreements contemplated hereby to which Seller is a party or the transactions contemplated hereby or thereby. Other than the Governmental Authorizations, no Consents are required on behalf of Seller in connection with (a) the due execution and delivery by Seller of this Agreement and Seller's Closing Documents and the performance of Seller's obligations thereunder, and (b) the consummation of the transactions by Seller.

**5.12    Litigation.** Except as listed on Schedule 5.11, there are no actions, suits, proceedings or orders pending or, to Seller's knowledge, threatened against or affecting Seller at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would prevent Seller's performance under this Agreement and the other agreements contemplated hereby to which Seller is a party or the consummation of the transactions contemplated hereby or thereby, provided there are various actions, suits and proceeding that have been associated with the Bankruptcy Case, but none of such matters adversely affects Seller's representation in this Section 5.11.

**5.13    Payoff of Synovus Debt.** Seller represents and warrants that the payoff amount of the indebtedness owed by KPH Properties II, Inc. to SB&T, a division of Synovus Bank, and secured by a first-priority deed to secure debt and a second-priority deed to secure debt on the real property described in Section 2.1(e) is $1,613,017.18 as of the Effective Date and further represents and warrants that KPH Properties II, Inc. is and remains current on all obligations owed by it to SB&T, a division of Synovus Bank.

**5.14    KPH Lease.** Seller represents and warrants that KPH Properties II, Inc. has furnished to Purchaser a true and correct copy of the current lease on the real property described in Section 2.1(e), that there are no defaults in the lease as of the Closing Date, and that the lease remains in full force and effect as of the Closing Date.

**5.15    Assigned Contracts and Cure Amounts.** Seller represents and warrants that the Assigned Contracts Cure Amount identified on Schedule 2.1(a)(ii) are true, complete, and accurate as of the Effective Date.

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES CONCERNING PURCHASER**

As a material inducement to Seller to enter into this Agreement, Purchaser hereby represents and warrants to Seller that to Purchaser's knowledge:

**6.1    Organization and Corporate Power.** Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Georgia, with full power and authority to enter into this Agreement and the other agreements contemplated hereby to which Purchaser is a party and perform its obligations hereunder and thereunder.

**6.2    Financial Capability.** Purchaser has the financial resources to consummate the transactions upon the terms and conditions set forth in this Agreement, and such financial resources are not subject to any constrains, contingencies, or conditions that could affect Purchaser's ability to consummate the transactions or perform thereunder.

**6.3    Authorization of Transaction.** The execution, delivery and performance of this Agreement and the other agreements contemplated hereby to which Purchaser is a party have been duly and validly authorized by all requisite action on the part of Purchaser, and no other proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement or any other agreements contemplated hereby. This Agreement constitutes, and each of the other agreements contemplated hereby to which Purchaser is a party shall when executed constitute, a valid and binding obligation of Purchaser, enforceable in accordance with their terms.

**6.4    No Violation.** Purchaser is not subject to or obligated under any applicable law, or rule or regulation of any governmental authority, or any agreement or instrument, or any license, franchise, or subject to any order, writ, injunction or decree, which would be breached or violated in any material respect by its execution, delivery or performance of this Agreement and the other agreements contemplated hereby to which Purchaser is a party.

**6.5    Governmental Authorities and Consents.** Other than the approval or non-objection of the FAA necessary for the transfer of the Type Certificates, Purchaser is not required to submit any notice, report, or other filing with any governmental authority in connection with the execution or delivery by it of this Agreement and the other agreements contemplated hereby to which Purchaser is a party or the consummation of the transactions contemplated hereby or thereby. No consent, approval, or authorization of any governmental or regulatory authority or any other party or person is required to be obtained by Purchaser in connection with its execution, delivery and performance of this Agreement and the other agreements contemplated hereby to which Purchaser is a party or the transactions contemplated hereby or thereby; provided, however, that this Section 6.5 shall not be deemed to limit, diminish or modify the Closing conditions or similar matters contained herein regarding those exemptions,

28

no action letters or other governmental approvals or authorizations which are conditions precedent to Purchaser's obligation to proceed to Closing. Seller shall assist Purchaser as requested in connection with Purchaser's application for the issuance of a Production Certificate from the FAA.  Purchaser's anticipated use of the Facility will not require a rezoning or new conditional use of the property.

      **6.6**    **Litigation.** There are no actions, suits, proceedings or orders pending or, to Purchaser's knowledge, threatened against or affecting Purchaser at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would prevent Purchaser's performance under this Agreement and the other agreements contemplated hereby to which Purchaser is a party or the consummation of the transactions contemplated hereby or thereby.

**ARTICLE VII**
**TERMINATION**

      **7.1**    **Termination.** This Agreement may, by written notice, be terminated at any time prior to the Closing:

      (a)    by either Purchaser or Seller if a material breach of any provision of this Agreement has been committed by the other party, and not cured during any relevant cure period, and such breach has not been waived by the non-breaching party in writing;

      (b)    by Purchaser if any of the conditions to Closing set forth in Article III have not been satisfied as of the Closing or if satisfaction of such a condition becomes impossible (other than through failure of Purchaser to comply with its obligations under this Agreement) and Purchaser has not waived such condition on or before the Closing;

      (c)    by Seller if any of the conditions to Closing set forth in Article III have not been satisfied as of the Closing or if satisfaction of such a condition becomes impossible (other than through failure of Seller to comply with its obligations under this Agreement) and Seller has not waived such condition on or before the Closing;

      (d)    by Seller upon the occurrence of a Purchaser Default (as defined in Section 9.1) or if the conditions precedent to Seller's obligations described in Article III in order to consummate the transactions contemplated hereby have not been satisfied within the time periods provided for therein (or waived in writing by Seller), unless Seller's willful or knowing breach of this Agreement has caused the condition to be unsatisfied;

      (e)    by Purchaser upon the occurrence of a Seller Default (as defined in Section 9.2) or if the conditions precedent to Purchaser's obligations described in Article III in order to consummate the transactions contemplated hereby have not been satisfied within the time periods provided for therein (or waived in writing by Purchaser), unless Purchaser's willful or knowing breach of this Agreement has caused the condition to be unsatisfied;

29

(f)     by Purchaser if the Closing has not occurred on or prior to November 15, 2019, notwithstanding good faith efforts on both sides to satisfy the conditions precedent for the transaction, or by Seller or Purchaser if the Closing has not occurred on or prior to December 1, 2019, notwithstanding good faith efforts on both sides to satisfy the conditions precedent for the transaction.

(g)     by Purchaser, prior to the Auction Date, if Purchaser shall not have received by the Auction Date reasonable assurances (in a form reasonably satisfactory to the Purchaser) from selected critical vendors of Seller that such vendors (including without limitation GE Aviation and Pratt & Whitney) will continue to do business with the Purchaser after the Closing on terms and conditions acceptable to Purchaser;

(h)     by Purchaser, prior to the Auction Date, if Purchaser shall not have received by the Auction Date reasonable assurances (in a form reasonably satisfactory to Purchaser) from Ex-Im Bank that Ex-Im Bank will continue to do business with Purchaser after the Closing Date on terms and conditions acceptable to Purchaser;

(i)     automatically without any further action by Seller or Purchaser if Court Approval is not obtained following the hearing to obtain the Court Approval; and

(j)     by mutual written agreement of Purchaser and Seller at any time.

Remedies upon termination are limited to those provided under Article IX of this Agreement.

## ARTICLE VIII
## BANKRUPTCY COURT APPROVAL

**8.1**    <u>**Break-Up Fee**</u>. In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of the assets of Seller, Seller shall pay Purchaser a break-up fee in an amount equal to $200,000.00 (**"Break-Up Fee"**) on the first business day following (a) the closing of a sale of the Acquired Assets (or any part thereof) to a party other than Purchaser (**"Competing Transaction"**), with the payment of the Break-Up Fee being paid from the proceeds received upon the closing of the Competing Transaction; or (b) the confirmation of a stand-alone plan of reorganization.

**8.2**    <u>**Bid Deadline**</u>. Any bidder, other than Purchaser, wishing to submit a bid for the Acquired Assets must submit its bid to Seller in accordance with the Bidding Procedures Order.

**8.3**    <u>**Bids**</u>. In conducting the bid process, additional bids shall be made as follows: the initial increment shall be not less than $250,000.00 over the sum of the Cash Price to Wells Fargo, the Promissory Note Purchase Price, the DIP Forgiveness Amount, and the Promissory Notes Payment (**"Topping Bid"**), and subsequent increments shall be at least $50,000.00 for each bid.

**8.4    Priority.** The Break-Up Fee shall be entitled to super priority administrative expense status and shall be payable directly from the proceeds of any Competing Transaction.

## ARTICLE IX
## DEFAULTS AND REMEDIES

**9.1    Defaults by Purchaser and Remedies of Seller.** If Purchaser fails, neglects, or refuses to perform any of Purchaser's obligations under this Agreement beyond applicable cure periods, materially breaches any representation or warranty under this Agreement, or otherwise defaults under this Agreement, and such Purchaser default is not cured during the cure period permitted under Section 9.3 following a Default Notice to Purchaser (**"Purchaser Default"**), Seller shall have the right to terminate and cancel this Agreement by written notice to Purchaser and Seller shall be authorized to draw in full on the Good Faith Deposit and retain the proceeds thereof as Seller's sole and exclusive remedy for Purchaser's Default, whereupon Purchaser and Seller shall be relieved of all obligations under this Agreement, except for any hold harmless, defense, and indemnity provisions of this Agreement that expressly survive a termination of this Agreement. Purchaser and Seller recognize that actual damages cannot be determined or will be difficult to ascertain with a reasonable degree of certainty and acknowledge that this provision constitutes a reasonable payment to Seller as a result of Purchaser's Default in accordance with O.C.G.A. § 13-6-7 and does not constitute a penalty. Purchaser acknowledges that upon termination of this Agreement, notwithstanding any other remedy at law or in equity either party may have against the other, Seller may immediately sell any Acquired Asset to any other party.

**9.2    Default by Seller and Remedies of Purchaser.** If for any reason Seller fails, neglects, or refuses to perform Seller's obligations under this Agreement, breaches any representation or warranty under this Agreement, or otherwise defaults under this Agreement, and such Seller default is not cured during the cure period permitted under Section 9.3 following a Default Notice to Seller (**"Seller Default"**), Purchaser shall have any one or more of the following remedies, as Purchaser's sole and exclusive remedies:

(a)    Purchaser shall have the right to seek specific performance;

(b)    Purchaser may elect to terminate and cancel this Agreement by written notice to Seller, whereupon Seller shall return the Good Faith Deposit to Purchaser, and Purchaser shall retain its right to pursue against Seller any available action for money damages; and

(c)    to the extent Purchaser is entitled to indemnification, defense, and being held harmless as provided in this Agreement, or if Seller defaults under this Agreement by conveying title to any of the Property then subject to this Agreement to a person other than Purchaser, or its permitted assignee, then Purchaser may pursue damages from Seller.

The foregoing provisions shall not limit the right of Purchaser to recover costs and attorney' and paralegals' fees as provided in this Agreement in the event of litigation arising out of this Agreement, whether such litigation concerns the recovery of Purchaser's costs and expenses or otherwise. Purchaser's exercise of any remedy under this Agreement shall not

31

operate to waive Purchaser's right to exercise any other remedy under this Agreement, it being
agreed that all such remedies are cumulative and non-exclusive of the other remedies.

      **9.3**    <u>**Notice and Opportunity to Cure.**</u> If either party considers the other to be in
default under this Agreement, such party shall provide to the other party written notice (**"Default
Notice"**) specifying in reasonable detail the act or omission alleged to constitute the default. The
party receiving the factually correct Default Notice shall not be considered to be in default under
this Agreement unless (i) the act or omission constituting the default is not cured within ten (10)
Business Days following receipt of the Default Notice, or (ii) in the event the act or omission
constituting the default is not reasonably susceptible of cure within such ten (10) Business Day
period, the party receiving such Default Notice fails to commence, within such ten (10) Business
Day period, all actions reasonably calculated to effect cure of such default and/or to diligently
and continuously prosecute all such actions to completion such that, in any event, the default is
cured within thirty (30) days following the date of receipt of the Default Notice. Notwithstanding
the foregoing, neither Purchaser nor Seller shall be obligated to provide a Default Notice, nor
shall either Party have any right to cure, with respect to any failure by either Party to make any
of the Closing deliveries required by this Agreement on the Closing Date. **The Parties hereto
stipulate and agree that as of the Effective Date hereof, neither has knowledge of any fact
which as of such date, or with the passage of time, would cause the other party to be in
default hereunder, giving the non-defaulting Party the right to issue a Default Notice as
contemplated under this Section.**

      **9.4**    <u>**Specific Performance.**</u> Notwithstanding anything to the contrary contained in this
Agreement, any claim for specific performance of this Agreement or any of the other
Transaction Documents, and any claim to enforce the terms of the Sale Order against a Party or a
third party, may be submitted for final determination to the Bankruptcy Court or to any other
court of competent jurisdiction.

      **9.5**    <u>**Survival**</u>. The provisions of this Article IX shall survive the expiration or any
termination of this Agreement.

**ARTICLE X**
**ADDITIONAL AGREEMENTS**

      **10.1**    <u>**Offers of Employment.**</u> Purchaser anticipates making offers of ongoing
employment (but is not obligated to do so) to those employees identified by Purchaser on a list
that may be updated up through ten days before Closing; provided that such list shall include
more than 75% of the full-time Company employees as of the Closing. If and to the extent that
Purchaser hires any such identified employees, the Purchaser will assume obligations related to
vacation and sick leave, if any, with respect to any such employees of Seller hired by the
Purchaser, but the Purchaser shall have no liability for any severance pay for any employees of
Seller not hired by the Purchaser or any other liability (including liability for future severance
pay) for any other employees of Seller not hired by Purchaser.

      **10. 2**    <u>**Tax Matters**</u>

(a)    All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest thereon), if any, incurred in connection with this Agreement shall be paid by Seller when due, and Seller shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable law, Purchaser shall join in the execution of any such Tax Returns and other documentation. Notwithstanding the foregoing, this Section 10.2 shall not be deemed to modify the required terms of the Sale Order.

(b)    Any ad valorem obligations, including all real property taxes, personal property taxes, and similar taxes imposed on a periodic basis, in each case levied with respect to the Acquired Assets for a taxable period which includes (but does not end on) the Closing Date shall be paid by Purchaser.

**10.3    Further Transfers.** Seller shall execute and deliver such further instruments of conveyance and transfer and take such additional action as Purchaser may reasonably request to effect, consummate, confirm or evidence the transfer to Purchaser of the Acquired Assets and any other transactions contemplated hereby.

**10.4    Expenses.** Except as otherwise provided herein, and subject to the terms of the DIP Financing Agreement and Budget, Seller and Purchaser shall pay all of their own fees, costs and expenses (including, without limitation, fees, costs and expenses of legal counsel, investment bankers, brokers or other representatives and consultants and appraisal fees, costs and expenses) incurred in connection with the negotiation of the this Agreement and the other agreements contemplated hereby, the performance of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby.

**10.5    Books and Records.** Seller will allow Purchaser's representatives, attorneys and accountants access to the Books and Records, upon reasonable request during Seller's normal business hours, for the purpose of examining and copying the same in connection with any matter whether or not related to or arising out of this Agreement or the transactions contemplated hereby.

**10.6    Third Party Consents** Notwithstanding anything to the contrary contained in this Agreement, this Agreement shall not constitute an agreement to transfer, sell or otherwise assign any instrument, contract, lease, license, permit or other agreement or arrangement relating to the Acquired Assets which is not permitted to be assigned in connection with a transaction of the type contemplated by this Agreement.

**10.7    Destruction.** If, prior to the Closing, there shall occur any damage or destruction to any or all of the Acquired Assets by fire, earthquake, erosion, flooding, or force of nature, then Seller shall immediately notify Purchaser of such fact in writing. Purchaser shall then have the option, in its sole discretion and judgment, either to terminate this Agreement or to complete this transaction as provided for in this Agreement. Purchaser shall give written notice of such election to Seller on or before the later to occur of (a) the date which is thirty (30) days after Purchaser shall have received written notice of such damage or destruction from Seller, or (b) the Closing Date, and if necessary, the Closing Date shall be extended to allow Purchaser at least

thirty (30) days within which to make said election. If Purchaser elects to close this transaction, all insurance proceeds collected by Seller prior to Closing shall be payable as provided in the governing insurance policy or policies. Upon any election by Purchaser to terminate this Agreement pursuant hereto, the Good Faith Deposit shall be returned to Purchaser and neither party shall have any further rights, duties or obligations hereunder, except with regard to provisions that by their express terms survive the termination of this Agreement. If Purchaser fails to make any election within the time permitted, it will be deemed to have elected to proceed with this transaction.

      **10.8**   **Condemnation**. If, prior to Closing, there shall occur any condemnation of all or any portion of the Acquired Assets, Seller shall give prompt written notice thereof to Purchaser, and Purchaser shall have the option, in its sole judgment and discretion, either to terminate this Agreement or to complete this transaction as provided for in this Agreement. Purchaser shall give written notice of such election to Seller on or before the later to occur of (a) the date which is thirty (30) days after Purchaser shall have received written notice from Seller of such condemnation or (b) the Closing Date. If necessary, the Closing Date shall be extended to allow Purchaser at least thirty (30) days within which to make such election. If Purchaser elects to close this transaction, all condemnation proceeds collected by Seller prior to Closing and attributable to collateral in which Wells Fargo has a first-priority lien shall be credited against the Cash Price to Wells Fargo at Closing. If Purchaser elects to terminate this Agreement pursuant hereto, the Good Faith Deposit shall be returned to Purchaser and neither party shall have any further rights or obligations hereunder, except with regard to provisions that shall by their express terms survive the termination of this Agreement. If Purchaser fails to make any election within the time permitted therefor, it shall be deemed to have elected to proceed with this transaction.

**ARTICLE XI**
**MISCELLANEOUS**

      **11.1**   **Amendment and Waiver**. This Agreement may be amended and any provision of this Agreement may be waived; provided, however, that any such amendment or waiver shall be binding upon a Party only if such amendment is set forth in a writing executed by Purchaser and Seller and only if such waiver is set forth in a writing signed by the party receiving the benefit of such right, remedy or condition being waived. No course of dealing between or among any persons having any interest in this Agreement shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Party under or by reason of this Agreement.

      **11.2**   **Notices**. All notices, Consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); or (b) sent via electronic transmittal in each case to the following addresses, or facsimile numbers and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, or Person as a party may designate by notice to the other parties):

Notices shall be addressed as follows:

If to Seller:

Thrush Aircraft, Inc.
300 Old Pretoria Road
Albany, Georgia 31712

With a copy to:

Ward Stone, Jr.
Matthew S. Cathey
Stone & Baxter, LLP
577 Mulberry Suite 800
Macon, Georgia 31201

If to Purchaser:

J. Mark McDonald
HHM Aviation Financing, LLC
325 N River Road NE
Rome, Georgia 30161

With a copy to:

John T. McGoldrick, Jr.
Stuart E. Walker
Martin Snow, LLP
240 Third Street
P.O. Box 1606
Macon, Georgia 31202

If a telecopied notice or demand is not given on a Business Day, then it shall be deemed delivered on the next Business Day. The foregoing telephone numbers and e-mail addresses are provided for informational purposes only and are not effective means for the giving of notices or demands hereunder.

**11.3   Binding Agreement; Assignment.** This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; provided, however, that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by Seller without the prior written consent of Purchaser or by Purchaser (except as otherwise provided in this Agreement) without the prior written consent of Seller; provided further that:

(a)   Purchaser may assign its rights under this Agreement for collateral security purposes to any lender providing financing to Purchaser and such lender may exercise all of the rights and remedies of Purchaser hereunder; and

35

(b)     Purchaser may assign its rights under this Agreement, in whole or in part, to any Affiliate of Purchaser or to any subsequent purchaser of Purchaser (or Purchaser's assignee) or any material portion of its (or such assignee's) assets (whether such sale is structured as a sale of membership interests, partnership interests, stock, assets, a merger or otherwise).

**11.4    Severability**. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

**11.5    No Strict Construction**. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any person.

**11.6    Captions**. The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no caption had been used in this Agreement.

**11.7    Incorporation of Schedules**. All Schedules referred to herein shall be incorporated hereto and herein. Schedules not completed and attached at the time of execution, may be completed and attached up to the date of Closing. Purchaser, in Purchaser's sole discretion, may extend the time for completion and attachment of a Schedule beyond the date set for the Closing, in which event, such Schedule, when completed and attached, shall be deemed to have been attached at the date of Closing.

**11.8    Entire Agreement**. This Agreement and the documents referred to herein contain the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way.

**11.9    Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Any counterpart hereof may be executed and delivered by facsimile or electronic transmission, which shall have the same force and effect as an original.

**11.10    Governing Law**. All questions concerning the construction, validity and interpretation of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of Georgia, without giving effect to any choice of law or conflict of law provision (whether of the State of Georgia or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Georgia.

36

**11.11** **Parties in Interest**. Nothing in this Agreement, express or implied, is intended to confer on any person other than the Parties and their respective successors and assigns any rights or remedies under or by virtue of this Agreement.

**11.12** **Attorneys' Fees**. In connection with any arbitration or litigation, including pretrial, trial, appellate and/or bankruptcy or collection proceedings, arising out of, under or relating to this Agreement or to the Acquired Assets, or in connection with any action for rescission of this Agreement or for declaratory or injunctive relief, the prevailing party shall be entitled to recover from the other party such prevailing party's actual, reasonable, out-of-pocket costs and reasonable attorneys' and paralegals' fees.

**11.13** **Time of Essence.** Time is of the essence of this Agreement and of each term and provision hereof.

**11.14.** **No Reliance on Oral Statements.** Seller shall not be deemed to make to Purchaser any representation or warranty other than those that may be expressly made in this Agreement, and Seller makes no representation or warranty to Purchaser with respect to any projections, estimates, or budgets delivered to or made available to Purchaser or its counsel, accountants, or advisors of future performance, revenues, expenses, expenditures, or future financial results of operations of Seller. Purchaser warrants that it has not relied upon, is not relying upon, and is not entitled to rely upon, any oral statements or representations by Seller or Seller's agents at all as to any matter and that it has not relied upon, is not relying upon, and is not entitled to rely upon, any written representations not specifically made by Seller in this Agreement or made by Seller in a writing that has been made available to Purchaser in the digital data room where written materials concerning the Seller and the Seller's Business are contained.

**Signature Page to Asset Purchase Agreement**
**By and Between Thrush Aircraft, Inc. and HHM Aviation Financing, LLC**

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the date first written above.

**THRUSH AIRCRAFT, INC.**

By: _____
Name: _____
Title: Pres

**HHM AVIATION FINANCING, LLC**

By: _____
Name: J. Mark McDonald
Title: Manager

**Schedule 2.1(a)(i)**

**Real Property**

**2512 Westgate Drive, Albany, Dougherty County, Georgia**

All that tract or parcel of land lying and being in the City of Albany, Dougherty County, Georgia, being a part of Land Lot 41 in the First Land District of said County, and being all of Unit No. 4 of Bradford Court Condominiums, Phase One, according to a map or plat of said Condominium Subdivision, as same is recorded in Condominium Plat Book 1, Page 52, in the Office of the Clerk of Superior Court, Dougherty County, Georgia, together with all rights, title, and interest contained in the Declaration of Condominium for Bradford Court, a Condominium, as recorded in Deed Book 1460, Page 204, et seq., said Clerk's office, and as amended and recorded in Deed Book 1494, Pages 156, et seq., said Clerk's office, and by this reference being incorporated herein and made a part hereof, together with the appurtenant percentages of undivided interest in the common element as described in said Declaration.

The above-described property is conveyed subject to any and all easements and restrictions of record.

## Schedule 2.1(a)(ii)

**Assigned Contracts**

# Schedule 2.1(a)(ii) -- Assigned Contracts

## THRUSH AIRCRAFT, INC. Contracts
Balances as of SEPTEMBER 27, 2019

| Capital Leases | Doc/Loan/Policy # | Collateral | Long Term | Short Term | Past Due | Total | Monthly Payment | Personal Guarantee | Contact Name | Phone Number |
|---|---|---|---|---|---|---|---|---|---|---|
| Trumpf Finance | 40026221-1 | Trumpf Laser | $(172,937.45) | $(126,744.00) | $(44,360.40) | $(344,041.85) | $10,562.00 | | Joseph Cruz | 201.839.8508 |
| Trumpf Finance | 40024998-1 | Trumpf Material tower | $(110,695.88) | $(90,812.40) | $(32,162.75) | $(233,671.03) | $7,567.70 | N | Joseph Cruz | 201.839.8508 |
| TOYOTA INDUSTRIES CO | 5028001G-1000026951T | Side Loader Fork Lift | $(27,727.95) | $(19,921.56) | $(6,376.96) | $(54,026.47) | $1,660.13 | Y | Kristin Erving | 972.443.7561 |
| Total | | | $(311,361.28) | $(237,477.96) | $(82,900.11) | $(631,739.35) | $19,789.83 | | | |

| Insurance | Doc/Loan/Policy # | Collateral | Long Term | Short Term | Past Due | Total | Payment | Personal Guarantee | Contact Name | Contract Number |
|---|---|---|---|---|---|---|---|---|---|---|
| IPFS CORPORATION | A3GA000456218AM / A2PR0005754218AM / A2GA000627718AM | Allianz Airplane Insurance | | $(113,108.56) | | $(113,108.56) | $56,904.44 | N | Kathy Walden | 720.746.3258 |
| IPFS CORPORATION | AWC03000065 | Workers Comp | | $(97,865.14) | $(628.29) | $(98,493.43) | $12,565.74 | N | Laura Brown | 229.436.2408 |
| TRAVELERS | 138PC020 630 | Facility and Inventoryt | | $(17,120.80) | | $(17,120.80) | $17,120.80 | N | Laura Brown | 229.436.2408 |
| TRAVELERS | 262946132 | Freight | $- | $- | $- | $- | $3,390.67 | N | Laura Brown | 229.436.2408 |
| Total | | | $- | $(228,094.50) | $(628.29) | $(228,722.79) | $89,981.65 | | | |

| True Operating Leases Debt Does Not show up on Balance sheet | Doc/Loan/Policy # | Collateral | Long Term* | Short Term | Past Due | Total | Payment | Personal Guarantee | Contact Name | Contract Number |
|---|---|---|---|---|---|---|---|---|---|---|
| Winthrop Resources C | TH051914 | Tube Cutter and SAP Implementation | $(225,000.00) | $(500,000.00) | $(41,737.25) | $(766,737.25) | $41,737.25 | Y | Barb King | 952.656.7481 |
| AMJ Leasing | 25398497 | CANON iRAC5235 SN:RRB268887/RRB26896 | $(2,766.60) | $(3,688.80) | $(1,562.51) | $(8,017.91) | $307.40 | N | Doug DiFilippo | 610.386.3594 |
| AMJ Leasing | 25406261 | CANON iRAC5235 SN:RRB27367 | $(2,365.55) | $(2,580.60) | $(1,094.19) | $(6,040.34) | $215.05 | N | Doug DiFilippo | 610.386.3594 |
| AMJ Leasing | 25468513 | CANON iRAC25SI SN:XUN01396 CANON iRAC25Si SN:WKN02221 CANON iRA4535i SN:UMU02203 | $(13,021.89) | $(7,441.08) | $(3,151.72) | $(23,614.69) | $620.09 | N | Doug DiFilippo | 610.386.3594 |
| AMJ Leasing | 25462580 | CANON iRAC5235 SN:WKM02638 | $(8,086.34) | $(4,218.96) | $(1,778.48) | $(14,083.78) | $351.58 | N | Doug DiFilippo | 610.386.3594 |
| AMJ Leasing | 25295686 | LEXMAR XS7480E SN:7526119441bh5 | | $(298.05) | $(298.05) | $(596.71) | $596.71 | N | Doug DiFilippo | 610.386.3594 |
| AMJ Leasing | 25348429 | CANON iRAC5235 SN:RRB15686 | $215.05 | $(2,150.50) | $(897.98) | $(2,833.43) | $215.05 | N | Doug DiFilippo | 610.386.3594 |
| AMJ Leasing | 25452150 | CANON iRAC5235 SN:WKF08989 | $(4,516.05) | $(2,580.60) | $(881.62) | $(7,978.27) | $215.05 | N | Doug DiFilippo | 610.386.3594 |
| AMJ Leasing | 25414120 | CANON DR-G1100 SN:GG310972 | | $(176.36) | $(714.91) | $(891.27) | $176.36 | N | Doug DiFilippo | 610.386.3594 |
| Canon | 949369 | CANON iRAC5235 SN:RRB23188 | | $(2,268.00) | | $(2,268.00) | $189.00 | N | Accounts Receivable Manager | 800.220.0330 |
| Neo Post | N18092783 | Postage meter #IN36OAI | $(3,116.00) | $(912.00) | $(587.20) | $(6,615.20) | $76.00 | N | Accounts Receivable Manager | 866.228.8571 |
| Pitney Bowes | 0015200980 | Postage meter | $(2,128.00) | $(912.00) | $(1,477.40) | $(4,517.40) | $76.00 | N | Accounts Receivable Manager | 844.256.6444 |
| Toyota | | Forklift | | $(440.00) | | $(440.00) | $440.00 | N | Kristin Erving | 972.443.7561 |
| Total | | | $(260,785.38) | $(527,568.90) | $(54,181.31) | $(842,335.59) | $44,715.54 | | | |

| Real Estate Contract | Doc/Loan/Policy # | Real Estate Address | Long Term* | Short Term | Past Due | Total | Payment | Personal Guarantee | Contact Name | Contract Number |
|---|---|---|---|---|---|---|---|---|---|---|
| KPH PROPERTIES II INC | Lease Agreement (1-1-14) | 300 Old Pretoria Rd, Albany GA 31721 | | | | | $20,000.00 | N | | |
| KPH PROPERTIES II INC | Lease Amendment (4-1-17) | | | | | | $25,000.00 | N | | |

| Service Contracts | Name of Service | Description of Service | Long Term* | Short Term | Past Due | Total | Monthly portion of payment | Personal Guarantee | Notes | Column2 |
|---|---|---|---|---|---|---|---|---|---|---|
| ADOBE Inc. | Acrobat/Creative Cloud. | Demuent edition/design | | | | | $454.77 | N | OnDemand | |
| ALTARO LLC | VM Software | Back-up | | | | | $75.00 | N | Yearly paid in advance | |
| Ashleys | C6201-101 | copies & maintenance for printers | | $(2,162.07) | | $(2,162.07) | $1,037.48 | N | | |
| Autodesk, Inc. | AUTOCAD | Engineering, drawings | | | | | $65.00 | N | Yearly paid in advance | |
| Barracuda Netwoks Inc. | Barracuda | Firewall security | | | | | $90.58 | N | Yearly paid in advance | |
| CNC Software, Inc. | MasterCAM | Machine shop | | | | | $355.00 | N | Yearly paid in advance | |

| Vendor | Product | Description | | | | Amount | Y/N | Notes |
|---|---|---|---|---|---|---|---|---|
| Connection | Microsoft Office 365 | Back office | | | $ - | $1,153.74 | N | OnDemand |
| Connection | Symantec Antivirus | Antivirus | | | $ - | $278.00 | N | Yearly paid in advance |
| Corel Inc. | Corel Draw | Small paint drawings | | | $ - | $100.00 | N | OnDemand |
| Domain Priced Right, Inc. | Trushaircraft.com | Thrush.com | | | $ - | $115.00 | N | Yearly paid in advance |
| Emergys | SAP ECC Licenses | Licencing | | $70,353.93 | $70,353.93 | $5,862.83 | N | Yearly invoiced in advance/not yet paid |
| Emergys | SAP Administration/Basis | System Maintenance | $39,000.00 | $73,000.00 | $112,000.00 | $6,500.00 | N | |
| Emergys | SAP Hosting | Storage and Backups | $24,300.00 | $24,300.00 | $48,600.00 | $4,050.00 | N | |
| Google | Smartsheet | Back office | | | $ - | $150.00 | N | on hold |
| IMPRIVATA, Inc. | Single Sign On | Single Sign On | | | $ - | $459.32 | N | Yearly paid in advance |
| Insight Software | Global Software | Spreadsheet connection | | | $ - | $104.04 | N | Yearly paid in advance |
| KPIT | C4C | CRM | $33,386.67 | $33,386.67 | $33,386.67 | $4,061.67 | N | Yearly invoiced in advance/not yet paid/on hold |
| KPIT | Hybris | Marketing Social Network | $43,800.00 | $43,800.00 | $43,800.00 | $4,500.00 | N | Yearly invoiced in advance/not yet paid/on hold |
| New River Kinematics | Spatial Analyzer | Metrology | | | | $1,240.83 | N | Yearly paid in advance |
| PAYCHEX Inc. | PAYCHEX | Payroll | | | | $7,037.83 | N | biweekly paid |
| SAP AG | ARIBA | Sales/Purchasing public pricing | | | | $40.00 | N | on hold |
| SigmaTek Systems, LLC. | SigmaTube | Tube Laser cut | | | | $1,908.00 | N | Yearly paid in advance |
| Sigmatek | SigmaNest | Water/eLasser | | | | $159.00 | N | Yearly paid in advance |
| Trimech | Solid Works/PDM | Drawings | | | | $2,200.00 | N | quarterly paid in advance |
| Trimech | PDM | Drawing teamwork | | | | $888.00 | N | quarterly paid in advance |
| Trumpf Inc. | Trumpf software | First cut | | | | $258.00 | N | Yearly paid in advance |
| **Total** | | | $63,300.00 | $242,678.53 | $305,978.53 | 43,184.09 | | |

**Grand Total** | $ - | $ (572,146.66) | $ (929,641.36) | $63,300.00 | $242,678.53 | $104,968.82 | $ (1,396,819.20) | $ 222,671.11

## <u>Schedule 2.1(a)(iii)</u>

**Excluded Account Receivables**

**None**

**Schedule 2.1(a)(x)**

**Acquired IP Assets**

**Due to the volume of Schedule 2.1(a)(x), a copy of the same will be filed with the
Bankruptcy Court and a filed copy will be provided by contacting Debtor/Seller's Counsel
at the following address:**

**Stone & Baxter, LLP
Matthew S. Cathey, Esq.
Fickling & Co. Building, Suite 800
577 Mulberry Street
Macon, Georgia 31201
Email: mcathey@stoneandbaxter.com**

## Schedule 2.2(a)

**Promissory Notes & Associated Collateral**

**Schedule 2.2(a) -- Promissory Notes and Associated Collateral**

**THRUSH AIRCRAFT, INC. Contrats**
Balances as of SEPTEMBER 27, 2019

| Notes Payable | Doc/Loan/Policy # | Collateral | Long Term | Short Term | Past Due | Total | Payment | Personal Guarantee | Contact Name | Phone Number |
|---|---|---|---|---|---|---|---|---|---|---|
| AB&T NATIONAL BANK | LNN00500 | Okuma Five Axis Mill | $ (484,534.30) | $ (218,278.44) | $ (18,189.87) | $ (721,002.61) | $ 18,189.87 | Y | Charlene Parker | 229.317.3542 ext 121 |
| OneGeorgia Authority | 16gq-047-3-4838 | 2nd on Okuma Quarterly Payments | $ (325,000.00) | $ (50,000.00) | $ (12,500.00) | $ (387,500.00) | $ 12,500.00 | N | | |
| LEAF Capital Funding | 100-3910469-001 | Makino Horizontal Mill | $ (48,410.56) | $ (43,032.24) | $ (11,833.86) | $ (103,276.66) | $ 3,586.02 | Y | Davin Manigo | 267.402.5319 |
| LEAF Capital Funding | 100-3910469-002 | Faro Arm | $ (49,379.99) | $ (45,966.36) | $ (8,427.16) | $ (103,773.51) | $ 3,830.53 | Y | Davin Manigo | 267.402.5319 |
| SB&T BANK | -5607 | Faro Arm | $ (1,148.12) | $ (23,970.36) | $ (4,095.06) | $ (29,213.54) | $ 1,997.53 | Y | Jill Creech | 229.430.7007 |
| Total | | | $ (908,472.97) | $ (381,247.40) | $ (55,045.95) | $ (1,344,766.32) | $ 40,103.95 | | | |

## Schedule 2.2(a)(i)

**Wells Fargo Equipment Finance, Inc. Promissory Notes & Associated Collateral**

# Schedule 2.2(a)(i) -- WFEF Notes

| Notes | Doc/Loan/Policy # | Collateral | Long Term | Short Term | Past Due | Total | Monthly Payment | Personal Guarantee | Needed | Contact Name | Phone Number |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WELLS FARGO EQUIPMEN | 001-0331232-703 | Haas Mill | $ (42,228.11) | $ (21,542.88) | $ (5,475.48) | $ (69,246.47) | $ 1,795.24 | Y | | Scott Rynerson | 866.726.4715 ext 8404 |
| WELLS FARGO EQUIPMEN | 001-0331232-704 | Red Bird Simulator | $ (63,548.69) | $ (29,402.16) | $ (7,473.05) | $ (100,423.90) | $ 2,450.18 | Y | Y | Scott Rynerson | 866.726.4715 ext 8404 |
| Total | | | $ (105,776.80) | $ (50,945.04) | $ (12,948.53) | $ (169,670.37) | $ 4,245.42 | | | | |

If WFEF declines to accept the $100,000 payment described in Section 2.2(a) of the Agreement in full satisfaction of the promissory notes identified on this Schedule 2.2(a)(i), the collateral securing the payment of these notes shall be an Excluded Asset under Section 2.2(b) of the Agreement.

## Schedule 2.3(b)(iii)

**Promissory Note to Wells Fargo Bank, National Association**

$1,150,000.00                                      [_____ _____], 2019

                                                   [_____, _____]

## NEGOTIABLE PROMISSORY NOTE

       **FOR VALUE RECEIVED**, the undersigned, **HHM AVIATION FINANCING, LLC**, a Georgia limited liability company ("Maker"), hereby promises to pay to the order of **WELLS FARGO BANK, NATIONAL ASSOCIATION** (together with its successors and assigns, "Payee") at 1 South Broad Street, 8th Floor - MAC Y1375-084, Philadelphia, Pennsylvania 19107, on or before the date required by this Negotiable Promissory Note (this "Note"), the principal sum of **ONE MILLION, ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($1,150,000.000)**, together with interest from and after the date hereof on the unpaid principal balance outstanding at a rate per annum equal to 5.00%.

       The outstanding principal amount of this Note shall bear interest, calculated daily on the basis of actual days elapsed in a year of 360 days.  Interest that accrues on the unpaid principal balance of this Note shall be paid as follows: one interest-only installment due on October 1, 2020; one interest-only installment due on April 1, 2021; one interest-only installment due on October 1, 2021; and one interest-only installment due on April 1, 2022.  The outstanding principal balance of this Note and all accrued and unpaid interest shall be due and payable on October 1, 2022.  All payments hereunder shall be made in lawful currency of the United States of America and remitted to Payee at Payee's address as set forth in the first paragraph hereof or at such other address as Payee may from time to time designate in writing to Maker.  Maker shall have the right to prepay this Note, in whole at any time or in part from time to time, without premium or penalty.

       Each of the following events shall constitute an "Event of Default": (a) Maker shall default in the payment of any principal, interest or other amount under this Note on the due date thereof and shall fail to cure such default within 10 days following its receipt from Payee of written notice of such default (any such written notice to be sent to Maker's address as set forth below or to such other address as Maker shall hereafter specify in writing to Payee); or (b) Maker shall (i) make an assignment for the benefit of its creditors, or become unable to pay (or admit in writing its inability to pay) its debts when they become due; (ii) file a petition or any other pleading for relief under any bankruptcy, insolvency, reorganization, arrangement, or other debtor relief law, including, without limitation, title 11 of the United States Code (each a "Debtor Relief Law"); (iii) have filed against it a petition or any other pleading under any Debtor Relief Law if the same is not dismissed within 60 days after the filing thereof; (iv) suffer (or consent to) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for all or any significant part of its assets; or (v) sell, assign or otherwise transfer all or a substantial part of its assets or dissolve or cease doing business in the ordinary course; or (c) Maker shall suffer a judgment to be entered against it for an amount that exceeds by $100,000 the uncontested insurance to satisfy such judgment, if such judgment is not satisfied in full within 60 days after entry thereof (unless and to the extent bonded on appeal), or the judgment creditor commences any levy or execution on, or other enforcement action with respect to, such judgment. Upon or after the occurrence of an Event of Default, Payee may declare the then outstanding principal balance and accrued interest hereof to be, and the same shall thereupon become, immediately due and payable without notice to or demand upon Maker, all of which Maker hereby expressly waives. At Payee's option at any time upon or during the existence of any Event of Default, the outstanding principal amount of this Note shall bear interest at the rate of 7.00% per annum.

Upon the occurrence and during the continuance of any Event of Default, Payee shall have the all of the rights and remedies available under applicable law, all of which rights and remedies shall be cumulative, and none of which shall be exclusive, in addition to any other rights and remedies contained in this Note. If this Note is collected by or through an attorney-at-law, Maker agrees to pay, in addition to the unpaid principal balance and accrued interest hereof, reasonable attorneys' fees (in an amount not to exceed 15% of the unpaid principal and accrued interest owing on this Note), together with all costs of collection.

Time is of the essence of this Note.  To the fullest extent permitted by applicable law, Maker, hereby expressly waives presentment, demand, protest, notice of dishonor, notice of non-payment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption or insolvency laws.

Wherever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Note.  No delay or failure on the part of Payee in the exercise of any right or remedy thereunder shall operate as a waiver thereof, nor as an acquiescence in any default, nor shall any single or partial exercise by Payee of any right or remedy preclude any other right or remedy. This Note is intended to take effect as an instrument under seal and shall be governed by, and construed and enforced according to, the internal laws of the State of Georgia (without giving effect to Georgia's conflict-of-law rules). If at any time and for any reason whatsoever, the interest rate payable on this Note shall exceed the maximum rate of interest permitted to be charged under applicable law, such interest rate shall be reduced automatically to the maximum rate of interest permitted to be charged under applicable law.

**IN WITNESS WHEREOF**, this Note has been duly signed, sealed and delivered on the date first above written.

ATTEST:                                    **HHM AVIATION FINANCING, LLC,**
                                           a Georgia limited liability company

_____           By: _____
Name:                                      Name:
Title:                                     Title:
                                                        [SEAL]

                                           Address for Notices:

                                           HHM Aviation Financing, LLC
                                           325 N. River Road NE
                                           Rome, Georgia 30161

## Schedule 3.1(e)

### Filings, Authorizations, and Approvals

**Permits required for business operations:**
Occupational Tax Certificate - City of Albany & Dougherty County. This document certifies that THRUSH AIRCRAFT, INC. located in 300 Old Pretoria Rd. Albany GA 31721 is licensed to do business in the City of Albany/Dougherty County. The license is renewed every year.
The Occupational Tax Certificate is not transferrable or assignable but shall be personal to whom it was issued, Thrush Aircraft, Inc.

Production Certificate – The United States of America Department of Transportation Federal Aviation Administration. This document shall continue in effect indefinitely, provided, the manufacturer continuously complies with the requirements for original issuance of certificate or until the certificate is canceller, suspended or revoked. The holder of the Production Certificate No. 5SO may receive the benefits incidental to the possession of such certificate with respect to Airplanes manufactured in accordance with the data forming the basis for the following Type Certificate (s) No.
The Production Certificate may not be transferrable or assignable but shall be personal to Thrush Aircraft, Inc., as long as the production process and the location remain the same.

**Business permits:**
      Occupational Tax Certificate - City of Albany & Dougherty County
      License Type: City Business
      License Number: AB12-000115
      NAICS: 336411 AIRCRAFT MANUFACTURING
      Tax Class: 1

      Production Certificate – Federal Aviation Association
      Number: 5SO
      Issued in: 12/13/77, reissued in 08/28/2003

**Environmental permits:**
Industrial Pretreatment Permit
Issued by: City of Albany Public Works Department Sewer Systems Division
Period: January 01, 2019 – midnight December 31, 2020
Thrush Aircraft, Inc. is authorized to discharge in our facility to the sewerage system tributary to the City of Albany, 2726 Joshua Street (Flint River Basin) water pollution in accordance with effluent limitations, monitoring requirements and other conditions.

CITY OF ALBANY
PUBLIC WORKS DEPARTMENT
SEWER SYSTEMS DIVISION

Permit No.  2

A.  **Effluent Limitations and Monitoring Requirements**

Such discharges shall be limited and monitored by the City of Albany as prescribed below:

| Parameter | Discharge Limitations mg/l unless otherwise specified | | Monitoring Requirements | | |
|---|---|---|---|---|---|
| | Thirty Day Average | Daily Maximum | Measurement Frequency | Sample Type | Sample Location |
| Flow (GPD) | 39,000 gpd | 81,000 gpd | Continuous | ---- | ----- |
| BOD5 | 250 | 250 | 2/Year | 24 Hr. Composite | N OF OFFICE MH |
| COD | 600 | 600 | 2/Year | 24 Hr. Composite | N OF OFFICE MH |
| TSS | 500 | 500 | 2/Year | 24Hr. Composite | N OF OFFICE MH |
| TDS | 1000 | 1000 | 2/Year | 24 Hr Composite | N OF OFFICE MH |
| OIL & GREASE | 100 | 100 | 2/Year | Grab | N OF OFFICE MH |
| CHROMIUM | | .800 | 2/Year | 24 Hr Composite | N OF OFFICE MH |
| COPPER | | .230 | 2/Year | 24 Hr Composite | N OF OFFICE MH |
| LEAD | | .170 | 2/Year | 24 Hr Composite | N of OFFICE MH |
| MERCURY | | .0006 | 2/Year | 24 Hr Composite | N OF OFFICE MH |
| ZINC | | .120 | 2/Year | 24 Hr Composite | N OF OFFICE MH |
| SELENIUM | | .200 | 2/Year | 24 Hr Composite | N OF OFFICE MH |
| CYANIDE | | 024 | 2/Year | Grab | N OF OFFICE MH |

The pH shall not be less than 5.0 standard units nor greater than 11.0 standard units and shall be monitored on the final effluent by a grab sample  The Discharge Limitations outlined above are subject to revision if dictated by Title 40, Code of Federal Regulations, Part 403, (40 CFR 403) or Environmental Protection Division (EPD) determinations.  The Permittee will be notified in writing of any changes in the above listed discharge limitations.

**Schedule 5.11**

**Litigation**

| | | |
|---|---|---|
| ACR<br>ACR Machine, Inc. v. Thrush Aircraft, Inc.<br>Chester County Court of Common Pleas, Chester<br>County, PA<br>Docket No 2019-02493-CT | Debt Collection | Campbell, Conroy & O'Neill<br><br>1205 Westlakes Drive<br>Suite 330<br>Berwyn, PA 19312<br><br>John Angeloni, Esq. |
| Winthrop Resources<br>Winthrop Resources Corporation v. Thrush<br>Aircraft, Inc.<br>    and K. Payne Hughes<br>County of Hennepin District Court, Fourth<br>Judicial District,<br>    State of Minnesota | Debt Collection | Sapentia Law Group<br>120 South 6th Street<br><br>Suite 100<br>Minneapolis, MN 55402<br>Sonia Miller-Van Oort, Esq. |
| Pontual<br>Pontual Aeroagricola Ltda and Gianluca<br>Possamai v. Export-Import<br>    Bank of the United States, PNC Bank and<br>Thrush Aircraft Inc.<br>30th Private Law Chamber of Sao Paulo State<br>Court of Appeals [Brazil]<br>Declaratory Lawsuit no. 0001653-<br>66.2011.8.26.0288 | Contract Dispute | Varella & Advogados Associados<br>Rua Pacheco Leao, 862 - Jardim Botanico<br>22460-030 - Rio de Janeiro<br>Brazil<br>Alexandre Varella, Esq |
| Foliar Aviacao Agricola Ltda v. Thrush Aircraft, Inc.<br>Procedimento Comum, 5254785.912019.8.09.0051<br>Goias, Brazil | Contract Dispute | |

Occurrence in Gypsum, Kansas on May 5, 2017

On May 5, 2017 a Thrush Aircraft S2R-H80 airplane impacted with terrain during a forced landing in Gypsum, Kansas following a claimed loss of engine power. The pilot was not injured, but the aircraft sustained substantial damage during the forced landing. In June 2017, a subrogation letter was presented to the Company by the aircraft's insurer, and also presented to General Electric and Weldon Pumps, forwarding repair quotes for the aircraft totaling $497,863.22. The Company has advised that it is continuing to investigate the cause of this accident.